IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

BARBARA ROBERTSHAW          :          CIVIL ACTION
                            :          NO.  11-7353
        v.                  :
                            :
GARY PUDLES, et al.         :

O'NEILL, J.                                      MARCH 20, 2012

## MEMORANDUM

Now before me are three fully briefed motions.  First, there is defendant Gary Pudles's motion to dismiss the amended complaint (Dkt. No. 95), plaintiff Barbara Robertshaw's response thereto (Dkt. No. 98) and Pudles's reply to the response (Dkt. No. 103).  Second, there is defendant AnswerNet's motion to dismiss the amended complaint (Dkt. No. 94), Robertshaw's response thereto (Dkt. No. 99), and AnswerNet's reply to the response (Dkt. No. 102).  Third, there is defendant Betty Babjak's motion to dismiss the amended complaint (Dkt. No. 104) and Robertshaw's response thereto (Dkt. No. 105).  For the following reasons I will deny Pudles's motion, grant Babjak's motion in part and deny Babjak's motion in part, and deny AnswerNet's motion.

## BACKGROUND

Plaintiff Robertshaw, an AnswerNet shareholder and former member of the board of directors, filed the instant action because she disputes a distribution of funds to defendant Pudles, who is also an AnswerNet shareholder and board member.  Her amended complaint contains nine claims: three against Pudles (one for breach of contract, one for breach of fiduciary duty and one for common law fraud); three against Babjak, AnswerNet's corporate secretary (one for breach of fiduciary duty, one for common law fraud, and one for negligence) and three others: a claim for declaratory judgment under 28 U.S.C. § 2201, a shareholder derivative claim brought

on behalf of AnswerNet pursuant to Federal Rule of Civil Procedure 23.1, and a claim seeking declaratory relief for alleged violations of § 219 of the Delaware General Corporation Law.

In support of her claims Robertshaw avers the following facts.  AnswerNet is a Delaware corporation, see Am. Compl. ¶¶ 4, 7-8, with a shareholder's agreement that she alleges required that "any distribution of funds made by the Corporation be distributed equally and simultaneously to [Robertshaw and Pudles]."  Am. Compl. ¶ 9.  This agreement, which Robertshaw attaches to her amended complaint, provides that "Pudles and Robertshaw each currently earn $350,000 per year in salary . . . and take matching distributions as necessary to fund their personal and estimated tax payments . . . from AnswerNet. . . .  Pudles and Robertshaw also have an agreement that Tax Distributions and other distributions from AnswerNet are made equally to Robertshaw and Pudles."  Am. Compl. Ex. A p. 1.  The agreement then outlines certain "special distributions" available at the request of either Pudles or Robertshaw and denotes that both Pudles and Robertshaw were entitled to them on specific dates.[1]  See Am. Compl. Ex. A p. 1-3.  It also stipulates that "nothing in this Agreement should be construed to change the Agreement between Pudles and Robertshaw regarding Salary payments or other distributions from AnswerNet to the Shareholders being equal between Robertshaw and Pudles."  Id. at 2.  The agreement also requires that either shareholder must inform the other of their intention to make the special distribution at least 90 days prior to the date of the special distribution, id. at 3, and specifies that "nothing in this Agreement should be construed to change the Agreement between Pudles and Robertshaw regarding Salary payments

---

[1] The provision entitled Special Distributions contains the following: "The shareholders agree to fund the following Special Distributions at the request of either Shareholder subject to the limitations contained herein: One million to Pudles and Robertshaw each August 1, 2010. Two million to Pudles and Robertshaw each August 1, 2013.  One million to Pudles and Robertshaw each August 1, 2016 (collectively "Special Distributions").  It is understood that these are not cumulative distributions."  Am. Compl. Ex. A p. 1-2.

or other distributions from AnswerNet to the Shareholders being equal between Robertshaw and

Pudles." Id. at 2.  Further the agreement states that "neither party shall be required to personally

guaranty any indebtedness to support the special distributions and nothing herein shall be

construed as a guaranty by either party of payments to be made hereunder." Id. at 4.[2]

Robertshaw also attaches to her amended complaint an email dated October 28, 2008

from Pudles to her that she argues confirms her interpretation of the Agreement as mandating

equal and simultaneous distributions.  In this email—which partially details the terms of Pudles's

divorce and the payments from AnswerNet to Pudles with which he intends to fund his divorce

settlement—Pudles wrote: "To fund these payments I will probably need to take distributions

_____

[2] The Agreement also contains the following clause:

> this agreement shall be construed, governed and enforced in
> accordance with the laws of New Jersey without regard to the
> principals relating to the conflict of law. Any action necessary to
> enforce or interpret the terms of this agreement may be only
> brought in the superior court located in Mercer County[,] New
> Jersey.

Am. Compl. Ex. A, p. 4.  No party has mentioned the forum selection clause or asserted that
venue is not proper here but rather should be in Mercer County, New Jersey.  I will thus consider
this provision waived by mutual assent of the parties.

There is some dispute over which state's law governs the case.  Pudles seems to argue
that Pennsylvania law governs, see e.g., Pudles Mot. Dismiss (Dkt. No. 95) ECF p. 8, while
Robertshaw and Babjak contend that Delaware law governs the suit.  See e.g., Am. Compl. ¶¶
82-87; Robertshaw Resp. (Dkt. No. 98) ECF p. 9; Babjak Mot. Dismiss (Dkt. No. 104), ECF p.
10.  AnswerNet does not address choice of law issues in its motion but does submit AnswerNet's
certificate of incorporation which reveals that AnswerNet is a corporation organized and existing
under the laws of the state of Delaware.  AnswerNet Mot. Dismiss (Dkt. No. 94) Ex. B, ECF p.
28.

