1                    UNITED STATES DISTRICT COURT
                    EASTERN DISTRICT OF PENNSYLVANIA
2
      BARBARA ROBERTSHAW,              )
3                                      )
                    Plaintiff,         )  2:11-cv-07353-TON
4                                      )
                    vs.                )  Philadelphia, PA
5                                      )  April 26, 2013
      GARY F. PUDLES, et al.,          )
6                                      )
                    Defendants.        )
7
8                       TRANSCRIPT OF BENCH TRIAL
                 BEFORE THE HONORABLE THOMAS N. O'NEILL, JR.
9                       UNITED STATES DISTRICT JUDGE
10
      APPEARANCES:
11
      For the Plaintiff:      F. EMMETT FITZPATRICK, III, ESQ.
12                            WALTER FLAMM, ESQ.
                              FLAMM BAROFF & BACINE
13                            794 Penllyn Pike
                              Suite 100
14                            Blue Bell, PA 19422
15
      For the Defendant       MAURICE R. MITTS, ESQ.
16    Gary Pudles and         MITTS LAW LLC
      AnswerNet, Inc.:        Two Logan Square
17                            12th Floor
                              Philadelphia, PA 19103
18
19
20
21    Proceedings recorded by electronic sound recording.
22
                     Veritext National Court Reporting Company
23                       Mid-Atlantic Region
                       1801 Market Street - Suite 1800
24                        Philadelphia, PA 19103
                             888-777-6690
25

Page 2

1                        I N D E X

                                                   VOIR
2    WITNESSES:            DIRECT  CROSS  REDIRECT  RECROSS  DIRE
     For the Plaintiff:
3    Gary Pudles              3    32,41      50
     John Mitchell           55    82,86
4    William Robertshaw     107
5
     EXHIBITS     DESCRIPTION                   ID.    EVID.
6
     For the Plaintiff:
7    O-2         Request for production of             51
                 documents
8
     For Defendant Pudle:
9    D397        Bills for legal services             105
                 from Burns and Kasmen PC
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 3

1        THE COURT:  Sorry to have delayed you a few
minutes.

2              DIRECT EXAMINATION RESUMED

3    BY MR. FLAMM:

4    Q.   Mr. Pudles, I'd like to just for a couple of minutes here

5    talk about how AnswerNet was run.

6    And if I were to characterize it that AnswerNet was run by

7    you, would that be an incorrect statement?

8    A.   It would be an incomplete statement.

9    Q.   Okay.  Would you like to say AnswerNet was run primarily

10   by you?  You made -- you were the CEO and were the prime

11   driver of AnswerNet; is that fair to say?

12   A.   AnswerNet Inc., I was the CEO and leader; but -- and

13   Signius, which is AnswerNet's wholly owned subsidiary since

14   2007; Bill was the CEO, I wasn't.

15        But to answer the question, Bill and I ran all of the

16   companies together.  We talked regularly, I shared information

17   with him freely and regularly.  So while we each deferred to

18   each other in certain operational decisions, when it came to

19   significant decisions, Bill and I made those decisions

20   jointly; and Barbara would be kept informed mostly by her

21   father and would give her input when she had an opinion that

22   she wanted to share.

23   Q.   So, well, isn't it correct that Barbara had no role in

24   the operation of AnswerNet?

25   A.   After the 2007 mergers to today, Barbara receded out of

Gary Pudles - Direct

1    operations; but from time to time I would -- she didn't have a

2    regular role, no, she did not.

3    Q.   And Bill was -- his role was construction and issues in

4    day-to-day management; isn't that right?

5    A.   No, that's not really correct.  Well, Bill Robertshaw and

6    I talked about all forms of business and even -- at some point

7    after -- in 2011 I actually put Bill Robertshaw on the

8    distribution list for all of the significant operational

9    communications with the executive management team; and Bill

10   had the ability to communicate and participate in any part of

11   that conversation or work; and sometimes did.

12   Q.   Can I direct your attention, please, to Plaintiff's

13   Exhibit K2.

14   A.   Plaintiff's -- yes, sir.

15   Q.   Are you there?

16   A.   Yes, sir.

17   Q.   Okay.  If you look about two-thirds down the page is

18   AnswerNet.  Do you see that?

19   A.   I do.

20   Q.   First of all, this is an e-mail from you; is it not?  To

21   the Robertshaws?

22   A.   It is.

23   Q.   Could you read the paragraph starting with "AnswerNet"?

24   A.   "AnswerNet.  Nothing had changed in AnswerNet or Cerida.

25   Now with Waterside out, I will continue to be the CEO of

Page 5

1    AnswerNet and Cerida; and Bill will continue to help manage

2    the construction facility issues; Barbara and Gary will

3    continue to get equal pay but Barbara will not have an

4    operating role in either of the companies."

5    Q.   Is that an accurate characterization of the operation of

6    AnswerNet as of the date of that e-mail?

7    A.   It was a characterization of my -- of my running the

8    business day to day; but, again, you asked about AnswerNet.

9    Signius Communications -- Signius is --

10   Q.   You're right, I asked about AnswerNet.

11   A.   Bill was continuing to be the CEO; and at that point

12   Signius was a wholly-owned subsidiary of AnswerNet, so -- I

13   mean, what was our agreement is there but what happened in

14   reality is, as I said, Bill and I ran the company together, we

15   made -- you know, operational decisions, day-to-day, I made

16   many of them.

17   Q.   Can you repeat -- the question was --

18            THE COURT:  Excuse me.  I'm not sure the witness had

19   finished his answer.

20            MR. FLAMM:  I was going to object to the witness not

21   being responsive to the question, so I was going to re-ask the

22   question.

23            THE COURT:  Well, let him finish his answer and then

24   we'll determine whether it was responsive.

25            THE WITNESS:  So, as I said, AnswerNet Inc. had a

**Gary Pudles - Direct**

1    wholly-owned subsidiary which Bill Robertshaw was respon --

2    was the CEO of.  And in reality, despite what's -- you know,

3    what's said on the paper is generally true; but in reality

4    Bill was my friend and my mentor and my guide; and together we

5    made decisions; we had agreements that we were running the

6    business together; we talked about it often.  And back then we

7    were -- my office was right next door to his; so we were

8    collaborating on most matters.  We'd go out to lunch every day

9    and we'd talk about -- as Barbara testified, we'd talk about

10   everything about the business.  We'd talk about our -- our --

11   you know -- operational issues, we would talk -- and Bill and

12   I would -- I'd make the decisions, I was the president of

13   AnswerNet Inc. -- or the C -- and the CEO, I was the president

14   of Signius, Bill was the CEO; so we had -- to other people, we

15   had our roles; but together we were running all of these

16   businesses from the time Barbara stepped out of operations

17   until -- until 2007, when the Robertshaws sold --

18   **Q.**   Would you say --

19   A.    -- sold Startel.

20   **Q.**   Are you done?

21   A.    I am now.  Thank you.

22   **Q.**   Would you say Bill trusted you?

23   A.    I would have said that before I saw what I saw in the

24   discovery.  So, yes, I thought -- I mean, in 2010 I invited

25   Bill -- my fiancee is a doctor.  We invited Bill to stay at

Gary Pudles - Direct

1  our home because we were concerned about him and wanted to

2  make sure he had care.  So I would say that Bill and I

3  appeared to have a very trusting and caring relationship.

4  Now, through this case, I've seen that he's not always been

5  completely truthful with me; but, you know, I -- at the time

6  this was happening I thought Bill -- I thought Bill and I were

7  extremely close.

8  Q.   AnswerNet had a separate accounting department from the

9  Robertshaw-owned companies that you had nothing to do with;

10 isn't that right?

11 A.   It did.

12 Q.   And the accounting -- that accounting department reported

13 to you, did it not?

14 A.   Well, no, actually, AnswerNet had two accounting

15 departments.  One was AnswerNet Inc. and Cerida and one group

16 of companies, so -- and the other was Signius, which was the

17 biggest part of our company.  And that accounting department

18 actually reported -- was run by a woman by the name of

19 Michelle Ju, who now -- who now works for Barbara as her CFO,

20 and she -- Michelle Ju reported up to Bill Robertshaw, and

21 still does.

22 Q.   When the -- do you recall testifying about the

23 transaction for the purchase of the three-percent warrants

24 where you said that we reclassified the payment by Cerida and

25 reclass -- that was listed as a distribution.  Do you recall

Gary Pudles - Direct

Page 8

1    that?

2    A.    I do.

3    Q.    Okay.  Was that done at your direction?

4    A.    I don't know whose direction it was done at, but I know

5    that --

6    Q.    Was it done at Bill Robertshaw's direction?

7    A.    I'm --

8           MR. MITTS:  Your Honor, he wasn't finished answering.

9           THE COURT:  Well -- I think both the witness and the

10   questioner should understand that only one person can speak at

11   a time, otherwise the record is going to be very garbled.

12   Let's start all over again.  Put the question, please,

13   counsel, and then the witness will answer.

14   BY MR. FLAMM:

15   Q.    Did you direct the accounting department to reclassify

16   those entries?

17   A.    Actually, let me -- let me be more clear.  I did not

18   direct the accounting department.  The audit preparation and

19   the audit documentation was prepared by Michelle Ju, not by

20   me.  I had nothing to do with the audit or any journal entries

21   or reclassifications of transaction.

22   Q.    So is it your testimony that the decision to

23   recharacterize, for instance, Barbara Robertshaw's 65,000-

24   dollar payment, from a payment to a loan, was not your

25   decision?

Gary Pudles - Direct

Page 9

1    A.   I don't think -- no, in fact, I'm sure that we decided

2    that the transaction was going to Cerida.  The actual how that

3    was going to be handled on the books and records would have

4    been handled by John Mitchell and Michelle Ju, and not me,

5    absolutely not me.  Yeah.

6    Q.   But it wasn't done by Bill or Barbara Robertshaw.

7    A.   To my knowledge, it would have -- it would have been John

8    Mitchell and Michelle Ju would have done that.

9    You're talking about the actual -- the actual entries and

10   things.  That would have been done by Michelle Ju and John

11   Mitchell.

12   Q.   And neither Bill nor Barbara Robertshaw would have been

13   consulted in advance of the reclassification of those entries

14   for accounting purposes, isn't that right?

15   A.   Again, I don't know who John and Michelle talked to.  I

16   certainly don't recall that.  I do know that it wasn't

17   shown -- that the distribution wasn't shown on any K1.  And it

18   was -- so I know that Barbara Robertshaw did not -- you know,

19   taxes are not paid on distributions; and it wasn't shown on a

20   K1; so Barbara would have certainly known that she didn't have

21   a distribution for this amount.

22   Q.   How about the accounting classification of how your

23   payout was treated?  Who -- and by that I mean the 980,000

24   dollars, the money that was paid to you in connection with the

25   divorce --

**Gary Pudles - Direct**

Page 10

1    A.   So what --

2    Q.   -- distribution.  Who --

3    A.   I'm sorry.  I apologize.  Go ahead.

4         THE COURT:  He hasn't finished his question.

5         THE WITNESS:  I apologize.

6    BY MR. FLAMM:

7    Q.   My question is, who made the determination how to

8    reclassify all of those transactions, or book all those

9    transactions?

10   A.   It was -- the process was started by John Mitchell and

11   Cindy Ravitch, pursuant to an e-mail, which is one of your

12   exhibits, if -- and I can point it out if you want me to do

13   so -- prior to the distribution.  And then there were a couple

14   of -- there were a couple of things that I didn't agree with,

15   so they were then, I believe, fixed by Joe Koletty or Mary

16   Cade (ph.) in the accounting department; but the actual plan,

17   et cetera, was actually done by John -- by Cindy Ravitch, I

18   think.  There's -- there's an e-mail --

19   Q.   The e-mail is from you?

20   A.   The e-mail is from me to Cindy and John.

21   Q.   Directing them to do what?

22   A.   If I could, let me pull up the e-mail.  I know it's in

23   your --

24        MR. MITTS:  Your Honor, to save time, it's Exhibit

25   N15 in the Plaintiff's binder.

Gary Pudles - Direct

Page 11

1             THE WITNESS:  Thank you.

2             THE COURT:  Thank you.

3             THE WITNESS:  So, on August 18th I sent Exhibit N15

4     to Cindy and John.  In it -- in it I lay out the goals, I

5     identify the loans.  I really lay out what I believe is the

6     right path for it.  And what I write at the end, which I think

7     is most important, "John, I need a plan for all of this, and I

8     would like to get it done prior to making this payment so I

9     can make sure that Cindy can put these entries into the final

10    balance sheets being prepared under her leadership."  She

11    was -- Cindy was leaving at the time.  "We need to make quick

12    decisions here and get them implemented in this financing

13    cycle."  "In this finance cycle."

14             So this was the actual entries and things like that

15    and how all that was done, I laid out a plan in Exhibit 15;

16    and they actually did the work and executed my request.

17    BY MR. FLAMM:

18    Q.   And that was -- that e-mail was your writing and your

19    ideas, correct?

20    A.    Correct.  In August, prior to the distribution.

21    Q.   Did you give similar inquiry, direction, suggestion to

22    the accounting department with respect to the reclassification

23    of the payments of the 376,000 dollars?

24    A.   I'm not sure I understand what you're saying.

25    Q.   Okay.

**Gary Pudles - Direct**

1          MR. FLAMM:  I'll withdraw the question.

2    **Q.**  If you'd turn to Exhibit K5, please.

3    A.   Yes, sir.

4    **Q.**  K5 consists of two documents.  Will you take a moment to

5    look at them?

6    A.   Yes, sir.

7    **Q.**  The first document is a draft of the second document; is

8    that fair to say?

9    A.   That appears to be, yes, sir.

10   **Q.**  Now, the -- can you take a moment, please, to tell me the

11   difference -- if you look at the paragraph that says, "Whereas

12   Pudles and Robertshaw each currently earn."  Do you see that

13   paragraph?  It's the third "whereas."

14   A.   Yes.

15   **Q.**  Okay.  Can you tell us what the difference is between the

16   draft and the final agreement, in that paragraph?

17          MR. FLAMM:  I'll withdraw that question.

18   **Q.**  Let me --

19   A.   The word "network" appears in the draft?

20          THE COURT:  Why don't -- the question has been

21   withdrawn, I thought you said.  Is that correct?

22          MR. FLAMM:  I with -- I'll try and make it simpler.

23   BY MR. FLAMM:

24   **Q.**  The final agreement says that "whereas Pudles and

25   Robertshaw each currently earn 350 per year in salary and they

Gary Pudles - Direct

1   take" -- the word "matching distributions" has been added in

2   the final agreement; isn't that right?

3   A.   I believe so, yes.

4   Q.   In addition -- if you'll turn to the second page?

5   A.   Of which -- of which document?  The signed document or --

6   Q.   I'm sorry.  Of the final agreement.

7   A.   Yes, sir.

8   Q.   At the top of the page, that says -- when it spells out

9   the money, it says, "One million to Pudles and Robertshaw

10  each, August 1, 2010"; correct?

11  A.   It does.

12  Q.   And if you look at the --

13       MR. MITTS:  Objection, Your Honor.  That's -- that's

14  not what it says.  There is -- objection.  That's not what it

15  says.  There is the Pudles -- Robertshaws -- the S that is

16  inserted across all of the definitions of "Robertshaw."

17       MR. FLAMM:  That's -- stand corrected.  It's -- but

18  it says that -- "one million to Pudles and Robertshaw" -- I

19  honestly didn't know that was an S -- "Pudles and

20  Robertshaws," if that's what it says, "each, August 1, 2010."

21  BY MR. FLAMM:

22  Q.   Now, that didn't mean that there was a million to you and

23  a million to Barbara and a million to Bill Robertshaw; did it?

24  A.   No, it didn't mean that at all.

25  Q.   Okay.  The first page of the draft agreement, where it

**Gary Pudles - Direct**

Page 14

1    specifies the million dollars, says, "One million in August

2    2010."  And "in" does not appear in the final agreement.

3    Rather, it says, "August 1, 2010," a specific date; isn't that

4    right?

5    A.   You're dealing with different paragraphs.  Barbara's

6    lawyer had us take out that paragraph that you're referencing,

7    because -- well, I don't know why because; you'd have to ask

8    them.  So this was a different paragraph and completely

9    different language that was part of changes requested by

10   Barbara Robertshaw.

11   Q.   Are the changes as I said?

12   A.   No, sir, this paragraph that you're referencing has

13   nothing to do with the paragraph that you're referencing in

14   the final agreement.

15   Q.   I don't believe I asked whether it had anything to do

16   with it.  I said, it has a specific date there, does it not.

17   A.   The final agreement does have a specific date --

18   Q.   Thank you.

19   A.   -- yes, sir.

20   Q.   If you'll go to the signature page of the final

21   agreement.

22   A.   Yes, sir.

23   Q.   The last sentence of section -- paragraph, whatever you

24   want to call it -- seven, at the top of the page.  Could you

25   read that, please?

Gary Pudles - Direct

Page 15

1    A.    "Neither party shall be required to personally guarantee

2    any indebtedness to support the special distributions; and

3    nothing herein shall be construed as a guarantee by either

4    party of payments to be made hereunder."

5    Q.    Could you turn now to Exhibit N6, please.

6    A.    Yes, sir.

7    Q.    Have you seen -- you've seen this document before,

8    haven't you?

9    A.    Oh, I believe I have, yes.

10   Q.    And does this document reflect how the transaction was

11   done for the 2011 distribution to you of a million dollars?

12   A.    I don't recall if it was correct.  During the time there

13   was a transition going on in the accounting department.  Our

14   CFO, Cindy Ravitch, was leaving the company; so in the middle

15   of -- and she was the one who sort of put the plan together as

16   to how everything was going to be handled.  Unfortunately, it

17   didn't get -- it didn't get handled by the accounting staff

18   exactly right; so there was a number of communications back

19   and forth with some minor details that had changed; but the

20   overall accounting, the goals that I expressed in my

21   December -- sorry -- my September 3rd e-mail to the

22   Robertshaws, the goals that I expressed in my August 18th e-

23   mail to John Mitchell were certainly part of it.  So as to

24   this particular e-mail, I would have to compare this to the

25   way the final -- the actual things, to make sure there isn't

Gary Pudles - Direct

1    one or two entries that weren't incorrect, or statements that

2    weren't incorrect.

3    Q.   Well, let's just start with what you may remember.

4    Number one, is that incorrect or correct?

5    A.   I don't -- I don't know that to be correct or incorrect.

6    I would -- I'm assuming it's correct but I don't know for

7    sure.

8    Q.   How about number two; is that correct or not?

9    A.   See, I -- now, again, I don't know -- that may be

10   correct; but I thought that the money was transferred to me

11   via wire; but that could be correct.  I don't know.  I didn't

12   do the actual nuts and bolts of the transfers.  But I have

13   testified that the money came from AnswerNet, so it came some

14   way.  Whether it came in the form of a check or it came in the

15   form of a wire transfer, I don't disagree that it came from

16   AnswerNet Inc.  The cash.

17        (Pause)

18   Q.   All right.  Now, when we left yesterday we were talking

19   about -- or, at least I thought we were talking about water --

20   your contention that Waterside somehow objected to -- excuse

21   me -- Barbara Robertshaw's warrant, which is -- which appears

22   as H23.  Do you want to take a look at H23 so you know what

23   we're talking about?

24   A.   Okay.  Yes, sir.

25   Q.   And I think I asked you whether there were any documents

Gary Pudles - Direct

1   that indicated Waterside's objection to that. And you, I

2   believe, said that -- you referred to your Exhibits 63, 64 and

3   65; is that right? Is that correct?

4   A.   That's not what I said.

5   Q.   Okay. What did you say?

6   A.   I said that my exhibit -- and I thought I was so

7   organized. Here. That my Exhibit 398 is that proof.

8   Q.   398, that's the only one?

9   A.   That's the only one I can put my hands on right now.

10  Q.   Okay. Are there any others that you recall?

11  A.   There was -- there was communications between Waterside

12  and myself after the fact. But as I -- but as I explained

13  earlier, I had a computer crash that wiped away pretty much

14  most of my e-mails from 2000 -- middle -- early to middle

15  2006. So this is the one that I have that I know of. I'm

16  sure there were other communications.

17  Q.   By the way, could you -- could you point me to the

18  notification that you gave us or that your counsel gave us

19  that you lost documents because of a computer crash?

20  A.   First of all, you never -- you never -- I guess I'm

21  putting my counsel hat on. You never sent me a document

22  request for me personally. So -- documents that you

23  requested. Secondly, let's not forget that the first time

24  that you have made this claim that you own this one and a half

25  percent warrant was in your pretrial brief. In your amended

**Gary Pudles - Direct**

Page 18

1    complaint you stated that you -- that Executel owned these

2    warrants.  So I had no reason to look for these kinds of

3    communications, because you changed your story at the last

4    minute, after all these years.

5    Q.   So is it your testimony that the only documents on your

6    computer are your personal documents?

7    A.   No.  My -- no; and that's not my -- that's not my

8    contention at all.

9    Q.   Well, did you have any AnswerNet records on your

10   computer?

11   A.   I had records on my computer that I produced, that I --

12   that I gave to counsel to produce.  Whether they were produced

13   or not is up to counsel.

14   Q.   Did you lose any AnswerNet records that were on your

15   computer that -- any records that in any way related to this

16   case that were on your computer?

17   A.   As I said, when we received -- remember, when you -- at

18   the end of discovery the issue of the Waterside warrant being

19   to your client wasn't at issue; and I had a release agreement

20   from -- from -- you know, approved by your client which

21   confirms that Waterside sold -- transferred that three-percent

22   warrant to Cerida and not your client.  So, at the last minute

23   you make a claim suddenly that your client owns this warrant,

24   and then you're going to complain that I didn't get -- I

25   didn't look for e-mails that are not corporate documents but

**Gary Pudles - Direct**

1    they certainly might be communications about a subject that we

2    didn't even know until the trial brief you planned on

3    litigating.

4    **Q.**   I realize it's not possible to have the question read

5    back; but I think what I asked was, were there any AnswerNet

6    records on your personal computer.  I think that's what I

7    asked.

8    **A.**   And the answer to that is, I would guess there are, yes.

9    **Q.**   Were any of those records lost as a result of this

10    computer crash?

11    **A.**   I have -- not that I know -- I don't know, because I

12    don't know what was lost.  It was 2006.  I don't know what was

13    on the computer that was lost at that time.

14    **Q.**   Well, why are you telling us now that you lost records on

15    your computer?  What importance is that now?

16    **A.**   You're asking me, Mr. Flamm -- I'm sorry, I guess I'm

17    confused, because what you're asking me is do I have any

18    additional proof that -- besides the release agreement, which

19    we've talked about at length --

20    **Q.**   Let's identify that as a document.

21    **A.**   I'm sorry.  The release agreement, which is -- if a real

22    lawyer would tell me what that number is?  64.  So the release

23    agreement in 64, which was -- which was done a year after your

24    claim that -- that the -- your client owned these warrants,

25    and -- a year afterwards; that --

Gary Pudles - Direct

Page 20

1   **Q.**   That's an agreement between --

2   A.    So that -- so that --

3   **Q.**   -- Cerida --

4   A.    -- document --

5   **Q.**   -- and --

6   A.    That doc --

7   **Q.**   That's an agreement between Waterside and AnswerNet; is

8   that right?

9        MR. MITTS:   Please, if we could just have one at a

10   time, it would give a better record.

11   And Your Honor, this really is argument.

12        THE COURT:   Well, I think your client -- no, it's not

13   your client.   I think the witness is doing a lot of argument

14   on the stand instead of responding directly to the questions.

15   I do agree that both the lawyer and the witness are talking at

16   the same time; and this has happened several times; and the

17   record is going to be quite confused.

18   Now, let's start all over again.   Put your question, counsel.

19   And then, instead of arguing, answer the question.

20        THE WITNESS:   Yes, Your Honor.   I'm sorry.

21   BY MR. FLAMM:

22   **Q.**   My question to you was, when I was asking you about what

23   documents you have that support the notion that Waterside

24   objected to Barbara Robertshaw's warrants that were identified

25   as H23, you said, among other things, that you had a computer

Gary Pudles - Direct

Page 21

1    crash.  And then I believe you testified -- I'm not quite sure

2    what --

3    A.   Okay.

4    Q.   -- but it sounded to me like you were saying that it had

5    nothing to do with anything here in this case.  So my question

6    to you then was, why did you raise that you had a computer

7    crash.  Of what significance is that?  What's gone?  What's

8    missing?  What do you think is missing?

9              MR. MITTS:  Your Honor, I'd like to note an objection

10   for that.  That's really not a proper question.  If he has a

11   proper -- that was a very long narrative.  If we could just

12   maybe take one bite at it?

13             THE WITNESS:  I'm going to -- if I -- if I --

14             MR. FLAMM:  No, just wait.

15             THE COURT:  Well, you know, you're not representing

16   this witness --

17             MR. MITTS:  No, Your Honor, but he is -- they're

18   asking about matters that relate to the corporation, and --

19             THE COURT:  Yeah, I don't quite understand the

20   corporation's position in this anyhow, to tell you the truth.

21   There's no claim pending against the corporation, there's a

22   claim pending on behalf of the corporation.  The corporation

23   is in this because -- it's named as a Defendant because it's

24   necessary for relief on the declaratory judgment action; but

25   passing that --

Gary Pudles - Direct

Page 22

1    Break up your question, please.

2    Can you -- let's see -- let's try first, can the witness

3    answer the question as it's posed to him?

4    I think the question basically is, why did you raise your

5    computer crash.

6                THE WITNESS:  Because there was some subsequent e-

7    mails that I don't have.  I don't know what they were, I can't

8    remember the dates; but there were -- there were subsequent e-

9    mails between Waterside and myself which talked about the

10   issue of percentages versus -- versus share -- numbers of

11   share.

12   BY MR. FLAMM:

13   Q.   Subsequent to what?

14   A.   Subsequent to March 20th.

15   Q.   Which is the date that the warrant was executed.

16   A.   Which is the date that the Waterside -- yes, the -- well,

17   I don't know when the warrant was executed; but it was the

18   date that I sent the warrant to Barbara Robertshaw and the

19   date that Waterside rejected this.  And I believe you're

20   right, it was the date that -- well, I don't know when Ms.

21   Robertshaw signed it.

22   Q.   So those documents, you're contending now, are relevant

23   to the issue of whether Waterside objected to Ms. Robertshaw's

24   warrants; is that right?

25   A.   I'm contending those documents I don't have, but other

Gary Pudles - Direct

Page 23

1    documents that I do have in this case is the -- is the release

2    agreement.  That's also the proof.

3            MR. FLAMM:  Your Honor, may I move to strike?

4            THE COURT:  Well --

5            MR. FLAMM:  I mean, I really don't know what to do

6    here.

7            THE COURT:  I'll consider it for whatever worth it

8    has.  Can we move on?

9    BY MR. FLAMM:

10   Q.   Besides the release agreement that you've cited as

11   Exhibit 64, is there any other writing that in your mind --

12   or, that you contend indicates or reflects Waterside's

13   objection to Barbara Robertshaw's warrant that's been

14   identified as H23?

15   A.   I believe that all the documents which I've already

16   testified to that set out the ownership of the shares is

17   further proof of Waterside's objection and the ultimate change

18   in the ownership, and the decision to who's going to own it.

19   So that's my opinion.

20   Q.   And those documents don't specifically object to Barbara

21   Robertshaw's warrant, which has been identified as H23, do

22   they?

23   A.   They don't speak directly to the warrant that you've

24   described.

25   Q.   And in fact there is no document that reflects an

Gary Pudles - Direct

Page 24

1    objection to her particular warrant, which has been marked as

2    Exhibit H23, other than perhaps your recitation of someone's

3    objection; isn't that right?

4    A.   No, it's not correct.

5    Q.   Okay.  What, once again I ask you, is that document?

6    A.   That document is Defendant's 398.

7    Q.   Anything else?

8    A.   Not that I can think of offhand.

9    Q.   Now, is there any document from AnswerNet to Barbara

10   Watershaw -- Robertshaw, rather, indicating that her warrant

11   is no good.

12   A.   Yes.

13   Q.   What document is that?

14   A.   The release agreement with Waterside and the e-mails --

15   Q.   That's number 64?

16   A.   That's number 64.

17   Q.   Okay.

18   A.   And the e-mails -- if you give me numbers -- the e-mail

19   where -- where we discuss the merger and I show Bar -- I

20   show -- I present the cap table to Barbara and Bill

21   Robertshaw, both in February and, I believe, in -- again, in

22   May.

23   Q.   Not -- are you done?

24   A.   I am done.

25   Q.   Not one of them specifically says, "Ms. Robertshaw, your

**Gary Pudles - Direct**

Page 25

1   warrants" -- that have been marked here as H23 -- "are

2   invalid"; do they?

3   A.   Those words don't appear in either -- any of those

4   docu -- they don't appear in the two e-mails.  They certainly,

5   by reference, would appear in the -- in the release agreement.

6   Q.   By -- is it your contention that the release agreement

7   refers to those documents?

8   A.   It's my contention that the release agreement refers to

9   the three percent -- shares that -- half of which Barbara

10  Robertshaw's now claiming.

11  Q.   And that speaks for itself.

12          THE COURT:  What number is the release agreement?

13          MR. FLAMM:  64, Your Honor.

14          MR. MITTS:  Number 64, Your Honor.

15          THE COURT:  All right.  Do I have that?

16          May I see it?  I'd like to see it.

17          You can proceed while I read it.

18          Thank you.

19      (Pause)

20  BY MR. FLAMM:

21  Q.   Mr. Pudles, there is no writing that goes to Ms.

22  Robertshaw revoking, voiding, declaring invalid her warrants

23  which appear as H23; is there?

24  A.   Yes, there is.

25  Q.   What document is that, sir?

Page 26

1    A.   Defendant's 398.

2    Q.   Okay.  You -- that's a document that is direct -- never

3    mind, I won't argue with you.

4    Anything else?

5    A.   Not that I can think of right now.

6    Q.   There is no writing that reassigns that warrant for three

7    percent from Executel to anyone else, is there?