The elements of a breach of contract claim are substantially the same in Pennsylvania,
New Jersey and Delaware, see e.g., RBC Bank (USA) v. Riley, Riper, Hollin & Colagreco, No.
09-00431, 2009 WL 2580354, at *6 (D.N.J. Aug. 19, 2009); VLIW Tech., LLC v. Hewlett-
Packard Co., 840 A.2d 606, 612 (Del. 2003), and while I find that Delaware law controls,
VantagePoint Venture Partners 1996 v. Examen, Inc., 871 A.2d 1108, 1112-13 (Del. 2005), I
also note that this is not outcome determinative.

from the company which likely will be funded by debt.  As per our agreement, every dollar I take I'll distribute an equal amount to you.  So when I get the funding I'll plan to take double."  See Am. Compl. Ex. B.[3]  Robertshaw alleges that on or about September 3, 2011 Pudles "caused the Corporation to issue a Special Distribution in the amount of $980,000.00, without making an equal and simultaneous distribution to [Robertshaw]."  Am. Compl. ¶ 10.  In support of this allegation Robertshaw attaches an email from Pudles to her dated September 3, 2011 in which he wrote: "Per our agreement I distributed money to make my required personal payment and created a distribution payable from the company to you so we can pay your matching as cash becomes available. . . . I took about 980K [sic] from the company."  Am. Compl. Ex. C p. 1.  Pudles also wrote that "we had three goals in our approach to the payment to me & [sic] the matching for you" and under the heading "Robertshaw Matching" wrote "we added an additional loan amount of about 646K to bring the total amount owed to the Robertshaws to 980K. . . . My goal is to pay 100K-150K per month in principal repayments . . . until the Robertshaw loans are paid.  This would mean that all loans to everyone would be paid off within 18 months."  Id. at 2.

Robertshaw contends that this distribution left the corporation with "insufficient funds to make an equal and simultaneous distribution to" her, was made without approval of the Board of Directors and was made improperly for Pudles's own personal use.  Am. Compl. ¶¶ 11-13.  Robertshaw then alleges that upon learning of the distribution she demanded that Pudles either "cause the Corporation to issue an equal special distribution to her, or that he return the funds he unilaterally took" but Pudles refused and instead demanded that Robertshaw "sign a personal guaranty so that he could cause the Corporation to borrow $1,000,000.00 that he represented it would need in order to make an equivalent special distribution to" her.  Id. at ¶¶ 15-16.

---

[3] The payment terms under the divorce settlement outlined in this email incidentally overlap with the dates of the Special Distributions outlined under the agreement.  Compare Am. Compl. Ex. A, p. 2 with Am. Compl. Ex. B.

Robertshaw then alleges that she made a demand that AnswerNet's board of directors meet and formally review the propriety of the Pudles distribution, but that the meeting, which took place on October 31, 2011, only resulted in deadlock and no action being taken.[4]  Id. at ¶¶ 17-18.

> I.     The Waterside Warrants

Robertshaw alleges that defendants falsely claimed that Cerida Investment Corporation owned 62,579 common shares of AnswerNet and that these shares in combination with those owned outright by Pudles constituted more than 51% of the issued and outstanding shares of Answernet Id. at ¶¶ 17, 34.  She further asserts that on November 22, 2011, in response to her demand to inspect AnswerNet's corporate records, "AnswerNet's counsel provided a document purporting to show warrant transactions ("the Waterside Warrants") which allegedly resulted in Cerida's obtaining its shares.  Id. at ¶ 40; see also Am. Comp. Ex. J.  Robertshaw alleges that the Waterside Warrants "were never assigned, transferred, sold, or given to Cerida"[5] but rather that they were assigned to Executel, a company wholly-owned by Robertshaw and were exercised by Executel in February 2006.  Id. at ¶¶ 41-43; see also Am. Compl. Ex. K.  Robertshaw alleges that the shares of AnswerNet owned by Robertshaw and Executel thus constituted a majority of the company's issued and outstanding shares.  Id. at ¶ 48.

> II.    The November 28, 2011 Special Shareholder Meeting

Robertshaw alleges that following her demand to inspect AnswerNet's records, Pudles noticed a Special Meeting of the shareholders "claiming that his shares, together with [shares he was entitled to vote owned by Cerida Investment Corporation] constituted 51%" of the

---

[4] Robertshaw avers that the deadlock was a result of the board being made up of Gary and Steven Pudles on one side and Barbara and William Robertshaw, plaintiff's father, on the other.  Am. Compl. ¶ 18.

[5] Robertshaw also contends that AnswerNet's share transfer ledger does not reflect Cerida's receipt or ownership of the Waterside Warrants and that AnswerNet never issued the share certificates that were authorized by the Waterside Warrants.  Id. at ¶¶ 44-46.

AnswerNet shares, the minimum required to call a special meeting.  Id. at ¶ 19.  She contends that Pudles's ownership claim of the Cerida shares was false.  Id. at ¶ 20.  Moreover, Robertshaw asserts that Pudles and Babjak knew or should have known that Pudles's ownership claim was false, and that Babjak personally delivered the Special Meeting notice which contained the false information.  Id. at ¶¶ 21-22; see also Am. Compl. Ex. E.

At the November 28, 2011 special meeting, Robertshaw demanded that the corporation provide a list of shareholders pursuant to Delaware General Corporations Law § 219 and in response received a partially-handwritten document titled the "AnswerNet Capitalization Table" which she claims "falsely asserts that Cerida owned 52,759 common shares of AnswerNet" and inaccurately reported the number of issued and outstanding shares.  Id. at ¶¶ 23-24.  Robertshaw further claims that Pudles and Babjak "knew that AnswerNet had never issued shares at all to Cerida."  Id. at ¶ 25.  At the special meeting Robertshaw alleges that "Pudles used the false Share Ownership Claim" to vote William Robertshaw off of the AnswerNet board of directors.  Id. at ¶ 29; Am. Compl. Ex. G.

III.     The December 15, 2011 Annual Shareholder Meeting

Robertshaw contends that following the November meeting Babjak noticed an annual meeting of the shareholders.  Id. at ¶ 30.  At the annual meeting, held on December 15, 2011, she claims that Babjak "falsely asserted that shares held by [Pudles and Cerida] constituted a quorum."  Id. at ¶¶ 31-32.  Robertshaw also contends that at this meeting Pudles and Babjak submitted a document entitled "'List of Shareholders of AnswerNet, Inc.' which falsely asserted that Cerida owned 52,759 common shares of AnswerNet" and inaccurately reported the number of issued and outstanding shares; Robertshaw asserts that Pudles and Babjak knew this information to be false and that no shares had actually been issued to Cerida.  Id. at ¶¶ 34-36.  At

this meeting, Robertshaw avers that "Pudles used the false Share Ownership Claim and false List of Shareholders of AnswerNet, Inc." to vote Robertshaw off of the AnswerNet board of directors.  Id. at ¶ 38.[6]