8    A.   There's no writing that I know of that reassigns -- I'm

9    sorry.  Reassigns this from -- reassigns what from whom to

10   whom?

11   Q.   Barbara's warrants for 6,351 shares are half of the

12   12,704 shares, isn't that right?

13   A.   Mr. Flamm, I've repeatedly testified that that warrant

14   was never a valid warrant.  Therefore, there was no

15   reassignment of something that's invalid.

16   Q.   I understand your position.  Is there a document -- if

17   you'll look at H6, please.  I think it's H6.  H6 is an

18   assignment by Waterside to Executel of warrants for 75.75

19   percent of their share -- 18 percent, or 52,890 shares, and

20   provides an option in paragraph 2 to acquire 3 percent or

21   12,702 shares; isn't that right?

22   A.   Part of what you said was right, part of it was wrong.

23   Q.   Okay.  Well, I'm sure you'll tell me what part was wrong.

24        MR. MITTS:  Objection.

25        THE WITNESS:  I'm sorry.  Is that a question?

**Gary Pudles - Direct**

1          MR. MITTS:  Is that a question?

2    BY MR. FLAMM:

3    **Q.**   Go ahead.

4    A.   I'm sorry?

5    **Q.**   Please tell me what was wrong.

6    A.   They didn't own eighteen percent at the time of the

7    assignment of warrant.

8    **Q.**   Anything else wrong with that statement?

9    A.   Could you repeat the rest of the statement, please?

10   **Q.**   I'll move on.

11   Is there a document that voids this document?

12   A.   That voids this assignment of warrant?

13   **Q.**   Yes.

14   A.   No.  Not that I know of.

15   **Q.**   Now, you claim that there was an agreement between you

16   and Bill Robertshaw to -- how should I characterize it --

17   issue the three-percent warrant to Cerida?

18   A.   Yes, sir.

19   **Q.**   When was that made?

20   A.   Sometime in March or April of -- or, sometime in early

21   2006.

22   **Q.**   And how did that come about, please?

23   A.   I can't -- well, I can't remember the conver -- exact

24   conversation, but I know that by -- I know -- I know that we

25   had it and we made the agreement.

Gary Pudles - Direct

Page 28

1    Q.   What was the agreement?

2    A.   That we were just -- we were going to take ownership of

3    the three-percent warrant -- share -- warrants in Cerida and

4    not personally.

5    Q.   What prompted that discussion --

6    A.   We --

7    Q.   -- if anything?

8    A.   I'm sorry.  We've been having that discussion since the

9    very beginning.  As you -- as you notice, we've been having --

10   we've been having that conversation --

11        THE WITNESS:  I will try not to argue.  I'm sorry,

12   Your Honor.

13        We were having that conversation even after Cerida

14   and Barbara and I made our payments to Executel.

15   BY MR. FLAMM:

16   Q.   What prompted that discussion that you had, changing the

17   warrants?

18   A.   I don't recall.

19   Q.   Where did it happen?

20   A.   We had a number of conversations, and I -- I can't say

21   specifically, but at that time we were -- we were talking

22   daily, when he was in the office; and if he happened to be out

23   in California during that period of time we would have been

24   talking on the phone; but at that point in time we were

25   talking -- we were talking daily, multiple times a day.

Gary Pudles - Direct

Page 29

1    Q.   So is your answer you don't recall?

2             MR. MITTS:  Objection.

3             THE WITNESS:  My answer's my answer.

4             MR. FLAMM:  I'll ask the question again.

5             MR. MITTS:  Your Honor, he started with the response,

6    "I don't recall specifically but at the time we spoke multiple

7    times a day; and if he were in the off" -- and -- "over a

8    number of period of days."  "Some of the time he was in the

9    office, some of the time he was in California and speaking on

10   the phone."  That's -- I believe he's fairly responded to the

11   question.

12   BY MR. FLAMM:

13   Q.   There's no writing memorializing that agreement, is

14   there?

15   A.   Yes, there is.

16   Q.   What -- please identify.

17   A.   The release agreement from 2007 memorializes that

18   agreement.  The reclassifica --

19   Q.   Sorry to interrupt.  That's number 64?

20   A.   Number 64.

21   Q.   Thank you.

22   A.   The reclassification of the -- of the payments evidence

23   is that -- that agreement.  The e-mail that I sent in February

24   outlining who owned the warrant shares or the shares of

25   AnswerNet confirmed that agreement.  The e-mail that I sent in

Gary Pudles - Direct

Page 30

1    May confirming the cap table confirmed that agreement.  The

2    conversation -- well, those were writings that absolutely

3    confirmed that agreement.

4    Q.  Could you identify the e-mail in February?

5    A.   Certainly.  The -- somebody read the e-mail that Ms.

6    Robertshaw forwarded to Mr. Strauss, what's that number?

7            MR. MITTS:  Oh, with the forty-four?

8            THE WITNESS:  With the forty-four pages, yes.

9            MR. MITTS:  I believe it is Plaintiff's 48.

10   Oh, excuse me.

11   BY MR. FLAMM:

12   Q.  Mr. Pudles, it would be the exhibit that correlates from

13   the Barbara Robertshaw deposition, so you'll see it flagged --

14   I don't know if her deposition is still there?

15           MR. MITTS:  It's not.

16           THE WITNESS:  I would say that the e-mail -- the e-

17   mail and the cap table attached to the e-mail, which is listed

18   as Defendant's 40?

19       (Pause)

20           MR. FLAMM:  May I approach, Your Honor?

21   BY MR. FLAMM:

22   Q.  Mr. Pudles, I'm handing you Barbara Robertshaw's

23   deposition transcript.

24   A.   Yes.  This is -- it's the e-mail, then the cap table,

25   which is listed as Exhibit 33 to Barbara Robertshaw's

**Gary Pudles - Direct**

Page 31

1    deposition.  The e-mail -- the other e-mail I'm referencing --

2    the other e-mail I'm referencing is number 67, which again --

3    which again demonstrates that Cerida owned those warrants.

4          LAW CLERK:  Defendant's?

5          THE WITNESS:  Yes, sir.  I'm sorry.  Defendant's 67.

6    BY MR. FLAMM:

7    Q.  Are there any other documents that you contend

8    indicate --

9    A.  Yes.  All of the audited financial statements from

10   AnswerNet Inc. and Cerida, and AnswerNet combined, which are

11   all of the companies that we own.  I'll represent that Cerida

12   owns 15 percent of the shares.  So, therefore, in order for

13   Cerida to own that, they would have had -- that warrant would

14   have to have been owned by Cerida.

15   Q.  Who supplies the information to the auditors?

16   A.  In 2006, when this was first added, Michelle Ju.

17   Barbara Robertshaw's CFO.

18   Q.  And where would she get that information?

19   A.  From the books and records of the company.  I don't know

20   where she got that information.  She's the one who prepared

21   the audit book that went to the auditors that year.

22         (Pause)

23         MR. FLAMM:  I have no further questions.

24         (Pause)

25         MR. MITTS:  Your Honor, Mr. Rhoads has questions.

**Gary Pudles - Cross**

Page 32

1    Would you prefer that he go -- Mr. Rhoads has questions.

2    Would you prefer that he goes before I go?

3              THE COURT:  That's entirely a matter between you and

4    Mr. Rhoads.

5              THE WITNESS:  You could arm wrestle to decide.

6              MR. RHOADS:  I can take him.

7              THE WITNESS:  I bet you can.

8              MR. MITTS:  Thanks a lot.

9              THE WITNESS:  Unless there's food on the other side.

10                        CROSS-EXAMINATION

11   BY MR. MITTS:

12   **Q.**  Mr. Pudles, you were asked by Plaintiff's counsel about

13   the day-to-day running of AnswerNet back in 2007.  Do you

14   remember that line?

15   A.   I do.

16   **Q.**  Okay.  I'd like you to turn to Exhibit D107.

17   A.   Oh, D107.  Okay.

18   **Q.**  Yes.  In the --

19   A.   Defendant's Exhibit 107.

20   **Q.**  Yes.

21   A.   Sorry.  I see it.

22   **Q.**  Okay.

23   A.   I see it.

24   **Q.**  Okay.  This is an e-mail dated 4/30/2009.  The Robert --

25   well, why don't you identify it for us.

Gary Pudles - Cross

1    A.    This is an e-mail from me to Bill and Barbara and John

2    Mitchell in response to an e-mail that Bill Robertshaw wrote

3    to me on April 30 -- earlier in that day.

4    Q.    Okay.  And I'd like you to read the part of the e-mail

5    that Mr. Robertshaw wrote to you and to John Mitchell, the

6    outside accountant and auditor.

7    A.    Read all of it?

8    Q.    Well, what is the subject matter about?

9    A.    The subject matter is Mr. Robertshaw and I agreed and

10   decided to hire a CFO for our companies, and Mr. Robertshaw

11   wrote down what he believed are important traits of a CFO; and

12   my response was, "Excellent list."

13   Q.    Okay.  Thank you.

14   I'd like you now to go to Exhibit 140 in the same binder.

15   A.    Yes.

16   Q.    Can you identify this document for His Honor, please?

17   A.    I can't.  This wasn't my document.

18   Q.    Okay.  Fair enough then; we'll leave it there.

19   I think we're only going to go into plaintiff's exhibit binder

20   once, but I'd like to go back to Exhibit N15.  N as in Nancy,

21   fifteen?

22   A.    Yes, sir.

23   Q.    Okay.  You were asked briefly about this document.  It's

24   August 18th 2011.  So this is before the distribution is made?

25   A.    Yes, sir.

**Gary Pudles - Cross**

Page 34

1   Q.   Okay.  Is this -- tell His Honor, what was the purpose of

2   this.

3   A.   The purpose of this was to tell the CFO and our outside

4   auditor the goals of how we -- A, to -- that we needed to make

5   the distribution -- as I said here, "Please set up

6   distributions from me, from the various entities, based on Jay

7   and John's response to the e-mails in the amount of a million

8   dollars."

9        So the idea here was, right from the top that it was

10  going to come from various entities, not just AnswerNet Inc.

11  but the various entities as set out in the shareholder

12  agreement; and that the payment -- based on John or Jay's --

13  subject to the review, approval and direction of our outside

14  auditors.

15  Q.   Okay.  And the recipients of this e-mail -- I see that

16  Cindy Ravitch is copied on it, but the recipients, are those

17  the outside accountants?

18  A.   Yes, it's John Mitchell, who is our partner-in-charge,

19  and Jay Brower, who is our tax manager in charge of our

20  account.

21  Q.   Thank you.  I'd like you to now go back to the

22  Plaintiff's binder.

23  A.   That one is --

24  Q.   Forgive me.  To the Defendant's binder, 146.

25  A.   Sorry.

**Gary Pudles - Cross**

Page 35

1            MR. MITTS:  I apologize to the Court for these

2      binders.  They were very expensive, and they don't stay

3      together well.

4            THE COURT:  I've been there.

5            MR. MITTS:  Oh, my goodness.  Twenty-eight dollars a

6      binder.

7            THE WITNESS:  Sorry, what was the number again, sir?

8      BY MR. MITTS:

9      **Q.**   It's Exhibit D146.

10     A.   Okay.

11     **Q.**   Okay.  Do you have that before you now?

12     A.   I do.

13     **Q.**   Okay.  Can you identify that document for His Honor,

14     please?

15     A.   This is a document prepared by the AnswerNet accounting

16     office, detailing the -- well, this document is an e-mail from

17     me to the Robertshaws -- from me to the Robertshaws.

18     **Q.**   Okay.  And what date is it?

19     A.   The date is September 28, 2011.

20     **Q.**   Okay.  So this is about a -- almost a month after the

21     distribution?

22     A.   Correct.

23     **Q.**   Okay.  And what was the purpose of this document?

24     A.   It was really important to me that the Robertshaws at

25     least, you know, had -- well, I knew at this point Barbara

Gary Pudles - Cross

1   didn't -- wasn't happy that she didn't get cash.  It was very

2   important for me that she -- that both of the Robertshaws know

3   that all of the transactions were properly booked, that they

4   were booked accordingly, you know, and addressed, that they

5   were going to be -- again, that they were going to be paid

6   back and how.

7   Q.   And this is the second e-mail that you sent after the

8   distribution?

9   A.   No, I sent many e-mails, but this was a -- as I said

10  earlier, there were some minor tweaks to the journal entries

11  that needed to be done, and I don't do journal entries, but

12  when -- what they will do is they would do -- they would send

13  me what they thought had to be done, I would tell them, and

14  then they would make the appropriate record -- you know, marks

15  in the books and records.

16  Q.   Thank you.  The next document I'd like you to look at is

17  a little farther back in that same binder.

18  Oh, it's not, actually.  It's Exhibit 202.  It's in the next

19  binder.

20  A.   Of course it is.  No, 202 is in that binder.

21  Q.   In --

22  A.   Two oh two is not in the binder that's in front of me.

23  Q.   Oh.  Okay.

24      (Pause)

25  A.   Okay.

Gary Pudles - Cross

Page 37

1    Q.   Do you have Exhibit 202 before you now?

2    A.   I do.

3    Q.   Okay.  Can you identify that for the record, please?

4    A.   Two oh two is unanimous written consent of directors that

5    Barbara insisted we execute as part of the completion of the

6    financing and the mergers, and as part of her leaving the

7    oper -- her operational role in the company.

8    Q.   Okay.  It's not immediately apparent from looking at it

9    what the date is.  Can you place this in a particular year for

10   us?

11   A.   This was some time in mid 2007.  It would have been

12   around the early part of June, which was when we got the

13   financing and -- to do the buyouts and do the mergers.

14   Q.   Who are the signatories --

15   Now, this is unanimous written consent of directors of

16   AnswerNet Inc.

17   A.   It is.

18   Q.   Okay.

19   A.   But it's as much a shareholder agreement as anything

20   else.

21   Q.   Okay.  And it has four signature lines?

22   A.   It does.

23   Q.   The signatures appear on two pages, because it's executed

24   in counterparts.  Bill Robertshaw, Barbara Robertshaw, Gary

25   Pudles and a David Shaw.

Gary Pudles - Cross

Page 38

1    A.    Yes.

2    Q.    Who is David Shaw?

3    A.    David Shaw was a board member of AnswerNet and somebody

4    who actually arranged the first meeting between Bill

5    Robertshaw and myself.

6    Q.    Okay.  The last document I want to direct your attention

7    to, Mr. Pudles, unfortunately is in binder one.

8    A.    Of course it is.

9    Q.    And it's -- worse, it's in the beginning of binder one;

10   it's number 37.  But you mentioned this subject before, and

11   I'd just like to draw your attention to it so that we have the

12   document that correlates to your testimony.

13   A.    Binder one.  What number -- what number is it, sir?

14   Q.    37.

15   A.    Okay.

16   Q.    Mr. Pudles, can you identify this document for us?

17   A.    Yes, the -- well, are you talking about the first page of

18   the Exhibit or the second?

19   Q.    Well, why don't you take the first, and then we'll go to

20   the second.

21   A.    All right.  The first page is an e-mail from me to Bill.

22   Q.    And what's the subject matter of this e-mail?

23   A.    The corporate records.

24   Q.    Corporate records of what?

25   A.    Well, I -- AnswerNet -- AnswerNet and Signius.

**Gary Pudles - Cross**

1    Q.   And can you tell His Honor why you sent this e-mail to

2    Mr. Robertshaw back in February of 2007?

3    A.   Yes, after I -- as I testified yesterday, after the board

4    meeting in which Bill and Barbara made a motion to assign

5    companies to themselves, I looked -- went looking for the

6    corporate records to find ways to stop that from happening.

7    And when I went to look, I found out that the AnswerNet

8    corporate records and files were missing.  And I was asking

9    Bill where they might be.

10   Q.   Okay.  Now, you pointed to the second page of this e-mail

11   thread.  What part of this is pertinent to that inquiry?

12   A.   I'm sorry?

13   Q.   You pointed to the -- you said there are two pages, at

14   the beginning of your answer.  Turn to the second page?

15   A.   Yes.

16   Q.   What part of this e-mail thread is pertinent to that

17   issue?

18   A.   Well, Bill responded that in -- with the current

19   activity, I wanted to look at the various books.  So based on

20   the timing of this, it appears that prior to making that

21   motion, they were looking at -- they were looking at the books

22   so that --

23   Q.   Can you -- can you read the bottom entry on page 2?  It's

24   Bates-stamped BRE830.  It begins with "Gary"?

25   A.   "With the current" -- "Gary, with the current activity I

**Gary Pudles - Cross**

Page 40

1   wanted to look at the various books.  They're on my table in

2   my office.  Please let Betty know to take them from my office.

3   I didn't look at them; and if Betty is making a copy for you,

4   will you have her make a copy for me.  Thanks."

5   **Q.**  Okay.  And that's how you found the location of the

6   books?

7   A.   Well, that's how I found whatever I found.  I don't think

8   we ever got them all back.

9            MR. MITTS:  Okay.  Your Honor, that's all I have for

10  Mr. Pudles at this time.

11           THE COURT:  Very well.

12           Mr. Rhoads, how much do you have?

13           MR. RHOADS:  Probably about ten, fifteen minutes,

14  Your Honor.

15           THE COURT:  Pardon me?

16           MR. RHOADS:  I just -- excuse me.  I probably have

17  ten or fifteen minutes.  I just --

18           THE COURT:  All right.  Let's take our mid-morning

19  break.

20           MR. RHOADS:  Thank you.

21      (Recess from 11:17 a.m. until 11:34 a.m.)

22           MR. RHOADS:  Thank you.

23           Good morning, Mr. Pudles.

24           THE WITNESS:  Good morning.

25           MR. RHOADS:  Counsel.

**Gary Pudles - Cross**

Page 41

1                           CROSS-EXAMINATION

2     BY MR. RHOADS:

3     Q.   Mr. Pudles, I'd like to ask you about certain documents

4     that we have produced -- I should say, that AnswerNet has

5     produced in the course of this litigation.

6     You have been the supervisor of Betty Babjak since she came to

7     work at AnswerNet in May of 2006, is that correct?

8     A.   Correct.

9     Q.   Her direct report, as some might say; is that right?

10    A.   Correct.

11    Q.   She testified that when she received the request for

12    inspection of documents by Barbara Robertshaw, as a

13    shareholder, in October of 2011, that she called the Mitts

14    firm and she called you.  Do you recall her calling you?  And

15    reporting that to you?

16    A.   Yes.

17    Q.   Do you recall Ms. Babjak telling you that she wished to

18    retain the outside law firm of Mitts Milavec to represent

19    AnswerNet's interests?

20    A.   Yes.

21    Q.   And did you approve that?

22    A.   Yes.  Immediately.

23    Q.   All right.  I'd like to refer to several documents in the

24    binder; but before I do, did you and Ms. Babjak have a typical

25    practice of her keeping you informed of what outside counsel

Gary Pudles - Cross

Page 42

1    was doing when she would engage outside counsel on behalf of

2    the company?

3    A.   Yes.

4    Q.   Were you typically copied on letters or provided with

5    copies of letters that outside counsel was sending on the

6    company's behalf?

7    A.   In this matter?

8    Q.   Yes, in this matter.

9    A.   Yes.

10   Q.   All right.  Why don't you first turn to what's

11   Defendant's Exhibit 373.  It's in the binder that has the last

12   set of exhibit numbers; 373.

13            UNIDENTIFIED MALE:  Six?  Volume 6?

14            MR. RHOADS:  Volume 6, right.

15        (Pause)

16            THE WITNESS:  I see it.

17   BY MR. RHOADS:

18   Q.   Okay.  This is an e-mail from Maurice Mitts.  He was

19   AnswerNet's outside counsel at this time, is that right?

20   A.   Correct.

21   Q.   Dated October 19th 2011, addressed to Mr. Fitzpatrick, is

22   that right?

23   A.   Correct.

24   Q.   You were not copied, at least shown as a copy on this e-

25   mail.  At some point in time did you become aware that Mr.

**Gary Pudles - Cross**

Page 43

1    Mitts sent an e-mail to Mr. Fitzpatrick on October 19th,

2    advising Mr. Fitzpatrick that the Mitts firm was acting as

3    counsel to AnswerNet?

4    A.   I believe so.

5    Q.   Okay.  This e-mail says, in the second line, "Please

6    provide us with the list of the information you seek and we

7    will promptly reply to your inquiry."

8    Was it your understanding that that's what Mr. Mitts would be

9    doing in the first few days of the engagement?

10   A.   Yes.

11   Q.   Were you aware then that in the next few days Mr.

12   Fitzpatrick sent to AnswerNet both a request for -- or, a

13   demand for inspection on behalf of Barbara Robertshaw -- well,

14   first of all, let me leave it at that.  Were you aware of that

15   demand?

16   A.   I was.

17   Q.   All right.  And did you also become aware of another

18   letter, also on October 20th, which we -- other witnesses have

19   talked about here, where Mr. Fitzpatrick took the position

20   that Barbara Robertshaw, together with her interest in

21   Executel, controlled more than fifty-one percent of the

22   AnswerNet shares?

23   A.   I remember seeing the letter where they said that.

24   Q.   Okay.  If you turn next to Exhibit 378, which is a letter

25   dated October 25th from Stanley J. Milavec of the Mitts

**Gary Pudles - Cross**

1    Milavec law firm to Emmett Fitzpatrick.  Do you see that?

2    A.   I do.

3    Q.   And in writing to Mr. Fitzpatrick, if you look at the

4    third paragraph, he says, "Second, you represented in one of

5    your letters that Barbara Robertshaw and Executel

6    Communications Corporation collectively hold fifty-one percent

7    of the shares of AnswerNet Inc.  Please explain how you

8    arrived at this conclusion as this does not correspond to the

9    AnswerNet corporate records."

10   Now, I see that you are copied or shown as a CC on this

11   letter.  Do you recall seeing this letter at or about the time

12   it was sent?

13   A.   I recall receiving this letter, yes.

14   Q.   At or about this time, had mister -- October 25th, had

15   Mr. Fitzpatrick provided AnswerNet or its attorneys, as far as

16   you know, with any information to establish Barbara

17   Robertshaw's right to vote more than fifty-one percent of the

18   shares?

19   A.   No.

20   Q.   If you would turn next to Exhibit 371.

21   This is a letter, again, on -- this is on Mitts Milavec

22   stationery from Maurice Mitts, November 1st.  In other words,

23   it's about a week after the letter we just looked at, at 378.

24   Do you see this?

25   A.   I do.

**Gary Pudles - Cross**

Page 45

1    **Q.**   You're not shown as a CC on this letter, but do you

2    recall receiving this letter to Mr. Fitzpatrick?

3    A.   I do remember seeing this letter.

4    **Q.**   Okay.  And in this letter Mr. Mitts is explaining to Mr.

5    Fitzpatrick the reason why he believes, based on information

6    presently available to him as AnswerNet's counsel, that Ms.

7    Robertshaw does not have the right to call a special meeting

8    of the shareholders because she doesn't hold more than fifty-

9    one percent of the stock; is that right?

10   A.   Correct.

11   **Q.**   In the third paragraph of this letter, you see Mr. Mitts

12   says, "Please be aware, however, that this firm has had

13   limited time to review AnswerNet's records and its

14   investigation with respect to AnswerNet's records is ongoing."

15   Was that true at the time?

16   A.   It was.

17   **Q.**   He goes on to say, "In that regard, I remind you that in

18   his October 24th 2011 letter to you, Stan Milavec requested

19   that you explain your contention that Barbara Robertshaw and

20   Executel Communications Corporation collectively own fifty-one

21   percent of the stock of AnswerNet.  To date we have not

22   received any reply or explanation from you."

23   Was that true that as of the date of this letter, November 1st

24   2011 that AnswerNet or its attorneys had not yet received any

25   explanation as to how Barbara Robertshaw held fifty-one

Gary Pudles - Cross

Page 46

1    percent or more of the shares?

2    A.    Correct.

3    Q.    And in closing, Mr. Mitts goes on to further -- or, renew

4    his request for information that would establish Barbara

5    Robertshaw's ownership interest in fifty-one percent or more

6    of the stock; is that right?

7    A.    Correct.

8    Q.    Let's turn to 372 then.  It's the next exhibit.

9    A.    Thank you.

10   Q.    See, this is also a letter from Maurice Mitts to Emmett

11   Fitzpatrick, this time dated November 10th 2011.  You are not

12   shown as a CC on this letter.  Do you recall receiving or

13   reviewing this at some point in time?

14   A.    I do.

15   Q.    Was this letter also in furtherance of the Mitts firm's

16   representation of AnswerNet as Betty Babjak had engaged them?

17   A.    Yes.

18   Q.    If you look at the second paragraph, it says, "The

19   information we reviewed as outside counsel in making an

20   initial determination that Barbara Robertshaw and Executel

21   Communications Corporation do not appear to hold fifty-one

22   percent of the outstanding shares of stock of AnswerNet are

23   contained within these documents and is summarized in a cap

24   table therein."

25         I neglected to mention that the first paragraph -- excuse

**Gary Pudles - Cross**

Page 47

1    me -- the second paragraph refers to enclosing certain

2    records; is that right?

3    A.    Correct.

4    Q.    Okay.  In other words, he says he's enclosing copies of

5    the records that were provided to Mr. Fitzpatrick at the

6    October 28th document inspection, correct?

7    A.    Yes.

8    Q.    All right.  Mr. Mitts goes on to say in the paragraph I

9    was just reading from, the third -- it's actually the third

10   paragraph.  "Please be aware, however, that our investigation

11   into the precise shareholdings of AnswerNet is ongoing."

12   And he goes on later to say, with -- in the next paragraph,

13   "With respect to that investigation, I'm reminding you of two

14   items I raised in my November 1st letter to you which you did

15   not address in your November 2nd response."

16        And he goes on to again request information from Mr.

17   Fitzpatrick to substantiate Barbara Robertshaw's claim to

18   fifty-one percent or more control of the shares; is that

19   right?

20   A.    Correct.

21   Q.    As far as you know, was any such information forthcoming

22   to AnswerNet or its attorneys?

23   A.    Mr. Fitzpatrick refused to provide the information

24   requested.

25   Q.    This is November 10th.  As you were sitting here in the

**Gary Pudles - Cross**

Page 48

1    courtroom earlier this week you heard testimony regarding

2    Defendant's Exhibit 175, which was the compilation of

3    documents, with a cover page that said, you know, "Documents

4    reviewed by Emmett Fitzpatrick on November 22nd 2011";

5    correct?

6    A.    Correct.

7    Q.    All right.  So the documents I've just read from are the

8    ones that led up to arranging for that second inspection and

9    exchange of documents that occur with Mr. Fitzpatrick on the

10   22nd of November, correct?

11   A.    That's my understanding, yes.

12   Q.    Throughout the time of these documents I've just reviewed

13   with you, was the Mitts firm acting on behalf of AnswerNet in

14   conducting the investigation and providing certain opinions to

15   AnswerNet with regard to the share ownership as between the

16   shareholders?

17   A.    Since the day we got the -- Ms. Babjak got the call and

18   letter from Mr. Fitzpatrick, the Mitts firm has been acting as

19   our counsel in all matters relating to this -- to the share

20   ownership of AnswerNet.

21   Q.    And did the Mitts firm in fact conclude and continue to

22   conclude that the share ownership -- the control of the

23   AnswerNet board by virtue of share ownership, and you, Mr.

24   Pudles, and Cerida Investment Corporation, is the controlling

25   interest in the corporation?

**Gary Pudles - Cross**

Page 49

1    A.   Yes.

2    **Q.**   And did you also ask the Mitts firm for an opinion with

3    respect to your authority as the president of Cerida

4    Corporation to vote the shares of -- that Cerida holds in

5    AnswerNet.

6    A.   Yes.

7    **Q.**   Did they provide you with that opinion?

8    A.   They showed me the law which supported that position,

9    yes.

10           MR. RHOADS:  All right.  Thank you very much.  That's

11   all the questions I have.

12           THE WITNESS:  If you may, Your Honor, I have one

13   quick thing?

14   I ask the -- just to -- I'm just going to quickly read into

15   the record --

16           THE COURT:  Wait a minute.  Who's speaking?  I'm

17   sorry.

18           THE WITNESS:  I'm sorry.  That's me, Your Honor.

19   That's --

20           THE COURT:  Oh.

21           THE WITNESS:  Just two -- very, very brief --

22           THE COURT:  Okay.

23           THE WITNESS:  The briefest of things.  I promise.

24   I'm reading N15.  And in N15 -- I want to point out that the

25   date of this is before the distribution and -- and I just want

**Gary Pudles - Redirect**

Page 50

1    to read into the record -- no, I think I've already read that.

2    Never mind.  That's -- I have nothing, Your Honor.

3               MR. FLAMM:  I just have two questions left.

4               THE COURT:  Of course.

5          (Pause)

6                    REDIRECT EXAMINATION

7    BY MR. FLAMM:

8    **Q.**  Mr. Pudles, I've given you a document that I have not

9    marked as an exhibit, but I'd ask you just to -- I note you're

10   looking at it.  Tell me when you're done.

11   A.   I see it.

12   **Q.**  Could you read the title?

13   A.    It says, "Plaintiff Barbara Robertshaw's request for

14   production of documents directed to Defendant Gary Pudles."

15   **Q.**  Do you recall receiving that?

16   A.   I don't.  I don't.  I'd have to look on my computer

17   and -- but I don't recall receiving this.

18   **Q.**  Do you deny receiving it?

19   A.   I don't recall receiving it.

20   **Q.**  Okay.  Can you look at item 13?

21   A.   I see it.

22   **Q.**  What's that ask for?

23   A.   "Any and all share certificates, LLC certificates,

24   agreements or other documents which reflect, relate to or in

25   any way reference Cerida Investment Corp.'s ownership of any

**Gary Pudles - Redirect**

1    interest in any other legal entity."

2    **Q.**  And that is directed at you personally, is it not?