### STANDARD OF REVIEW

Federal Rule of Civil Procedure 12(b)(6) permits a court to dismiss all or part of an action for "failure to state a claim upon which relief can be granted."  Fed. R. Civ. P. 12(b)(6).  Typically, "a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations," though plaintiff's obligation to state the grounds of entitlement to relief "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."  Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007).  "Factual allegations must be enough to raise a right to relief above the speculative level . . . on the assumption that all of the allegations in the complaint are true (even if doubtful in fact)."  Id. (citations omitted).  The complaint must state "'enough facts to raise a reasonable expectation that discovery will reveal evidence of' the necessary element."  Wilkerson v. New Media Tech. Charter Sch. Inc., 522 F.3d 315, 321 (3d Cir. 2008), quoting Twombly, 550 U.S. at 556.  The Court of Appeals has made clear that after Ashcroft v. Iqbal, 556 U.S. 662 (2009), "conclusory or 'bare-bones' allegations will no longer survive a motion to dismiss: 'threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice.'  To prevent dismissal, all civil complaints must now set out 'sufficient factual matter' to show that the claim is facially plausible."  Fowler v. UPMC Shadyside, 578 F.3d 203, 210 (3d Cir. 2009),

_____

[6] Also contained in the meeting minutes is a reference to the $980,000 distribution referenced in the September 3, 2011 email and discussed above.  The minutes reflect that "Pudles stated that AnswerNet, Inc. did not make a distribution, it paid back a loan."  Am. Compl. Ex I. p. 3

quoting Iqbal, 556 U.S. at 678.  The Court also set forth a two part-analysis for reviewing

motions to dismiss in light of Twombly and Iqbal:

> First, the factual and legal elements of a claim should be separated.
> The District Court must accept all of the complaint's well-pleaded
> facts as true, but may disregard any legal conclusions.  Second, a
> District Court must then determine whether the facts alleged in the
> complaint are sufficient to show that the plaintiff has a "plausible
> claim for relief."

Id. at 210-11, quoting Iqbal, 556 U.S. at 679.  The Court explained, "a complaint must do more

than allege the plaintiff's entitlement to relief.  A complaint has to 'show' such an entitlement

with its facts."  Id., citing Phillips v. Cnty. of Allegheny, 515 F.3d 224, 234-35 (3d Cir. 2008).

"[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of

misconduct, the complaint has alleged–but it has not 'show[n]'–'that the pleader is entitled to

relief.'"  Iqbal, 556 U.S. at 679.

## DISCUSSION

I.    Claims Against Pudles

Robertshaw asserts three claims against Pudles individually: one for breach of contract,

one for breach of fiduciary duty and one for common law fraud.  Pudles moves to dismiss each

of these claims.

a. *Breach of Contract*

In order to state a breach of contract claim under Delaware law Robertshaw must plead:

first, the existence of the contract; second, the breach of an obligation imposed by that contract;

and third, resultant damages.  VLIW Tech., LLC v. Hewlett-Packard Co., 840 A.2d 606, 612

(Del. 2003).  "In deciding a motion to dismiss, the trial court cannot choose between two

differing reasonable interpretations of ambiguous provisions"; rather, "dismissal . . . is proper

only if the defendants' interpretation is the *only* reasonable construction as a matter of law."  Id.

8

at 615 (emphasis in original).  Ambiguity exists "when the provisions in controversy are reasonably or fairly susceptible of different interpretations."  Id.  While there is no dispute that the AnswerNet Shareholder Agreement constituted a contract between Robertshaw and Pudles, the parties vigorously contest whether that agreement was breached and, if so, whether the breach resulted in damages.

In moving to dismiss the breach of contract claim, Pudles argues that Robertshaw's claim rests on her misinterpretation of the AnswerNet Shareholder Agreement as requiring equal and simultaneous distributions, but that the plain language of the agreement does not in fact require that any distributions be simultaneous.  Pudles Mot. Dismiss (Dkt. No. 95) ECF p. 6-7.  Further, he argues that "even if the document upon which [Robertshaw] relies did not clearly refute her suggestion that there was a breach of contract," the claim must be dismissed because "(i) at the time Pudles received a distribution Plaintiff was simultaneously given a promissory note guaranteeing her receipt of an equal distribution plus interest; and (ii) since the filing of the Complaint, Plaintiff has received and retained an equal distribution plus interest" and thus she has suffered no damages from the alleged breach.  Id. at 7-8.  Pudles argues that "[h]aving not suffered any damage from Pudles' allegedly improper actions, [Robertshaw] cannot maintain her claim[ ] for breach of contract . . ."  Id. at 8.  Additionally, Pudles argues that attorney's fees and other litigation costs are not recoverable as damages in a breach of contract claim, and that punitive damages for the alleged breach are not appropriate because the requisite willfulness or malicious conduct by the defendants is not present.  Pudles Reply (Dkt No. 103), ECF p. 12.

Robertshaw in her response maintains that her interpretation of the agreement as requiring equal and simultaneous distributions is not based solely on the language of the Agreement but rather also on the "parties longstanding agreement and practice regarding

simultaneous distributions."   Robertshaw Resp. (Dkt. No. 98), ECF p. 10.   Additionally, Robertshaw contends that the promissory note regarding the schedule of Robertshaw's matching distribution referenced by Pudles is not in the record, "and the sufficiency, timing, nature, and basis of payments that were made to [Robertshaw] after Mr. Pudles took $980K in cash for himself . . .  remain fundamental disputes in this action."   Id. at 8 n.2.  She argues that her damages, beyond the fact that she was not given the simultaneous distribution, also include: 1) the subsequent costs and legal fees she incurred because she had to sue to enforce her rights under the agreement; and, 2) her request for punitive damages, each of which she contends are recoverable under Delaware law.  Id. at 9.

I find that Robertshaw has sufficiently alleged that the shareholder agreement between Pudles and Robertshaw plausibly required equal and simultaneous distributions.  The agreement is ambiguous on this point but permits Robertshaw and Pudles to "take matching distributions as necessary," Am. Compl. Ex. A, p. 1, states that "Pudles and Robertshaw also have an agreement that Tax Distributions and other distributions from AnswerNet are made equally to Robertshaw and Pudles," id., and stipulates that "nothing in this Agreement should be construed to change the Agreement between Pudles and Robertshaw regarding Salary payments or other distributions from AnswerNet to the shareholders being equal between Robertshaw and Pudles."  Id.  at 2. The agreement also specifies that "nothing in this Agreement should be construed to change the Agreement between Pudles and Robershaw regarding Salary payments or other distributions from AnswerNet to the Shareholders being equal between Robertshaw and Pudles."  Id.  Further, Robertshaw also cites and attaches an email to her amended complaint dated October 28, 2008 from Pudles to her in which Pudles described a distribution he was intending to take and wrote: "To fund these payments I will probably need to take distributions from the company which

likely will be funded by debt.  As per our agreement, every dollar I take I'll distribute an equal

amount to you.  So when I get the funding I'll plan to take double."  See Am. Compl. Ex. B.; see

also Am. Compl. ¶ 9.