3    A.   It is, but -- me pers -- in my personal capacity, I

4    wouldn't have authority to give away Cerida Inc. doc -- Cerida

5    Corporation documents.  If they were Cerida documents -- I

6    don't recall ever seeing this, but I do recall -- I do know

7    that we gave you all of the corporate documents that we had in

8    AnswerNet.  I don't recall this document, and I don't recall

9    my response to this document.  Do you have my response to this

10   document?

11            MR. FLAMM:  I think we'll mark that as -- and I'll

12   have to get a copy of it, Your Honor, subsequently -- as

13   Plaintiff's Exhibit --

14            UNIDENTIFIED MALE:  Zero two.

15            MR. FLAMM:  What?

16            UNIDENTIFIED MALE:  Zero two.

17            MR. FLAMM:  Plaintiff's Exhibit O2.

18            UNIDENTIFIED MALE:  Oh two, not zero.

19            MR. FLAMM:  Oh two.  Oh as in Oscar.  Two.

20            MR. MITTS:  Your Honor, Mr. Flamm didn't have an

21   extra copy.  Is it okay if I just walk up and look at the copy

22   that the witness has?

23            THE COURT:  Of course.

24       (Pause)

25   BY MR. FLAMM:

**Gary Pudles - Redirect**

1    Q.   Do you remember the Court ordering you to supply

2    documents?

3    A.   No.

4    Q.   Okay.  You don't recall that.

5    A.   No.  Do you have a copy of a court order or a reply from

6    me that was then objected to by you?

7    Q.   And you have been representing yourself throughout this

8    proceeding.

9    A.   I have been representing myself.  And I don't recall

10   receiving this, I don't recall a court order ordering me

11   personally to do anything.  And I don't recall ever -- if I

12   would have received it, I would have responded to this; and I

13   don't recall ever responding to this.  So if you have a

14   response, then I can look at what my response was to this

15   request.

16   Q.   So is it your testimony that you did not receive the

17   document marked zero -- oh two.

18   A.   My testimony is I have no idea what this is.  I don't

19   recall it, I don't -- I'm not saying I didn't receive it, I'm

20   not saying -- I'm saying I don't recall ever receiving it.  I

21   don't recall ever working on it.  But that --

22   Q.   You may -- you may --

23   A.   But I'm running -- but I'm running a number of businesses

24   simultaneously as handling this case, so I can't say for sure.

25   There's discovery coming at me in many different forms, so --

Gary Pudles - Redirect

Page 53

1   **Q.**  All I'm trying to separate here is whether you're denying

2   it or whether you're saying you have no recollection

3   whatsoever.

4   A.   I don't have a recollection.

5          MR. FLAMM:  Thank you.

6   I have no further questions.

7          MR. MITTS:  Your Honor, I just have a quick point of

8   clarification for the Court.

9          Well, Mr. Pudles may not remember, though, as I have

10  a copy of the docket entries from this case.  And there was a

11  motion for protective order that Mr. Pudles filed relating to

12  this document request, because this document request, which

13  was served and due -- was served in January and due to be

14  responded to the last day of discovery, requested fifteen

15  years of information.  And Judge Restrepo, docket entry number

16  114, entered a protective order relieving Mr. Pudles from any

17  obligation to respond to this, because he, in a written

18  opinion, said that there was abuse of conduct [sic] by

19  Plaintiff's counsel in serving such a massive document request

20  to be responded to on the very last day of the third discovery

21  extension.  And there was an opinion in this case to that

22  effect.

23         MR. FLAMM:  Document was simply offered because the

24  witness said he was never served with any discovery.  That's

25  not true.

Colloquy

1          THE COURT:  Anything else?

2          MR. FLAMM:  No further questions, Your Honor.

3          THE COURT:  All right.  The witness may step down.

4          THE WITNESS:  Thank you.

5      (Pause)

6          MR. MITTS:  Your Honor, I don't know the Court's

7   preference in terms of timing.  Would you like -- I have

8   another witness.

9          THE COURT:  Yes, let's call him for --

10         MR. MITTS:  May --

11         THE COURT:  -- for about, you know, twenty-five

12  minutes.

13         MR. MITTS:  Perfect, Your Honor.  Thank you so much.

14  The witness is out in the hall.  It is John Mitchell, the

15  accountant auditor.

16         THE COURT:  Fine.

17         MR. MITTS:  Your Honor, also, just before we begin,

18  as a housekeeping matter, yesterday your Clerk asked me for a

19  better copy of the September 4th 2003 Waterside letter,

20  because it was -- it's -- actually, the letter's been faxed

21  three times.  I have my team going through, finding a cleaner

22  copy.  In the meantime what I did was I had it blown up on

23  eleven-by-seventeen paper, and I have marked it for

24  Identification.  I call it blowup D175, because it's within

25  D175, and it's sub-Exhibit 4 to that document.  I've provided

John Mitchell - Cross

Page 55

1    a copy to Your Honor, to opposing counsel.  I just wanted to

2    state it for the record.

3            THE COURT:  Thank you very much.

4            MR. MITTS:  And this is what has that -- the table on

5    page 3, the before, during and after?

6            THE COURT:  Right.

7            JOHN MITCHELL, DEFENDANT'S WITNESS, SWORN

8                   DIRECT EXAMINATION

9    BY MR. MITTS:

10   **Q.**   Mr. Mitchell, can you position yourself in such a way

11   that you can speak directly into the mic?  It makes a big

12   difference in the sound quality of the room, we've discovered.

13           Can you tell His Honor what your profession is, please.

14   A.   I'm a certified public accountant.

15   **Q.**   Okay.  And where do you work?

16   A.   Currently the name of the firm is G3 CPAs of

17   Pennsylvania.  I'm the managing partner of the firm.

18   **Q.**   Okay.  And what was the name of the firm prior to being

19   G3?

20   A.   Prior to G3 it was Gold Gocial Gernstein.  Prior to that

21   it was Gocial Gernstein.  Prior to that it was Gocial and

22   Company.

23   **Q.**   Okay.  If you could, please, give His Honor just a little

24   background, your education and employment experience.

25   A.   Okay.  I am a graduate of La Salle University, 1977.  I

John Mitchell - Cross

Page 56

1    have been a licensed certified public accountant since 1979.

2    I have worked in the field of public accounting my entire

3    working career, have been with my current firm in its prior

4    iterations since about 1991.

5    Q.   Okay.  Do you -- in addition to providing accounting

6    service, do you also provide audit services?

7    A.   Yes, my practice involves accounting, auditing, financial

8    reporting, litigation consulting, expert witness testimony,

9    business valuations, things of that nature.

10   Q.   Have you testified in court proceedings before?

11   A.    Many times, yes.

12   Q.   Okay.  Have you been qualified as an expert previously?

13   A.   Yes, I have.

14   Q.   Okay.  Are you familiar with the company AnswerNet?

15   A.   Yes, I am.

16   Q.   Can you tell His Honor how you came to be familiar with

17   that company?  And what would be helpful is for you to give a

18   historical perspective.

19   A.    Well, before there was AnswerNet, I knew Gary Pudles

20   through -- our kids went to preschool together.  Gary moved

21   into the same neighborhood that we lived in, in Lafayette

22   Hill; got to know Gary through the synagogue and through

23   preschool; and Gary was a practicing attorney at that time

24   that was general counsel for some other privately-held

25   businesses but, you know, Gary used to talk a lot about

John Mitchell - Cross

Page 57

1    developing his entrepreneurial spirit.  So I've probably known

2    Gary since about 1995, 1996.  At some point, 1997, 1998, Gary

3    left his prior employment, where he was general counsel, and,

4    if I remember this correctly, went onto the internet, found a

5    business that he thought that he could enter into, the tele

6    services, the telemessaging business, and sought out to

7    acquire a telemessaging company.

8    **Q.**   Okay.  And do you know what -- anything about the

9    creation of AnswerNet?

10   A.    Yes, I do.  I worked with Gary -- this was really before

11   he became a client.  He identified a company, a telemessaging

12   business, in the Princeton, New Jersey area, that I helped

13   Gary do some due diligence.  The owner of that business, after

14   a fairly protracted period, decided that he was not going to

15   sell that business; but we were up in the Princeton area

16   and -- I don't know how the name Bill Robertshaw came up or

17   what the exact connection was, but Gary and myself wound up in

18   Bill Robertshaw's office in Princeton, after this failed

19   attempt to buy the other business, and we had a three-way

20   meeting -- or, it was really a meeting between Bill and Gary,

21   and I was just observing.  And at that point, you know, Bill

22   looked at Gary and said something along the lines that "you

23   know what, you're a bright young guy, I'm sorry that Sandy did

24   not want to sell his business to you, but we own a number of

25   these businesses and I'm going to give you a chance to" -- you

John Mitchell - Cross

Page 58

1    know, "perhaps we can do something, you can be my daughter's

2    partner in one of these."  His daughter being Barbara,

3    obviously.  And at that --

4    **Q.**   What year are we in?

5    A.   This was -- this is, I think, 1998.

6    **Q.**   Okay.

7    A.   And that's how it all started, really out of a failed

8    attempt to buy another business, where the owner decided not

9    to sell, he met Bill; and AnswerNet was born, thinking

10   sometime in the spring, early summer of 1998.

11   **Q.**   Okay.  Were you present with any discussions about what

12   the ownership interests were going to be between Barbara

13   Robertshaw and Gary Pudles?

14   A.   With respect to AnswerNet -- and AnswerNet started with a

15   company called Tel-A-Talk, which was based in Allentown; and

16   Gary, in effect, acquired a fifty percent interest in that

17   business from the Robertshaws.  Really, from -- from day one

18   it was equal partners, fifty-fifty; and that's the way that

19   the relationship was set up.

20   **Q.**   Was it also that same fifty-fifty with respect to

21   acquisitions?

22   A.   I believe so.  I believe so.  After AnswerNet was

23   established with -- with Tel-A-Talk, and then Signius was

24   acquired, and then after that this company Cerida was formed

25   to do another acquisition; and that was a fifty-fifty company

John Mitchell - Cross

Page 59

1    with Barbara and with Gary; and -- and again, my

2    understanding, just in talking to the parties over the years,

3    primarily Gary, was that, whenever there were opportunities,

4    they were to be brought to the partners, with the idea being

5    that they would each have the opportunity to invest in these

6    deals on a fifty-fifty basis.

7    Q.   Okay.  And the partners that you're referring to are?

8    A.   Really, Gary as one fifty -- as one side of the fifty and

9    Barbara as the other side; but Barbara was also, you know,

10   kind of behind the scenes; and her father, Bill Robertshaw,

11   was in effect Barbara's proxy for -- for many of these deals.

12   Q.   When do you start doing the accounting or audit work for

13   AnswerNet and the growing family of companies?

14   A.   It would have been after the first acquisition in 1998,

15   because as a result of that AnswerNet, at the outset, had some

16   outside equity in it; and those outside investors required

17   audited financial statements.  So, really, with the very first

18   year we did audited financial statements of AnswerNet and did

19   all of the tax work for the companies from inception, and

20   continue to this day.

21   Q.   Did you have an opportunity, when AnswerNet's offices

22   were in New Jersey -- in Princeton, New Jersey, to observe the

23   working relationship between Mr. Robertshaw and Gary Pudles?

24   A.   Yes, I did, many times.

25   Q.   Can you describe that relationship to His Honor, please.

John Mitchell - Cross

Page 60

1    A.    It was cordial.  Offices side by side.  In many respects,

2    it was like father-son, big brother-little brother.  You know,

3    Bill loves the art of the deal, Bill loves doing deals.  He

4    had a very energetic, outgoing partner in Gary who also lived

5    to do deals; and I remember, you know, Gary spent many a --

6    many years driving from the Lafayette Hill area up to

7    Princeton; and I think -- you know, a long commute every day,

8    but he got to sit there and talk and do business with Bill.

9    And I mean, that was -- when we would go out there to do the

10   audits and whatnot, you know, I think there was really a

11   pretty good spirit in the office; and there was a lot of

12   communication back and forth.  And when Bill was in town, he

13   and -- he and Gary were pretty tight and, you know, talked

14   daily.  Did a lot of great stuff -- did a lot of great things

15   together.

16   Q.    You said in one of your earlier answers that Mr.

17   Robertshaw was a proxy for Barbara Robertshaw.  What did you

18   mean by that?

19   A.    Bill had always related to me that, you know, Barbara was

20   an investor, Barbara liked to stay behind the scenes.  Bill,

21   for the most part, represented Barbara's interests in many of

22   these things.  When Bill and Gary, you know, did the first

23   deal in Allentown for Tel-A-Talk, it was a company that

24   Barbara owned but, you know, Bill was the guy that was kind of

25   managing the day-to-day relationship with Gary.  So most of --

John Mitchell - Cross

1    most of Gary's dealings with Bill, when it came time to the

2    actual finances and the ownership of the company -- you know,

3    when they formed Cerida to do acquisitions, it might have been

4    Bill and Gary doing the acquisitions, but Barbara was the

5    partner on paper.

6    Q.   Okay.  What was your level of access to Mr. Robertshaw?

7    A.   Totally unfiltered.  In addition to having a very open

8    relationship with Gary, I've also enjoyed having a very open

9    relationship with Bill over the years.  Bill could call me at

10   any time.  Bill and I have had numerous discussions over the

11   years on any number of topics.  And, you know, it was -- it

12   was free -- free and open, with no restrictions.

13   Q.   Do you also do either accounting or audit work for any of

14   the Robertshaw companies?

15   A.   We do audit and tax work for one company in which Barbara

16   is one of the primary shareholders that Gary is not a

17   shareholder.  That company is called Endicott.  And that's a

18   company that has seven or eight or ten different shareholders.

19   Q.   And Mr. Pudles is not one of them.

20   A.   Mr. Pudles is not one of those, no.

21   Q.   Okay.  Now, you said -- you made a reference to

22   acquisitions through Cerida.  Can you explain what you were

23   referring to?

24   A.   The way that the company grew is that AnswerNet was the

25   first company, and AnswerNet was initially owned fifty-fifty

John Mitchell - Cross

1    by Barbara and Gary.  In order to fund some additional

2    acquisitions, Gary went out and attracted outside investor

3    capital.  The group was called Waterside.  They owned some

4    preferred stock for a period of years.

5    I think Gary at that point decided that if he was going to

6    expand AnswerNet or expand in the telemessaging business, he

7    wanted to make money for himself, Barbara and Bill, and not

8    necessarily for Waterside.  So from 1998 and then 2000, Gary

9    and Bill did a -- what turned out to be a phenomenal

10   acquisition with this company called Signius, which is really

11   the biggest individual company.

12   Signius was acquired from a group of private equity types that

13   had, you know, taken a forty or fifty million dollar revenue

14   company, burned through forty or fifty million dollars of

15   investor capital, ran it into the ground; and Bill and Gary,

16   you know, together, bought it for literally 100,000 dollars

17   and nurtured the company back to life and made it into a

18   phenomenal success story.  But in buying Signius, that

19   business also had outside investors in it, legacy investors,

20   some shareholders that had owned Signius shares and continued

21   to own Signius shares up until 2007.  So it was not a fifty-

22   fifty/Barbara-Gary company.

23        A couple of years later -- and again, I'm not sure where

24   the lead came from, but the company Cerida was formed; and it

25   was formed to acquire an outbound marketing company in the

John Mitchell - Cross

Page 63

1    Boston area; I think, by the name of Cerida.  And at that

2    point Cerida was formed as a fifty-fifty company, Barbara and

3    Gary; and that became the acquisition vehicle.  And most of

4    the other acquisitions that happened after that time all were

5    funneled into Cerida.  And again, my discussions with Gary,

6    and recollection is, let's put all of the new stuff into

7    Cerida so we don't have to share it with the Watersides of the

8    world and we don't have to share it with some of the legacy

9    Signius investors.

10   Q.   Was Mr. Robertshaw also privy to those conversations, and

11   involved in them?

12   A.   With respect to Cerida -- Mr. Robertshaw -- in my mind,

13   Mr. Robertshaw was privy to everything.  You know, the way

14   that it -- the way that it worked -- after the Signius

15   acquisition, which was on March 1st 2000, you know, Mr.

16   Robertshaw pretty much became the hands-on operating manager

17   for that business.  Gary was the hands-on operating manager

18   for the AnswerNet business and for the Cerida businesses.  And

19   that's how they divided the operational responsibility.

20   Q.   I'd like to now take you to the 2003 time period.  With

21   respect to Waterside Capital Corporation, do you know that in

22   2003 there was a sale of some of the warrants that Waterside

23   Capital held in AnswerNet to Executel?

24   A.   Yes.  I'm aware of that, yes.

25   Q.   Okay.  Can you tell His Honor what your historic

John Mitchell - Cross

Page 64

1   understanding is of that.

2   A.   My historic understanding was that as part of their

3   preferred stock deal --

4            THE COURT:  Can we establish first what personal

5   knowledge he has of it?  Not what his understanding of it is.

6            MR. MITTS:  Much better, Your Honor.  Thank you.

7            THE COURT:  Yeah.  I want to know what he had to do

8   with it.

9            MR. MITTS:  Okay.

10   BY MR. MITTS:

11   Q.   His Honor's request for clarification is an excellent

12   question.  Can you explain what your involvement and source of

13   knowledge is about the Waterside deal back in the day.

14   A.   Back in the day, my source of knowledge would have been

15   receiving the documents and the correspondence between

16   Waterside and Executel, where Executel acquired -- I believe

17   the number was 52,900 shares of warrants which were converted

18   into shares of AnswerNet stock.  And that was all part of the

19   Waterside warrant package as part of their preferred stock

20   holdings in AnswerNet.

21            THE COURT:  Well, counsel, if he's only testifying

22   about what he knows from documents that are in evidence and

23   had nothing to do with the transactions themselves, I don't

24   know that his testimony is going to be particularly helpful.

25   BY MR. MITTS:

John Mitchell - Cross

Page 65

1    **Q.**  Did you have any involvement in the way in which the

2    books and records of AnswerNet were reflecting the treatment

3    of the Waterside warrants back in the day?

4    A.   The -- well, at the AnswerNet level, once -- once

5    Executel acquired the AnswerNet warrants, Executel became a

6    shareholder of AnswerNet; and AnswerNet's capital stock

7    structure changed as a result of that.  That would have been

8    something that was reflected in our audited financial

9    statements.

10   **Q.**  Okay.  And is that something that your team was working

11   on in terms of creating?

12   A.   Recording.  Recording the transactions based on the

13   documents that had been given to us that evidenced the

14   purchase of the warrants by Executel.

15   **Q.**  Now, in addition --

16        MR. FITZPATRICK:  Your Honor, I have an objection.

17   And I move to strike that.  The question to the witness was,

18   "Did you have any involvement in AnswerNet's treatment of that

19   transaction on its books and records."  And the witness

20   replied that his only involvement was his treatment in his own

21   financial statements, not AnswerNet's.  So it's not responsive

22   to the question.

23        MR. MITTS:  No, he said this is AnswerNet's audited

24   financial statements.

25        THE COURT:  Well, he explained what his part -- what

John Mitchell - Cross

Page 66

1    he did.  That's what I really wanted --

2                MR. FITZPATRICK:  Very well, Your Honor.

3                THE COURT:  So that's -- that's fine.  Let's move on.

4                MR. MITTS:  Sure.

5    BY MR. MITTS:

6    Q.   Now, with respect to the deal with Executel, did you also

7    understand that Executel, in 2003, for 5,000 dollars, bought

8    an option on another three percent of Waterside's warrants in

9    AnswerNet?

10   A.   I knew that there was another transaction between

11   Executel and AnswerNet but was not aware of the purchase price

12   or the fact that it was an option.

13   Q.   Okay.  In -- let's go -- let's go -- bless you.

14   Let's go forward to the 2006 period.  Do you know what

15   happened with the Executel option for three percent of the

16   Waterside warrants?

17   A.   The Executel option was purchased by Cerida.

18   Q.   Okay.  And how do you know that?

19   A.   Because at that time, in addition to doing the audit of

20   AnswerNet, we were also doing compiled financial statements

21   for Cerida; and that was prior -- and then also we were doing

22   the Cerida tax returns; so we were, you know, doing, in

23   effect, the year-end accounting for all of the,

24   "Pudles/Robertshaw entities".

25   Q.   Okay.  If we were to look at the 2006 Cerida financial

John Mitchell - Cross

Page 67

1  statements and the 2006 Cerida tax returns, would the source

2  of the funds for the exercise of that warrant be evidenced

3  there?

4  A.   Uh --

5  Q.   I mean, for the -- I didn't say -- I said "exercise."  I

6  meant, purchase of the warrant be reflected there.

7  A.   Yes, it would.

8  Q.   Mr. Mitchell, there are a number of big black binders in

9  front of you.

10  A.   Yeah, I see.

11  Q.   One of them is -- one of them is volume two of

12  Plaintiff's Exhibits -- I'm sorry -- Defendant's Exhibits.

13  And it goes from 176 to 206.  Do you have that before you?

14  A.   I do, yes.

15  Q.   Okay.  Can you ident -- let me let you get there first.

16  I'm sorry.

17  A.   I'm in the binder.

18  Q.   Okay.

19  A.   What tab number?

20  Q.   Tab number 203, please.

21  A.   Okay.  I'm there.

22  Q.   Okay.  First, can you identify this document for His

23  Honor?

24  A.   This is the compiled financial statement for Cerida for

25  the years ending December 31st 2007 and 2006 that was prepared

John Mitchell - Cross

Page 68

1    by my firm.

2    Q.   Okay.  Is there any doc -- any portion of the financial

3    statement that would show the source of funds for the exercise

4    of the -- I'm sorry -- for the purchase of the Waterside

5    warrant by Cerida in this document.

6    A.   This will show what happened in 2007.  By looking at the

7    consolidated balance sheet, you can see that the investment in

8    AnswerNet warrants increased from 731,000 to 981,000, 250,000

9    dollars, during the year 2007.

10   Q.   Now, I'd like to direct your attention.  You'll see at

11   the lower right-hand corner of each page there is a Bates

12   number.  Go to page BRE207.  And let me know when you're

13   there.

14   A.   I am there.

15   Q.   Okay.  About three-fourths of the way down, under the

16   non -- the heading "non-investing and financial activities,"

17   the very last entry is "investment in AnswerNet, warrants

18   funded by shareholder loans, 131,000, for the year 2006."

19   A.   That -- that is correct.

20   Q.   Can you explain to His Honor what that is?

21   A.   That was part of the purchase in 2006 of AnswerNet

22   warrants by Cerida, which was really done in two pieces.

23   There was a 250,000-dollar payment to Executel, which is

24   reflected midway up the page, under "cash flows from investing

25   activities," second line, "investment in AnswerNet warrants,

John Mitchell - Cross

Page 69

1   250,000 dollars," as well as the second piece was 131,000

2   dollars, which were shareholder loans, 65,500 dollars to Gary

3   and 65,500 dollars to Barbara, for the second part of that

4   transaction.  The total purchase price for that basket of

5   warrants was 381,000.

6   Q.  Did that consist of 5,000 for the option and 376 for the

7   warrant?

8   A.  I know -- I know the total purchase price was 381; and,

9   again, I had no knowledge that the option itself was 5,000

10  dollars.

11  Q.  Okay.  Now, in addition to the financial statements, did

12  Cerida file tax returns for the year 2006 that would have

13  reflected the shareholder loans that you just testified to?

14  A.  Yes, it would have.

15      (Pause)

16  Q.  Mr. Mitchell, I've handed you a document that we've

17  marked for Identification as Exhibit 402.  Can you identify

18  this for the Court, please?

19  A.  Yes, this is the 2006 Cerida federal income tax return.

20  Q.  Okay.

21      MR. FITZPATRICK:  Your Honor, I'd like to pose an

22  objection at this point.  This is not listed as an exhibit.

23      MR. MITTS:  They -- they -- first they have switched

24  counsel, so --

25      THE COURT:  Pardon me?

John Mitchell - Cross

Page 70

1              MR. MITTS:  They have -- we -- they've got two

2     lawyers that are speaking as to the --

3              MR. FITZPATRICK:  We did -- I apologize.

4              THE COURT:  All right.  I will regard the objection

5     made by Mr. Flamm as made by Mr. Fitzpatrick.

6              MR. FITZPATRICK:  Actually --

7              MR. FLAMM:  The reverse.

8              MR. FITZPATRICK:  The reverse.

9              THE COURT:  All right.  The reverse then.

10             MR. FITZPATRICK:  Sorry.

11             MR. FLAMM:  Thank you.

12             THE COURT:  All right.  You know, without a jury

13    here, I'm not going to worry too much about that rule.  I

14    mean, I'd rather get to the substance of the matter, frankly.

15             MR. MITTS:  Certainly, Your Honor.

16    BY MR. MITTS:

17    Q.  Mr. Mitchell, can you identify this document for His

18    Honor, please?

19             THE COURT:  Well, the question is -- it wasn't listed

20    as an exhibit, is the objection.

21             MR. MITTS:  No, Your Honor, it wasn't, because this

22    was identified as rebuttal to the issue that they raised for

23    the first time in their pretrial.  The very first -- as we

24    developed through the cross-examination of Barbara Robertshaw,

25    the first time that they changed it -- their story, as

John Mitchell - Cross

Page 71

1    Plaintiffs, from Executel owning this three percent to Barbara

2    Robertshaw owning one and a half percent is in the pretrial

3    and in her testimony here.  And so this is offered as rebuttal

4    and impeachment evidence for Barbara Robertshaw's newly-

5    asserted claim of one and a half percent --

6               THE COURT:  Okay.  I will listen to it and reserve

7    judgment on the question.  And as soon as you finish your

8    questioning on this return, we'll take our lunch break.

9               MR. MITTS:  Thank you, Your Honor.

10              MR. PUDLES:  Maurice, on the record, it's also --

11    it's rebuttal to her testimony.

12              MR. MITTS:  Yes.

13    BY MR. MITTS:

14    Q.   Okay.  Mr. Mitchell, can you please identify this

15    document for the record.

16    A.   Yes, this is the 20- --

17              THE COURT:  He has.  He has.

18              THE WITNESS:  Yes.

19              THE COURT:  He's already identified it.

20    BY MR. MITTS:

21    Q.   This is the 2006 Cerida tax return?

22    A.   Correct.

23    Q.   I was asking you a moment ago, is there any portion of

24    the 2006 Cerida tax return which reflects the shareholder

25    loans from Mr. Pudles and Ms. Robertshaw to Cerida for the

John Mitchell - Cross

Page 72

1    purchase of the stock warrants from Waterside?

2    A.   If you turn to page 4 of the tax return, Schedule L,

3    which is the balance sheet -- Cerida's balance sheet.

4    Q.   Yes, I have it.

5    A.   Line 19 of Schedule L is loans from shareholders?

6    Q.   Yes.

7    A.   And the balance at the beginning of the year, January 1st

8    2006, was 129,057?

9    Q.   Yes.

10   A.   The balance of loans from shareholders at the end of the

11   year, December 31st 2006, is 260,057.  The difference is

12   131,000 dollars, which is the 265,500 dollar notes, one from

13   Gary, one from Barbara.  It's the same 131,000 that was

14   reflected in the compiled financial statement that we looked

15   at a moment ago.

16   Q.   Okay.  And was this tax return prepared by your firm?

17   A.   Yes, it was.

18   Q.   And was the information in this return shared with the

19   Robertshaws?

20   A.   The process at the time -- and I just want to be exactly

21   clear here.  The process at the time is that Gary was -- had

22   primary responsibility for reviewing the AnswerNet and the

23   Cerida returns.  Bill had primary responsibility for reviewing

24   the Signius returns.  If Bill -- Bill may have reviewed this

25   return, but he probably would have reviewed -- if he reviewed

John Mitchell - Cross

Page 73

1    this return prior to its issuance, it probably would have --

2    he probably would have gotten it from Gary.  At any time up

3    until 2011, when this litigation commenced, if Bill had asked

4    us for a copy of this return, we would have given it to him.

5            THE COURT:  Well, that's all -- wait a minute.  He

6    doesn't know.

7            MR. FLAMM:  Right.

8    BY MR. MITTS:

9    Q.   Did you regularly provide information to Mr. Robertshaw,

10   upon his request?

11   A.   All the time, yes.

12   Q.   Did you ever deny his requests?

13   A.   No.

14   Q.   Okay.

15           THE COURT:  All right.  I think we can take our lunch

16   break.

17           MR. MITTS:  Let's take our lunch break, and we'll

18   come back.

19   Oh, Your Honor, what time would you like us back today?

20           THE COURT:  One-thirty, please.

21           MR. MITTS:  Thank you, Your Honor.

22       (Recess from 12:28 p.m. until 1:35 p.m.)

23           MR. MITTS:  May I continue, Your Honor?

24           THE COURT:  Please do.

25           MR. MITTS:  Thank you.

Page 74

1    BY MR. MITTS:

2    Q.   Mr. Mitchell, before the lunch break we were look at

3    Exhibit 402, the Cerida 2006 tax return.

4         In 2002 -- forgive me.  In 2006 who were you working with

5    at the AnswerNet offices on the underlying numbers that you

6    were using for the returns?

7    A.   For the year ended 2006, either -- that specific year

8    Michelle Ju had come over from Signius to help with the 2006

9    AnswerNet and Cerida year-end numbers because the control --

10   AnswerNet's CFO at the time had left right before the start of

11   the year-end tax season.

12   Q.   Okay.  And do you know who Ms. Ju reported to in the

13   Princeton office?

14   A.   Michelle reported to Bill.

15   Q.   Bill Robertshaw?

16   A.   Yes.

17   Q.   Okay.  Now, the shareholder loans that you've identified

18   in the 2006 Cerida tax return, do you know if they appear in

19   the succeeding year's tax returns?

20   A.   They do.

21   Q.   Okay.  Did you have involvement in preparing the 2007 tax

22   return?

23   A.   Yes.

24   Q.   And do they appear in that return?

25   A.   Yes.

Page 75

1  Q.  Okay.  How long do they continue to appear in the Cerida

2  tax returns?

3  A.   They continue up through 2010, and they were repaid in --

4  as -- really through the -- they appear as shareholder loans

5  through the end of 2010; and in 2011, as part of the special

6  distribution, the loans that were payable to Barbara were

7  memorialized in a note; and Gary repaid himself some of his --

8  his shareholder loans as part of that special distribution.