Finally, Robertshaw also submits an email from Pudles to her dated September 3, 2011 in

which he describes a distribution he took from AnswerNet and his plan to provide Robertshaw

with her matching distribution and wrote: "Per our agreement I distributed money to make my

required personal payment and created a distribution payable from the company to you so we can

pay your matching as cash becomes available. . . .  I took about 980K [sic] from the company."

Am. Compl. Ex. C p. 1.  While the plan described in that email contemplates that Robertshaw

would take her matching distribution over time, she contends that this distribution left the

corporation with "insufficient funds to make an equal and simultaneous distribution to" her, was

made without approval of the Board of Directors and was made for Pudles's own personal use.

Am. Compl. ¶¶ 11-13.  Given that the agreement's provisions and the parties's distribution

practices at issue are susceptible to more than one reasonable interpretation, and that for

purposes of deciding a motion to dismiss the meaning of the contract terms must be construed in

the light most favorable to the non-moving party, VLIW Tech., 840 A.2d at 615, I find that

Robertshaw has adequately alleged that Pudles breached the agreement such that dismissal at this

stage in the proceedings is not appropriate.

Pudles argues that even if there was a breach of the agreement that Robertshaw's claims

are still deficient because at the time Pudles took his distribution she received a promissory note

guaranteeing her receipt of an equal distribution with interest and Robertshaw has since received

payment under the terms of that promissory note.  Pudles Mot. Dismiss (Dkt. No. 95), ECF p. 7.

The promissory note is not before the court.  Given the absence of the promissory note and the

fact that if Robertshaw is correct that the agreement required equal and simultaneous distributions, any delay in her distribution may constitute damages.  See e.g., Gibraltar Private Bank & Trust Co. v. Boston Private Fin. Holdings, Inc., No. 6276, 2011 WL 6000792, at *4 (Del. Ch. Nov. 30, 2011) ("it cannot be said that the timing of the payment is irrelevant; cash management considerations and the concept of the time value of money are just two reasons why the timing of a payment may be important."); see also Matter of Milwaukee Cheese Wisconsin, Inc., 112 F.3d 845, 849 (7th Cir. 1997) ("Compensation deferred is compensation reduced by the time value of money.").  Thus I find that she has sufficiently alleged damages resulting from the breach.[7]

### b.  Breach of Fiduciary Duty

In moving to dismiss the breach of fiduciary duty claim, Pudles does not address Robertshaw's breach of fiduciary duty claim independently of the breach of contract claim nor does he attempt to clarify its elements.  Pudles Mot. Dismiss (Dkt. No. 95), ECF p. 6-8.  Rather, Pudles argues that the breach of fiduciary duty claim is also based on Robertshaw's misinterpretation of the shareholder agreement as requiring that any distribution be equal and

---

[7] I thus find it unnecessary at this time to resolve the party's contentions regarding whether litigation costs are recoverable as damage.  With respect to punitive damages I note that

> "In actions arising *ex contractu*, punitive damages may be assessed if the breach of conduct is characterized by willfulness or malice."
> "[W]here the defendant's actions are similar in nature to that of a tort," or it appears that the defendant has committed a "willful wrong, in the nature of deceit," the Court will award punitive damages under a contract.

Shore Invs., Inc. v. Bhole, Inc., No. S09C-09-013ESB, 2011 WL 5967253, at *14 (Del. Super. Nov. 28, 2011) (citations omitted, alterations in original).  "In either setting, the focus is upon the defendant's state of mind.  If the defendant's conduct reflects a conscious indifference to a foreseeable result punitive damages may be imposed to punish such indifference and to deter others from similar conduct."  Jardel Co., Inc. v. Hughes, 523 A.2d 518, 529-30 (Del. 1987).  A determination as to whether the defendants' conduct in this case rises to such a level is not appropriate at this time.

simultaneous.  Id. at 7.  He also argues that Robertshaw did not suffer any damages from Pudles's actions and thus cannot maintain her claim for breach of fiduciary duty.  Id. at 8.

Robertshaw in her amended complaint alleges that Pudles owed her fiduciary duties "including honest, fair dealing, good faith, and the duty to refrain from self-dealing" and that he breached those duties through the actions recapitulated in her amended complaint.  Am. Comp. ¶ 53.  She contends that that these actions did indeed cause her damages.  Robertshaw Resp. (Dkt. No. 98), ECF p. 8-11.  Because I find that Robertshaw has alleged sufficient damages to state a claim for breach of contract and Pudles does not contest, nor even identify, any other elements of the breach of fiduciary duty claim, I find that Robertshaw has sufficiently alleged damages for this claim as well and will not dismiss it.

   *c. Common Law Fraud*

The elements of fraud under Delaware law  are: (1) a false representation, usually one of fact, made by the defendant; (2) the defendant's knowledge or belief that the representation was false or was made with reckless indifference to the truth; (3) an intent to induce the plaintiff to act or to refrain from acting; (4) the plaintiff's action or inaction taken in justifiable reliance upon the representation; and (5) damage to the plaintiff as a result of such reliance.  Metro. Life Ins. Co. v. Tremont Group Holdings, Inc., No. 7092, 2012 WL 6632681, at *16 (Del. Ch. Dec. 20, 2012).  Federal Rule of Civil Procedure 9(b), which requires that fraud be pled with particularity, may be satisfied by describing the circumstances of the alleged fraud with precise allegations of date, time, or place, or by using some means of injecting precision and some measure of substantiation into the allegations of fraud.  Bd. of Trs. of Teamsters Local 863 Pension Fund v. Foodtown, Inc., 296 F.3d 164, 172 n.10 (3d Cir. 2002).