9  Q.  Now, in 2008 do you know anything about the financial

10  transaction of Cerida exercising the Waterside warrants, the

11  three-percent Waterside warrants?

12  A.   In 2008?

13  Q.  Yes.

14  A.  Can you show me a document to refresh my memory?

15  Q.  Sure.

16  Which document would be most helpful to you on that?

17  A.   Well, what I would look for would be a Cerida financial

18  statement in any year in which the warrants were exercised or

19  purchased by Cerida; we would see an increase in the

20  investment in AnswerNet warrants in the Cerida financial

21  statements.  And that happened over a two or three-year

22  period.

23  Q.  Would the AnswerNet general ledger provide this

24  information also?

25  A.   If AnswerNet -- if AnswerNet made a payment, yes, it

John Mitchell - Cross

Page 76

1    would.  If Cerida made the payment, it would be recorded on

2    the Cerida general ledger.

3    Q.   There's a -- I just have a question so I'm making sure

4    that I'm locating the right document for you.

5    I'm looking at, for example, a document that is the combined

6    financial statements for AnswerNet.  Would that include the

7    information that you are looking for?

8    A.   Yes, it would.

9    Q.   Okay.  Then I'd like to direct your attention to --

10   again, we're in exhibit binder number 2.  Exhibit tab 204,

11   please.

12   A.   I'm there.

13   Q.   Okay.  Now, can you show us in this exhibit where you

14   would find the supporting entry regarding the exercise by

15   Cerida of the Waterside warrant?

16   A.   If you look -- if you look at page 2 of that document,

17   which is Bates stamp number 5576, this is a combined balance

18   sheet which includes AnswerNet, its subsidiaries plus Cerida.

19   plus some other commonly-owned entities.

20   Q.   Yes.

21   A.   And in the equity section of that balance sheet, you

22   would see a caption, "Cerida Investment Corp. investment in

23   AnswerNet Inc."

24   Q.   I see it.

25   A.   And it has a --

John Mitchell - Cross

1    Q.    That's the fifth line down -- or, fourth line down?

2    A.    That is the fourth line down.  And it has a balance of

3    1,231,059 for both the year ended December 31st 2011 and 2010.

4    And that represents the cumulative payments that had been made

5    by Cerida to purchase AnswerNet warrants up through the end of

6    2011.

7    Q.    Okay.  Thank you.

8    I'd like to -- since we're in this exhibit, I'd like to direct

9    your attention to note 11 of this exhibit.  It appears on page

10   AN5592?

11   A.    I'm there.

12   Q.    Okay.  You see the heading, "capitalization"?

13   A.    Yes, I do.

14   Q.    Okay.  Can you explain to the Court, please, the

15   significance of this second paragraph with respect to the

16   Cerida shares in AnswerNet.

17   A.    This was a note that was carried over and updated from

18   year to year.  It basically explains -- or, identifies

19   Cerida's acquisition of the AnswerNet warrants over a period

20   of time.  And it just kind of lays out the ownership of all of

21   the entities that are included in the financial statements and

22   which companies -- basically, who owns what.

23   Q.    All right.  And you said this was carried over from year

24   to year.

25   A.    From year to year, it is -- you know, in 2006, 2007, and

John Mitchell - Cross

Page 78

1    maybe 2008.  Cerida was acquiring a chunk of warrants each

2    year.

3    Q.   All right.  Now, you made a reference a moment ago about

4    the distribution to Mr. Pudles and Ms. Robertshaw.  That's the

5    distribution in the summer of 2011?

6    A.   Correct.

7    Q.   Okay.  You understand that Mr. Pudles received a lump-sum

8    payment of 980,000 dollars?

9    A.   Correct.

10   Q.   Okay.  What is your understanding of what Ms. Robertshaw

11   received, and what's the source of that understanding?

12   A.   Ms. Robertshaw also received 980,000 dollars but she did

13   not receive it at the same time as Mr. Pudles.  It was paid

14   out over a period of several months.  My -- the source of my

15   understanding is really an analysis that was prepared by the

16   AnswerNet CFO as to how they would account and fund the

17   special distribution to Mr. Pudles and at the same time make

18   sure that Ms. Robertshaw also received the same amount of

19   dollars in terms of a distribution.  Total gross dollars.

20   Q.   Do you -- you understand she also received interest

21   payments because her payments were over time?

22   A.   Because her payments were made over time, she received

23   interest on her money, and she did.

24   Q.   Now, a few moments ago I was questioning you about the

25   shareholder loans that appear in the tax returns and in the

John Mitchell - Cross

1   Cerida and AnswerNet financial statements.

2   Do you know if the distribution to Ms. Robertshaw had any

3   relationship to those outstanding shareholder loans by her?

4   A.   As part of the distribution to Ms. Robertshaw, all

5   shareholder loans, including the shareholder loan from Cerida,

6   were eventually repaid.

7   Q.   Mr. Mitchell, I'd like to draw your attention to one of

8   the loose exhibits that's before you.  It's been marked for

9   Identification as Exhibit 400 -- D400.  It's a landscape

10  document.

11  A.   I have it.

12  Q.   There are four -- it's entitled "notes payable to Barbara

13  Robertshaw as of August 31, 2011."

14  Were you familiar with these loans prior to the repayment of

15  these loans?

16  A.   Yes, I was.

17  Q.   Okay.  So the amounts of the loans are in the first

18  column, under "principal balance due."  50,985; 50,080; 80,028

19  dollars.  Did you understand that some of these loans had an

20  interest rate on the books of ten percent?

21  A.   Some of them did, yes.

22  Q.   And some of them had an interest rate of zero?

23  A.   That is correct.

24  Q.   Okay.  Do you know from your review of the records of

25  AnswerNet and Cerida if the interest on these loans has been

John Mitchell - Cross

Page 80

1    repaid through the distribution back to Ms. Robertshaw?

2    A.   Yes, through the -- through the 2012 audit and review

3    of -- review and compilation of the various entities, we saw

4    the -- we saw the actual repayments of principal and interest

5    to Ms. Robertshaw.

6    Q.   For accounting purposes, is the payment of loans over

7    time with interest the same as the payment of a lump sum?

8              MR. FLAMM:  Objection, Your Honor.  Calls for a

9    conclusion.  This witness has not been put up there as an

10   expert.  They're posing him as an expert now.  He was never

11   listed as an expert.

12             THE COURT:  Well, just as a matter of common sense,

13   payment over time doesn't give you immediate use of the money,

14   so --

15   BY MR. MITTS:

16   Q.   And what is your understanding, Mr. Mitchell, of the

17   significance of interest?

18   A.   The significance of the interest is really -- it really

19   relates to the time value of money.

20   Q.   Okay.  And it's really the reverse of a present-value

21   calculation, isn't it?

22   A.   That is correct, yes.

23   Q.   Okay.

24             THE COURT:  But the point is, you still don't have

25   the use of the money immediately, do you?

**John Mitchell - Cross**

Page 81

1          THE WITNESS:  No, you do not.

2          THE COURT:  Right.

3    BY MR. MITTS:

4    Q.  Mr. Mitchell, just by way of a little bit more context.

5    I hurried through your background.  In addition to being a

6    certified public accountant, do you hold other professional

7    designations?

8    A.  Yes, along with the CPA designation, I have two specialty

9    credentials issued by the AICPA.

10   Q.  What is the AICPA?

11   A.  The AICPA is the American Institute of Certified Public

12   Accountants.

13   Q.  What are those designations?

14   A.  And those designations -- one is ABV, which is accredited

15   in business valuation.  The other is CFF, which is certified

16   in financial forensics.  I also hold a business valuation

17   credential from the National Association of Certified

18   Valuation Analysts, and that's a CVA, standing for certified

19   valuation analyst.

20          MR. MITTS:  Thank you.

21   Your Honor, I don't have anything further for Mr. Mitchell at

22   this time.

23          (Pause)

24          MR. PUDLES:  I just have three questions.

25                    CROSS-EXAMINATION

John Mitchell - Cross

Page 82

1    BY MR. PUDLES:

2    Q.   First, could you look at N15 in the Plaintiff's binder?

3    Plaintiff N15.  I'm sorry.  N15?  One of the white -- one of

4    the white binders.  N as in Nancy.

5    A.   Finally, I'm there.

6    Q.   Okay.  Thank you.

7    Can you identify that document for the record?

8    A.   This is an e-mail from you to myself, Jay Brower, who is

9    my tax partner, and Cindy Ravitch, who was the CFO of

10   AnswerNet at the time, regarding the funding of the special

11   distribution which was really tied to your payment obligation

12   to Linda in 2011.

13   Q.   And that e-mail was dated what?

14   A.   August 18th 2011.

15   Q.   And in that e-mail were you asked to provide counsel and

16   advice?

17   Maybe if I ask you to look at the -- I believe, the bottom

18   section, the last paragraph; if that will refresh your

19   recollection.

20   A.   Yes.

21   Q.   And -- thank you very much.  Let's move on.

22   I want you to pick up that document.  What's the document ID,

23   the one with the loans that you were just looking at?  If you

24   could.

25   A.   Defendant's Exhibit 400.

John Mitchell - Cross

Page 83

1    Q.   Defendant's Exhibit 400.  Thank you.

     And on that document -- it reflects interest rates on loans

2

3    that existed at the time of the distribution; does it not?

4    A.   Yes, it does.

5    Q.   And are the interest rates listed on those distribution

6    the interest rates that were being paid at that time by the

7    company to Ms. Robertshaw and myself?

8    A.   Yes, they are.

9    Q.   Okay.  And were some of those interest rates zero?

10   A.   Yes, they were.

11   Q.   And in your experience in reviewing the books and records

12   of AnswerNet, have you ever seen interest rates between --

13             MR. PUDLES:  Let me strike that.

14   Q.   Are you -- is it normal practice for there to be loans

15   between the various companies -- the various AnswerNet

16   companies owned by Ms. Robertshaw and myself?

17   A.   Yes.

18             MR. FLAMM:  Objection, Your Honor.  Lack of

19   foundation.

20             THE COURT:  If he knows, he can answer.

21             THE WITNESS:  Yes -- yes, there are loans between the

22   various companies owned by you and Ms. Robertshaw.

23   BY MR. PUDLES:

24   Q.   And have those -- has it always been the practice, since

25   there are multiple companies, for there to be loans between

John Mitchell - Cross

Page 84

1    the companies?

2                MR. FLAMM:  Same objection, Your Honor.

3                THE WITNESS:  Yes, that's been the practice from --

4                THE COURT:  He can answer, if he knows.

5                THE WITNESS:  From almost day one that's been the

6    practice.

7    BY MR. PUDLES:

8    Q.   And to your knowledge, from your experience in providing

9    audits and reviewing the financials of AnswerNet Inc., have

10   those loans between the companies been different interest

11   rates, depending on the cost of money of the company at the

12   time of those loans?

13   A.   Most of the -- the loans between the companies generally

14   are -- have been interest free.

15   Q.   Okay.  And on the books of AnswerNet -- for the year

16   ending 2011, do the books of AnswerNet reflect that AnswerNet

17   Inc. made a distribution to Gary Pudles in the amount 980,000

18   dollars?

19   A.   Not on the books of AnswerNet, no.

20   Q.   Did the books of AnswerNet reflect loan repayments from

21   AnswerNet to Cerida Investment Corp., Contact America and Gary

22   Pudles?

23   A.   I'm not sure if I understand your question.  To the

24   extent that there were shareholder loans that Gary Pudles had

25   with AnswerNet, those were repaid in 2011.

John Mitchell - Cross

Page 85

1    Q.   And was there -- were there loans between AnswerNet -- at

2    the beginning --

3    During 2011, at the time of the distribution, were there loans

4    from Cerida Investment Corp. to AnswerNet -- or, sums due from

5    Cerida Investment Corp. to AnswerNet?

6    A.   There were -- there have historically been intercompany

7    advances between AnswerNet and Cerida.

8    Q.   And as part of the transaction, the distribution, were --

9    did AnswerNet pay back some of those loans to Cerida?

10   A.   I'm questioning whether there was something defined as a

11   loan versus a normal intercompany balance.

12   Q.   So there was -- but there was some kind --

13   A.   But there are -- there are always -- there are always

14   payments that are going back and forth between Cerida and

15   AnswerNet and all of the other companies, for a myriad of

16   business reasons.

17   Q.   Okay.  So it would be normal -- part of the normal course

18   of business for AnswerNet to pay sums due to Cerida and sums

19   due to Contact America, whether they were called loans or not.

20   A.   Correct.  And vice versa.

21   Q.   And as part of this, were sums that were due from Cerida,

22   whether they were called loans or not, and sums that were due

23   from Contact America to AnswerNet repaid as part of the

24   transaction?

25   A.   Yes.

John Mitchell - Cross

1    Q.   And as part of the 980,000 dollars, was a distribution

2    actually made from Cerida and not AnswerNet Inc.?

3    A.   The distribution that was made was made from Cerida and

4    not AnswerNet.  We would -- part of our advice and tax counsel

5    would be not to take a dividend out of AnswerNet because it

6    would be subject to double taxation.

7    Q.   Okay.  I have my last question.  At the time -- at the

8    time --

9         MR. PUDLES:  No, strike that.

10   Q.   As of October 15th 2011 did you -- were you doing the tax

11   returns for Startel Corporation?

12   A.   Yes.

13   Q.   And did Startel Corporation, as of December 31, 2011,

14   have in excess of a million dollars in the bank?

15   A.   Startel had a significant amount of cash in the bank at

16   the end of 2011.  What the exact amount was, whether it was

17   more than or less than a million, I don't recall.

18        MR. PUDLES:  Okay.  I have no further questions, Your

19   Honor.

20        MR. RHOADS:  I have no questions, Your Honor.

21        THE COURT:  Very well.

22        (Pause)

23                    CROSS-EXAMINATION

24   BY MR. FLAMM:

25   Q.   Mr. Mitchell, are you here today pursuant to subpoena?

John Mitchell - Cross

Page 87

1   A.   Yes, I am.

2   Q.   Okay.  Now, let me see if I understand how an accountant

3   works.  And let's talk a minute about the -- Cerida obtaining

4   warrants from Waterside.  The three-percent warrants.  You

5   know what we're talking about?

6   A.   Yes, I do.

7   Q.   You didn't negotiate any of the warrants, did you?

8   A.   I did not.

9   Q.   You didn't create any of the documents that conferred the

10  warrants, did you?

11  A.   I did not.

12  Q.   You didn't talk to Waterside about the warrants, did you?

13  A.   No.

14  Q.   In fact, would it be fair to say that you really have no

15  firsthand knowledge about what happened with those warrants,

16  and your knowledge is exclusively what was told you by the

17  company.

18  A.   By the company and by the documents that were provided,

19  yes.

20  Q.   That the company provided you.

21  A.   That the company provided.

22  Q.   Okay.  Did the company provide you a document that showed

23  warrants in the amount of 6,351 shares, or one and a half

24  percent, of the AnswerNet stock that were issued to Barbara

25  Robertshaw?  Did you see those warrants?

John Mitchell - Cross

Page 88

1    A.   I don't -- that's not a number that I recollect, so I'm

2    going to say no.

3    Q.   Did you see any documents that conferred the Progress

4    warrants on Cerida?

5    A.   I may have.

6    Q.   Did you actually see Cerida warrants from Progress or Ben

7    Franklin?

8    A.   We have Progress and we have Ben Franklin documents in

9    our files.  Whether -- the exact content of what's in those

10   documents, I don't recollect.

11   Q.   Did you verify that the transactions took place that were

12   reported on the books?  Did you independently verify them, to

13   your own personal knowledge?

14   A.   At the time that the transactions took place, we would

15   have asked to see copies of checks and other documentation

16   that may have been exchanged to support the transactions.

17   Q.   So is it your testimony now that you saw an assignment of

18   the Waterside three-percent warrants to Cerida?

19   A.   I just indicated that we got a series of documents that

20   relate to Progress, to Ben Franklin, in our audit files, going

21   back many years.  Would I recollect those actual documents

22   were today, I can't tell you, I don't have that degree of

23   recollection.

24   Q.   And you don't have any firsthand knowledge of the actual

25   transaction itself on the three-percent warrants, nor do you

John Mitchell - Cross

Page 89

1    have firsthand knowledge of the assignment of the Ben Franklin

2    or Progress warrants; is that right?

3    A.    I'm not sure what you mean by "firsthand knowledge."  Was

4    I there when the transaction was negotiated?  No, I was not.

5    Q.    As an accountant, isn't it true that all you're doing is

6    you're taking documents and information that's told to you by

7    the company about what happened and you're recording it in an

8    accounting fashion.

9         THE COURT:  I thought he previously answered that

10   question.  And he said yes.

11        THE WITNESS:  We're testing the recording of it, if

12   it was done by the company, as part of our audit procedures,

13   yes.

14   BY MR. FLAMM:

15   Q.    I'd like you to turn -- if you have the Defendant's

16   binders there -- to Defendant's Exhibit 25.

17        MR. FLAMM:  While you're doing that --

18   Your Honor, at this time I'd like to move to strike his

19   testimony about the fact of the assignment of any of the

20   warrants, or the acquisition of warrants, because it's not

21   based on any firsthand knowledge.  All he testified --

22        THE COURT:  He said it's based on the documents that

23   were supplied to him by the company.  I understand that.

24        THE WITNESS:  I'm there.

25   BY MR. FLAMM:

John Mitchell - Cross

Page 90

1   Q.   If you'd look at -- excuse me.   Those documents are

2   checks -- or, a copy of a check from Barbara Robertshaw; isn't

3   that right?

4   A.   Yeah, Barbara Robertshaw Alenzar (ph.), yes.

5   Q.   For 65,520 dollars?

6   A.   Correct.

7   Q.   Made out to Executel.

8   A.   Correct.

9   Q.   This is the check that you then recorded as a loan?

10  A.   This is one of the two checks that was recorded as a

11  shareholder loan, yes.

12  Q.   And you recorded it as a shareholder loan because why?

13  Did you talk to Ms. Robertshaw about why she wrote the check?

14  A.   I did not, no.

15  Q.   What made you call that a shareholder loan?

16  A.   Based on discussions with Mr. Pudles at that time.

17  Q.   Did he tell you to classify it as a shareholder loan?

18  A.   At the time -- yeah -- yes, because we would not have

19  made that journal entry on our own.

20  Q.   And when you say "at the time," at what time?   At the

21  time that the check was written or some time later, or don't

22  you know?

23  A.   Probably in connection with the year-end work at the end

24  of 2006.

25  Q.   So do you know or do you not know?

John Mitchell - Cross

Page 91

1    A.   No, what I know is that the actual transaction to record

2    the warrant was a year-end journal entry that we had made as

3    of December 31st 2006, an adjusting entry to Cerida's books,

4    based on information and discussion with Mr. Pudles.

5    Q.   And was it Mr. Pudles who told you that Cerida had

6    acquired the warrants?

7    A.   Yes, it was.

8    Q.   Can you turn to Defendant's Exhibit 23, third page?

9    A.   I have it.

10   Q.   It's a check from Cerida Investment for 250,000 dollars.

11   Do you see that?

12   A.   Yes, I do.

13   Q.   Right above the check is the check stub.  Can you read

14   what it says there?

15   Q.   What the recordation of the check -- what it's for.

16        Oh, I'm sorry, is it -- it's page -- it may not be on the

17   same page on mine.  Okay.

18   A.   On page 3 of --

19   Q.   Page 3, yes.

20   And that check says that the -- the money is for a shareholder

21   distribution?

22   A.   That's what it says, yes.

23   Q.   But that's not the way you booked it, is it?

24   A.   It was booked by Cerida as a shareholder distribution to

25   Executel.

John Mitchell - Cross

Page 92

1    **Q.**   And how was it carried on the books?

2    A.    And since Executel was not a shareholder of Cerida, it

3    could not receive a distribution; so we reclassified the

4    shareholder distribution as an investment in AnswerNet

5    warrants on Cerida's books.

6    **Q.**   Okay.  So it's a shareholder distribution to Barbara

7    Robertshaw that you recorded as a shareholder distribution to

8    Executel, who's not a shareholder; is that right?

9    A.    No, the company had recorded it as a shareholder

10   distribution to Executel.

11   **Q.**   You didn't, the company did that?

12   A.    The company did that.

13   **Q.**   So who at the company did that?

14   A.    Whoever was making the accounting entries at the time the

15   check was written back in February of 2006.

16   **Q.**   And do you think the person who was making the accounting

17   entries was the person -- would make that determination to

18   change the characterization themselves, or would they be told

19   to do that?  Based on your knowledge of AnswerNet.

20   A.    I would have no idea.

21   **Q.**   But in any event, the way it was carried on the books is

22   not the way it's recorded on the check when the check was

23   written, correct?

24   A.    That is correct.

25   **Q.**   You testified that the deals with Mr. Pudles and

John Mitchell - Cross

Page 93

1    Robertshaw were fifty-fifty deals.  Did you see any agreement

2    on that?

3    A.    No.

4    Q.    So would it be fair to say that your basis is that you've

5    seen them do deals on a fifty-fifty basis and therefore

6    concluded that it was a fifty-fifty deal?

7    A.    No, up until 2009 or so there was no shareholders

8    agreement between the parties that I'm aware of.  My general

9    recollection in working with both the Robertshaws and with Mr.

10   Pudles was that they did a lot of things on a handshake.

11   Q.    My question was, your testimony that they did things as a

12   fifty-fifty deal is based on your observation of some deals

13   that they did, as opposed to seeing any agreement; isn't that

14   right?

15   A.    That's correct.

16   Q.    And would it surprise you if I told you that any fifty-

17   fifty agreement was based on distributions and not

18   opportunities?  Not investment opportunities?

19   A.    Well, the distributions that were made by Cerida would

20   have to be fifty-fifty to remain in compliance with the tax

21   code.

22   Q.    Okay.  I'll withdraw the question.

23   You said that Bill was the proxy for Barbara.  When's the

24   first time you met Barbara Robertshaw?  In person.

25   A.    Probably at an event where the company was being honored

John Mitchell - Cross

Page 94

1    as one of the fastest-growing companies in the region.

2    Q.   Probably or for sure?

3    A.   No, for -- for sure, at some point going back to the mid

4    2000s.  I think I only had met Barbara, you know, once -- once

5    for sure, maybe twice.

6    Q.   So when you say Bill was the proxy for Barbara, you

7    really don't have any experience with that, do you?  You just

8    know that you've talked to Bill a few times when he may have

9    related something for Barbara, isn't that right?

10   A.   No, I talked to Bill many times.  And conversations with

11   Bill -- to the extent that they were talking about

12   opportunities, deals, the business, whatever, you know, Bill

13   always made it known to me -- many different occasions -- that

14   he was representing his daughter and was the voice of his

15   daughter in conducting these transactions.

16   Q.   Well, you understand the difference between acting for

17   someone on a transaction and being their proxy?

18   A.   I use the term "proxy" not in a legal sense.

19   Q.   So what you meant to say was that you dealt with some

20   deals with Bill Robertshaw where he spoke on behalf of his

21   daughter.  Would that be a fair way of characterizing what you

22   meant to say?

23   A.   I think that's fair.

24   Q.   You testified that Michelle Ju brought you the

25   information for one of the tax years.  I think it was 2006.

John Mitchell - Cross

Page 95

1   Do you know whether Michelle Ju prepared the information that

2   she brought you, or was she just bringing it over?

3   A.    No, Michelle was the controller for the Signius company.

4   And due to some issues at AnswerNet, Michelle stepped in to

5   assist AnswerNet and Cerida with the preparation of its books

6   for the year ended December 31st 2006; so for that one year

7   she was, in effect, the point person for the audit and

8   assisted with closing the books that year.

9   Q.    And over what period of time was that that you acted with

10  her as the point person?

11  A.    Probably January of 2007 through whenever the financial

12  statements were issued, which would have been April or May of

13  2007.

14  Q.    Me not being an accountant, this is probably a dumb

15  question, but it seems to me, from a cash standpoint -- well,

16  first of all, what happened with the -- Mr. Pudles' divorce

17  transaction was that the company borrowed a million dollars,

18  right?  One of the companies did.

19  A.    Company borrowed against its line of credit.

20  Q.    So it took a million dollars from a bank that it didn't

21  have.

22  A.    Don't know if the exact amount was a million but the

23  company borrowed some money from its line of credit.  Whatever

24  the amount was.

25  Q.    Whatever the amount.  And so, just call it a million to

John Mitchell - Cross

1    be -- I'm just trying to get the concept down here.

2    So from a cash standpoint, the company has to pay that money

3    back, plus interest, right?

4    A.   Correct.

5    Q.   And it also gave that million dollars to Mr. Pudles.

6    A.   Correct.

7    Q.   So when it eventually pays the money back to the bank,

8    that comes out of profits, doesn't it?

9    A.   Comes out of cash flow.

10   Q.   Okay.  Isn't that somehow a double cash flow if you pay

11   the money back to the bank and you also paid it to Mr. Pudles?

12   Doesn't it have a double impact on your cash flow?

13   A.   No, I don't -- I don't see that.  Either the company

14   could have paid Mr. Pudles the million dollars or it could

15   have borrowed the million dollars, in which you would have

16   cash in and then cash out to Mr. Pudles, but it's still only

17   one million dollars in your example.

18   Q.   Okay.  So it's not paying a million dollars to Mr. Pudles

19   and at the same time paying a million dollars back to the bank

20   that it borrowed.

21   A.   No, because the bank gave the company a million dollars.

22   Q.   It didn't give it, it loaned it, right?

23   A.   It loaned it.

24   Q.   Loaned the money.

25   A.   But I have a million dollars in, I have two million

John Mitchell - Cross

Page 97

1    dollars out, then that is one million dollars out.

2    Q.   You said -- you testified that Cerida was acquiring a

3    chunk of warrants each year.  Did you actually see the

4    transactions that supported the Cerida acquisition of

5    warrants?  Did you see the warrants?

6    A.    I didn't see the -- I didn't see the warrants in terms of

7    the actual stock certificates.  I saw whatever evidentiary

8    transact -- whatever evidentiary documents there were that

9    supported the payments that Cerida made to acquire the

10   warrants each year.

11   Q.   And they were what?  Do you recall?

12   A.   Some combination of -- some combination of cancelled

13   checks and/or a letter or some type of documentation --

14   Q.   You don't --

15   A.   -- agreement.

16   Q.   You don't remember specifically as you sit here what you

17   saw for any specific acquisition of any specific chunk of

18   warrants?

19   A.   Probably, for most of the warrants --

20   Q.   Sir, "probably" doesn't help us.  I need to know what --

21   A.   Well --

22   Q.   -- actually --

23   A.   -- I'm trying to answer to the best of my recollection.

24   Q.   I'd like to know what you know, I'd like you not to

25   guess.

John Mitchell - Cross

Page 98

1    A.    Well, then, I won't guess.

2    Q.    Okay.  Did you prepare for your testimony today?

3    A.    Slightly, yes.

4    Q.    With whom did you prepare?

5    A.    I prepared with myself.

6    Q.    Okay.  Nobody else.  You didn't meet with any counsel?

7    A.    No.

8              MR. FLAMM:  Okay.  Thank you very much.  I have no

9    further questions.

10             THE COURT:  Anything else?

11             MR. PUDLES:  None for me.

12             MR. MITTS:  Nothing else -- oh, excuse me, Your

13   Honor.  Nothing for the Defendants.

14             THE COURT:  Okay.  Anybody else?

15   All right.  You may step down, sir.

16             THE WITNESS:  Thank you, Your Honor.

17             THE COURT:  Thank you.  You're free to stay but

18   you're free to leave the courtroom.  Thank you for coming in.

19   All right.  Your next witness.

20             MR. MITTS:  Your Honor, at this point the Defense

21   would like to offer some documents -- requests for admissions,

22   discovery responses by the -- from the Plaintiff.

23             We have no more witnesses that we're going to call.

24   We are going to provide your law clerk and Your Honor with a

25   list of the exhibits.  I have a list worked up now but I'd

Colloquy

1    like to just go over it one more time to make sure it's

2    comprehensive.

3             THE COURT:  Yeah, there is no hurry about the exhibit

4    list.

5             MR. MITTS:  Okay.

6             THE COURT:  Right.  Sure.

7             MR. MITTS:  All right.  So I will just identify the

8    specific discovery responses.

9             THE COURT:  Okay.  Fine.

10         (Pause)

11            THE COURT:  Now, I don't want to limit your -- the

12   way you present your case.  Unless you feel it necessary, I

13   would think -- and if you think it necessary, okay, but you

14   could simply identify by number the request or the

15   interrogatory and the response, because we'll have a lot of

16   briefing with -- supporting it all.  Now, if there's anything

17   in particular you want to emphasize, of course you're free to

18   draw my attention to it.

19            MR. MITTS:  Your Honor, at this time I thought the

20   best shorthand way to do it was just to actually identify the

21   specific discovery requests.  And in the briefing, I would

22   direct the Court's attention to the relevant request and

23   response.

24            THE COURT:  Fine.

25            MR. MITTS:  Okay.  Your Honor, the first is --

Colloquy

Page 100

1          THE COURT:  Why don't you just read off the numbers,

2    you know.

3          MR. MITTS:  Okay.  The first is Defendant AnswerNet's

4    first request for admissions directed to Plaintiff Barbara

5    Robertshaw.  The specific numbers that I'm referencing right,

6    but I'll detail it more in our submission, are Admission 14,

7    15, 22, 24, 25, 34, 35, 36, 38.

8          From AnswerNet's second request for admissions,

9    number 48, number 49, number 50, number 51.

10         With respect to the request for admissions that

11   Codefendant Betty Babjak served on the Plaintiff, Admission 1

12   and Admission 3.

13         That concludes the request for admissions part, Your

14   Honor.

15         The next document that we would offer is the

16   Plaintiff's Rule 26(a)(1) statement of damages.  And

17   specifically I there would reference Roman F(iii), computation

18   of each category of claimed damages.