With respect to Robertshaw's fraud claim against Pudles, he argues that it is "principally based on plaintiff's claim that the share ownership stated in the shareholder list and stock ledger provided by AnswerNet, through Pudles and Babjak, prior to a November 28, 2011 special meeting of shareholders" were materially wrong.  Pudles Mot. Dismiss (Dkt. No. 95), ECF p. 4. Pudles contends that Robertshaw "has provided no substantiation of her allegations of fraud; namely, she alleges no basis for Pudles to have questioned what was presented in the AnswerNet Stock Ledger . . . and in the shareholder lists presented to Plaintiff and her counsel prior to and at each of the two shareholder meetings."  Id. at p. 9 (citations omitted).  Pudles also argues that even if the shareholder lists were inaccurate, Robertshaw did not reasonably rely on them.  Id. at p. 11.  Finally he asserts that the assignment of the Waterside Warrants to Executel in 2003 demonstrates that Robertshaw "knew of the facts concerning the ownership in AnswerNet as early as 2006."  Id.  Pudles also points to deposition testimony which he argues demonstrates that Robertshaw received the AnswerNet capitalization table as an attachment to an email in 2007 and did not question its validity until much later.  Id.[8]

Robertshaw counters that the AnswerNet stock ledger does not contain any evidence of a transfer of shares to Cerida.  Robertshaw Resp. (Dkt. No. 98), ECF p. 15-16.  Further, Robertshaw submits a chain of emails in which Babjak writes to Peter Wszalek on May 14, 2008 "to confirm that [Pudles] cannot locate the Cerida warrants and we need to prepare affidavits of lost warrants."  Robertshaw Resp. (Dkt. No. 98), ECF p. 16; see also id. Ex. 6.  This was in response to an email sent on May 13, 2008 from Pudles to Babjak and Wszalek in which he assets: "Cerida owns some AnswerNet warrants.  I want to make sure we exercise them ASAP." Robertshaw Response (Dkt. No. 98) Ex. 6.  With respect to the element of reliance, Robertshaw

---

[8] AnswerNet in its motion also argues that Robertshaw does not allege sufficient facts to support her fraud claim against Pudles, AnswerNet Mot. Dismiss (Dkt. No. 94), ECF p. 12-13, and that Robertshaw does not adequately plead reliance or damages.  Id. at 13.

asserts that while she did believe that she owned a greater percentage of shares in AnswerNet than Pudles and Babjak represented, she "was forced to accept [Pudle's] contrary false representations because he controlled the corporation and all of its records and he claimed the authority to remover her from the [board]," and thus she was forced to participate in the special and annual meetings in late 2011. Id. at p. 17.

I find that Robertshaw has alleged sufficient facts in support of her fraud allegations for her claim to survive Pudles's motion to dismiss. Robertshaw alleges that Pudles falsely represented that he owned more than 51% of the shares of AnswerNet, which entitled him to call a special meeting of the board. Am. Compl. ¶19; see also Am. Compl. Ex. E. Robertshaw also asserts that on November 22, 2011, in response to her demand to inspect AnswerNet's corporate records, "AnswerNet's counsel provided a document purporting to show warrant transactions which allegedly resulted in Cerida's obtaining the 62,579 common shares of AnswerNet which" the defendants claimed Cerida owned. Id. at ¶ 40; see also Am. Comp. Ex. J. The document allegedly provided to her is undated and untitled but does show two entries that appear to be transactions between Cerida and Waterside. Am. Comp. Ex. J.

Further, Robertshaw alleges that at the special meeting, in response to her demand, Pudles and Babjak provided her the "AnswerNet Capitalization Table," a partially handwritten document she attaches to her complaint, which she alleges falsely represented that Cerida owned 62,579 shares of AnswerNet. Am. Compl. ¶25; see also Am. Compl. Ex. F. Robertshaw also alleges that Babjak and Pudles knew that this document was false and that no shares had been issued to Cerida. Am. Compl. ¶25-27.[9] Additionally, Robertshaw submits a copy of

---

[9] Robertshaw also alleges that at the December meeting she was provided with a document entitled "List of Shareholders of AnswerNet" which also ostensibly demonstrated Cerida owned shares of AnswerNet. Am. Compl. ¶ 34-36. The fact that this document was

AnswerNet's "official stock ledger" which was produced in discovery. Robertshaw Resp. (Dkt. No. 98) ECF p. 15; see also id. Ex. 3. She alleges that this is the only stock ledger in the record. Id. at p. 15. This ledger is handwritten, not very legible and contains no entry referencing Cerida. See Robertshaw Resp. Ex. 3. Finally, Robertshaw submits a chain of emails in which Babjak confirms that Pudles "cannot locate the Cerida warrants" in response to an email from Pudles in which he asserted "Cerida owns some AnswerNet warrants. I want to make sure we exercise them ASAP." Id. Ex. 6. I find that Robertshaw has sufficiently alleged for the purposes of a motion to dismiss that Pudles made material representations that he knew to be false.

With respect to reliance, I find unavailing Pudles's argument that Robertshaw could not have relied on the representations about share ownership because she had notice as early as 2006 of Pudles's contention that Cerida owned AnswerNet stock. In support Pudles submits an email with an attachment which purportedly was AnswerNet's capitalization table as of 2007. See Pudles Mot. Dismiss (Dkt. No. 95) Ex. E, ECF p. 47. This document does not establish that Robertshaw knew the relative ownership shares of AnswerNet. Moreover, Robertshaw alleges that she "was forced to accept [Pudle's] contrary false representations because he controlled the corporation and all of its records," and thus was forced to participate in the special and annual meetings in late 2011 to protect her interests. Robertshaw Resp. (Dkt. No. 98), ECF p. 17. No one makes any arguments about what other options she may have had. Thus I find that Robertshaw has sufficiently alleged reliance such that her fraud claim can withstand Pudles's motion to dismiss.

II.     Claims Against Babjak

---

handed over to Robertshaw is reflected in the shareholder meeting minutes but the document is not before the Court. Am. Compl. Ex I.

Robertshaw asserts three claims against Babjak: one for common law fraud, one for breach of fiduciary duty and one for "negligence."  Babjak argues that "the common necessary element of each of these claims is that Pudles and Cerida, combined, were not in fact AnswerNet's majority stockholder and that Babjak knew or should have known that fact.  The Amended Complaint fails to state facts sufficient to support Babjak's knowledge—actual or constructive—and therefore fails."  Babjak Mot. Dismiss (Dkt. No. 104), ECF p. 10.  I disagree.