19         The next discovery request and response is Defendant

20   Gary A. Pudles' interrogatories directed to Plaintiff, and the

21   Plaintiff's response to those.  And these I will do separately

22   in the briefing.

23         And I have also the Plaintiff's response to those

24   interrogatories.

25         Similarly, I have Defendant Betty Babjak's

Colloquy

Page 101

1    interrogatories addressed to Plaintiff.  And I have the

2    responses from Plaintiff to that as well.

3            THE COURT:  Do you have any -- are you offering them

4    all or just particular ones?

5            MR. MITTS:  I'm going to offer them all and, in our

6    briefing, direct the Court's attention to specific responses.

7            THE COURT:  Very well.

8            MR. MITTS:  And with that, Your Honor, I'd move the

9    admission of those as well as the documents that we identified

10   during the course of Plaintiff's case as well as our case.

11   And as I said, I will provide Your Honor with a detailed list

12   of those documents.

13           THE COURT:  Fine.

14           MR. MITTS:  And with that, Your Honor, I thank you,

15   and the Defendant AnswerNet rests its case.

16           THE COURT:  Fine.

17           MR. RHOADS:  Your Honor, on behalf of Defendant Betty

18   Babjak, I'd simply like to join in the submission that Mr.

19   Mitts just made on behalf of all Defendants.  And with that,

20   we rest Ms. Babjak's case as well.  Thank you.

21           MR. PUDLES:  Your Honor, on behalf of myself, I also

22   join in Mr. Mitts' submission.  And I ask the Court, do you --

23   I have one exhibit that I need to put in for my counterclaim.

24   And otherwise I will -- and that will be the whole sum total

25   of the counterclaim.

Colloquy

Page 102

1          THE COURT:  Okay.

2          MR. PUDLES:  And that would be Exhibit 397.

3          THE COURT:  Very well.

4          MR. PUDLES:  And I would certify that I paid all of

5    the bills referenced in Exhibit 397.  I continue to accrue

6    legal fees.  In addition, I've been -- and I will continue

7    through trial briefing, et cetera.  And those are ongoing

8    legal feels as my damages for my -- for the abuse of process

9    claim.

10          THE COURT:  All right.  Do Plaintiffs wish to

11   question Mr. Pudles on that exhibit?

12          MR. FITZPATRICK:  And I do.  I don't even -- I

13   haven't even seen it.

14          MR. MITTS:  It's number --

15          THE COURT:  Pardon me?

16          MR. MITTS:  -- 397 in the binder.

17          MR. FITZPATRICK:  In the binder?

18          MR. MITTS:  Yes.

19          MR. FITZPATRICK:  Okay.

20          MR. PUDLES:  Should I take the stand then, Your

21   Honor?

22          MR. FITZPATRICK:  Judge, could we just take -- can we

23   just take a moment?

24          THE COURT:  Sure.  Sure.

25   Do you want to sit down till they find --

Colloquy

Page 103

1           Would you like a short recess while you're searching

2      for that?

3      Counsel?  Would you like a short recess while you're searching

4      for that?

5           MR. FLAMM:  Yes, Your Honor, we would.

6           MR. FITZPATRICK:  I think that would be great.  Thank

7      you.

8           THE COURT:  Huh?

9           MR. FITZPATRICK:  That would be good.

10          THE COURT:  Okay.  Great.

11      (Recess from 2:28 p.m. to 2:45 p.m.)

12          THE COURT:  Where are we now?

13          MR. FITZPATRICK:  We were at the question of Mr.

14      Pudles moving for the admission of D -- what is this?

15          MR. PUDLES:  397.

16          MR. FITZPATRICK:  D-397, which are a number of legal

17      bills -- or, bills for legal services from a Burns and Kasmen

18      PC.

19          We're not going to object to the admission of this,

20      but we are going to reserve oral arguments as to the validity

21      of these legal bills for a Defendant who has been representing

22      himself pro se in this case.

23          THE COURT:  All right.  Well, now, just a minute.

24      These are part of your counterclaim, Mr. Pudles?

25          MR. PUDLES:  Yes, Your Honor.

Colloquy

Page 104

1          THE COURT:  Okay.  Now, you don't wish to examine Mr.

2     Pudles about these, you're just going to --

3          MR. FITZPATRICK:  My -- with my understanding is the

4     representation from him, before we broke, was that he incurred

5     these bills that are marked with that exhibit number as a

6     result of this case.

7          THE COURT:  Yeah, I -- yeah, yeah, right; and you

8     were going to present argument to me at the appropriate time.

9          MR. FITZPATRICK:  Yes, sir.

10          THE COURT:  Right.  Okay.

11          MR. FITZPATRICK:  Yes.

12          THE COURT:  Fine.

13     All right.  Now, just so you understand, Mr. Pudles, I said

14     that I would try the counterclaim separately.  And you're

15     telling me this is the evidence you are presenting on your

16     counterclaim, correct?

17          MR. PUDLES:  Yes, together with all of the evidence

18     presented --

19          THE COURT:  Yeah, well, of course.

20          MR. PUDLES:  -- in the primary trial.

21          THE COURT:  Well, yeah, of course.

22          MR. PUDLES:  Yes, Your Honor.

23          THE COURT:  Together with all the evidence that's

24     been presented in the case.  So -- so --

25          MR. PUDLES:  Yes.

Colloquy

Page 105

1            THE COURT:  -- you're resting on your counterclaim as

2      well.

3            MR. PUDLES:  I am, Your Honor.

4            THE COURT:  All right.  Fine.

5            So we now are at the point where I assume we're to

6      see if there's any rebuttal by Plaintiff?

7            MR. FITZPATRICK:  Yes, Your Honor.  But just before

8      that, as a matter of housekeeping --

9            THE COURT:  Yes.

10           MR. FITZPATRICK:  -- I'd like to make a formal motion

11     to dismiss that counterclaim.  We don't need argument on it

12     now.  I know you reserved argument on the other motions to

13     dismiss, but I want to put it on the record.

14           THE COURT:  Yeah.  Of course, of course.

15           MR. FITZPATRICK:  Thank you, Your Honor.

16           THE COURT:  Now, is there anybody -- at the end of

17     the case I will assume that you will all renew all your

18     motions, just so your record's all clear, okay?  So I'm going

19     to take it -- I'm telling you right now, as of now, at the end

20     of the case and all the evidence, you all have renewed all

21     your motions, so your records are all protected.  Okay?

22           MR. PUDLES:  Thank you, Your Honor.

23           MR. FITZPATRICK:  Thank you so much, Your Honor.

24           THE COURT:  Right.  Okay.

25           MR. FLAMM:  Your Honor, we have one very brief

Colloquy

Page 106

1    rebuttal witness.

2              THE COURT:  Very well.

3              MR. FLAMM:  It's William Robertshaw.

4              THE COURT:  All right.  Now, would Mr. Robertshaw be

5    more comfortable just staying -- is he in a wheelchair?

6              MR. FLAMM:  Yes.

7              THE COURT:  If he is, he could testify from his

8    wheelchair down there, and we'll put a microphone in front of

9    him.

10             MR. ROBERTSHAW:  Your Honor, I can get into the

11   chair.

12             THE COURT:  Whatever -- your choice.

13             MR. ROBERTSHAW:  Thank you, sir.

14        (Pause)

15             MR. FLAMM:  Your Honor, I just wanted to let you know

16   that this trial made me get hearing aids.

17             THE COURT:  Pardon me?

18             MR. FLAMM:  I just wanted to let you know this trial

19   made me get hearing aids.

20             THE COURT:  Oh, well, I hope yours work better than

21   mine do.  Mine are supposed to arrive -- new ones are supposed

22   to arrive any minute.

23             MR. FLAMM:  I just got them and just tried them, and

24   they're swell.

25             THE COURT:  Well, I appreciate all counsel.  I have

Colloquy

1    no problem in the courtroom at all as long as counsel speak

2    into a microphone.  And believe me, during this trial, you've

3    all been very good about that.  And the witnesses as well.  So

4    I really haven't had any problem hearing at all.

5    But, you know, as you mature, which is a word I like to use

6    rather than "getting older," it's very frustrating when

7    somebody says something to you and you have to pretend you

8    understand.  And the fellow might be saying to you, "You're

9    the biggest SOB I ever met in my life," and you sit there

10   smiling and say, "Well, thank you."

11   All right.  Let's proceed.

12           MR. FLAMM:  And your family gets tired of you saying,

13   "What --

14           THE COURT:  Yes.

15           MR. FLAMM:  -- what?"

16           THE COURT:  Oh, yes.  You can hear me keeping quiet

17   on that remark.

18   All right.  Let's proceed.

19           THE CLERK:  Before we begin, would you just please

20   raise your hand?

21       WILLIAM ROBERTSHAW, PLAINTIFF'S WITNESS, SWORN

22           THE CLERK:  Thank you very much.

23                         DIRECT EXAMINATION

24   BY MR. FLAMM:

25   Q.  Could you state your full name for the record, please?

**William Robertshaw - Direct**

1    A.    William Robertshaw.

2    Q.    And Mr. Robertshaw, you've been here through the trial,

3    so you've heard pretty --

4              THE COURT:  No, he hasn't been here --

5              MR. FLAMM:  Excuse me.

6              THE COURT:  -- through all of the trial.

7    BY MR. FLAMM:

8    Q.    You've been here for the second half of the trial.

9    A.    Most of the trial, yes.

10   Q.    Why don't you describe briefly who you are and what you

11   do.

12   A.    I'm a manager of multiple message centers, and I'm the

13   president of most of my daughter's investments in message

14   centers.

15   Q.    And you've worked closely with Gary Pudles, isn't that

16   right?

17   A.    Yes, I have.

18   Q.    All right.  And your office is in Princeton with -- where

19   he used to be.

20   A.    Yes, it is.

21   Q.    Since the office moved, by the way, from Princeton to

22   Willow Grove in 2007, do you still work as closely with him?

23   A.    No.

24   Q.    Now, I want to ask you just a couple of questions.

25   First of all, did you ever make a deal or an agreement with

William Robertshaw - Direct

Page 109

1    Mr. Pudles that a three-percent warrant that Barbara

2    Robertshaw had been assigned half of -- the document that's

3    been marked H23; do you know the document I'm talking about?

4    I can show you the document.

5    A.    Please do.

6              MR. FLAMM:  Pardon me for one moment, Your Honor.

7         (Pause)

8              UNIDENTIFIED MALE:  Oh, that was -- that's the

9    release.  That's Defendant's Exhibit 64.

10             THE COURT:  Oh.

11             UNIDENTIFIED MALE:  You were looking at it -- you

12   asked for it this morning.

13             THE COURT:  Yeah.  What are we referring to now?

14             UNIDENTIFIED MALE:  Now we are looking at the stock

15   purchase agreement.

16             MR. FITZPATRICK:  H23.

17             THE COURT:  Okay.

18             MR. FITZPATRICK:  Your Honor, may I just ask -- may I

19   just ask if we could retrieve Mr. Robertshaw's magnifier for

20   him?  It's right next door.

21             THE COURT:  Of course.

22             MR. FLAMM:  Can I go make a copy of that real quick?

23             THE COURT:  Sure.

24             MR. FLAMM:  I'll make two photocopies.

25             THE COURT:  Okay.  Just --

```
                                                        Page 110
 1              THE WITNESS:  I can read this okay.

 2              THE COURT:  -- wait a minute.  We're making a copy.

 3              THE WITNESS:  You want this for a copy?

 4              UNIDENTIFIED MALE:  No, they're making copies.

 5              THE COURT:  They're making a copy for my law clerk.

 6         (Pause)

 7              THE WITNESS:  I don't need it.

 8              MR. FITZPATRICK:  You're okay?

 9              THE WITNESS:  I'm okay.

10              THE COURT:  Why don't you keep the original --

11              MR. FITZPATRICK:  Got it.

12              THE COURT:  And give me the copy.

13              THE WITNESS:  Thank you.

14              THE COURT:  All right.  Thank you.

15              Okay.  We're ready to proceed when you are, Mr.

16    Flamm.

17         (Pause)

18    BY MR. FLAMM:

19    Q.   Mr. Robertshaw, I think I can make this even simpler.

20    A.   Yes, I am familiar with this.

21    Q.   Did you ever enter into any agreement with Mr. Pudles to

22    have any warrants from Waterside assigned to Cerida?

23    A.   No, I did not.

24    Q.   Did you ever make any agreement with Mr. Pudles that

25    while he would get paid his million dollars -- his million-
```

William Robertshaw - Direct

1    dollar divorce distribution in one lump sum that Barbara

2    Robertshaw would receive her million dollars in installment

3    payments, or delayed payments or over time.

4    A.   No, I did not.

5    Q.   Do you recall seeing any capitalization tables in

6    AnswerNet over the period 2005, '06, '07?

7    A.   Yes, I did.  I saw several.

8    Q.   All right.  Do you recall them showing Cerida with

9    ownership of warrants or stock?

10   A.   Yes, I did.

11   Q.   Okay.  Did you say anything about any of them to Mr.

12   Pudles or anyone else?

13   A.   I asked questions several times about ownership but not

14   specifically questioning Cerida.

15   Q.   Why not?

16   A.   I didn't see any reason to inquire about that, because I

17   assumed that my daughter owned a majority of the AnswerNet

18   company through her initial numbers of shares in AnswerNet

19   plus the large interest she bought directly from Waterside --

20   the warrants from Waterside, and converted into ownership

21   rights.  So I didn't think I needed to press on it, but I did

22   ask and things kept changing, and I wasn't sure why.  That's

23   about it.

24           MR. FLAMM:  Okay.  I have no further questions.

25           MR. PUDLES:  Can we have a minute, Your Honor?

William Robertshaw - Direct

Page 112

1          (Pause)

2              MR. MITTS:  Your Honor, we have no questions for this

3      witness.

4              THE COURT:  Anyone else?

5              MR. RHOADS:  I have no questions for this witness,

6      Your Honor.

7              MR. PUDLES:  I have no questions for this witness.

8              THE COURT:  Very well.

9      All right.  Is that -- the Plaintiffs are resting?

10             MR. FLAMM:  We are, Your Honor.

11             THE COURT:  Defense is resting?

12             MR. MITTS:  Yes.  Yes, Your Honor.  We are resting.

13             THE COURT:  And Mr. Pudles, you've already rested on

14     your counterclaim, I believe?

15             MR. PUDLES:  Yes, Your Honor.  Thank you.

16             THE COURT:  All right.  And then, I take it all the

17     evidence in this case has been completed?

18             MR. FITZPATRICK:  That's correct, Your Honor.

19             THE COURT:  Subject to the offering of the exhibits.

20             MR. RHOADS:  Yes, Your Honor.  And we will get those

21     to you, if we can, by -- is it by the end of the week?  Well,

22     I guess today is the end of the week.

23             THE COURT:  Sometime next week, if you can.

24             MR. RHOADS:  Thank you so much, Your Honor.

25             THE COURT:  We'll have to set a schedule and --

Colloquy

Page 113

1    you're busy lawyers, so don't put a lot of pressure on

2    yourself.  This case obviously is going to take some time to

3    resolve in this court, so --

4            MR. RHOADS:  We'll just --

5            THE COURT:  I'll be in your hands on a schedule,

6    okay?

7            MR. MITTS:  I just want to say, on behalf of

8    everybody, Your Honor, thank you for the time and the

9    flexibility that you gave us, starting those days when you did

10   at one-thirty.  That was a big help, and we do really

11   appreciate it.

12           THE COURT:  Well, good.

13           Now, if -- yes, if you'd --

14           Thank you, Mr. Robertshaw.

15           If you'd take Mr. Robertshaw back there, and

16   everybody sit down, I have a few words I want to say to all of

17   you.

18               (Pause)

19           THE COURT:  First of all, I'd like to compliment the

20   lawyers.  You've tried this case expeditiously and

21   professionally.  That's a great help to a Judge.  It's not

22   always the case in this courtroom, so thank you.

23           The other thing is -- I want to say to the lawyers, I

24   want you to go back with your clients now that all the

25   evidence has come in and take off your advocate's hat.  You've

Colloquy

1    all seen how the evidence has gone in, and evaluate it

2    objectively.  And give them some good advice about where you

3    think this case is going to go.

4          And I would say to the clients, you know, I've seen

5    this week on this witness stand some brilliant, able business

6    people, and I can't help but thinking that their time would be

7    better spent devoted to their business than to hours of

8    expensive litigation.  A divorce is never pleasant when two

9    people have been close, but what you have ahead of you is a

10   lot of briefing, oral argument, a decision from this Court.

11   It doesn't stop here.  It's going to go up to the Court of

12   Appeals no matter what my decision is.  These lawyers will

13   tell you, predicting what our Court of Appeals will do in a

14   given case is very risky business indeed.  In fact, in my

15   chambers, my law clerks are trained, whenever the words "the

16   Court of Appeals" are used, they must say, "COA within their

17   infinite wisdom."

18         So I would urge you, I really would urge you, however

19   painful it might be to have a divorce, it's -- for business

20   people, their lives are better spent devoted to their business

21   than in litigation.  Now, it's my duty to decide this case,

22   and I will do it, if called upon.  I've got plenty of cases,

23   so it doesn't matter to me whether I work in this case or

24   others; but I hate to see all this ability and talent wasted

25   when it could be out there building a business.

Page 115

1        So if you wish to go back to Judge Restrepo, you

2    should promptly let Mr. Irvin (ph.) know.  If for some

3    reason -- I can't think why -- because he's a super whiz at

4    settling cases, he is, as you know, been nominated to come on

5    this court, but if for some reason you prefer not to go back

6    to him, I'll find either another Magistrate-Judge or a Judge

7    of this Court to send you to.  I can't do it because I'm the

8    fact-finder.

9        But I would urge you to consider that very carefully.

10   Of course, it's your call, not mine; but I would urge you to

11   make that decision whether you're going to do that promptly,

12   before we incur any more expense and labor.  And if you decide

13   no, then I'll expect counsel to agree on a schedule.

14       And then I think they should confer on whether they

15   want to file a request for findings of fact or conclusions of

16   law, or whether they want to waive those and just file briefs.

17   I will, of course, hold oral argument after the briefs are

18   filed and I've read them.  If you waive -- I don't know in

19   this case whether findings of fact and conclusions of law

20   would help me or not; I'm not sure about that.  If you waive

21   them, I can just say my opinion constitutes my findings of

22   fact and conclusions of law.  I often do that, but I don't

23   know in this kind of case whether that's desirable or not, so

24   I invite your thoughts on that.

25       So I hope you'll all -- especially the clients, will

Colloquy

1    bear in mind what I've said to you.  You're good business

2    people.  I'm not a businessperson, but I think maybe I've

3    given you some good business advice.

4         All right.  Thank you, all.  It's been a pleasure to

5    have you in my courtroom.  Now I'd like to see the lawyers

6    alone in my courtroom, without client -- in my chambers,

7    without the clients, please.

8         Not about the case.  This will be off the record.

9              (Court is adjourned)

10                  * * * * *

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

# C E R T I F I C A T I O N

1

2          I, Karen Nevins, the court approved transcriber, do

3

4    hereby certify the foregoing is a true and correct transcript

5    from the official electronic sound recording of the

6

7    proceedings in the above-entitled matter.

8

9

10

_____          _____

11   KAREN NEVINS                      DATE

12

13

14

15

16

17

18

19

20

21

22

23

24

25

VERITEXT NATIONAL COURT REPORTING COMPANY
888-777-6690 ~ 215-241-1000 ~ 610-434-8588 ~ 302-571-0510

**A**

ability 4:10 114:24
able 114:5
above-entitled 117:7
absolutely 9:5 30:2
abuse 53:18 102:8
ABV 81:14
access 61:6
account 34:20 78:16
accountant 33:6 54:15 55:14 56:1 81:6 87:2 89:5 95:14
accountants 34:17 81:12
accounting 7:8,12 7:12,14,17 8:15 8:18 9:14,22 10:16 11:22 15:13,17,20 35:15 56:2,5,7 59:12 61:13 66:23 80:6 89:8 92:14,16
accredited 81:14
accrue 102:5
accurate 5:5
acquire 26:20 57:7 62:25 97:9
acquired 58:16,24 62:12 64:16 65:5 91:6
acquiring 78:1 97:2
acquisition 58:25 59:14 62:10 63:3 63:15 77:19 89:20 97:4,17
acquisitions 58:21 61:3,4,22 62:2 63:4
acted 95:9
acting 43:2 48:13 48:18 94:16

action 21:24
activities 68:16,25
activity 39:19,25
actual 9:2,9,9 10:16 11:14 15:25 16:12 61:2 80:4 88:21,24 91:1 97:7
added 13:1 31:16
addition 13:4 56:5 61:7 65:15 66:19 69:11 81:5 102:6
additional 19:18 62:1
address 47:15
addressed 36:4 42:21 101:1
adjourned 116:9
adjusting 91:3
admission 100:6 100:11,12 101:9 103:14,19
admissions 98:21 100:4,8,10,13
advance 9:13
advances 85:7
advice 82:16 86:4 114:2 116:3
advising 43:2
advocate's 113:25
ago 71:23 72:15 78:3,24
agree 10:14 20:15 115:13
agreed 33:9
agreement 5:13 12:16,24 13:2,6 13:25 14:2,14,17 14:21 18:19 19:18,21,23 20:1 20:7 23:2,10 24:14 25:5,6,8,12 27:15,25 28:1 29:13,17,18,23 29:25 30:1,3 34:12 37:19 93:1 93:8,13,17 97:15

108:25 109:15 110:21,24
agreements 6:5 50:24
ahead 10:3 27:3 114:9
AICPA 81:9,10,11
aids 106:16,19
al 1:5
Alenzar 90:4
Allentown 58:15 60:23
amended 17:25
America 84:21 85:19,23
American 81:11
amount 9:21 34:7 78:18 84:17 86:15,16 87:23 95:22,24,25
amounts 79:17
analysis 78:15
analyst 81:19
Analysts 81:18
and/or 97:13
answer 3:15 5:19 5:23 8:13 19:8 20:19 22:3 29:1,3 39:14 83:20 84:4 97:23
answered 89:9
answering 8:8
AnswerNet 1:16 3:5,6,9,11,12,24 4:18,23,24,24 5:1 5:6,8,10,12,25 6:13 7:8,14,15 16:13,16 18:9,14 19:5 20:7 24:9 29:25 31:10,10 32:13 34:10 35:15 37:16 38:3 38:25,25 39:7 41:4,7 43:3,12,22 44:7,9,15 45:21 45:24 46:16,22 47:11,22 48:13

48:15,20,23 49:5 51:8 56:14,19 57:9 58:9,14,14 58:22 59:13,15 59:18 61:24,25 62:6 63:18,23 64:18,20 65:2,4,5 65:6 66:9,11,20 68:8,17,21,25 72:22 74:5,9 75:20,23,25,25 76:6,18,23 77:5 77:16,19 78:16 79:1,25 82:10 83:12,15 84:9,15 84:16,16,19,20 84:21,25 85:1,4,5 85:7,9,15,18,23 86:2,4,5 87:24 92:4,19 95:4,5 101:15 111:6,17 111:18
AnswerNet's 3:13 41:19 42:19 45:6 45:13,14 59:21 65:6,18,21,23 74:10 100:3,8
answers 60:16
answer's 29:3
anybody 98:14 105:16
AN5592 77:10
apologize 10:3,5 35:1 70:3
apparent 37:8
Appeals 114:12,13 114:16
appear 14:2 25:3,4 25:5,23 37:23 46:21 74:18,24 75:1,4 78:25
APPEARANCES 1:10
appeared 7:3
appears 12:9,19 16:21 39:20 77:9
appreciate 106:25

113:11
approach 30:20
appropriate 36:14 104:8
approval 34:13
approve 41:21
approved 18:20 117:4
April 1:5 27:20 33:3 95:12
area 57:12,15 60:6 63:1
argue 26:3 28:11
arguing 20:19
argument 20:11,13 104:8 105:11,12 114:10 115:17
arguments 103:20
arm 32:5
arranged 38:4
arranging 48:8
arrive 106:21,22
arrived 44:8
art 60:3
asked 5:8,10 14:15 16:25 19:5,7 32:12 33:23 54:18 73:3 82:15 88:15 109:12 111:13
asking 19:16,17 20:22 21:18 39:8 71:23
asserted 71:5
assign 39:4
assigned 109:2 110:22
assignment 26:18 27:7,12 88:17 89:1,19
assist 95:5
assisted 95:8
Association 81:17
assume 105:5,17
assumed 111:17
assuming 16:6
attached 30:17

**attempt** 57:19 58:8
**attention** 4:12 38:6
  38:11 68:10 76:9
  77:9 79:7 99:18
  99:22 101:6
**attorney** 56:23
**attorneys** 44:15
  45:24 47:22
**attracted** 62:2
**audit** 8:18,19,20
  31:21 56:6 59:12
  61:13,15 66:19
  80:2 88:20 89:12
  95:7
**audited** 31:9 59:17
  59:18 65:8,23
**auditing** 56:7
**auditor** 33:6 34:4
  54:15
**auditors** 31:15,21
  34:14
**audits** 60:10 84:9
**August** 11:3,20
  13:10,20 14:1,3
  15:22 33:24
  79:13 82:14
**authority** 49:3
  51:4
**available** 45:6
**aware** 42:25 43:11
  43:14,17 45:12
  47:10 63:24
  66:11 93:8
**a.m** 40:21,21

**B**

**Babjak** 41:6,17,24
  46:16 48:17
  100:11 101:18
**Babjak's** 100:25
  101:20
**BACINE** 1:12
**back** 6:6 15:18
  19:5 32:13 33:20
  34:21 36:6,17
  39:2 40:8 60:12
  62:17 64:13,14

65:3 73:18,19
  80:1 85:9,14
  88:21 92:15 94:3
  96:3,7,11,19
  113:15,24 115:1
  115:5
**background** 55:24
  81:5
**balance** 11:10 68:7
  72:3,3,7,10 76:17
  76:21 77:2 79:18
  85:11
**bank** 86:14,15
  95:20 96:7,11,19
  96:21
**Bar** 24:19
**Barbara** 1:2 3:20
  3:23,25 5:2,3 6:9
  6:16 7:19 8:23
  9:6,12,18,20
  13:23 14:10
  16:21 20:24
  22:18 23:13,20
  24:9,20 25:9
  28:14 30:13,22
  30:25 31:17 33:1
  35:25 37:5,24
  39:4 41:12 43:13
  43:20 44:5,16
  45:19,25 46:4,20
  47:17 50:13 58:2
  58:12 59:1,9,9
  60:17,19,20,24
  61:4,15 62:1,7
  63:2 69:3 70:24
  71:1,4 72:13 75:6
  79:12 87:24 90:2
  90:4 92:6 93:23
  93:24 94:4,6,9
  100:4 109:1
  111:1
**Barbara's** 14:5
  26:11 59:11
  60:21
**BAROFF** 1:12
**based** 34:6,12
  39:19 45:5 58:15

65:12 89:21,22
  90:16 91:4 92:19
  93:12,17
**basically** 22:4
  77:18,22
**basis** 59:6 93:4,5
**basket** 69:4
**Bates** 68:11 76:17
**Bates-stamped**
  39:24
**bear** 116:1
**beginning** 28:9
  38:9 39:14 72:7
  85:2
**begins** 39:24
**behalf** 21:22 42:1
  42:6 43:13 48:13
  94:20 101:17,19
  101:21 113:7
**believe** 10:15 11:5
  13:3 14:15 15:9
  17:2 21:1 22:19
  23:15 24:21
  29:10 30:9 43:4
  58:22,22 64:16
  82:17 107:2
  112:14
**believed** 33:11
**believes** 45:5
**Bell** 1:14
**Ben** 88:6,8,20 89:1
**BENCH** 1:8
**best** 97:23 99:20
**bet** 32:7
**better** 20:10 54:19
  64:6 106:20
  114:7,20
**Betty** 40:2,3 41:6
  46:16 100:11,25
  101:17
**big** 55:11 60:2 67:8
  113:10
**biggest** 7:17 62:11
  107:9
**Bill** 3:14,15,19 4:3
  4:5,7,9 5:1,11,14
  6:1,4,11,14,22,25

6:25 7:2,6,6,20
  8:6 9:6,12 13:23
  24:20 27:16 33:1
  33:2 37:24 38:4
  38:21 39:4,9,18
  57:16,18,20,21
  58:9 59:10 60:3,3
  60:8,12,19,20,22
  60:24 61:1,4,9,9
  61:10 62:7,9,15
  72:23,24,24 73:3
  74:14,15 93:23
  94:6,8,10,11,12
  94:20
**bills** 2:9 102:5
  103:17,17,21
  104:5
**binder** 10:25 33:14
  33:19 34:22,24
  35:6 36:17,19,20
  36:22 38:7,9,13
  41:24 42:11
  67:17 76:10 82:2
  102:16,17
**binders** 35:2 67:8
  82:4 89:16
**bit** 81:4
**bite** 21:12
**black** 67:8
**bless** 66:13
**blown** 54:22
**blowup** 54:24
**Blue** 1:14
**board** 38:3 39:3
  48:23
**bolts** 16:12
**book** 10:8 31:21
**booked** 36:3,4
  91:23,24
**books** 9:3 31:19
  36:15 39:19,21
  40:1,6 65:2,19
  79:20 83:11
  84:15,16,19,20
  88:12 91:3 92:1,5
  92:21 95:5,8
**born** 58:9

**borrowed** 95:17,19
  95:23 96:15,20
**Boston** 63:1
**bottom** 39:23
  82:17
**bought** 62:16 66:7
  111:19
**break** 22:1 40:19
  71:8 73:16,17
  74:2
**BRE207** 68:12
**BRE830** 39:24
**brief** 17:25 19:2
  49:21 105:25
**briefest** 49:23
**briefing** 99:16,21
  100:22 101:6
  102:7 114:10
**briefly** 33:23
  108:10
**briefs** 115:16,17
**bright** 57:23
**brilliant** 114:5
**bringing** 95:2
**broke** 104:4
**brother** 60:2
**brother-little** 60:2
**brought** 59:4
  94:24 95:2
**Brower** 34:19 82:8
**building** 114:25
**burned** 62:14
**Burns** 2:9 103:17
**business** 4:6 5:8
  6:6,10 56:9 57:5
  57:6,12,13,15,19
  57:24 58:8,17
  60:8 62:6,19
  63:17,18 81:15
  81:16 85:16,18
  94:12 114:5,7,14
  114:19,20,25
  116:1,3
**businesses** 6:16
  52:23 56:25
  57:25 63:18
**businessperson**