    *a.  Common Law Fraud*

With respect to the fraud claim, Babjak asserts that Robertshaw "has not articulated why Babjak would be aware" that Robertshaw and not Pudles was the controlling member of AnswerNet.  Babjak Mot. Dismiss (Dkt. No. 104), ECF p. 11.  Babjak argues that to resist dismissal "Robertshaw must plead the circumstances under which Babjak allegedly learned that Cerida's previously undisputed stockholdings were, purportedly, false.  She must also explain how she was reasonably deceived by Babjak—a heavy burden, in light of the fact that Robertshaw was both a board member of AnswerNet and an investor in Cerida."  Id.  Babjak further contends that "Robertshaw has failed to articulate how Babjak could have known that Cerida's stake in AnswerNet was disputed, let alone fraudulent . . . [and] it is unclear how Robertshaw could have 'justifiably' relied on Babjak's assertions regarding the stock of either Cerida or AnswerNet, since Robertshaw herself has independent knowledge of those companies."  Id. at 16.

Robertshaw responds that Babjak "personally represented that the total of shares issued to Mr. Pudles and AnswerNet constituted a majority of the issued and outstanding shares of AnswerNet."  Robertshaw Resp. (Dkt. No. 105), ECF p. 3.  Thus, Babjak knowingly and intentionally defrauded Robertshaw by misrepresenting both the number of shares issued by the

corporation and the attendant voting rights of its shareholders. Id. at 6. This allegedly occurred

three times. First, Babjak allegedly delivered the special meeting notice which contained the

false share ownership claim. Am. Compl. ¶ 22; see also Am. Compl. Ex. E. Second,

Robertshaw contends Babjak also submitted a partially handwritten document entitled

AnswerNet Capitalization Table to Robertshaw at the November 2011 special board meeting that

Babjak knew was inaccurate. Id. at 3; see also Am. Compl. ¶¶ 24-27. Third, Robertshaw

contends that Babjak again, presiding as Secretary at the annual shareholder meeting in

December 2011, knowingly and falsely asserted that the shares owned by Pudles (including the

Cerida shares) constituted a majority of the AnswerNet shares; similarly, Babjak presented

Robertshaw with a document titled "List of Shareholders of AnswerNet, Inc." which falsely

asserted Cerida owned shares in AnswerNet. Am. Compl. ¶¶ 32-36; see also Am. Compl. Ex. I.

Finally, Robertshaw submits a chain of emails in which Babjak confirms that Pudles "cannot

locate the Cerida warrants" in response to an email from Pudles in which he asserts "Cerida

owns some AnswerNet warrants. I want to make sure we exercise them ASAP." Robertshaw

Resp. to Pudles Mot. Dismiss (Dkt. No. 98) Ex. 6. Thus I find that Robertshaw has sufficiently

alleged a claim for fraud against Babjak to resist a motion to dismiss.

b. *Breach of Fiduciary Duty*

Babjak construes Robertshaw's thinly-pled breach of fiduciary duty claim as one for

wrongful dilution. Babjak Mot. Dismiss (Dkt. No. 104), ECF p 12-13. "Put another way,

Robertshaw complains that the value of her shares were diminished because Babjak recognized

the voting rights of other shares. To the extent that Robertshaw claims Babjak erred by

recognizing Cerida's shares—she did not—this states a straightforward claim for wrongful

dilution. Her direct suit is therefore barred under Delaware law." Id. at 14. Babjak argues also

18

that the claim for wrongful dilution is a derivative claim, rather than a direct claim, and thus Robertshaw is not a proper plaintiff (and also has failed to follow the proper procedure governing derivative claims by, inter alia, demonstrating that she made a demand on the corporation to act or plead that demand would have been futile.)  Id.  Finally, Babjak claims that "even if true, [her] purported error did not reduce the number of shares actually owned by Robertshaw.  Nor has Robertshaw been deprived of income.  On the contrary, her holdings in AnswerNet are worth as much today as they were before suit was brought" and thus she has suffered no damages.  Id. at 15.

Robertshaw contends that Babjak mischaracterizes the breach of fiduciary duty claim against Babjak as a wrongful dilution claim.  Robertshaw Resp. (Dkt. No. 105), p. 12.  Rather, Robertshaw reiterates that Babjak "fraudulently affirmed the existence of shares which were never issued by AnswerNet and do not exist" causing Robertshaw damages.  Id. at 13.

I find that Babjak misconstrues Robertshaw's claim as one for wrongful dilution. Robertshaw does not contend that Babjak's actions resulted in the diminution of the value of Robertshaw's shares but rather that Babjak participated in a fraud by which she misrepresented the number of shares which were issued to Pudles, which conferred on Pudles voting powers that he was not entitled to and allowed him to take action detrimental to the shareholders.  I also find that this claim is not necessarily a derivative claim because Robertshaw alleges that these actions caused her direct harm, independent from any injury to AnswerNet, and that she would benefit from the recovery she seeks from Babjak.  See Tooley v. Donaldson, Lufkin & Jenrette, Inc., 845 A.2d 1031, 1033 (Del. 2004).  Thus, Babjak's arguments about the lack of a demand upon the board are inapposite.[10]  Further, Babjak does not contest that she owed a duty to Robertshaw,

---

[10] Incidentally Robertshaw does allege that she made a demand that the corporation take corrective action but that the corporation failed to do so.  Am. Compl. ¶ 81.

and I find that Robertshaw has sufficiently alleged that Babjak's actions constitute a breach of fiduciary duty to withstand a motion to dismiss.  Finally, as above, I find that Robertshaw has sufficiently alleged damages stemming from Babjak's actions, and accordingly will not dismiss this claim.[11]

    *c.  The Negligence Claim*

Babjak contends that I must dismiss the negligence claim against her because Robertshaw only alleges ordinary negligence which is insufficient to state a claim against her under Delaware law.  Babjak Mot. Dismiss (Dkt. No. 104), ECF p 18.  Rather, Babjak argues that Robertshaw must plead that Babjak acted with gross negligence.  Id.  Robertshaw responds that the amended complaint explicitly alleges that Babjak was grossly negligent and reckless.  Robertshaw Resp. (Dkt. No. 105) ECF p. 16-17; see also Am. Compl. ¶ 72.