116:2
**busy** 113:1
**buy** 57:19 58:8
**buying** 62:18
**buyouts** 37:13

**C**

**C** 6:13 117:2,2
**Cade** 10:16
**calculation** 80:21
**California** 28:23
  29:9
**call** 14:24 45:7
  48:17 54:9,24
  61:9 90:15 95:25
  98:23 115:10
**called** 41:13,14
  58:15 61:17 62:3
  62:10 85:19,22
  114:22
**calling** 41:14
**Calls** 80:8
**cancelled** 97:12
**cap** 24:20 30:1,17
  30:24 46:23
**capacity** 51:3
**capital** 62:3,15
  63:21,23 65:6
**capitalization**
  77:12 111:5
**caption** 76:22
**care** 7:2
**career** 56:3
**carefully** 115:9
**caring** 7:3
**carried** 77:17,23
  92:1,21
**case** 7:4 18:16 21:5
  23:1 52:24 53:10
  53:21 99:12
  101:10,10,15,20
  103:22 104:6,24
  105:17,20 112:17
  113:2,20,22
  114:3,14,21,23
  115:19,23 116:8
**cases** 114:22 115:4

**cash** 16:16 36:1
  68:24 86:15
  95:15 96:2,9,10
  96:12,16,16
**category** 100:18
**CC** 44:10 45:1
  46:12
**centers** 108:12,14
**CEO** 3:10,12,14
  4:25 5:11 6:2,13
  6:14
**Cerida** 4:24 5:1
  7:15,24 9:2 18:22
  20:3 27:17 28:3
  28:13 31:3,10,11
  31:13,14 48:24
  49:3,4 50:25 51:4
  51:4,5 58:24 61:3
  61:22 62:24 63:1
  63:2,5,7,12,18
  66:17,21,22,25
  67:1,24 68:5,22
  69:12,19 71:21
  71:24,25 72:23
  74:3,9,18 75:1,10
  75:17,19,20 76:1
  76:2,15,18,22
  77:5,16 78:1 79:1
  79:5,25 84:21
  85:4,5,7,9,14,18
  85:21 86:2,3 87:3
  88:4,6,18 91:5,10
  91:24 92:2 93:19
  95:5 97:2,4,9
  110:22 111:8,14
**Cerida's** 72:3
  77:19 91:3 92:5
**certain** 3:18 41:3
  47:1 48:14
**certainly** 9:16,20
  15:23 19:1 25:4
  30:5 70:15
**certificates** 50:23
  50:23 97:7
**certified** 55:14
  56:1 81:6,11,15
  81:17,18

**certify** 102:4 117:5
**cetera** 10:17 102:7
**CFF** 81:15
**CFO** 7:19 15:14
  31:17 33:10,11
  34:3 74:10 78:16
  82:9
**chair** 106:11
**chambers** 114:15
  116:6
**chance** 57:25
**change** 23:17
  92:18
**changed** 4:24
  15:19 18:3 65:7
  70:25
**changes** 14:9,11
**changing** 28:16
  111:22
**characterization**
  5:5,7 92:18
**characterize** 3:6
  27:16
**characterizing**
  94:21
**charge** 34:19
**check** 16:14 90:2,9
  90:13,21 91:10
  91:13,13,15,20
  92:15,22,22
**checks** 88:15 90:2
  90:10 97:13
**choice** 106:12
**chunk** 78:1 97:3
  97:17
**Cindy** 10:11,17,20
  11:4,9,11 15:14
  34:16 82:9
**cited** 23:10
**claim** 17:24 18:23
  19:24 21:21,22
  27:15 47:17 71:5
  102:9
**claimed** 100:18
**claiming** 25:10
**clarification** 53:8
  64:11

**classification** 9:22
**classify** 90:17
**cleaner** 54:21
**clear** 8:17 72:21
  105:18
**clerk** 31:4 54:18
  98:24 107:19,22
  110:5
**clerks** 114:15
**client** 18:19,20,22
  18:23 19:24
  20:12,13 57:11
  116:6
**clients** 113:24
  114:4 115:25
  116:7
**close** 7:7 114:9
**closely** 108:15,22
**closing** 46:3 95:8
**COA** 114:16
**code** 93:21
**Codefendant**
  100:11
**collaborating** 6:8
**collectively** 44:6
  45:20
**column** 79:18
**combination** 97:12
  97:12
**combined** 31:10
  76:5,17
**come** 27:22 34:10
  73:18 74:8
  113:25 115:4
**comes** 96:8,9
**comfortable** 106:5
**coming** 52:25
  98:18
**commenced** 73:3
**common** 80:12
**commonly-owned**
  76:19
**communicate** 4:10
**communication**
  60:12
**communications**
  4:9 5:9 15:18

17:11,16 18:3
  19:1 44:6 45:20
  46:21
**commute** 60:7
**companies** 3:16
  5:4 7:9,16 31:11
  33:10 39:5 59:13
  59:19 61:14
  77:22 83:15,16
  83:22,25 84:1,10
  84:13 85:15 94:1
  95:18
**company** 1:22 5:14
  7:17 15:14 31:19
  37:7 42:2 55:22
  56:14,17 57:7,11
  58:15,24,25
  60:23 61:2,15,17
  61:18,24,25
  62:10,11,14,17
  62:22,24,25 63:2
  83:7 84:11 87:17
  87:18,20,21,22
  89:7,12,23 92:9
  92:11,12,13
  93:25 95:3,17,19
  95:23 96:2,13,21
  111:18
**company's** 42:6
**compare** 15:24
**compilation** 48:2
  80:3
**compiled** 66:20
  67:24 72:14
**complain** 18:24
**complaint** 18:1
**completed** 112:17
**completely** 7:5
  14:8
**completion** 37:5
**compliance** 93:20
**compliment**
  113:19
**comprehensive**
  99:2
**computation**
  100:17

**computer** 17:13,19
18:6,10,11,15,16
19:6,10,13,15
20:25 21:6 22:5
50:16
**concept** 96:1
**concerned** 7:1
**conclude** 48:21,22
**concluded** 93:6
**concludes** 100:13
**conclusion** 44:8
80:9
**conclusions** 115:15
115:19,22
**conduct** 53:18
**conducting** 48:14
94:15
**confer** 115:14
**conferred** 87:9
88:3
**confirmed** 29:25
30:1,3
**confirming** 30:1
**confirms** 18:21
**confused** 19:17
20:17
**connection** 9:24
57:17 90:23
**consent** 37:4,15
**consider** 23:7
115:9
**consist** 69:6
**consists** 12:4
**consolidated** 68:7
**constitutes** 115:21
**construction** 4:3
5:2
**construed** 15:3
**consulted** 9:13
**consulting** 56:8
**Contact** 84:21
85:19,23
**contained** 46:23
**contend** 23:12 31:7
**contending** 22:22
22:25
**content** 88:9

**contention** 16:20
18:8 25:6,8 45:19
**context** 81:4
**continue** 4:25 5:1
5:3 48:21 59:20
73:23 75:1,3
102:5,6
**continued** 62:20
**continuing** 5:11
**control** 47:18
48:22 74:9
**controlled** 43:21
**controller** 95:3
**controlling** 48:24
**conver** 27:23
**conversation** 4:11
27:24 28:10,13
30:2
**conversations**
28:20 63:10
94:10
**converted** 64:17
111:20
**copied** 34:16 42:4
42:24 44:10
**copies** 42:5 47:4
88:15 110:4
**copy** 40:3,4 42:24
51:12,21,21 52:5
53:10 54:19,22
55:1 73:4 90:2
109:22 110:2,3,5
110:12
**cordial** 60:1
**corner** 68:11
**Corp** 50:25 76:22
84:21 85:4,5
**corporate** 18:25
38:23,24 39:6,8
44:9 51:7
**corporation** 21:18
21:21,22,22 44:6
45:20 46:21
48:24,25 49:4
51:5 63:21 86:11
86:13
**corporation's**

21:20
**correct** 3:23 4:5
11:19,20 12:21
13:10 15:12 16:4
16:5,6,8,10,11
17:3 24:4 35:22
41:7,8,10 42:20
42:23 45:10 46:2
46:7 47:3,6,20
48:5,6,10 68:19
71:22 78:6,9
79:23 80:22
85:20 90:6,8
92:23,24 93:15
96:4,6 104:16
112:18 117:5
**corrected** 13:17
**correctly** 57:4
**correlates** 30:12
38:12
**correspond** 44:8
**correspondence**
64:15
**cost** 84:11
**counsel** 8:13 17:18
17:21 18:12,13
20:18 32:12
40:25 41:25 42:1
42:5,19 43:3 45:6
46:19 48:19
53:19 55:1 56:24
57:3 64:21 69:24
82:15 86:4 98:6
103:3 106:25
107:1 115:13
**counterclaim**
101:23,25 103:24
104:14,16 105:1
105:11 112:14
**counterparts**
37:24
**couple** 3:4 10:13
10:14 62:23
108:24
**course** 36:20 38:8
41:5 50:4 51:23
85:17 99:17

101:10 104:19,21
105:14,14 109:21
115:10,17
**court** 1:1,22 3:1
5:18,23 8:9 10:4
11:2 12:20 20:12
21:15,19 23:4,7
25:12,15 32:3
35:1,4 40:11,15
40:18 49:16,20
49:22 50:4 51:23
52:1,5,10 53:8
54:1,3,9,11,16
55:3,6 56:10 64:4
64:7,21 65:25
66:3 69:18,25
70:4,9,12,19 71:6
71:17,19 73:5,15
73:20,24 77:14
80:12,24 81:2
83:20 84:4 86:21
89:9,22 98:10,14
98:17 99:3,6,9,11
99:24 100:1
101:3,7,13,16,22
102:1,3,10,15,24
103:8,10,12,23
104:1,7,10,12,19
104:21,23 105:1
105:4,9,14,16,24
106:2,4,7,12,17
106:20,25 107:14
107:16 108:4,6
109:10,13,17,21
109:23,25 110:2
110:5,10,12,14
112:4,8,11,13,16
112:19,23,25
113:3,5,12,19
114:10,11,13,16
115:5,7 116:9
117:4
**courtroom** 48:1
98:18 107:1
113:22 116:5,6
**Court's** 54:6 99:22
101:6

**cover** 48:3
**CPA** 81:8
**CPAs** 55:16
**crash** 17:13,19
19:10 21:1,7 22:5
**create** 87:9
**creating** 65:11
**creation** 57:9
**credential** 81:17
**credentials** 81:9
**credit** 95:19,23
**CROSS** 2:7
**cross-examination**
32:10 41:1 70:24
81:25 86:23
**cumulative** 77:4
**current** 39:18,25
39:25 56:3
**currently** 12:12,25
55:16
**CVA** 81:18
**cycle** 11:13,13

---

**D**

**D** 2:1 103:14
**daily** 28:22,25
60:14
**damages** 100:16
100:18 102:8
**date** 5:6 14:3,16,17
22:15,16,18,19
22:20 35:18,19
37:9 45:21,23
49:25 117:12
**dated** 32:24 42:21
43:25 46:11
82:13
**dates** 22:8
**daughter** 58:2
94:14,15,21
111:17
**daughter's** 58:1
108:13
**David** 37:25 38:2,3
**day** 5:8,8 6:8 28:25
29:7 33:3 48:17
53:14,20 58:17

59:20 60:7 64:13
64:14 65:3 84:5
**days** 29:8 43:9,11
113:9
**day-to-day** 4:4
5:15 32:13 60:25
**deal** 60:3,23 64:3
64:13 66:6 93:6
93:12 108:25
**dealing** 14:5
**dealings** 61:1
**deals** 59:6,11 60:3
60:5 92:25 93:1,5
93:12 94:12,20
**dealt** 94:19
**December** 15:21
67:25 72:11 77:3
86:13 91:3 95:6
**decide** 32:5 114:21
115:12
**decided** 9:1 33:10
57:14 58:8 62:5
**decision** 8:22,25
23:18 114:10,12
115:11
**decisions** 3:18,19
3:19 5:15 6:5,12
11:12
**declaratory** 21:24
**declaring** 25:22
**Defendant** 1:15
2:8 21:23 50:14
100:3,19,25
101:15,17 103:21
**Defendants** 1:6
98:13 101:19
**Defendant's** 24:6
26:1 30:18 31:4,5
32:19 34:24
42:11 48:2 55:7
67:12 82:25 83:1
89:15,16 91:8
109:9
**Defense** 98:20
112:11
**deferred** 3:17
**defined** 85:10

**definitions** 13:16
**degree** 88:22
**delayed** 3:1 111:3
**demand** 43:13,15
**demonstrates** 31:3
**deny** 50:18 73:12
**denying** 53:1
**department** 7:8,12
7:17 8:15,18
10:16 11:22
15:13
**departments** 7:15
**depending** 84:11
**deposition** 30:13
30:14,23 31:1
**describe** 59:25
108:10
**described** 23:24
**DESCRIPTION**
2:5
**designation** 81:8
**designations** 81:7
81:13,14
**desirable** 115:23
**despite** 6:2
**detail** 100:6
**detailed** 101:11
**detailing** 35:16
**details** 15:19
**determination**
10:7 46:20 92:17
**determine** 5:24
**developed** 70:24
**developing** 57:1
**devoted** 114:7,20
**difference** 12:11
12:15 55:12
72:11 94:16
**different** 14:5,8,9
52:25 61:18
84:10 94:13
**diligence** 57:13
**DIRE** 2:2
**direct** 2:2 3:2 4:12
8:15,18 26:2 38:6
41:9 55:8 68:10
76:9 77:8 99:22

101:6 107:23
**directed** 50:14
51:2 100:4,20
**Directing** 10:21
**direction** 8:3,4,6
11:21 34:13
**directly** 20:14
23:23 55:11
111:19
**directors** 37:4,15
**disagree** 16:15
**discovered** 55:12
**discovery** 6:24
18:18 52:25
53:14,20,24
98:22 99:8,21
100:19
**discuss** 24:19
**discussion** 28:5,8
28:16 91:4
**discussions** 58:11
61:10 63:5 90:16
**dismiss** 105:11,13
**distribution** 4:8
7:25 9:17,21 10:2
10:13 11:20
15:11 33:24 34:5
35:21 36:8 49:25
75:6,8 78:4,5,17
78:19 79:2,4 80:1
82:11 83:3,5
84:17 85:3,8 86:1
86:3 91:21,24
92:3,4,6,7,10
111:1
**distributions** 9:19
13:1 15:2 34:6
93:17,19
**DISTRICT** 1:1,1,9
**divided** 63:19
**dividend** 86:5
**divorce** 9:25 95:16
111:1 114:8,19
**doc** 20:6 51:4 68:2
**docket** 53:10,15
**doctor** 6:25
**docu** 25:4

**document** 12:7,7
13:5,5 15:7,10
17:21 19:20 20:4
23:25 24:5,6,9,13
25:25 26:2,16
27:11,11 33:16
33:17,23 35:13
35:15,16,23
36:16 38:6,12,16
47:6 50:8 51:8,9
51:10 52:17
53:12,12,19,23
54:25 67:22 68:5
69:16 70:17
71:15 75:14,16
76:4,5,16 79:10
82:7,22,22 83:2
87:22 100:15
109:2,3,4
**documentation**
8:19 88:15 97:13
**documents** 2:7
12:4 16:25 17:19
17:22 18:5,6,25
20:23 22:22,25
23:1,15,20 25:7
31:7 41:3,12,23
46:23 48:3,3,7,9
48:12 50:14,24
51:5,5,7 52:2
64:15,22 65:13
87:9,18 88:3,8,10
88:19,21 89:6,22
90:1 97:8 98:21
101:9,12
**doing** 20:13 42:1
43:9 59:12 60:3
61:4 66:19,20,21
66:22 86:10 89:5
89:17
**dollar** 8:24 62:13
72:12 111:1
**dollars** 9:24 11:23
14:1 15:11 34:8
35:5 62:14,16
66:7 68:9 69:1,2
69:2,3,10 72:12

78:8,12,19,19
79:19 84:18 86:1
86:14 90:5 91:10
95:17,20 96:5,14
96:15,17,18,19
96:21,25 97:1,1
110:25 111:2
**door** 6:7 109:20
**double** 86:6 96:10
96:12
**draft** 12:7,16,19
13:25
**draw** 38:11 79:7
99:18
**driver** 3:11
**driving** 60:6
**due** 53:13,13 57:13
79:18 85:4,18,19
85:21,22 95:4
**dumb** 95:14
**duty** 114:21
**D-397** 103:16
**D107** 32:16,17
**D146** 35:9
**D175** 54:24,25
**D397** 2:9
**D400** 79:9

---

## E

**e** 2:1 15:22 22:6,8
30:16 42:24
117:2
**earlier** 17:13 33:3
36:10 48:1 60:16
**early** 17:14 27:20
37:12 58:10
**earn** 12:12,25
**EASTERN** 1:1
**education** 55:24
**effect** 53:22 58:16
59:11 66:23 95:7
**eight** 61:18
**eighteen** 27:6
**either** 5:4 15:3
25:3 61:13 74:7
96:13 115:6
**electronic** 1:21

117:6
eleven-by-sevent...
54:23
**Emmett** 1:11 44:1
46:10 48:4
emphasize 99:17
employment 55:24
57:3
enclosing 47:1,4
ended 74:7 77:3
95:6
Endicott 61:17
energetic 60:4
engage 42:1
engaged 46:16
engagement 43:9
enjoyed 61:8
enter 57:5 110:21
entered 53:16
entire 56:2
entirely 32:3
entities 34:6,10,11
66:24 76:19
77:21 80:3
entitled 79:12
entity 51:1
entrepreneurial
57:1
entries 8:16,20 9:9
9:13 11:9,14 16:1
36:10,11 53:10
92:14,17
entry 39:23 53:15
68:17 76:14
90:19 91:2,3
equal 5:3 58:18
equity 59:16 62:12
76:21
especially 115:25
ESQ 1:11,12,15
establish 44:16
46:4 64:4
established 58:23
et 1:5 10:17 102:7
evaluate 114:1
event 92:21 93:25
eventually 79:6

96:7
everybody 113:8
113:16
**EVID** 2:5
evidence 29:22
64:22 71:4
104:15,17,23
105:20 112:17
113:25 114:1
evidenced 65:13
67:2
evidentiary 97:7,8
exact 27:23 57:17
86:16 88:9 95:22
exactly 15:18
72:20
**EXAMINATION**
3:2 50:6 55:8
107:23
examine 104:1
example 76:5
96:17
excellent 33:12
64:11
excess 86:14
exchange 48:9
exchanged 88:16
exclusively 87:16
excuse 5:18 16:20
30:10 40:16
46:25 90:1 98:12
108:5
execute 37:5
executed 11:16
22:15,17 37:23
Execute1 18:1 26:7
26:18 28:14
43:21 44:5 45:20
46:20 63:23
64:16,16 65:5,5
65:14 66:6,7,11
66:15,17 68:23
71:1 90:7 91:25
92:2,8,10
executive 4:9
exercise 67:2,5
68:3 76:14

exercised 75:18
exercising 75:10
exhibit 4:13 10:24
11:3,3 15:12:2 15:5
17:6,7 23:11 24:2
30:12,25 32:16
32:19 33:14,19
33:20 35:9 36:18
37:1 38:18 42:11
42:12 43:24
44:20 46:8 48:2
50:9 51:13,17
69:17,22 70:20
74:3 76:10,10,13
77:8,9 79:9 82:25
83:1 89:16 91:8
99:3 101:23
102:2,5,11 104:5
109:9
exhibits 2:5 10:12
17:2 67:12,12
79:8 98:25
112:19
existed 83:3
expand 62:6,6
expect 115:13
expeditiously
113:20
expense 115:12
expensive 35:2
114:8
experience 55:24
83:11 84:8 94:7
expert 56:8,12
80:10,10,11
explain 44:7 45:19
61:22 64:12
68:20 77:14
explained 17:12
65:25
explaining 45:4
explains 77:18
explanation 45:22
45:25
expressed 15:20,22
extension 53:21
extent 84:24 94:11

extra 51:21
extremely 7:7
e-mail 4:20 5:6
10:11,18,19,20
10:22 11:18
15:21,24 24:18
29:23,25 30:4,5
30:16,17,24 31:1
31:1,2 32:24 33:1
33:2,4 34:15
35:16 36:7 38:21
38:22 39:1,10,16
42:18 43:1,5 82:8
82:13,15
e-mails 17:14
18:25 24:14,18
25:4 34:7 36:9

---

**F**

**F** 1:5,11 117:2
facility 5:2
fact 9:1 17:12
23:25 48:21
66:12 87:14
89:19 114:14
115:15,19,22
fact-finder 115:8
failed 57:18 58:7
fair 3:11 12:8
33:18 87:14 93:4
94:21,23
fairly 29:10 57:14
familiar 56:14,16
79:14 110:20
family 59:13
107:12
far 44:15 47:21
farther 36:17
fashion 89:8
fastest-growing
94:1
father 3:21 59:10
father-son 60:2
faxed 54:20
February 24:21
29:23 30:4 39:2
92:15

federal 69:19
feel 99:12
feels 102:8
fees 102:6
fellow 107:8
fiancee 6:25
field 56:2
fifteen 33:21 40:13
40:17 53:14
fifth 77:1
fifty 45:8 58:16
59:8,8 62:13,14
62:21 93:16,17
fifty-fifty 58:18,20
58:25 59:6 61:25
63:2 93:1,5,6,12
93:20
fifty-one 43:21
44:6,17 45:20,25
46:5,21 47:18
fifty/Barbara-G...
62:22
file 69:12 115:15
115:16
filed 53:11 115:18
files 39:8 88:9,20
final 11:9 12:16,24
13:2,6 14:2,14,17
14:20 15:25
Finally 82:5
finance 11:13
finances 61:2
financial 31:9 56:7
59:17,18 65:8,21
65:24 66:20,25
67:24 68:2,16
69:11 72:14 75:9
75:17,20 76:6
77:21 79:1 81:16
95:11
financials 84:9
financing 11:12
37:6,13
find 39:6 76:14
102:25 115:6
finding 54:21
findings 115:15,19

115:21
**fine** 54:16 66:3
  99:9,24 101:13
  101:16 104:12
  105:4
**finish** 5:23 71:7
**finished** 5:19 8:8
  10:4
**firm** 41:14,18 43:2
  44:1 45:12 48:13
  48:18,21 49:2
  55:16,17,18 56:3
  68:1 72:16
**firm's** 46:15
**first** 4:20 12:7
  13:25 17:20,23
  22:2 31:16 38:4
  38:17,19,21
  42:10 43:9,14
  46:25 59:14,17
  60:22 61:25 64:4
  67:15,22 69:23
  70:23,23,25
  79:17 82:2 93:24
  95:16 99:25
  100:3,4 108:25
  113:19
**firsthand** 87:15
  88:24 89:1,3,21
**Fitzpatrick** 1:11
  42:21 43:1,2,12
  43:19 44:1,3,15
  45:2,5 46:11 47:5
  47:17,23 48:4,9
  48:18 65:16 66:2
  69:21 70:3,5,6,8
  70:10 102:12,17
  102:19,22 103:6
  103:9,13,16
  104:3,9,11 105:7
  105:10,15,23
  109:16,18 110:8
  110:11 112:18
**fixed** 10:15
**flagged** 30:13
**Flamm** 1:12,12 3:3
  5:20 8:14 10:6

11:17 12:1,17,22
12:23 13:17,21
19:16 20:21
21:14 22:12 23:3
23:5,9 25:13,20
26:13 27:2 28:15
29:4,12 30:11,20
30:21 31:6,23
50:3,7 51:11,15
51:17,19,20,25
53:5,23 54:2 70:5
70:7,11 73:7 80:8
83:18 84:2 86:24
89:14,17,25 98:8
103:5 105:25
106:3,6,15,18,23
107:12,15,24
108:5,7 109:6,22
109:24 110:16,18
111:24 112:10
**flexibility** 113:9
**Floor** 1:17
**flow** 96:9,10,12
**flows** 68:24
**food** 32:9
**foregoing** 117:5
**forensics** 81:16
**forget** 17:23
**forgive** 34:24 74:4
**form** 16:14,15
**formal** 105:10
**formed** 58:24 61:3
  62:24,25 63:2
**forms** 4:6 52:25
**forth** 15:19 60:12
  85:14
**forthcoming** 47:21
**forty** 62:13,14
**forty-four** 30:7,8
**forward** 66:14
**forwarded** 30:6
**found** 39:7 40:5,7
  40:7 57:4
**foundation** 83:19
**four** 37:21 79:12
**fourth** 77:1,2
**Franklin** 88:7,8,20

89:1
**frankly** 70:14
**free** 61:12,12
  84:14 98:17,18
  99:17
**freely** 3:17
**friend** 6:4
**front** 36:22 67:9
  106:8
**frustrating** 107:6
**full** 107:25
**fund** 62:1 78:16
**funded** 68:18
**funding** 82:10
**funds** 67:2 68:3
**funneled** 63:5
**further** 23:17
  31:23 46:3 53:6
  54:2 81:21 86:18
  98:9 111:24
**furtherance** 46:15
**F(iii)** 100:17

### G

**garbled** 8:11
**Gary** 1:5,16 2:3
  5:2 37:24 39:24
  39:25 50:14
  56:19,20,22,23
  56:25 57:2,2,10
  57:13,17,20,22
  58:13,16 59:1,3,8
  59:23 60:4,5,13
  60:22,25 61:4,8
  61:16 62:1,2,5,8
  62:15 63:3,5,17
  69:2 72:13,21
  73:2 75:7 84:17
  84:21,24 100:20
  108:15
**Gary's** 61:1
**general** 56:24 57:3
  75:23 76:2 93:8
**generally** 6:3
  84:13
**Gernstein** 55:20
  55:21

**getting** 107:6
**give** 3:21 11:21
  20:10 24:18 51:4
  55:23 56:17
  57:25 80:13
  96:22 110:12
  114:2
**given** 50:8 65:13
  73:4 114:14
  116:3
**go** 6:8 10:3 14:20
  27:3 32:1,2 33:14
  33:19,20 34:21
  38:19 60:9 66:13
  66:13,14 68:12
  99:1 109:22
  113:24 114:3,11
  115:1,5
**goals** 11:4 15:20
  15:22 34:4
**Gocial** 55:20,21,21
**goes** 25:21 32:2
  45:17 46:3 47:8
  47:12,16 67:13
**going** 5:20,21 8:11
  9:2,3 15:13,16
  18:24 20:17
  21:13 23:18 28:2
  33:19 34:10 36:5
  36:5 49:14 54:21
  57:14,25 58:12
  62:5 64:24 70:13
  85:14 88:2,20
  94:3 98:23,24
  101:5 103:19,20
  104:2,8 105:18
  113:2 114:3,11
  115:11
**Gold** 55:20
**good** 24:11 40:23
  40:24 60:11
  103:9 107:3
  113:12 114:2
  116:1,3
**goodness** 35:5
**gotten** 73:2
**graduate** 55:25

**great** 60:14,14
  103:6,10 113:21
**grew** 61:24
**gross** 78:19
**ground** 62:15
**group** 7:15 62:3,12
**Grove** 108:22
**growing** 59:13
**guarantee** 15:1,3
**guess** 17:20 19:8
  19:16 97:25 98:1
  112:22
**guide** 6:4
**guy** 57:23 60:24
**G3** 55:16,19,20

### H

**half** 17:24 25:9
  26:11 71:2,5
  87:23 108:8
  109:2
**hall** 54:14
**hand** 107:20
**handed** 69:16
**handing** 30:22
**handled** 9:3,4
  15:16,17
**handling** 52:24
**hands** 17:9 113:5
**handshake** 93:10
**hands-on** 63:16,17
**happen** 28:19
**happened** 5:13
  20:16 28:22 63:4
  66:15 68:6 75:21
  87:15 89:7 95:16
**happening** 7:6
  39:6
**happy** 36:1
**hat** 17:21 113:25
**hate** 114:24
**heading** 68:16
  77:12
**hear** 107:16
**heard** 48:1 108:3
**hearing** 106:16,19
  107:4

held 45:25 63:23
help 5:1 74:8 97:20
  113:10,21 114:6
  115:20
helped 57:12
helpful 56:17
  64:24 75:16
hereunder 15:4
Hill 56:22 60:6
hire 33:10
historic 63:25 64:2
historical 56:18
historically 85:6
hold 44:6 45:8
  46:21 81:6,16
  115:17
holdings 64:20
holds 49:4
home 7:1
honestly 13:19
Honor 8:8 10:24
  13:13 20:11,20
  21:9,17 23:3
  25:13,14 28:12
  29:5 30:20 31:25
  33:16 34:1 35:13
  39:1 40:9,14
  49:12,18 50:2
  51:12,20 53:7
  54:2,6,13,17 55:1
  55:13,23 56:16
  59:25 63:25 64:6
  65:16 66:2 67:23
  68:20 69:21
  70:15,18,21 71:9
  73:19,21,23 80:8
  81:21 83:18 84:2
  86:19,20 89:18
  98:13,16,20,24
  99:19,25 100:14
  101:8,11,14,17
  101:21 102:21
  103:5,25 104:22
  105:3,7,15,22,23
  105:25 106:10,15
  109:6,18 111:25
  112:2,6,10,12,15

112:18,20,24
  113:8
HONORABLE
  1:8
honored 93:25
Honor's 64:11
hope 106:20
  115:25
hours 114:7
housekeeping
  54:18 105:8
Huh 103:8
hurried 81:5
hurry 99:3
H23 16:22,22
  20:25 23:14,21
  24:2 25:1,23
  109:3,16
H6 26:17,17,17