"[T]o survive this motion to dismiss, [Robertshaw] must assert that [Babjak's] conduct constituted at least gross negligence."  Metro. Life Ins. Co. v. Tremont Grp. Holdings, Inc., No. 7092, 2012 WL 6632681, at *7 (Del. Ch. Dec. 20, 2012).  "In the civil context, the Delaware Supreme Court has defined 'gross negligence' as 'a higher level of negligence representing 'an extreme departure from the ordinary standard of care.'"  Id., quoting Browne v. Robb, 583 A.2d 949, 953 (Del. 1990), cert denied, 499 U.S. 952 (1991) (further citations omitted).  Generally, factual questions regarding whether or not a standard of care has been met are resolved later in the proceedings, not at the motion to dismiss stage.  Metro. Life Ins., 2012 WL 6632681, at *7.

---

[11] AnswerNet argues that the assignment and exercise of the warrants claimed by both Cerida and Executel all took place prior to Babjak's tenure as Secretary or General Counsel, AnswerNet Mot. Dismiss (Dkt. No. 94) ECF p. 15, and so the claims directed against her must fail.  I find this argument to be unavailing because, as discussed above, Robertshaw has sufficiently alleged that Bajak personally defrauded and breached her fiduciary duties to Robertshaw such that those claims survive the motion to dismiss.

However, AnswerNet asserts in its motion to dismiss that its certificate of incorporation precludes Robertshaw's breach of fiduciary duty and negligence claims against Babjak because of a clause that explicitly exempts its officers and directors from liability for such claims. AnswerNet Mot. Dismiss (Dkt. No. 94) ECF p. 14, citing DGCL § 102(b)(7); see also id. Ex. B (Dkt. No. 94-1), ECF p. 15.[12]  AnswerNet contends that "the [Delaware General Corporations Law] specifically authorizes corporations to limit officer and director liability" for "unintentional torts or any other actions short of willful misconduct" and that this provision therefore immunizes Babjak from liability.  AnswerNet Mot. Dismiss (Dkt. No. 94), ECF p. 14, citing DGCL § 102(b)(7).  I agree.

The Delaware Supreme Court has made clear that

> [T]he shield from liability provided by a certificate of incorporation provision adopted pursuant to [§ 102(b)(7)] is in the nature of an affirmative defense. . . .  Defendants seeking exculpation under such a provision will normally bear the burden of establishing each of its elements. . . .  Nonetheless, where the factual basis for a claim solely implicates a violation of the duty of care, this Court has indicated that the protections of such a charter provision may properly be invoked and applied. [13]

_____

[12] The relevant provision reads:

> To the fullest extent permitted by the [DGCL] . . . no officer or director of [AnswerNet] shall be liable for any amount of monetary damages to [AnswerNet] or its shareholders arising out of a single transaction, occurrence or course of conduct, for breach of fiduciary duty or otherwise.  The liability of an officer or director shall not be limited . . . if the officer or director engaged in willful misconduct . . . .

AnswerNet Mot Dismiss Ex. B (Dkt. No. 94-1), ECF p. 15.

[13] A "claim that a corporate manager [or director] acted with gross negligence is the same as a claim that she breached her fiduciary duty of care."  Albert v. Alex. Brown Mgmt. Servs., No. 04C-05-250, 2004 WL 2050527, at *6 (Del. Super. Ct. Sept. 15, 2004); see also McMullin v. Beran, 765 A.2d 910, 921 (Del. 2000) (stating that "[d]irector liability for breaching the duty of care is predicated upon concepts of gross negligence").  Similar to the protection it affords from a claim of breach of the duty of care, an exculpatory provision protects officers and directors

Emerald Partners v. Berlin, 726 A.2d 1215, 1223–24 (Del. 1999).[14]  Here, since the negligence

claim against Babjak alleges gross negligence, it is clearly precluded by the exculpation clause in

the certificate of incorporation and that claim against Babjak will be dismissed.[15]  However,

willful misconduct by a fiduciary can constitute a breach of the fiduciary duty of loyalty.  See

Stone v. Ritter, 911 A.2d 362, 369-70 (Del. 2006).  Thus, to the extent that Robertshaw is

alleging that that Babjak was grossly negligent, that claim is dismissed, and to the extent that

Robertshaw alleges Babjak's action constituted willful misconduct, those allegations are

subsumed into the breach of fiduciary duty claim.

   III.      Other Claims Alleged Generally

        Robertshaw's amended complaint also asserts three others claims: a claim for declaratory

judgment under 28 U.S.C. § 2201, a shareholder derivative claim brought on behalf of

AnswerNet pursuant to Federal Rule of Civil Procedure 23.1, and a claim seeking declaratory

relief for violations of § 219 of the DGCL.

   a.   Robertshaw's Request for Declaratory Relief

        Robertshaw requests a declaratory judgment declaring, inter alia, that the actions taken at

the special and annual meetings are void; that Cerida does not possess the shares of AnswerNet

at issue; that Robertshaw and Executel own the majority of the AnswerNet shares; that Babjak

was never lawfully elected secretary of AnswerNet; and that Robertshaw and Executel may at

_____

from claims of gross negligence. See Malpiede v. Townson, 780 A.2d 1075, 1094-1095 (Del.
2001).

        [14] The Delaware Supreme Court also has made clear that such a provision under
§ 102(b)(7) would not provide protections for directors or officers who breach the fiduciary duty
of loyalty.  Malpiede v. Townson, 780 A.2d 1075, 1100 (Del. 2001).  However, the defendants
do not argue that Robertshaw fails to state such a claim.

        [15] I also find that amending the complaint as to this claim would be futile because of the
exculpation clause contained in AnswerNet's certificate of incorporation.

any time call a special meeting of AnswerNet shareholders in order to elect new corporate officers.  Am. Compl. ¶ 75.

The Declaratory Judgment Act provides that in "a case of actual controversy within its jurisdiction, . . . any court of the United States . . . may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201(a).  In determining whether to issue a declaratory judgment, federal courts should exercise discretion.  Schulman v. J.P. Morgan Inv. Mgmt., Inc., 35 F.3d 799, 811 (3d Cir. 1994).  As the Supreme Court has explained, "[t]he Declaratory Judgment Act was an authorization, not a command.  It gave the federal courts competence to make a declaration of rights; it did not impose a duty to do so." Public Affairs Assocs., Inc. v. Rickover, 369 U.S. 111, 112 (1962).  Where there is "some overlap" between plaintiffs' declaratory judgment claim and other substantive claims, courts may refuse to dismiss the declaratory judgment claim if the plaintiffs' "remaining claims have not been fully developed . . . [and] the Court cannot fully evaluate the extent of the overlap to determine whether declaratory judgment would serve [any] useful purpose in clarifying the legal rights and relationships at issue." Fleisher v. Fiber Composites, LLC, No. 12-1326, 2012 WL 5381381, at *12 (E.D. Pa. Nov. 2, 2012), quoting Johnson v. GEICO Cas. Co., 516 F. Supp. 2d 351, 357 (D. Del. 2007).