I

ID 2:5 82:22
idea 34:9 52:18
  59:4 92:20
ideas 11:19
ident 67:15
Identification
  54:24 69:17 79:9
identified 20:24
  23:14,21 57:11
  70:22 71:19
  74:17 101:9
identifies 77:18
identify 11:5 19:20
  29:16 30:4 32:25
  33:16 35:13 37:3
  38:16 67:22
  69:17 70:17
  71:14 82:7 99:7
  99:14,20
III 1:11
immediate 80:13
immediately 37:8
  41:22 80:25
impact 96:12
impeachment 71:4
implemented

11:12
importance 19:15
important 11:7
  33:11 35:24 36:2
inception 59:19
include 76:6
included 77:21
includes 76:18
including 79:5
income 69:19
incomplete 3:8
incorrect 3:7 16:1
  16:2,4,5
increase 75:19
increased 68:8
incur 115:12
incurred 104:4
indebtedness 15:2
independently
  88:12
indicate 31:8
indicated 17:1
  88:19
indicates 23:12
indicating 24:10
individual 62:11
infinite 114:17
information 3:16
  31:15,18,20 43:6
  44:16 45:5 46:4
  46:19 47:16,21
  47:23 53:15
  72:18 73:9 75:24
  76:7 89:6 91:4
  94:25 95:1
informed 3:20
  41:25
initial 46:20
  111:18
initially 61:25
input 3:21
inquire 111:16
inquiry 11:21
  39:11 43:7
inserted 13:16
insisted 37:5
inspection 41:12

43:13 47:6 48:8
installment 111:2
instance 8:23
Institute 81:11
intercompany
  85:6,11
interest 43:20 46:5
  48:25 51:1 58:16
  78:20,23 79:20
  79:22,25 80:4,7
  80:17,18 83:2,5,6
  83:9,12 84:10,14
  96:3 111:19
interests 41:19
  58:12 60:21
internet 57:4
interrogatories
  100:20,24 101:1
interrogatory
  99:15
interrupt 29:19
invalid 25:2,22
  26:15
invest 59:5
investigation
  45:14 47:10,13
  48:14
investing 68:24
investment 48:24
  50:25 68:7,17,25
  75:20 76:22,22
  84:21 85:4,5
  91:10 92:4 93:18
investments
  108:13
investor 60:20
  62:2,15
investors 59:16
  62:19,19 63:9
invite 115:24
invited 6:24,25
involved 63:11
involvement 64:12
  65:1,18,20 74:21
involves 56:7
Irvin 115:2
issuance 73:1

issue 18:18,19
  22:10,23 27:17
  39:17 70:22
issued 81:9 87:24
  95:12
issues 4:3 5:2 6:11
  95:4
item 50:20
items 47:14
iterations 56:4

J

J 43:25
January 53:13
  72:7 95:11
Jay 34:6,19 82:8
Jay's 34:12
Jersey 57:12 59:22
  59:22
Joe 10:15
John 2:3 9:4,7,10
  9:15 10:10,17,20
  11:4,7 15:23 33:1
  33:5 34:12,18
  54:14 55:7
John's 34:7
join 101:18,22
jointly 3:20
journal 8:20 36:10
  36:11 90:19 91:2
JR 1:8
Ju 7:19,20 8:19 9:4
  9:8,10 31:16 74:8
  74:12 94:24 95:1
Judge 1:9 53:15
  102:22 113:21
  115:1,6
judgment 21:24
  71:7
June 37:12
jury 70:12

K

Karen 117:4,12
Kasmen 2:9
  103:17
keep 110:10

**keeping** 41:25
  107:16
**kept** 3:20 111:22
**kids** 56:20
**kind** 59:10 60:24
  77:20 85:12
  115:23
**kinds** 18:2
**knew** 35:25 56:19
  66:10
**know** 5:15 6:2,11
  7:5 8:4,4 9:15,16
  9:18,18 10:22
  13:19 14:7 16:5,6
  16:9,11,22 17:15
  18:20 19:2,11,11
  19:12,12 21:15
  22:7,17,20 23:5
  26:8 27:14,24,24
  27:24 30:14
  31:19 35:25 36:2
  36:4,14 40:2
  44:16 47:21 48:3
  51:6 54:6,11
  56:22,25 57:8,16
  57:21,23 58:1
  59:9 60:2,5,7,10
  60:13,19,22,24
  61:2,11 62:13,16
  63:13,15,21 64:7
  64:24 66:14,18
  66:22 68:12 69:8
  69:8 70:12 73:6
  74:12,18 75:9
  77:25 79:2,24
  87:5 90:22,25,25
  91:1 94:4,8,12
  95:1,22 97:20,24
  97:24 100:2
  105:12 106:15,18
  107:5 109:3
  114:4 115:2,4,18
  115:23
**knowledge** 9:7
  64:5,13,14 69:9
  84:8 87:15,16
  88:13,24 89:1,3

89:21 92:19
**known** 9:20 57:1
  94:13
**knows** 64:22 83:20
  84:4
**Koletty** 10:15
**K1** 9:17,20
**K2** 4:13
**K5** 12:2,4

---
**L**

**L** 72:2,5
**La** 55:25
**labor** 115:12
**Lack** 83:18
**Lafayette** 56:21
  60:6
**laid** 11:15
**landscape** 79:9
**language** 14:9
**large** 111:19
**law** 1:16 31:4
  41:18 44:1 49:8
  98:24 110:5
  114:15 115:16,19
  115:22
**lawyer** 14:6 19:22
  20:15
**lawyers** 70:2 113:1
  113:20,23 114:12
  116:5
**lay** 11:4,5
**lays** 77:20
**lead** 62:24
**leader** 3:12
**leadership** 11:10
**leave** 33:18 43:14
  98:18
**leaving** 11:11
  15:14 37:6
**led** 48:8
**ledger** 75:23 76:2
**left** 16:18 50:3
  57:3 74:10
**legacy** 62:19 63:8
**legal** 2:9 51:1
  94:18 102:6,8

103:16,17,21
**length** 19:19
**letter** 43:18,23,24
  44:11,11,13,21
  44:23 45:1,2,3,4
  45:11,18,23
  46:10,12,15
  47:14 48:18
  54:19 97:13
**letters** 42:4,5 44:5
**letter's** 54:20
**let's** 8:12 16:3
  17:23 19:20
  20:18 22:2,2
  40:18 46:8 54:9
  63:6 66:3,13,13
  66:14 73:17
  82:21 87:3
  107:11,18
**level** 61:6 65:4
**licensed** 56:1
**life** 62:17 107:9
**liked** 60:20
**limit** 99:11
**limited** 45:13
**Linda** 82:12
**line** 32:14 43:5
  68:25 72:5 77:1,1
  77:2 95:19,23
**lines** 37:21 57:22
**list** 4:8 33:12 43:6
  98:25,25 99:4
  101:11
**listed** 7:25 30:17
  30:25 69:22
  70:19 80:11 83:5
**listen** 71:6
**literally** 62:16
**litigating** 19:3
**litigation** 41:5 56:8
  73:3 114:8,21
**little** 36:17 55:23
  81:4
**lived** 56:21 60:4
**lives** 114:20
**LLC** 1:16 50:23
**loan** 8:24 79:5

84:20 85:11 90:9
  90:11,12,15,17
**loaned** 96:22,23,24
**loans** 11:5 68:18
  69:2,13 71:25
  72:5,10 74:17
  75:4,6,8 78:25
  79:3,5,14,15,17
  79:19,25 80:6
  82:23 83:2,14,21
  83:25 84:10,12
  84:13,24 85:1,3,9
  85:19,22
**locating** 76:4
**location** 40:5
**Logan** 1:16
**long** 21:11 60:7
  75:1 107:1
**look** 4:17 12:5,11
  13:12 16:22 18:2
  18:25 26:17
  36:16 39:7,19
  40:1,3 44:3 46:18
  50:16,20 51:21
  52:14 66:25 74:2
  75:17 76:16,16
  82:2,17 90:1
**looked** 39:5 44:23
  57:22 72:14
**looking** 37:8 39:5
  39:21,21 50:10
  68:6 76:5,7 82:23
  109:11,14
**loose** 79:8
**lose** 18:14
**lost** 17:19 19:9,12
  19:13,14
**lot** 20:13 32:8
  56:25 60:11,14
  60:14 93:10
  99:15 113:1
  114:10
**loves** 60:3,3
**lower** 68:11
**lump** 80:7 111:1
**lump-sum** 78:7
**lunch** 6:8 71:8

73:15,17 74:2

---
**M**

**Magistrate-Judge**
  115:6
**magnifier** 109:19
**mail** 15:23 30:17
  42:25
**mails** 22:7,9
**majority** 111:17
**making** 11:8 39:20
  40:3 46:19 76:3
  92:14,16 110:2,4
  110:5
**MALE** 42:13
  51:14,16,18
  109:8,11,14
  110:4
**manage** 5:1
**management** 4:4,9
**manager** 34:19
  63:16,17 108:12
**managing** 55:17
  60:25
**March** 22:14 27:20
  63:15
**mark** 51:11
**marked** 24:1 25:1
  50:9 52:17 54:23
  69:17 79:8 104:5
  109:3
**Market** 1:23
**marketing** 62:25
**marks** 36:14
**Mary** 10:15
**massive** 53:19
**matching** 13:1
**matter** 32:3 33:8,9
  38:22 42:7,8
  54:18 70:14
  80:12 105:8
  114:12,23 117:7
**matters** 6:8 21:18
  48:19
**mature** 107:5
**Maurice** 1:15
  42:18 44:22

46:10 71:10
**mean** 5:13 6:24
9:23 13:22,24
23:5 60:9,18 67:5
70:14 89:3
**meant** 67:6 94:19
94:22
**meet** 98:6
**meeting** 38:4 39:4
45:7 57:20,20
**member** 38:3
**memorialized** 75:7
**memorializes**
29:17
**memorializing**
29:13
**memory** 75:14
**mention** 46:25
**mentioned** 38:10
**mentor** 6:4
**merger** 24:19
**mergers** 3:25 37:6
37:13
**message** 108:12,13
**met** 58:9 93:24
94:4 107:9
**mic** 55:11
**Michelle** 7:19,20
8:19 9:4,8,10,15
31:16 74:8,14
94:24 95:1,3,4
**microphone** 106:8
107:2
**mid** 37:11 94:3
**middle** 15:14
17:14,14
**midway** 68:24
**Mid-Atlantic** 1:23
**mid-morning**
40:18
**Milavec** 41:18
43:25 44:1,21
45:18
**million** 13:9,18,22
13:23,23 14:1,1
15:11 34:7 62:13
62:14 86:14,17

95:17,20,22,25
96:5,14,15,17,18
96:19,21,25,25
97:1 110:25,25
111:2
**mind** 23:11 26:3
50:2 63:12 116:1
**mine** 91:17 106:21
106:21 115:10
**minor** 15:19 36:10
**minute** 18:4,22
49:16 73:5 87:3
103:23 106:22
110:2 111:25
**minutes** 3:1,4
40:13,17 54:12
**missing** 21:8,8
39:8
**mister** 44:14
**Mitchell** 2:3 9:4,8
9:11 10:10 15:23
33:2,5 34:18
54:14 55:7,10
67:8 69:16 70:17
71:14 74:2 79:7
80:16 81:4,21
86:25
**Mitts** 1:15,16 8:8
10:24 13:13 20:9
21:9,17 25:14
26:24 27:1 29:2,5
30:7,9,15 31:25
32:8,11 35:1,5,8
40:9 41:13,18
42:18 43:1,2,8,25
44:21,22 45:4,11
46:3,10,15 47:8
48:13,18,21 49:2
51:20 53:7 54:6
54:10,13,17 55:4
55:9 64:6,9,10,25
65:23 66:4,5
69:23 70:1,15,16
70:21 71:9,12,13
71:20 73:8,17,21
73:23,25 74:1
80:15 81:3,20

98:12,20 99:5,7
99:19,25 100:3
101:5,8,14,19,22
102:14,16,18
112:2,12 113:7
**moment** 12:4,10
71:23 72:15 78:3
102:23 109:6
**moments** 78:24
**money** 9:24 13:9
16:10,13 62:7
78:23 80:13,19
80:25 84:11
91:20 95:23 96:2
96:7,11,24
**month** 35:20
**months** 78:14
**morning** 40:23,24
109:12
**motion** 39:4,21
53:11 105:10
**motions** 105:12,18
105:21
**move** 23:3,8 27:10
65:17 66:3 82:21
89:18 101:8
**moved** 56:20
108:21
**moving** 103:14
**multiple** 28:25
29:6 83:25
108:12
**myriad** 85:15

**N**
**N** 1:8 2:1 33:20
82:4 117:2
**name** 7:18 55:16
55:18 57:16 63:1
107:25
**named** 21:23
**Nancy** 33:20 82:4
**narrative** 21:11
**National** 1:22
81:17
**nature** 56:9
**necessarily** 62:8

**necessary** 21:24
99:12,13
**need** 11:7,11 97:20
101:23 105:11
110:7
**needed** 34:4 36:11
111:21
**neglected** 46:25
**negotiate** 87:7
**negotiated** 89:4
**neighborhood**
56:21
**neither** 9:12 15:1
**network** 12:19
**never** 17:20,20,21
26:2,14 50:2
53:24 80:10
114:8
**Nevins** 117:4,12
**new** 57:12 59:22
59:22 63:6
106:21
**newly** 71:4
**nominated** 115:4
**non** 68:16
**non-investing**
68:16
**normal** 83:14
85:11,17,17
**note** 21:9 50:9 75:7
77:9,17
**notes** 72:12 79:12
**notice** 28:9
**notification** 17:18
**notion** 20:23
**November** 44:22
45:23 46:11
47:14,15,25 48:4
48:10
**number** 15:18 16:4
16:8 19:22 24:15
24:16 25:12,14
28:20 29:8,19,20
30:6 31:2 35:7
38:10,13,13
52:23 53:15
57:24 61:11

64:17 67:8,19,20
68:12 76:10,17
88:1 99:14 100:9
100:9,9,9 102:14
103:16 104:5
**numbers** 22:10
24:18 42:12 74:5
74:9 100:1,5
111:18
**numerous** 61:10
**nurtured** 62:17
**nuts** 16:12
**N15** 10:25 11:3
33:20 49:24,24
82:2,3,3
**N6** 15:5

**O**
**O** 117:2
**object** 5:20 23:20
103:19
**objected** 16:20
20:24 22:23 52:6
**objection** 13:13,14
17:1 21:9 23:13
23:17 24:1,3
26:24 29:2 65:16
69:22 70:4,20
80:8 83:18 84:2
**objectively** 114:2
**obligation** 53:17
82:11
**observation** 93:12
**observe** 59:22
**observing** 57:21
**obtaining** 87:3
**obviously** 58:3
113:2
**occasions** 94:13
**occur** 48:9
**October** 41:13
42:21 43:1,18,25
44:14 45:18 47:6
86:10
**offer** 98:21 100:15
101:5
**offered** 53:23 71:3

offering 101:3
112:19
offhand 24:8
office 6:7 28:22
29:9 35:16 40:2,2
57:18 60:11
74:13 108:18,21
offices 59:21 60:1
74:5
official 117:6
oh 15:9 30:7,10
32:17 35:5 36:18
36:22,23 37:4
49:20 51:18,19
51:19 52:17
73:19 91:16
98:12 106:20
107:16 109:8,10
okay 3:9 4:17 8:3
11:25 12:15
13:25 16:24 17:5
17:10 21:3 24:5
24:17 26:2,23
32:16,17,22,24
33:4,13,18,23
34:1,15 35:10,11
35:13,18,20,23
36:23,25 37:3,8
37:18,21 38:6,15
39:10 40:5,9
42:18 43:5,24
45:4 47:4 49:22
50:20 51:21 52:4
55:15,18,23,25
56:5,12,14 57:8
58:6,11 59:7 61:6
61:21 63:25 64:9
65:10 66:13,18
66:25 67:15,18
67:21,22 68:2,15
69:11,20 71:6,14
72:16 73:14
74:12,17,21 75:1
76:9,13 77:7,12
77:14 78:7,10
79:17,24 80:20
80:23 82:6 83:9

84:15 85:17 86:7
86:18 87:2,22
91:17 92:6 93:22
96:10,18 98:2,6,8
98:14 99:5,9,13
99:25 100:3
102:1,19 103:10
104:1,10 105:18
105:21,24 109:17
109:25 110:1,8,9
110:15 111:11,24
113:6
older 107:6
once 24:5 33:20
65:4,4 94:4,4
ones 48:8 101:4
106:21
one-thirty 73:20
113:10
ongoing 45:14
47:11 102:7
open 61:7,8,12
oper 37:7
operating 5:4
63:16,17
operation 3:24 5:5
operational 3:18
4:8 5:15 6:11
37:7 63:19
operations 4:1
6:16
opinion 3:21 23:19
49:2,7 53:18,21
115:21
opinions 48:14
opportunities 59:3
93:18,18 94:12
opportunity 59:5
59:21
opposed 93:13
opposing 55:1
option 26:20 66:8
66:12,15,17 69:6
69:9
oral 103:20 114:10
115:17
order 31:12 52:5

52:10 53:11,16
62:1
ordering 52:1,10
organized 17:7
original 110:10
Oscar 51:19
outbound 62:25
outgoing 60:4
outlining 29:24
outset 59:15
outside 33:6 34:3
34:13,17 41:18
41:25 42:1,5,19
46:19 59:16,16
62:2,19
outstanding 46:22
79:3
overall 15:20
owned 3:13 18:1
19:24 29:24 31:3
31:14 60:24
61:25 62:3,20
83:16,22 111:17
owner 57:13 58:8
ownership 23:16
23:18 28:2 46:5
48:15,20,22,23
50:25 58:12 61:2
77:20 111:9,13
111:20
owning 71:1,2
owns 18:23 31:12
77:22
O'NEILL 1:8
O-2 2:7
O2 51:17

P

PA 1:4,14,17,24
package 64:19
page 4:17 13:4,8
13:25 14:20,24
38:17,21 39:10
39:14,23 48:3
55:5 68:11,12,24
72:2 76:16 77:9
91:8,16,17,18,19

pages 30:8 37:23
39:13
paid 9:19,24 36:5
78:13 83:6 96:11
96:14 102:4
110:25
painful 114:19
paper 6:3 54:23
61:5
paragraph 4:23
12:11,13,16 14:6
14:8,12,13,23
26:20 44:4 45:11
46:18,25 47:1,8
47:10,12 77:15
82:18
paragraphs 14:5
Pardon 40:15
69:25 102:15
106:17 109:6
part 4:10 7:17 14:9
15:23 26:22,22
26:23 33:4 37:5,6
37:12 39:11,16
60:21 64:2,18,19
65:25 68:21 69:3
75:5,8 79:4 85:8
85:17,21,23 86:1
86:4 89:12
100:13 103:24
participate 4:10
particular 15:24
24:1 37:9 99:17
101:4
particularly 64:24
parties 59:2 93:8
partner 55:17 58:2
60:4 61:5 82:9
partners 58:18
59:4,7
partner-in-charge
34:18
party 15:1,4
passing 21:25
path 11:6
Pause 16:17 25:19
30:19 31:22,24

36:24 42:15 50:5
51:24 54:5 69:15
81:23 86:22
99:10 106:14
109:7 110:6,17
112:1 113:18
pay 5:3 85:9,18
96:2,10
payable 75:6 79:12
paying 96:18,19
payment 7:24 8:24
8:24 11:8 34:12
68:23 75:25 76:1
78:8 80:6,7,13
82:11
payments 11:23
15:4 28:14 29:22
77:4 78:21,21,23
85:14 97:9 111:3
111:3
payout 9:23
pays 96:7
PC 2:9 103:18
pending 21:21,22
Penllyn 1:13
Pennsylvania 1:1
55:17
people 6:14 114:6
114:9,20 116:2
percent 17:25 25:9
26:7,19,19,20
27:6 31:12 43:21
44:6,17 45:9,21
46:1,5,22 47:18
58:16 66:8,15
71:1,2,5 79:20
87:24
percentages 22:10
Perfect 54:13
period 28:23 29:8
57:14 62:4 63:20
66:14 75:22
77:19 78:14 95:9
111:6
pers 51:3
person 8:10 92:16
92:17 93:24 95:7

95:10
**personal** 18:6 19:6
51:3 64:4 88:13
**personally** 15:1
17:22 28:4 51:2
52:11
**perspective** 56:18
**pertinent** 39:11,16
**ph** 10:16 90:4
115:2
**phenomenal** 62:9
62:18
**Philadelphia** 1:4
1:17,24
**phone** 28:24 29:10
**photocopies**
109:24
**pick** 82:22
**piece** 69:1
**pieces** 68:22
**Pike** 1:13
**place** 37:9 88:11
88:14
**Plaintiff** 1:3,11 2:2
2:6 50:13 82:3
98:22 100:4,11
100:20 101:1,2
105:6
**Plaintiffs** 71:1
102:10 112:9
**plaintiff's** 4:12,14
10:25 30:9 32:12
33:19 34:22
51:13,17 53:19
67:12 82:2
100:16,21,23
101:10 107:21
**plan** 10:16 11:7,15
15:15
**planned** 19:2
**pleasant** 114:8
**please** 4:12 8:12
12:2,10 14:25
15:5 20:9 22:1
26:17 27:5,9,22
29:16 33:16 34:5
35:14 37:3 40:2

43:5 44:7 45:12
47:10 55:13,23
59:25 67:20
69:18 70:18
71:14 73:20,24
76:11 77:14
107:19,25 109:5
116:7
**pleasure** 116:4
**plenty** 114:22
**plus** 76:18,19 96:3
111:19
**point** 4:6 5:11
10:12 17:17
28:24 35:25
42:25 46:13
49:24 53:7 57:2
57:21 62:5 63:2
69:22 80:24 94:3
95:7,10 98:20
105:5
**pointed** 39:10,13
**portion** 68:2 71:23
**pose** 69:21
**posed** 22:3
**posing** 80:10
**position** 21:20
26:16 43:19 49:8
55:10
**possible** 19:4
**practice** 41:25
56:7 83:14,24
84:3,6
**practicing** 56:23
**precise** 47:11
**predicting** 114:13
**prefer** 32:1,2
115:5
**preference** 54:7
**preferred** 62:4
64:3,19
**preparation** 8:18
95:5
**prepare** 98:2,4
**prepared** 8:19
11:10 31:20
35:15 67:25

72:16 78:15 95:1
98:5
**preparing** 74:21
**preschool** 56:20,23
**present** 24:20
58:11 99:12
104:8
**presented** 104:18
104:24
**presenting** 104:15
**presently** 45:6
**present-value**
80:20
**president** 6:12,13
49:3 108:13
**press** 111:21
**pressure** 113:1
**pretend** 107:7
**pretrial** 17:25
70:23 71:2
**pretty** 17:13 60:11
60:13 63:16
108:3
**previously** 56:12
89:9
**price** 66:11 69:4,8
**primarily** 3:9 59:3
**primary** 61:16
72:22,23 104:20
**prime** 3:10
**Princeton** 57:12,15
57:18 59:22 60:7
74:13 108:18,21
**principal** 79:18
80:4
**prior** 10:13 11:8
11:20 39:20
55:18,20,20,21
56:3 57:3 66:21
73:1 79:14
**private** 62:12
**privately-held**
56:24
**privy** 63:10,13
**pro** 103:22
**probably** 40:13,16
57:1 72:25 73:1,2

90:23 93:25 94:2
95:11,14 97:19
97:20
**problem** 107:1,4
**procedures** 89:12
**proceed** 25:17
107:11,18 110:15
**proceeding** 52:8
**proceedings** 1:21
56:10 117:7
**process** 10:10
72:20,21 102:8
**produce** 18:12
**produced** 18:11,12
41:4,5
**production** 2:7
50:14
**profession** 55:13
**professional** 81:6
**professionally**
113:21
**profits** 96:8
**Progress** 88:3,6,8
88:20 89:2
**promise** 49:23
**prompted** 28:5,16
**promptly** 43:7
115:2,11
**proof** 17:7 19:18
23:2,17
**proper** 21:10,11
**properly** 36:3
**protected** 105:21
**protective** 53:11
53:16
**protracted** 57:14
**provide** 43:6 47:23
49:7 56:6 73:9
75:23 82:15
87:22 98:24
101:11
**provided** 42:4
44:15 47:5 54:25
87:18,20,21
**provides** 26:20
**providing** 48:14
56:5 84:8

**proxy** 59:11 60:17
93:23 94:6,17,18
**public** 55:14 56:1
56:2 81:6,11
**Pudle** 2:8
**Pudles** 1:5,16 2:3
3:4 12:12,24 13:9
13:15,18,19
25:21 30:12,22
32:12 37:25 38:7
38:16 40:10,23
41:3 48:24 50:8
50:14 53:9,11,16
56:19 58:13
59:23 61:19,20
71:10,25 78:4,7
78:13,17 81:24
82:1 83:13,23
84:7,17,22,24
86:9,18 90:16
91:4,5 92:25
93:10 95:16 96:5
96:11,14,16,18
98:11 100:20
101:21 102:2,4
102:11,20 103:14
103:15,24,25
104:2,13,17,20
104:22,25 105:3
105:22 108:15
109:1 110:21,24
111:12,25 112:7
112:13,15
**Pudles/Robertsh...**
66:24
**pull** 10:22
**purchase** 7:23
65:14 66:11 67:6
68:4,21 69:4,8
72:1 77:5 109:15
**purchased** 66:17
75:19
**purpose** 34:1,3
35:23
**purposes** 9:14 80:6
**pursuant** 10:11
86:25

**put** 4:7 8:12 11:9
15:15 17:9 20:18
63:6 80:9 101:23
105:13 106:8
113:1
**putting** 17:21
**p.m** 73:22,22
103:11,11

**Q**

**qualified** 56:12
**quality** 55:12
**question** 3:15 5:17
5:21,22 8:12 10:4
10:7 12:1,17,20
19:4 20:18,19,22
21:5,10 22:1,3,4
26:25 27:1 29:4
29:11 64:12
65:17,22 70:19
71:7 76:3 84:23
86:7 89:10 93:11
93:22 95:15
102:11 103:13
**questioner** 8:10
**questioning** 71:8
78:24 85:10
111:14
**questions** 20:14
31:23,25 32:1
49:11 50:3 53:6
54:2 81:24 86:18
86:20 98:9
108:24 111:13,24
112:2,5,7
**quick** 11:11 49:13
53:7 109:22
**quickly** 49:14
**quiet** 107:16
**quite** 20:17 21:1
21:19

**R**

**R** 1:15 117:2
**raise** 21:6 22:4
107:20
**raised** 47:14 70:22

**ran** 3:15 5:14
62:15
**rate** 79:20,22
**rates** 83:2,5,6,9,12
84:11
**Ravitch** 10:11,17
15:14 34:16 82:9
**read** 4:23 14:25
19:4 25:17 30:5
33:4,7 39:23 48:7
49:14 50:1,1,12
91:13 100:1
110:1 115:18
**reading** 47:9 49:24
**ready** 110:15
**real** 19:21 109:22
**reality** 5:14 6:2,3
**realize** 19:4
**really** 4:5 11:5
20:11 21:10 23:5
35:24 57:10,20
58:7,17 59:8,17
60:10 62:10 66:1
68:22 75:4 78:15
80:18,18,20
82:11 87:14 94:7
107:4 113:10
114:18
**reason** 18:2 45:5
111:16 115:3,5
**reasons** 85:16
**reassignment**
26:15
**reassigns** 26:6,8,9
26:9
**rebuttal** 70:22
71:3,11 105:6
106:1
**recall** 7:22,25 9:16
15:12 17:10
28:18 29:1,6
41:14,17 44:11
44:13 45:2 46:12
50:15,17,19 51:6
51:6,8,8 52:4,9
52:10,11,13,19
52:20,21 86:17

97:11 111:5,8
**receded** 3:25
**receive** 52:16,19
78:13 92:3 111:2
**received** 18:17
41:11 45:22,24
52:12 78:7,11,12
78:18,20,22
**receiving** 44:13
45:2 46:12 50:15
50:17,18,19
52:10,20 64:15
**recess** 40:21 73:22
103:1,3,11
**recharacterize**
8:23
**recipients** 34:15,16
**recitation** 24:2
**reclass** 7:25
**reclassifica** 29:18
**reclassification**
9:13 11:22 29:22
**reclassifications**
8:21
**reclassified** 7:24
92:3
**reclassify** 8:15
10:8
**recollect** 88:1,10
88:21
**recollection** 53:2,4
63:6 82:19 88:23
93:9 97:23
**record** 8:11 20:10
20:17 36:14 37:3
49:15 50:1 55:2
71:10,15 82:7
91:1 105:13
107:25 116:8
**recordation** 91:15
**recorded** 1:21 76:1
90:9,10,12 92:7,9
92:22
**recording** 1:21
65:12,12 89:7,11
117:6
**records** 9:3 18:9

18:11,14,15 19:6
19:9,14 31:19
36:15 38:23,24
39:6,8 44:9 45:13
45:14 47:2,5 65:2
65:19 79:24
83:11 105:21
**record's** 105:18
**RECROSS** 2:2
**REDIRECT** 2:2
50:6
**refer** 41:23
**reference** 25:5
50:25 61:21 78:3
100:17
**referenced** 102:5
**referencing** 14:6
14:12,13 31:1,2
100:5
**referred** 17:2
**referring** 59:7
61:23 109:13
**refers** 25:7,8 47:1
**reflect** 15:10 50:24
84:16,20
**reflected** 65:8 67:6
68:24 69:13
72:14
**reflecting** 65:2
**reflects** 23:12,25
71:24 83:2
**refresh** 75:14
82:18
**refused** 47:23
**regard** 45:17 48:15
70:4
**regarding** 48:1
76:14 82:10
**region** 1:23 94:1
**regular** 4:2
**regularly** 3:16,17
73:9
**rejected** 22:19
**relate** 21:18 50:24
88:20
**related** 18:15
60:19 94:9