Babjak asks me to dismiss the part of this claim specifically directed toward her.  She argues that Robertshaw's contention that Babjak was never lawfully elected secretary of AnswerNet is "unsupported by any allegations in any pleadings to date, and should be dismissed."  Babjak Mot. Dismis (Dkt. No. 104), ECF p. 19.  She contends that the amended complaint "includes no explanation of why she believes Babjak's election or appointment as

secretary was not lawful. . . .  Without such an explanation, she is self-evidently unentitled to the declaratory judgment she demands." Id. at 20.[16]

AnswerNet argues that because "the success of a declaratory relief claim regarding AnswerNet is dependent upon the allegations in the Amended Complaint as 'the actual controversy,' consideration of those claims is necessary as they relate to this motion." AnswerNet Mot. Dismiss (Dkt. No. 94), ECF p. 5.  Further, AnswerNet asserts that because "the other claims must be dismissed for failure to state a claim upon which relief may be granted, so too must [Robertshaw's] request for declaratory judgment be dismissed. Id. at 5.

Robertshaw responds that her claim for declaratory relief is subject to proof at trial and that nothing requires her to set forth any further allegations on the matter.  Robertshaw Resp. (Dkt. No. 105) ECF p. 16-17.

Because I find that the factual allegations are sufficient to sustain Robertshaw's claims against both Pudles and Babjak, and that proof of these claims necessarily overlaps with a Robertshaw demonstrating her entitlement to the declaratory judgment she requests, I will allow the declaratory judgment claim to proceed.

b. *Shareholder Derivative Claim*

Robertshaw also brings a shareholder's derivative claim on behalf of AnswerNet alleging that Pudles's actions constituted a "misuse of his position as President" and that he took actions that were against the interests of the corporation, causing the corporation to borrow money and

---

[16] Pudles does not address Robertshaw's request for declaratory judgment in his motion. Robertshaw's exhibits to the amended complaint do reflect some ambiguity as to the corporate secretary. See Am. Compl. Ex. G p. 2 (in response to a request by Robertshaw for the previous shareholder meeting's minutes, "Mr. Pudles stated that Alan Zar was the corporate secretary and so any meeting minutes or corporate documents would be in his possession.").  However, in the notice of the AnswerNet annual shareholder meeting, Babjak writes to Robertshaw and Alan Zar, and refers to Zar as president of Execute.  See Am. Compl. Ex. H.  She also signs the notice as secretary of AnswerNet. Id.  I find that at this juncture the record is not sufficiently developed for me to make any findings on this issue.

weakening its financial position.  Am. Compl. ¶¶ 77-80.  She seeks "all damages . . . to which

[AnswerNet] may be entitled," reasonable attorneys' fees and costs.  Am. Compl. ECF p. 15.

Neither Pudles nor Babjak challenge these allegations in their respective motions and so I will

not dismiss the claim.

      *c.  Violations of § 219 of the Delaware General Corporation Law*

      Robertshaw also requests declaratory relief for alleged violations of Deleware General

Corporation Law § 219; specifically she seeks a declaration that AnswerNet must produce a full

and complete share transfer ledger and all supporting documentation requested by Robertshaw,

including all financial records related to the issuance of the allegedly improper distribution to

Pudles, and that "the Directors who refused or neglected to produce the [statutorily] required list

are ineligible for election to any corporate office."  Am. Compl. ECF p. 16-17.  She also requests

reasonable attorneys' fees and costs.  Id. at 17.

      Pudles argues that the stock ledger, see Am. Compl. Ex. J, ECF p. 51-52, and the

shareholder lists, Am. Compl. Ex. F, ECF p. 37[17], were already provided to Robertshaw

fulfilling his legal duty, and contends that Robertshaw "has alleged no facts which would support

her conclusory statements that the lists were wrong or, more importantly, that Pudles or Babjak

knew or should have known they were wrong or that Pudles or Babjak would not have been

entitled to rely on what was contained in the stock ledger."  Pudles Mot. Dismiss (Dkt. No. 95),

ECF p. 10.  AnswerNet similarly argues that the fact that shareholder lists were provided to

Robertshaw means that the statute's requirements were met.  AnswerNet Mot. Dismiss (Dkt. No.

94), ECF p. 15-18.  It further argues that the statute does not authorize all of the declaratory

relief requested by Robertshaw.  Id. at 17.  Finally, it asserts that a reward of attorneys' fees is

---

[17] The shareholder list provided to Robertshaw at the December 2011 meeting is not
before me.

not appropriate.  Id. at 18.[18]  Robertshaw in her response to AnswerNet's motion reiterates that the documents given to her by Pudles and Babjak in response to her requests for shareholder lists were "legally deficient and intentionally false" and that neither "comports with records contained in [AnswerNet's] actual stock ledger" and that the question of who owns what portion of AnswerNet is better resolved by a jury.  Robertshaw Resp. (Dkt. No. 99), ECF p. 17.

As above, because I find that the factual allegations in the amended complaint are sufficient to sustain Robertshaw's claims against both Pudles and Babjak and that proof of these claims necessarily overlaps with Robertshaw demonstrating her entitlement to the declaratory relief she seeks for the defendants' alleged statutory violations, I will allow this claim to proceed.[19]

Finally, although the parties have asked me to set a schedule for motions for summary judgment, I will not do so as this opinion should make clear that there are many factual issues in the record which preclude a grant of summary judgment.

An appropriate Order follows.

---

[18] Babjak does not respond to this claim in her motion to dismiss.

[19] While taking no position on whether Robertshaw is entitled to the declaratory relief that she seeks, I note only that a declaratory judgment is an equitable remedy requiring a court to exercise discretion and balance the needs of the plaintiff and the consequences of giving the desired relief.  See e.g., Wohl v. Wilkoski, No. 87-1445, 1989 U.S. Dist. LEXIS 6601, at *12-13 (E.D. Pa. June 13, 1989) (citations omitted).