**relates** 80:19
**relating** 48:19
53:11
**relationship** 7:3
58:19 59:23,25
60:25 61:8,9 79:3
**release** 18:19
19:18,21,22 23:1
23:10 24:14 25:5
25:6,8,12 29:17
109:9
**relevant** 22:22
99:22
**relief** 21:24
**relieving** 53:16
**remain** 93:20
**remark** 107:17
**remember** 16:3
18:17 22:8 27:23
32:14 43:23 45:3
52:1 53:9 57:4
60:5 97:16
**remind** 45:17
**reminding** 47:13
**renew** 46:3 105:17
**renewed** 105:20
**repaid** 75:3,7 79:6
80:1 84:25 85:23
**repayment** 79:14
**repayments** 80:4
84:20
**repeat** 5:17 27:9
**repeatedly** 26:13
**replied** 65:20
**reply** 43:7 45:22
52:5
**report** 41:9
**reported** 7:12,18
7:20 74:12,14
88:12
**reporting** 1:22
41:15 56:8
**represent** 31:11
41:18
**representation**
46:16 104:4
**represented** 44:4

60:21
**representing** 21:15
52:7,9 94:14
103:21
**represents** 77:4
**request** 2:7 11:16
17:22 41:11
43:12 46:4 47:16
50:13 52:15
53:12,12,19
64:11 73:10
99:14,22 100:4,8
100:10,13,19
115:15
**requested** 14:9
17:23 45:18
47:24 53:14
**requests** 73:12
98:21 99:21
**required** 15:1
59:16
**reserve** 71:6
103:20
**reserved** 105:12
**resolve** 113:3
**respect** 11:22
45:14 47:13 49:3
58:14,20 63:12
63:21 66:6 77:15
100:10
**respects** 60:1
**respon** 6:1
**respond** 53:17
**responded** 29:10
39:18 52:12
53:14,20
**responding** 20:14
52:13
**response** 29:5 33:2
33:12 34:7 47:15
51:9,9 52:14,14
99:15,23 100:19
100:21,23
**responses** 98:22
99:8 101:2,6
**responsibility**
63:19 72:22,23

**responsive** 5:21,24
65:21
**rest** 27:9 101:20
**rested** 112:13
**resting** 105:1
112:9,11,12
**Restrepo** 53:15
115:1
**restrictions** 61:12
**rests** 101:15
**result** 19:9 59:15
65:7 104:6
**RESUMED** 3:2
**retain** 41:18
**retrieve** 109:19
**return** 69:19 71:8
71:21,24 72:2,16
72:18,25 73:1,4
74:3,18,22,24
**returns** 66:22 67:1
69:12 72:23,24
74:6,19 75:2
78:25 86:11
**revenue** 62:13
**reverse** 70:7,8,9
80:20
**review** 34:13 45:13
79:24 80:2,3
**reviewed** 46:19
48:4,12 72:24,25
72:25
**reviewing** 46:13
72:22,23 83:11
84:9
**revoking** 25:22
**re-ask** 5:21
**Rhoads** 31:25 32:1
32:4,6 40:12,13
40:16,20,22,25
41:2 42:14,17
49:10 86:20
101:17 112:5,20
112:24 113:4
**right** 4:4 5:10 6:7
7:10 9:14 11:6
13:2 14:4 15:18
16:18 17:3,9 20:8

22:20,24 24:3
25:15 26:5,12,21
26:22 34:9 38:21
40:18 41:9,23
42:10,14,19,22
43:17 44:17 45:7
45:9 46:6 47:2,8
47:19 48:7 49:10
54:3 55:6 70:4,9
70:12 73:7,15
74:10 76:4 77:23
78:3 81:2 89:2
90:3 91:13 92:8
93:14 94:9 95:18
96:3,22 98:15,19
99:6,7 100:5
102:10 103:23
104:7,10,13
105:4,19,24
106:4 107:11,18
108:16,18 109:20
110:14 111:8
112:9,16 116:4
**rights** 111:21
**right-hand** 68:11
**risky** 114:14
**Robert** 32:24
**Robertshaw** 1:2
2:4 4:5,7 6:1 7:20
9:6,12,18 12:12
12:25 13:9,16,18
13:23 14:10
22:18,21 24:10
24:21,25 25:22
27:16 30:6,13
33:2,5,9,10 37:24
37:24 38:5 39:2
41:12 43:13,20
44:5 45:7,19,25
46:20 57:16
58:13 59:10,23
60:17,17 61:6,14
63:10,12,13,16
70:24 71:2,25
73:9 74:15 78:4
78:10,12,18 79:2
79:4,13 80:1,5

83:7,16,22 87:25
90:2,4,13 92:7
93:1,24 94:20
100:5 106:3,4,10
106:13 107:21
108:1,2 109:2
110:19 111:2
113:14,15
**Robertshaws** 4:21
6:17 13:15,20
15:22 35:17,17
35:24 36:2 58:17
72:19 93:9
**Robertshaw's** 8:6
8:23 16:21 20:24
22:23 23:13,21
25:10 30:22,25
31:17 44:17 46:5
47:17 50:13
57:18 71:4
109:19
**Robertshaw-ow...**
7:9
**role** 3:23 4:2,3 5:4
37:7
**roles** 6:15
**Roman** 100:17
**room** 55:12
**rule** 70:13 100:16
**run** 3:5,6,9 7:18
**running** 5:7 6:5,15
32:13 52:23,23

---
**S**
**s** 13:15,19 50:25
**salary** 12:25
**sale** 63:22
**Salle** 55:25
**Sandy** 57:23
**save** 10:24
**saw** 6:23,23 80:3,4
88:17 97:7,17
111:7
**saying** 11:24 21:4
52:19,20,20 53:2
107:8,12
**says** 12:11,24 13:8

13:9,14,15,18,20
14:1,3 24:25 43:5
44:4 45:12 46:18
47:4 50:13 91:14
91:20,22 107:7
**scenes** 59:10 60:20
**schedule** 72:2,5
112:25 113:5
115:13
**se** 103:22
**searching** 103:1,3
**season** 74:11
**second** 12:7 13:4
36:7 38:18,20
39:10,14 43:5
44:4 46:18 47:1
48:8 68:25 69:1,3
77:15 100:8
108:8
**Secondly** 17:23
**section** 14:23
76:21 82:18
**see** 4:18 12:12 16:9
22:2 25:16,16
30:13 32:21,23
34:15 42:16 44:1
44:10,24 45:11
46:10 50:11,21
67:10 68:7,10
75:19 76:22,24
77:12 87:2,25
88:3,6,15 91:11
93:1 96:13 97:3,5
97:6,6 105:6
111:16 114:24
116:5
**seeing** 43:23 44:11
45:3 51:6 93:13
111:5
**seek** 43:6
**seen** 7:4 15:7,7
83:12 93:5
102:13 114:1,4
**sell** 57:15,24 58:9
**send** 36:12 115:7
**sending** 42:5
**sense** 80:12 94:18

**sent** 11:3 17:21 22:18 29:23,25 36:7,9 39:1 43:1 43:12 44:12
**sentence** 14:23
**separate** 7:8 53:1
**separately** 100:21 104:14
**September** 15:21 35:19 54:19
**series** 88:19
**served** 53:13,13,24 100:11
**service** 56:6
**services** 2:9 56:6 57:6 103:17
**serving** 53:19
**set** 23:16 34:5,11 42:12 58:19 112:25
**settling** 115:4
**seven** 14:24 61:18
**share** 3:22 22:10 22:11 26:19 28:3 48:15,19,22,23 50:23 63:7,8
**shared** 3:16 72:18
**shareholder** 34:11 37:19 41:13 61:17 65:6 68:18 69:2,13 71:24 74:17 75:4,8 78:25 79:3,5,5 84:24 90:11,12 90:15,17 91:20 91:24 92:2,4,6,7 92:8,9
**shareholders** 45:8 48:16 61:16,18 62:20 72:5,10 93:7
**shareholdings** 47:11
**shares** 23:16 25:9 26:11,12,19,21 29:24,24 31:12 43:22 44:7,18

46:1,22 47:18 49:4 62:20,21 64:17,18 77:16 87:23 111:18
**Shaw** 37:25 38:2,3
**sheet** 68:7 72:3,3 76:18,21
**sheets** 11:10
**short** 103:1,3
**shorthand** 99:20
**show** 24:19,20 68:3,6 75:14 76:13 109:4
**showed** 49:8 87:22
**showing** 111:8
**shown** 9:17,17,19 42:24 44:10 45:1 46:12
**sic** 53:18
**side** 32:9 59:8,9 60:1,1
**signatories** 37:14
**signature** 14:20 37:21
**signatures** 37:23
**signed** 13:5 22:21
**significance** 21:7 77:15 80:17,18
**significant** 3:19 4:8 86:15
**Signius** 3:13 5:9,9 5:12 6:14 7:16 38:25 58:23 62:10,12,18,20 62:21 63:9,14 72:24 74:8 95:3
**similar** 11:21
**Similarly** 100:25
**simpler** 12:22 110:19
**simply** 53:23 99:14 101:18
**simultaneously** 52:24
**sir** 4:14,16 12:3,6,9 13:7 14:12,19,22 15:6 16:24 25:25

27:18 31:5 33:22 33:25 35:7 38:13 97:20 98:15 104:9 106:13
**sit** 60:8 97:16 102:25 107:9 113:16
**sitting** 47:25
**Six** 42:13
**Slightly** 98:3
**smiling** 107:10
**SOB** 107:9
**sold** 6:17,19 18:21
**somebody** 30:5 38:3 107:7
**someone's** 24:2
**soon** 71:7
**sorry** 3:1 10:3 13:6 15:21 19:16,21 20:20 26:9,25 27:4 28:8,11 29:19 31:5 32:21 34:25 35:7 39:12 49:17,18 57:23 67:12,16 68:4 70:10 82:3 91:16
**sort** 15:15
**sought** 57:6
**sound** 1:21 55:12 117:6
**sounded** 21:4
**source** 64:12,14 67:1 68:3 78:11 78:14
**speak** 8:10 23:23 55:11 107:1
**speaking** 29:9 49:16 70:2
**speaks** 25:11
**special** 15:2 45:7 75:5,8 78:17 82:10
**specialty** 81:8
**specific** 14:3,16,17 74:7 97:17,17 99:8,21 100:5 101:6

**specifically** 23:20 24:25 28:21 29:6 97:16 100:17 111:14
**specifies** 14:1
**spells** 13:8
**spent** 60:5 114:7 114:20
**spirit** 57:1 60:11
**spoke** 29:6 94:20
**spring** 58:10
**Square** 1:16
**staff** 15:17
**stamp** 76:17
**Stan** 45:18
**stand** 13:17 20:14 102:20 114:5
**standing** 81:18
**standpoint** 95:15 96:2
**Stanley** 43:25
**start** 8:12 16:3 20:18 59:12 74:10
**started** 10:10 29:5 58:7,14
**Startel** 6:19 86:11 86:13,15
**starting** 4:23 113:9
**state** 55:2 107:25
**stated** 18:1
**statement** 3:7,8 27:8,9 67:24 68:3 72:14 75:18 100:16
**statements** 16:1 31:9 59:17,18 65:9,21,24 66:20 67:1 69:11 75:21 76:6 77:21 79:1 95:12
**STATES** 1:1,9
**stationery** 44:22
**stay** 6:25 35:2 60:20 98:17
**staying** 106:5
**step** 54:3 98:15

**stepped** 6:16 95:4
**stock** 45:9,21 46:6 46:22 62:4 64:3 64:18,19 65:6 72:1 87:24 97:7 109:14 111:9
**stop** 39:6 114:11
**story** 18:3 62:18 70:25
**Strauss** 30:6
**Street** 1:23
**strike** 23:3 65:17 83:13 86:9 89:18
**structure** 65:7
**stub** 91:13
**stuff** 60:14 63:6
**subject** 19:1 33:8,9 34:13 38:10,22 86:6 112:19
**submission** 100:6 101:18,22
**subpoena** 86:25
**subsequent** 22:6,8 22:13,14
**subsequently** 51:12
**subsidiaries** 76:18
**subsidiary** 3:13 5:12 6:1
**substance** 70:14
**substantiate** 47:17
**sub-Exhibit** 54:25
**succeeding** 74:19
**success** 62:19
**suddenly** 18:23
**suggestion** 11:21
**Suite** 1:13,23
**sum** 80:7 101:24 111:1
**summarized** 46:23
**summer** 58:10 78:5
**sums** 85:4,18,18,21 85:22
**super** 115:3
**supervisor** 41:6
**supplied** 89:23

**supplies** 31:15
**supply** 52:1
**support** 15:2 20:23
  88:16
**supported** 49:8
  97:4,9
**supporting** 76:14
  99:16
**supposed** 106:21
  106:21
**sure** 5:18 7:2 9:1
  11:9,24 15:25
  16:7 17:16 21:1
  26:23 52:24
  62:23 66:4 75:15
  76:3 78:18 84:23
  89:3 94:2,3,5
  99:1,6 102:24,24
  109:23 111:22
  115:20
**surprise** 93:16
**swell** 106:24
**switched** 69:23
**SWORN** 55:7
  107:21
**synagogue** 56:22

**T**

**T** 117:2,2
**tab** 67:19,20 76:10
**table** 24:20 30:1,17
  30:24 40:1 46:24
  55:4
**tables** 111:5
**take** 12:4,10 13:1
  14:6 16:22 21:12
  28:2 32:6 38:19
  40:2,18 63:20
  71:8 73:15,17
  86:5 102:20,22
  102:23 105:19
  112:16 113:2,15
  113:25
**taken** 62:13
**talent** 114:24
**talk** 3:5 6:9,9,10
  6:11 56:25 60:8

**talked** 3:16 4:6 6:6
  9:15 19:19 22:9
  43:19 60:13 94:8
  94:10
**talking** 9:9 16:18
  16:19,23 20:15
  28:21,24,25,25
  38:17 59:2 87:5
  94:11 109:3
**tax** 34:19 59:19
  61:15 66:22 67:1
  69:12,19 71:21
  71:24 72:2,16
  74:3,11,18,19,21
  75:2 78:25 82:9
  86:4,10 93:20
  94:25
**taxation** 86:6
**taxes** 9:19
**team** 4:9 54:21
  65:10
**tele** 57:5
**telemessaging** 57:6
  57:7,11 62:6
**tell** 12:10,15 19:22
  21:20 26:23 27:5
  34:1,3 36:13 39:1
  50:10 55:13
  56:16 63:25
  88:22 90:17
  114:23
**telling** 19:14 41:17
  104:15 105:19
**Tel-A-Talk** 58:15
  58:23 60:23
**ten** 40:13,17 61:18
  79:20
**term** 94:18
**terms** 54:7 65:11
  78:19 97:6
**testified** 6:9 16:13
  21:1 23:16 26:13
  39:3 41:11 56:10
  69:13 89:21
  92:25 94:24 97:2
**testify** 106:7

**testifying** 7:22
  64:21
**testimony** 8:22
  18:5 38:12 48:1
  52:16,18 56:8
  64:24 71:3,11
  88:17 89:19
  93:11 98:2
**testing** 89:11
**thank** 6:21 11:1,2
  14:18 25:18
  29:21 33:13
  34:21 36:16
  40:20,22 46:9
  49:10 53:5 54:4
  54:13 55:3 64:6
  70:11 71:9 73:21
  73:25 77:7 81:20
  82:6,21 83:1 98:8
  98:16,17,18
  101:14,20 103:6
  105:15,22,23
  106:13 107:10,22
  110:13,14 112:15
  112:24 113:8,14
  113:22 116:4
**Thanks** 32:8 40:4
**thing** 49:13 113:23
**things** 9:10 10:14
  11:14 15:25
  20:25 49:23 56:9
  60:14,22 93:10
  93:11 111:22
**think** 8:9 9:1 10:18
  11:6 16:25 19:5,6
  20:12,13 21:8
  22:4 24:8 26:5,17
  33:19 40:7 50:1
  51:11 58:5 60:7
  60:10 62:5 63:1
  73:15 92:16 94:4
  94:23,25 99:13
  99:13 103:6
  110:19 111:21
  114:3 115:3,14
  116:2
**thinking** 58:9

114:6
**third** 12:13 44:4
  45:11 47:9,9
  53:20 91:8
**THOMAS** 1:8
**thought** 6:24 7:6,6
  12:21 16:10,19
  17:6 36:13 57:5
  89:9 99:19
**thoughts** 115:24
**thread** 39:11,16
**three** 25:9 26:6
  54:21 66:8,15
  71:1 81:24
**three-fourths**
  68:15
**three-percent** 7:23
  18:21 27:17 28:3
  75:11 87:4 88:18
  88:25 109:1
**three-way** 57:19
**three-year** 75:21
**tied** 82:11
**tight** 60:13
**till** 102:25
**time** 4:1,1 6:16 7:5
  8:11 10:24 11:11
  15:12 17:23
  19:13 20:10,16
  27:6 28:21,23,24
  29:6,8,9 37:11
  40:10 42:19,25
  44:11,14 45:13
  45:15 46:11,13
  48:12 56:23 61:1
  61:10 63:4,20
  66:19 70:23,25
  72:20,21 73:2,11
  73:19 74:10
  77:20 78:13,17
  78:21,22 80:7,13
  80:19 81:22
  82:10 83:3,6
  84:12 85:3 86:7,8
  88:14 89:18
  90:16,18,20,20
  90:21,21 92:14

93:24 95:9 96:19
  99:1,19 104:8
  111:3 113:2,8
  114:6
**times** 20:16 28:25
  29:7 54:21 56:11
  59:24 94:8,10
  111:13
**timing** 39:20 54:7
**tired** 107:12
**title** 50:12
**today** 3:25 73:19
  86:25 88:22 98:2
  112:22
**told** 87:16 89:6
  91:5 92:18 93:16
**top** 13:8 14:24
  34:9
**topics** 61:11
**total** 69:4,8 78:19
  101:24
**Totally** 61:7
**town** 60:12
**trained** 114:15
**traits** 33:11
**transact** 97:8
**transaction** 7:23
  8:21 9:2 15:10
  65:19 66:10 69:4
  75:10 85:8,24
  88:25 89:4 91:1
  94:17 95:17
**transactions** 10:8
  10:9 36:3 64:23
  65:12 88:11,14
  88:16 94:15 97:4
**transcriber** 117:4
**transcript** 1:8
  30:23 117:5
**transfer** 16:15
**transferred** 16:10
  18:21
**transfers** 16:12
**transition** 15:13
**treated** 9:23
**treatment** 65:2,18
  65:20

trial 1:8 19:2 102:7
104:20 106:16,18
107:2 108:2,6,8,9
tried 106:23
113:20
true 6:3 45:15,23
53:25 89:5 117:5
trusted 6:22
trusting 7:3
truth 21:20
truthful 7:5
try 12:22 22:2
28:11 104:14
trying 53:1 96:1
97:23
turn 12:2 13:4
15:5 32:16 39:14
42:10 43:24
44:20 46:8 72:2
89:15 91:8
turned 62:9
tweaks 36:10
Twenty-eight 35:5
twenty-five 54:11
twice 94:5
two 1:16 7:14 12:4
16:1,8 25:4 36:22
36:22 37:4,4,23
39:13 47:13
49:21 50:3 51:14
51:16,18,19,19
52:17 67:11
68:22 70:1 75:21
81:8 90:10 96:25
109:24 114:8
two-thirds 4:17
type 97:13
types 62:12
typical 41:24
typically 42:4

**U**
Uh 67:4
ultimate 23:17
unanimous 37:4
37:15
underlying 74:5

understand 8:10
11:24 21:19
26:16 66:7 78:7
78:20 79:19
84:23 87:2 89:23
94:16 104:13
107:8
understanding
43:8 48:11 59:2
64:1,2,5 78:10,11
78:15 80:16
104:3
unfiltered 61:7
unfortunately
15:16 38:7
UNIDENTIFIED
42:13 51:14,16
51:18 109:8,11
109:14 110:4
UNITED 1:1,9
University 55:25
updated 77:17
urge 114:18,18
115:9,10
use 80:13,25 94:18
107:5

**V**
valid 26:14
validity 103:20
valuation 81:15,16
81:18,19
valuations 56:9
value 80:19
various 34:6,10,11
39:19 40:1 80:3
83:15,15,22
vehicle 63:3
verify 88:11,12
Veritext 1:22
versa 85:20
versus 22:10,10
85:11
vice 85:20
virtue 48:23
voice 94:14
voiding 25:22

voids 27:11,12
VOIR 2:1
volume 42:13,14
67:11
vote 44:17 49:4
vs 1:4

**W**
wait 21:14 49:16
73:5 110:2
waive 115:16,18
115:20
walk 51:21
WALTER 1:12
want 10:12 14:24
16:22 38:6 49:24
49:25 57:24 64:7
72:20 82:22
99:11,17 102:25
105:13 108:24
110:3 113:7,16
113:23,24 115:15
115:16
wanted 3:22 7:1
39:19 40:1 55:1
62:7 66:1 106:15
106:18
warrant 16:21
17:25 18:18,22
18:23 22:15,17
22:18 23:13,21
23:23 24:1,10
26:6,13,14 27:7
27:12,17 28:3
29:24 31:13
64:19 67:2,6 68:5
69:7 76:15 91:2
109:1
warrants 7:23 18:2
19:24 20:24
22:24 25:1,22
26:11,18 28:3,17
31:3 63:22 64:17
65:3,5,14 66:8,16
68:8,17,22,25
69:5 72:1 75:10
75:11,18,20 77:5

77:19 78:1 87:4,4
87:7,10,12,15,23
87:25 88:4,6,18
88:25 89:2,20,20
91:6 92:5 97:3,5
97:5,6,10,18,19
110:22 111:9,20
wasn't 3:14 8:8 9:6
9:16,17,19 18:19
33:17 36:1 70:19
70:21 111:22
wasted 114:24
water 16:19
Watershaw 24:10
Waterside 4:25
16:20 17:11
18:18,21 20:7,23
22:9,16,19,23
24:14 26:18
54:19 62:3,8
63:21,22 64:13
64:16,19 65:3
66:16 68:4 72:1
75:10,11 76:15
87:4,12 88:18
110:22 111:19,20
Watersides 63:7
Waterside's 17:1
23:12,17 66:8
way 15:25 16:14
17:17 18:15
50:25 55:10
58:18 61:24
63:13,14 65:1
68:15 81:4 91:23
92:21,22 94:21
99:12,20 108:21
ways 39:6
week 44:23 48:1
112:21,22,23
114:5
went 31:21 39:5,7
56:20 57:4 62:2
weren't 16:1,2
we'll 5:24 33:18
38:19 51:11 71:8
73:17 99:15

106:8 112:25
113:4
we're 16:23 33:19
76:10 77:8 87:5
89:11 98:23
103:19 105:5
110:2,15
we've 19:19 28:8,9
28:10 55:12
69:16
whatnot 60:10
whatsoever 53:3
wheelchair 106:5,8
When's 93:23
white 82:3,4
whiz 115:3
wholly 3:13
wholly-owned 5:12
6:1
William 2:4 106:3
107:21 108:1
Willow 108:22
wiped 17:13
wire 16:11,15
wisdom 114:17
wish 102:10 104:1
115:1
wished 41:17
withdraw 12:1,17
93:22
withdrawn 12:21
witness 5:18,20,25
8:9,13 10:5 11:1
11:3 20:13,15,20
21:13,16 22:2,6
26:25 28:11 29:3
30:8,16 31:5 32:5
32:7,9 35:7 40:24
42:16 49:12,18
49:21,23 51:22
53:24 54:3,4,8,14
55:7 56:8 65:17
65:19 71:18 80:9
81:1 83:21 84:3,5
89:11,24 98:16
98:19 106:1
107:21 110:1,3,7

110:9,13 112:3,5
112:7 114:5
**witnesses** 2:2
43:18 98:23
107:3
**woman** 7:18
**word** 12:19 13:1
107:5
**words** 25:3 44:22
47:4 113:16
114:15
**work** 4:11 11:16
41:7 55:15 59:12
59:19 61:13,15
90:23 106:20
108:22 114:23
**worked** 56:2 57:10
63:14 98:25
108:15
**working** 52:21
56:3 59:23 65:10
74:4 93:9
**works** 7:19 87:3
**world** 63:8
**worry** 70:13
**worse** 38:9
**worth** 23:7
**wouldn't** 51:4
**wound** 57:17
**wrestle** 32:5
**write** 11:6
**writing** 11:18
23:11 25:21 26:6
26:8 29:13 44:3
**writings** 30:2
**written** 37:4,15
53:17 90:21
92:15,23
**wrong** 26:22,23
27:5,8
**wrote** 33:2,5,11
90:13

___
**X**
**X** 2:1
___
**Y**

**yeah** 9:5 21:19
64:7 67:10 90:4
90:18 99:3 104:7
104:7,7,19,21
105:14 109:13
**year** 12:25 19:23
19:25 31:21 37:9
58:4 59:18 68:9
68:18 69:12 72:7
72:11 74:7,7
75:18 77:3,18,18
77:23,24,25,25
78:2 84:15 95:6,6
95:8 97:3,10
**years** 18:4 53:15
59:2 60:6 61:9,11
62:4,23 67:25
88:21 94:25
**year's** 74:19
**year-end** 66:23
74:9,11 90:23
91:2
**yesterday** 16:18
39:3 54:18
**young** 57:23
___
**Z**
**zero** 51:14,16,18
52:17 79:22 83:9
___
**0**
**06** 111:6
**07** 111:6
___
**1**
**1** 13:10,20 14:3
100:11
**1st** 44:22 45:23
47:14 63:15 72:7
**1,231,059** 77:3
**1:35** 73:22
**10th** 46:11 47:25
**100** 1:13
**100,000** 62:16
**105** 2:9
**107** 2:4 32:19
**11** 77:9

**11:17** 40:21
**11:34** 40:21
**114** 53:16
**12** 117:10
**12th** 1:17
**12,702** 26:21
**12,704** 26:12
**12:28** 73:22
**129,057** 72:8
**13** 50:20
**131,000** 68:18 69:1
72:12,13
**14** 100:6
**140** 33:14
**146** 34:24
**15** 11:15 31:12
100:7
**15th** 86:10
**175** 48:2
**176** 67:13
**18** 26:19
**18th** 11:3 15:22
33:24 82:14
**1800** 1:23
**1801** 1:23
**19** 72:5
**19th** 42:21 43:1
**19103** 1:17,24
**19422** 1:14
**1977** 55:25
**1979** 56:1
**1991** 56:4
**1995** 57:2
**1996** 57:2
**1997** 57:2
**1998** 57:2 58:5,10
59:14 62:8
___
**2**
**2** 26:20 39:23
76:10,16
**2nd** 47:15
**2:11-cv-07353-T...**
1:3
**2:28** 103:11
**2:45** 103:11
**20** 71:16

**20th** 22:14 43:18
**2000** 17:14 62:8
63:15
**2000s** 94:4
**2002** 74:4
**2003** 54:19 63:20
63:22 66:7
**2005** 111:6
**2006** 17:15 19:12
27:21 31:16 41:7
66:14,25 67:1,25
68:18,21 69:12
69:19 71:21,24
72:8,11 74:3,4,7
74:8,18 77:25
90:24 91:3 92:15
94:25 95:6
**2007** 3:14,25 6:17
29:17 32:13
37:11 39:2 62:21
67:25 68:6,9
74:21 77:25
95:11,13 108:22
**2008** 75:9,12 78:1
**2009** 93:7
**2010** 6:24 13:10,20
14:2,3 75:3,5
77:3
**2011** 4:7 15:11
33:24 35:19
41:13 42:21
45:18,24 46:11
48:4 73:3 75:5
77:3,6 78:5 79:13
82:12,14 84:16
84:25 85:3 86:10
86:13,16
**2012** 80:2
**2013** 1:5 117:10
**202** 36:18,20 37:1
**203** 67:20
**204** 76:10
**206** 67:13
**22** 100:7
**22nd** 48:4,10
**23** 91:8
**24** 100:7

**24th** 45:18
**25** 89:16 100:7
**25th** 43:25 44:14
**250,000** 68:8 69:1
91:10
**250,000-dollar**
68:23
**26** 1:5
**26(a)(1)** 100:16
**260,057** 72:11
**265,500** 72:12
**28** 35:19
**28th** 47:6
___
**3**
**3** 2:3 26:20 55:5
91:18,19 100:12
**3rd** 15:21
**30** 33:3
**31** 79:13 86:13
**31st** 67:25 72:11
77:3 91:3 95:6
**32,41** 2:3
**33** 30:25
**34** 100:7
**35** 100:7
**350** 12:25
**36** 100:7
**37** 38:10,14
**371** 44:20
**372** 46:8
**373** 42:11,12
**376** 69:6
**376,000** 11:23
**378** 43:24 44:23
**38** 100:7
**381** 69:8
**381,000** 69:5
**397** 102:2,5,16
103:15
**398** 17:7,8 24:6
26:1
___
**4**
**4** 54:25 72:2
**4th** 54:19
**4/30/2009** 32:24

**40** 30:18
**400** 79:9 82:25
  83:1
**402** 69:17 74:3
**48** 30:9 100:9
**49** 100:9

**5**

**5,000** 66:7 69:6,9
**50** 2:3 100:9
**50,080** 79:18
**50,985** 79:18
**51** 2:7 100:9
**52,890** 26:19
**52,900** 64:17
**55** 2:3
**5576** 76:17

**6**

**6** 42:13,14
**6,351** 26:11 87:23
**63** 17:2
**64** 17:2 19:22,23
  23:11 24:15,16
  25:13,14 29:19
  29:20 109:9
**65** 17:3
**65,000** 8:23
**65,500** 69:2,3
**65,520** 90:5
**67** 31:2,5

**7**

**731,000** 68:8
**75.75** 26:18
**794** 1:13

**8**

**80,028** 79:18
**82,86** 2:3
**888-777-6690** 1:24

**9**

**980,000** 9:23 78:8
  78:12 84:17 86:1
**981,000** 68:8