IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| BARBARA ROBERTSHAW | : | CIVIL ACTION |
| | : | NO.  11-7353 |
| v. | : | |
| | : | |
| GARY PUDLES, et al. | : | |

O'NEILL, J.                                              AUGUST 5, 2013

## MEMORANDUM

This case arises out of an allegedly improper shareholder distribution which plaintiff

Barbara Robertshaw asserts breached a shareholder agreement between her and defendant Gary

Pudles.[1]  The complaint was amended after approximately a year of discovery and now

Robertshaw asserts eight claims against three defendants: against defendant Gary Pudles there is

one claim for breach of contract, one for breach of fiduciary duty, one claim for common law

fraud and a shareholder derivative action; against defendant Betty Babjak, the secretary and

general counsel of Answernet, the corporation which is at the center of this dispute and that

Pudles and Robertshaw were each large shareholders in, there is claim for breach of fiduciary

duty and a claim for fraud; and against defendant Answernet, there is a claim for violation of §

219 of the Delaware General Corporations Law and a request for various forms of declaratory

relief.  Am. Compl., Dkt. No. 86.  Robertshaw's request for declaratory relief emanates from

what has become perhaps the heart of this case: a dispute over the exercise of various stock

warrant rights and the control of Answernet.  Pudles has also asserted a counterclaim for abuse

---

[1] Unless otherwise noted, references to Robertshaw refer to Barbara Robertshaw.
References to her father, William (Bill) Robertshaw, also a key figure in this suit, will note his
first name.  References to Pudles refer to Gary Pudles.  His father, Michael Pudles, also plays a
role in this suit, and references to Michael Pudles will be made by his full name.

of process.  Dkt. No. 22.  Jurisdiction is based on diversity of citizenship.  Dkt. No. 86 ¶¶ 1-6.

On April 23, 2013 I held a bench trial which lasted for four days.  I received post-trial briefs on

June 4, 2013 and held oral argument on June 19, 2013 and June 24, 2013.  Pursuant to Federal

Rule of Civil Procedure 52(a) and after review of the evidence presented and applicable law, I

make the following findings of fact and conclusions of law.

**FINDINGS OF FACT**

I.      **The Capital Structure of Answernet**

Answernet, a business that provides call center services, was incorporated in Delaware in

1998.  Trial Tr. April 25, 2013 50:3-5 (Pudles); Trial Tr. April 23, 2013 7:4-7 (Robertshaw); A3[2]

p. 7.  When a fledgling Answernet desired external financing, it turned to a number of outside

entities, namely Waterside Capital, Ben Franklin/Progress Bank, and Progress Capital Bank,

which each took warrants from Answernet in exchange for cash loans.  Trial Tr. April 25, 2013

56:8-57:4 (Pudles).  As of May 19, 2000, the shareholders of Answernet were as follows:

- Gary Pudles (150,000 shares of common stock),

- Barbara Robertshaw (150,000 shares of common stock, warrant to purchase
  3,959.03 shares of common stock),

- Progress Capital Bank (warrant to purchase 18,148.02 shares of common stock),

- Waterside Capital Corp. (warrant to purchase 69,837.37 shares of common stock),

- Ben Franklin/Progress Capital (warrant to purchase 27,493.3 shares of common
  stock)

- Michael Pudles (warrant to purchase 3,959.03 shares of common stock).

---

[2] References to the trial exhibits in this case will be made as follows: defendants' exhibits
all are labeled DX and identified by number (e.g., DX175); plaintiff's exhibits have been divided
by plaintiff into alphabetical categories and then identified by number (e.g., A3, H12).

DX4 p. 15.[3]  This represents "all of the equity that has ever been authorized" by Answernet,

Trial Tr. April 25, 2013 55:22-23 (Pudles), though the parties hotly contest the current ownership

status of a substantial percentage of these shares.  This section traces the ownership of the

disputed shares and the rights of the various current Answernet shareholders.

     **A.**     **Michael Pudles's Warrants for 3,959 Shares of Answernet**

On May 17, 2000, Michael Pudles, Pudles's father, wrote a letter to Pudles to confirm his

ownership of 3,959 warrant shares in Answernet.  DX175 p. 14.  Michael Pudles received these

warrants in exchange for an investment in the company of $50,000 in May 2000.  Id. at 11, 13.

     **B.**     **Barbara Robertshaw's Warrants for 3,959 Shares of Answernet**

Also on May 17, 2000, Robertshaw wrote a letter to Pudles to confirm her ownership of

3,959 warrant shares in Answernet.  Id. at 15.  Robertshaw received these warrants in exchange

for an investment of $50,000 in May 2000.  Id. at 11.

     **C.**     **The Progress Capital Warrants**

On October 15, 1998, Answernet and Progress Capital[4] entered into a common stock

purchase agreement that provided: "for good and valuable consideration . . . [Progress Capital],

its successors and assigns are entitled to purchase from [Answernet] [18,148] . . . [shares of

Answernet common stock]."  H1 p. 49; see also DX175 p. 16.[5]  This warrant contract contained

the following relevant provisions.  Section 2, titled "Exercise of Warrant," provided that the

---

[3] This document, an early Answernet "Shareholder Agreement," appends a chart that lists the shareholder interests in the company.  The total outstanding shares in Answernet, counting the warrants, per this document is 423,396.75.  DX4 p. 15.

[4] The record evidence refers to this entity at times as Progress Capital, at other times as Progress Bank and sometimes as simply Progress.  Reference to any of those three terms refers to the Progress Capital warrants created by H1.

[5] The warrant was set to expire if not exercised on or before October 15, 2008.  H1 p. 55.

> warrant may be exercised by the holder of this warrant . . . by
> presentation and surrender of this warrant to the company together
> with the annexed exercise form duly completed and executed . . .
> Upon [Answernet's] receipt of this warrant the completed and
> signed exercise form and the requisite payment the company shall
> issue and deliver to the exercising holder stock certificates. . . .

Id. at 56 (section 2a).  Section 3, titled "Warrant Register, Exchange, Transfer, Loss, Etc.,"

provided that

> this warrant from time to time may be transferred in whole or in
> part by the holder or any duly authorized representative of such
> holder.  A transfer may be registered with the company by
> submission to it of this warrant together with the annexed
> assignment form duly completed and executed. . . . [A]fter the
> company's receipt of this warrant and the assignment form so
> completed and executed the company will issue and deliver to the
> transferee a new warrant representing the portion of the exercise
> quantity transferred . . . and otherwise having the same terms and
> provisions as this warrant which the company will register in the
> new holders name.  . . . [U]pon the due delivery of this warrant for
> transfer the transferee shall be deemed for all purposes to have
> become the holder of the new warrant issued.

Id. at 57-58 (section 3c).[6]  Further, Answernet "shall not be bound by any notice or other

communication asserting any change in ownership of this warrant other than through a request to

register transfer in accordance with subsection c."  Id. at 58 (section 3d).

Regarding lost warrants, the agreement provided that

> in the event of the loss, theft or destruction of this warrant the
> company shall execute and deliver an identical new warrant to the
> holder in substitution therefor upon the company's receipt of
> evidence reasonably satisfactory to the company of such event
> (with the affidavit of an institutional holder being sufficient
> evidence).

Id. at 58 (section 3e).  Finally, section 4, entitled "Surrender of Warrant, Expenses, Etc."

provides that "upon the surrender of this warrant in connection with any exercise exchange

---

[6] See also H1 p. 90 (blank assignment form).

transfer or replacement, this warrant shall be promptly canceled by [Answernet]." Id. at 59

(section 4c).

###### D.    The Waterside Warrants

On July 20, 1999, Answernet issued Waterside Capital Corporation (WSCC) a warrant

for 18% of the common stock of Answernet.  H27 p. 1.  The warrant contained the following

provisions regarding exercise, specifying that this "Warrant may be exercised by the Holder (but

only on the following conditions) . . . on delivery of written notice of intent to exercise to

[Answernet] . . . together with this Warrant and payment to [Answernet of the aggregate Exercise

Price of the Shares so purchased.]"  Id. at 1-2.  The exercise price was $.01 a share.  Id. at 1.  The

warrant also contained the following provisions:

> On exercise of this Warrant, [Answernet] will . . . execute and
> deliver to the Holder a certificate . . . for the total number of whole
> Shares for which this Warrant is being exercised. . . .  If this
> Warrant is exercised [for] less than all of the Shares, the Holder is
> entitled to receive a new warrant covering the number of Shares  in
> respect of which this Warrant has not been exercised . . . .

Id. at p. 2.  Regarding transfer and assignment, section five of the warrant provided that the

warrant

> may be transferred by the Holder on presentation of this Warrant to
> [Answernet] with written instructions for such transfer.  On such
> presentation for transfer [Answernet] will promptly execute and
> deliver a new Warrant . . . in the name of the assignee . . . and in
> the denominations specified in such instructions.

Id. at p. 3.  There were several transactions involving this 18% share in Answernet which I will

now describe in turn.

###### 1.    The First Waterside Warrant Transaction (WSCC 1)

On March 27, 2003, Waterside assigned 75.75% of its interest in Answernet to Execuatel

Communications.  See H6 p. 1.[7]  Barbara Robertshaw is the sole owner of Execuatel and Bill

Robertshaw is its president.  Robertshaw Post-trial Br., Dkt. No. 164, p. 2-3; Trial Tr. April 23,

2013 52:6-17 (Robertshaw).  This first warrant assignment granted Execuatel the right to acquire

12.5% of Answernet common stock, which was calculated at 52,899 shares.  H6 p. 1.  The

purchase price paid by Execuatel for the assignment was $1,566,000.  Id.

The assignment also contained the following option:

> In consideration of the payment of $5,000 in readily available
> funds at closing, [WSCC] hereby grants [Execuatel] an option to
> purchase and a right of first refusal . . . on [75%] of [WSCC's]
> remaining warrant rights . . . .  If exercised immediately, under
> Answernet's current capitalization, the Options Warrants could be
> exercised to acquire [3%] or 12,702 shares of Answernet's
> common stock.  The option shall expire . . . on April 30, 2006.
> Assignee may exercise its Option upon written notice delivered to
> [WSCC].  . . . If [Execuatel] fails to exercise its option . . . WSCC
> shall be free to sell the option warrants, subject only to the
> restriction that such sale must close within 45 days of the
> expiration of the Exercise period.  . . . [T]he exercise price for the
> Option Warrants shall be $376,000 . . . .

Id. at 1-2.

On September 3, 2003, Martin Speroni of WSCC wrote to Bill Robertshaw regarding a

"small discrepancy in the number of shares under the warrant that [WSCC] sold [Execuatel]" and

clarified that the warrant could be exercised for 52,900 shares of Answernet common stock.

DX175 p. 21.  Pudles responded via email with the further clarification that Execuatel would

actually own only 12.49% of Answernet.  Id. at 22.  Sometime in the fall of 2003, Answernet

---

[7] The WSCC assignment to Execuatel also contains a choice of law provision selecting
Virginia law to resolve questions of validity, construction and enforcement, H6 p. 5, and a forum
selection clause naming the state and federal courts of Norfolk, VA as the forum for any
proceeding arising from or related to this assignment.  Id. at 3-4.  No party has raised this issue
and I consider it waived.

issued a stock purchase warrant to Executel for 12.494% of the shares of Answernet; the stock purchase warrant contains handwritten modifications made by Pudles, clarifying that Executel had a right to purchase only 12.494% of Answernet common stock, rather than 12.5% (the percentage conveyed in the assignment from WSCC to Executel). H7 p. 1. Though the exact date is unclear, Executel completed its purchase of 52,900 shares in the fall of 2003, see H7; Trial Tr. April 23, 2013 12:22-13:10 (Robertshaw), and Answernet issued a share certificate to Executel for that number of shares. H12. The document that Pudles asserts is the Answernet capitalization table supporting chart ("the share transfer ledger"), which ostensibly recorded all of the transactions involving warrants and shares from Answernet's inception, also displays an entry in September 2003 for the assignment from WSCC to Executel of the warrant rights to 52,900 shares, as well as an entry for the conversion of those warrants into common stock, also in September 2003. DX175 p. 8.[8] That Executel purchased the assignment of these warrants, exercised the warrants and owns these shares is not in dispute. The parties vigorously contest, however, the disposition of the balance of WSCC's interest in Answernet.

### 2.    The Second Waterside Warrant Transaction (WSCC 2)

As noted above, when Executel purchased the WSCC 1 warrants, it also acquired an option to purchase an additional 3% of Answernet's stock. H6 p. 1-2. Executel notified WSCC of its intent to exercise this option in 2006 by letter from William Robertshaw to Alan Lindauer, stating that it was Executel's "intent to sell the Option Warrants to Gary Pudles and Barbara

---

[8] This document was part of a large packet of documents gathered by Babjak and compiled by the Mitts Firm, a law firm retained by Answernet, for a meeting with F. Emmett Fitzpatrick, Robertshaw's lawyer, in fall 2011. Trial Tr. April 25, 2013 10:14-11:11; 32:4-33:7 (Babjak). It is also referred to in testimony and record evidence as the share transfer ledger. Trial Tr. April 25, 2013 156:5-9 (Pudles). The share transfer ledger, DX175 p. 8-9, as well as the Answernet capitalization table, id. at 6, were created and maintained by Pudles. Trial Tr. April 25, 2013 156:5-157:22 (Pudles).

Robertshaw (or their assigns) immediately following this transaction."  H30.  The letter enclosed a check for $376,000 from Executel to WSCC.  Id.; H32; DX26.

Preceding the transmission of the warrant option exercise letter from Executel to WSCC, Pudles wrote an email on February 2, 2006 to the Robertshaws attaching a draft of the warrant option exercise letter and describing how the transaction would be funded:

> my plan is to pay $250,000 out of Cerida[9] (which will be shown as a distribution to Barbara and me of $125k each) and then write a personal check for $65,500. We will need an equal check from Barbara for the $65,500.  This will total $381k ($376k for the warrants plus 5$ [sic] for the option).

H28.  The record reveals that this funding plan was enacted.  A check dated February 8, 2006 for $250,000 was sent from Cerida to Executel with the notation "shareholder distribution" for Pudles and Robertshaw for $125,000, DX23, and both Pudles and Robertshaw sent personal checks for $65,500 to Executel in February 2006.  DX24; DX25.[10]

On March 16, 2006, Pudles wrote to Alan Lindauer at WSCC with respect to this transaction.  H33.  He stated that he and Robertshaw were "extremely concerned that Answernet has not received any request from Waterside regarding the issuance of a new warrant related to Barbara and my personal purchase of Executel's Option Warrants.  We made our payment over a month ago and Waterside has not taken any action to deliver the shares . . . ."  Id.  In response, Martin Speroni of WSCC wrote:

---

[9] Cerida was a company owned by some combination of Pudles and the Robertshaws.  It is unclear what the respective ownership shares were.  Pudles testified that he owned 50% of Cerida and either Barbara or the Robertshaws together owned the other 50% (though the Robertshaw's respective ownership shares are not in the record).  Trial Tr. April 25, 2013 84:20-85:8 (Pudles).  Robertshaw, however, testified that she "own[s] half of [Cerida] along with [Pudles].  Trial Tr. April 23, 2013 90:11-13 (Robertshaw).  As will be detailed further below, Cerida's ownership of various Answernet warrant rights is a key issue in this case.

[10] Cerida consolidated financial statements for the years 2006 and 2007 show a notation for a distribution of $250,000 for "Investment in [Answernet] warrants" in 2006.  DX88 p. 13.

> If you please, go [ahead] and have Answernet issue the two separate warrants (3% and 1%), so we may send one and keep the other.  Executel exercised its rights and now owns the 3% warrant, and so if you want to issue it in that name that would be ok with us—or any other name, for that matter, that Executel is ok with accepting.  Please be sure to stick to the language, so that only the numbers "4%" to "3%" and "1%" are changed.

Id.

Seemingly in response to the Speroni email, on March 20, 2006, Answernet issued two warrants, one to Barbara Robertshaw for 6,351.5 shares of Answernet (or one half of the three percent for which Executel had bought the option), and the other to WSCC for its remaining 1% interest in Answernet.[11]  Trial Tr. April 23, 2013 68:22-72:20 (Robertshaw); DX29.  However, while Robertshaw maintains the assignment of the issuance of the warrant from Answernet to her was valid, Trial Tr. April 23, 2013 71:17-72:6 (Robertshaw), she also conceded that she never exercised the warrant.  Id. at 72:15-20 ("[Its] expiration [date] came and went."); see also DX29 p. 8 ("This Warrant will [be] exercisable in whole or in part at any time . . . until July 20, 2009").

Pudles insists that WSCC "rejected" the warrant dated March 20, 2006 that had been reissued to WSCC because the warrant stated a certain number of shares rather than a percentage (though it did also state WSCC's remaining interest as a percentage of Answernet).  Trial Tr. April 25, 2013 79:25-80:21 (Pudles); DX29 p. 1.  He points to an email written by Speroni on March 20, 2006 to Pudles and the Robertshaws in which Speroni discusses the issue:

> As you know the issue of inserting the current number of shares that the warrant represents has been discussed and rejected by Waterside. . . .  Please re-issue the 1% warrant with the agreed upon language it now has, except that instead of saying "from 18% to 4%" it should read "from 18% to 1%."  The rest of the language should be unaltered.

---

[11] Each of these two new warrants has language regarding exercise and transfer of the warrant rights that is substantially the same as the language in the corresponding sections from the original WSCC warrant.  Compare H27 p. 1-2 with DX29 p. 3-4, 8-10.

DX398.  His email continued with a line directed specifically to Barbara Robertshaw: "Please let me know if it is ok with you (Executel) to have the 3% warrant issued directly to you by Answernet."  Id.  Pudles also testified that, as a result of his further communications with WSCC regarding this issue, he produced a new warrant for Waterside's remaining 1%, but never reissued a warrant for the other 3% because "by the time we resolved the issue with Waterside, Bill [Robertshaw] and I had agreed that we were going to take the warrant in Cerida.  So I never created another actual warrant document for Cerida, because Cerida, you know, was us [, i.e., owned 50% by Pudles and 50% by the Robertshaws]."  Trial Tr. April 25, 2013 84:20-85:8 (Pudles).[12]  In the record there is also an internal Answernet memorandum prepared by Babjak which reads: "Executel's option for 3% of Waterside's 4% warrant was assigned to Cerida; the warrant was exercised and paid in full.  Per conversation with [Gary Pudles] 5/22/08."  Trial Tr. April 24, 2013 79:18-80:16 (Babjak); DX79.  Finally, there is a notation in the Answernet share transfer ledger indicating that a transaction for 12,704 shares between Cerida and Waterside took place in June 2006, DX175 p. 8, but there is no notation referencing a transfer between Executel and Cerida.

### 3.    The Third Waterside Warrant Transaction (WSCC 3)

Pudles also claims that Cerida bought WSCC's remaining 1% interest in Answernet in May 2007.  In an email dated April 30, 2007, Speroni wrote to Pudles describing the contours of the deal for the remaining Waterside warrants: "As per our conversation.  Answernet buys the WSCC 1% for $250k.  Cash by Friday 5/4/07.  Full and mutual release on Answernet."  DX62.

---

[12] Bill Robertshaw disputed this contention in his own testimony, stating that there was never an agreement to assign any warrants from WSCC to Cerida.  Trial Tr. April 26, 2013 110:21-23 (Bill Robertshaw).  Additionally, Barbara Robertshaw testified that she "own[s] half of [Cerida] along with [Pudles].  Trial Tr. April 23, 2013 90:11-13.

That same day Pudles forwarded Speroni's email to the Robertshaws and wrote that the deal was "subject to your approval."  Id.  Robertshaw responded on that same day: "That is ok with me." DX63; Trial Tr. April 25, 2013 96:10-25 (Pudles).  However, the agreement subsequently went through some modifications before the transaction was finalized; as Pudles testified,

> when we got the agreement, I forwarded the agreement . . . with a letter that I sent in [defendant's exhibit] 65.  And I forwarded the agreement with notes to Barbara and Bill Robertshaw, telling them of my plans to modify the agreement.  I then made the modifications, sent that modified document to . . . the lawyer for Waterside, and Martin Speroni, and then forwarded that document with my -- essentially my suggested changes, because they hadn't been adopted yet, to Bill and Barbara Robertshaw.  . . . I then got that document back from [WSCC's counsel] and forwarded . . . the completely signed document to the Robertshaws.

Trial Tr. April 25, 2013 97:13-25 (Pudles).[13]

On May 3, 2007, WSCC's counsel emailed Pudles a release agreement signed by WSCC regarding the transaction for the remaining 1% and said that "once I have received all original signatures to the Release Agreement and the Purchase Price from Answernet, I will release the original documents and funds from escrow, [and transfer] the purchase price to [WSCC.]"  DX65 p. 1-2.[14]  On May 4, 2007, Pudles forwarded the email regarding the release agreement from WSCC's counsel to the Robertshaws and wrote:

> I have modified the agreement, signed the agreement and sent payment to them out of Cerida.  I paid it out of Cerida because [it]

---

[13] Apparently it was Pudles's practice to make modifications to signed agreements in the hopes that they would be ratified by the counterparty: "[T]hat was our practice with Waterside. That was my practice with Waterside and Waterside's practice back to me, which was, do an agreement that you would hope would get through, and sign it, and hopefully they would just -- you know, the other side would sign it."  Trial Tr. April 25, 2013 94:1-7 (Pudles).

[14] In this email WSCC's counsel also surrendered a stock certificate for 700 shares of preferred stock in Answernet which WSCC still possessed *as well as the new warrant it was issued in October 2003 following its transaction with Executel* (WSCC 1).  DX65 p. 1 (attaching scanned copies of documents referred to in this email) (emphasis added).

had the cash and so that the acquisition of these shares are equal between the Robertshaws and me.  If we purchased them through Answernet, we would have increased the disparity of ownership between me and the Robertshaws further by .13%.

If you want us to take ownership of these shares personally instead of through Cerida that is fine.  At this point we simply increased the Cerida [i]nvestment in Answernet and that will be reflected on the Cerida Balance Sheet.  If you would prefer to own these warrants individually, we can simply reclassify the payment from Cerida as an equal distribution to us personally and then own the shares individually.  Let me know your preference.

DX65 p. 1.  The release agreement between WSCC and Answernet has several handwritten modifications, initialed by Pudles, that are described in his May 4, 2007 email to the Robertshaws.  DX64.  Of prime importance is that Cerida rather than Answernet purchased the warrants under the agreement as unilaterally modified by Pudles.

Pudles altered two clauses to reflect the change in purchaser.  The first initially read: "whereas Answernet desires to close out [WSCC's] investment by purchasing the Warrant from Waterside for a price of $250,000."  Id. at 1.  However, Pudles, as he describes in his email, crossed out the word "purchasing" and replaced it with "allowing Cerida to purchase."  Id.  The second change is on the same page; the clause initially read: "Answernet shall pay or cause to be paid to Waterside by wire transfer or other immediately available funds the sum of [$250,000] no later than May 4, 2007."  Id.  Pudles crossed out "pay" and "be paid" and replaced it with "Cerida to pay" so the sentence now begins "Answernet shall cause Cerida to pay Waterside  . . . ."  Id.  There is no evidence in the record that the Robertshaws reviewed these modifications before Pudles signed and transmitted the release to Waterside.

The agreement also contains the following clause which Pudles relies on in support of his contention that Cerida was also the owner of the warrants for the 3% interest in Answernet (WSCC 2):

> whereas Waterside invested in Answernet pursuant to . . . Stock
> Purchase Agreements dated July 20, 1999 and February 29, 2000,
> and a Stock Purchase Warrant dated July 20, 1999 and
> subsequently reissued in October 2003 for four percent of
> Answernet's common stock and then sold to [Cerida] as to three
> percent of Answernet's common stock so that Waterside's
> remaining warrant rights apply to one percent of Answernet's
> common stock . . . .

DX64 p. 1.  On May 7, 2007 Pudles emailed the Robertshaws with a breakdown of the

ownership of Answernet in which he asserted Cerida owned 62,579.7 shares, or 14.78 percent of

the company.  DX67.  Cerida financial statements for 2007 show a notation for a distribution of

$250,000 for "Investment in [Answernet] warrants" in 2007.  DX88 p. 13.

**E.       The Ben Franklin/Progress Capital Warrants**

On May 19, 2000 Ben Franklin/Progress Capital Fund (BF/PC) and Answernet entered

into a contract providing that in exchange for BF/PC giving Answernet $500,000, Answernet

issued a warrant to BF/PC to purchase 27,493.3 shares of the company.  H3 p. 1, 23.[15]  The

warrant to purchase Answernet stock contained several relevant provisions.  Article II contained

detailed specifications regarding the exercise of the warrant including:

> Section 2.02(a): The warrant holder may exercise this warrant, in
> whole or in part, upon surrender of this Warrant with the form of
> exercise attached hereto duly executed, to [Answernet] . . . together
> with the full warrant price for each share of common stock.
>
> (b) Upon receipt of this warrant with the form of exercise duly
> executed and accompanied by payment of the aggregate warrant
> price for the shares of common stock for which this warrant is then
> being exercised, [Answernet] will cause to be issued certificates
> for the total number of whole warrant shares (as provided in
> section 4.04 hereof) for which this warrant is being exercised in
> such denominations as are required for delivery to the warrant
> holder, and [Answernet] shall thereupon deliver such certificates to
> the warrant holder or its assignee.

---

[15] The warrant was set to expire on May 19, 2010 if not exercised on or before that date.
H3 p. 1.

Id. at 24.  The BF/PC warrant also contained several provisions with respect to its transfer or

assignment:

> Section 2.04. . . .  Subject to the foregoing transfer restrictions set
> forth in this Section 2.04, this warrant is transferable, in whole or
> in part, on the books of [Answernet], upon surrender of this
> warrant to [Answernet], together with a written assignment duly
> executed by the holder.
> . . .
> Section 6.02.  Any assignment permitted hereunder shall be made
> by surrender of this warrant to  [Answernet] at its principal office
> with the form of assignment attached hereto duly executed. . . .  In
> such event [Answernet] shall, without charge, execute and deliver
> a new warrant in the name of the assignee named in such
> instrument of assignment and this warrant shall promptly be
> canceled.
> . . .
> Section 8.06.  Any term of this warrant may be amended and the
> observance of any term of this warrant may be waived (either
> generally or in a particular instance and either retroactively or
> prospectively), only with written consent of [Answernet and],
> BF/PC if it is still a holder of any Registrable Securities and the
> holders of at least a majority of the Registrable Securities that have
> not been registered and are held by holders who are not employees,
> officers or directors of the company.

Id. at 26, 33, 40; see also id. at 44 (blank assignment form).  Article IV, titled "Other Provisions

Relating to Right of Warrant Holder," specified the following:

> Section 4.02.  If this warrant is lost, stolen, mutilated or destroyed,
> [Answernet] shall, on such reasonable terms as to indemnity or
> otherwise as it may impose (which shall, in the case of a mutilated
> warrant, include the surrender thereof), issue a new warrant of like
> denomination and tenor as, and in substitution for, this warrant,
> which shall thereupon become void.  No bond shall be required.

Id. at 31.  Article V clarified that

> Section 5.01:  Prior to due presentment for registration of transfer
> of this warrant, [Answernet] may deem and treat the warrant
> holder as the absolute owner of this warrant (notwithstanding any
> notation of ownership or other writing hereon) for the purpose of

14

any exercise hereof and for all other purposes, and the company
shall not be affected by any notice to the contrary.

Id. at p. 32.

## II.   Documents Relating to the Assignment and Exercise of Warrants by Cerida and Gary Pudles

Pudles claims that Cerida at some point came into possession of the warrants for the

Progress Capital, BF/PC, and WSCC 2 and WSCC 3 shares.  He also claims that he personally

came into possession of the Michael Pudles shares.  In support of these contentions, he points to

the following record evidence, which relates to the assignment and exercise of warrants by

Cerida or, as to the Michael Pudles shares, him personally.  In September 2003, Martin Speroni

of WSCC sent a letter to Bill Robertshaw regarding the details of the WSCC-Executel

transaction (WSCC 1); attached to the letter is a chart which Speroni explains reflects his

"current understanding of the common stock and warrant status in [Answernet]."  DX175 at p.

23.  The chart has three tables, labeled "Pre Executel Transaction," "Post Executel Transaction"

and "Post Executel transaction and Executel warrant exercise" which each reflect an entry

naming Progress/Cerida as a shareholder of Answernet.  DX175 at p. 25.  However, each entry

for Progress/Cerida has a notation stating that "[t]his transfer is in dispute."  Id.

By 2007, the relationship between Pudles and the Robertshaws had seemingly become

more contentious.  In February 2007 Pudles wrote an email to Robertshaw with a subject line of

"stock issues" in which he wrote that over the last two weeks he had had a chance to "review all

of the corporate documents and agreements.  It turns out that my previous understanding of the

capital table may have been wrong."  DX40 p. 1.  He then attached "the current [Answernet]

capitalization table based on transactions that have occurred." Id.[16]  The attached table shows

that Cerida owns warrants for 58,345 shares of Answernet. Id. at 3.[17]  In this email Pudles also

discussed his review of the "Progress Bank warrants (now owned by Cerida)." Id. at 1.[18]  In

addition to the attached capitalization table, Pudles attached the Progress Bank warrant.  Id.; see

also DX399.  Robertshaw forwarded this attachment to her father and her attorney.  DX399;

Trial Tr. April 25, 2013 90:3-10 (Pudles).

---

[16] This email also alludes to ongoing acrimony between Pudles and Robertshaw.  Pudles
writes that he is "really committed to working towards allowing you to exit the company as soon
as possible. . . .  I wish I was able to buy you out personally with a single check but as you know
this isn't possible.  However, I am meeting with a number of people on Tuesday so getting your
'number' by Monday afternoon would be helpful."  DX40 p. 1.  The email goes on to describe
the quarrelsome recent history of the parties' relationship, and then Pudles states that his
objective in this email is to begin a discussion about achieving each of their goals, namely:

> my goal of owning all of the company without having it broken
> apart and your goal of exiting the company as completely as
> possible. . . .  [This] means that we realize that our goals are
> different and no one is going to try to sneak board motions or take
> actions without consulting and working with the other one.  The
> worst part of the last two weeks was that you [and Bill
> Robertshaw] would try to push your goals at my expense without
> even discussing them with me first.  I have never wanted to fight
> with you but I also can't just walk away from millions of dollars
> just to avoid being called unappreciative . . . .

Id.  The email foreshadows the dispute over corporate control in this litigation.

[17] The chart also shows that Pudles and Robertshaw each own 150,000 shares of common
stock and each have a warrant for 3,959 shares.  Id. at 3.  It also shows that Executel owns
52,900 shares and WSCC owns 4,234 shares.  Id.

[18] In the context of his review of the Progress Warrants Pudles also discusses the WSCC
1 transaction as an "insider deal" proscribed by the Progress Bank agreement: "[T]he Executel
transaction . . . should not have been done without the approval of the disinterested Answernet
Board members."  DX40 p. 1.  He also proposes that he and Barbara Robertshaw "enter into a
written agreement that no transaction will be done at any level without agreement between you
(Barbara) and me and that we both agree to be fair and reasonable with each other."  Id.

On May 7, 2007, Pudles again wrote Robertshaw an email with a subject "Merger provision" in which he pasted a capitalization table into the body of the email; this table is the same as the previous one except that Cerida now owns 62,579.9 shares of Answernet.  DX67.

On May 13, 2008, Pudles wrote an email to Babjak and Peter Wszalek, then the controller of Answernet, in which he asserts: "Cerida owns some AnswerNet warrants.  I want to make sure we exercise them ASAP."  M2.  That same day, Babjak wrote to Wszalek regarding Answernet warrants: "this is to confirm that Gary cannot locate the Cerida Warrants and we need to prepare affidavits of lost warrants. . . .  I reviewed Answernet corporate records and whatever Leslie[19] has on Cerida and I cannot locate the warrants."  Id.  However, no affidavits of lost warrants were ever prepared. Trial Tr. April 24, 2013 73:13-24 (Babjak).

On May 15, 2008, Pudles wrote an email to the Robertshaws with the subject line "Cerida Warrants":

> Per my conversation with Bill, I'm letting you both know that Cerida is exercising all of its [Answernet] warrants over the next few days.  Shares will be issued to Cerida and all the warrants will be completed.  This does not require board action and actually confers no new or additional rights on anyone as we are still bound by the shareholder agreements.  It simply completes the equity transactions that began early on.  There will be no changes to the cap tables previously delivered to you except where there were warrants, there will now be shares.

DX77.[20]  On May 22, 2008, Pudles as President of Cerida submitted a warrant exercise form to Answernet which recited that "the undersigned Holder of the attached original, executed stock Purchase Warrant hereby elects to exercise its purchase right under such Warrant with respect to Warrant Shares . . . by the cancellation of indebtedness of [Answernet] to the undersigned Holder

---

[19] Leslie Dennis was Gary Pudles's assistant.  Trial Tr. April 25, 2013 38:12-15 (Babjak).

[20] Babjak's name appears at the top of this email on the exhibit.

in the amount of $249,914.10 (27,493.3 @ $9.09/share)." DX82 p. 2-3.[21]   The warrant exercise

form directed Answernet to "issue a stock certificate . . . representing the appropriate number of

Warrant Shares in the name of . . . [Cerida]" and named the warrant holder as Cerida.  Id. at 2-3.

The exercise form was actually prepared by Babjak,  Trial Tr. April 25, 2013 17:13-19 (Babjak),

and no warrant was attached to the exercise form.  Trial Tr. April 24, 2013 76:21-77:11 (Babjak).

Also on May 22, 2008, Pudles, as President of Cerida submitted a warrant exercise form

to Answernet which recited that "the undersigned Holder of the within Warrant hereby

irrevocably elects to exercise the within Warrant to the extent of 18,148 shares of common stock

. . of [Answernet].  The undersigned herewith encloses the Warrant and a check . . . in the

amount of $.05 in payment of the purchase price thereof." DX80.   The exercise form was

actually prepared by Babjak,[22] Trial Tr. April 24, 2013 73:25-74:3, 75:1-3 (Babjak), and no

warrant was attached to the exercise form.  Trial Tr. April 24, 2013 76:7-20 (Babjak).[23]

On this same day, Pudles, in his personal capacity, also submitted a warrant exercise

form which recited that "the undersigned Holder of the within Warrant hereby irrevocably elects

to exercise the within Warrant to the extent of 3,959 shares of common stock . . . of [Answernet].

A check in the amount of 39.59 in payment of the purchase price thereof is enclosed." DX81.

No warrant for these shares is in the record.[24]

---

[21] No explanation of the "indebtedness" referred to in this document has been offered.

[22] Babjak was Answernet's general counsel since 2006 and director of corporate
administration since 2007, Trial Tr. April 24, 2013 57:1-11 (Babjak), and became corporate
secretary in 2010.  Id. at 90:6-8 (Babjak).

[23] The exhibit also does not contain a check.

[24] The exhibit also does not contain a check.

Also on May 22, 2008, Pudles, as President of Cerida, submitted a document to Answernet which recited that "the undersigned Holder of the within Warrant hereby irrevocably elects to exercise the within Warrant to the extent of 12,704 shares of commons stock . . . of Answernet.  Please credit $127.04 to [Answernet] in payment of the purchase price thereof."  DX78 (WSCC 2 exercise form).  Here too the exercise form was actually prepared by Babjak, Trial Tr. April 24, 2013 73:25-74:3, 75:1-3 (Babjak), and no warrant was attached to the exercise form.  Id. at 75:4-76:6 (Babjak).[25]  There is no similar exercise form for the 4,234.37 (WSCC 3) shares putatively owned by Cerida.

Babjak testified that she never saw any written assignments nor written payment records for any of those allegedly executed warrants, nor any request to reissue the warrants sent to Answernet by any of those third-party owners of the warrants.  Id. at 71:11-20 (Babjak).  Nor did Babjak ever see any transfer documentation regarding any of these warrants allegedly acquired by Cerida.  Id. at 72:23-73:2 (Babjak).  Nevertheless, Babjak prepared the warrant exercise forms as set forth above.  Id. at 73:25-74:3, 75:1-3.

On May 23, 2008, Pudles wrote an email to the Robertshaws in which he stated: "As part of cleaning up the warrant situation I am also exercising the 3,959 warrant shares that Barbara and I own related to preferred shares purchased in 1999.  If Barbara wants to exercise her similar warrants she will need to write Answernet a check for $39.59.  If she wants to exercise her similar warrants, please send the check to me and I'll have the paperwork processed."  DX83 p. 2.[26]  On that same day, Bill Robertshaw replied to Pudles: "Doing the warrants is proper and ok.

_____

[25] The exhibit also does not contain a check.

[26] On the exhibit there is a handwritten notation from Alan Zar, former Answernet secretary, see Trial Tr. April 24, 2013 90:23-24 (Babjak), regarding sending Robertshaw's check

19

Barbara will send her check to you for Answernet.  The Progress and Ben Franklin are ok.  What amount gets paid for these warrants[?]"  Id. at p. 1.  Pudles replied on May 24, 2008: "In order to execute on all the warrants, Cerida will have to pay about 250K to Answernet.  Some of the warrants have a strike price of 9.09.  Basically the Ben Franklin Warrants will cost Cerida 9.09 cents [sic] a share. . . .  The Progress Bank Warrants will be about 5 cents for the 18k shares (although I think I calculated the payment at a penny per share for these as well).  Our personal warrants will be a penny a share as well."  Id.

Entries from the Answernet general ledger reflect a credit on June 30, 2008 to Answernet for $249,914.10, and the comment in the ledger states: "Cerida exercised warrants for 27,493 [shares]."  DX 401 p. 2.[27]  Additionally, the share transfer ledger, which was part of the package of documents that Babjak and the Mitts firm, Answernet's attorneys, compiled for Robertshaw's attorney to review in November 2011, see Trial Tr. April 25, 2013 14:16-20, 27:5-28:8 (Babjak), shows a notation purporting to document a transaction between Cerida and BF/PC that occurred sometime in 2005.  DX175 p. 8.  Similarly, the Answernet general ledger shows a credit on June 30, 2008 for $18.15, and the comment in the ledger states "Cerida exercised warrants for 18,148 [shares]."  DX401 p. 2.[28]

---

to exercise the warrants and asking Pudles to have the warrant sent to the Princeton office. DX83 p. 2; Hrg. Tr. June 19, 2013 42:16-25 (Pudles).

[27] There is a slight discrepancy between the amount paid for the exercise, the strike price and the number of shares the comment in the ledger identifies as being exercised.  The credited amount would represent an exercise of 27,493.3 shares at the exercise price of $9.09, both of which reflect the underlying agreement between Answernet and BF/PC.  H3 p. 1.  I find the slight discrepancy to not affect my analysis.

[28] There is also slight discrepancy between the amount paid for the exercise, the strike price and the number of shares the comment in the ledger identifies as being exercised.  The credited amount would represent an exercise of 18,148 shares at an exercise price of $.001, while the underlying agreement between Answernet and Progress Capital called for an exercise price

The share transfer ledger also shows a notation purporting to document a transaction between Cerida and Progress that occurred sometime in 2003.  DX175 p. 8.  The Answernet general ledger also has separate entries each for a credit of $39.59 on June 13, 2008, and the comment states: "Warrant common stock Barbara Robertshaw and Warrant common stock Gary Pudles."  DX401 p. 2.  The share transfer ledger also shows a notation purporting to document a transaction between Gary Pudles and Michael Pudles that occurred sometime in 2006.  DX175 p. 8.[29]  It also displays entries for transactions between Cerida and Waterside for 12,704 shares in June 2006, and for 4,234.37 shares in 2007.  Id.  The Answernet general ledger also has an entry reflecting a credit for $127.04 on June 30, 2008, and the comment states: "Cerida exercised warrants for 12,704 shares."  DX401 p. 2.  The share transfer ledger records the above described warrant exercises (WSCC 2 and 3, Progress and BF/PC, and the Michael Pudles shares), and also credits Robertshaw for 3,959.03[30] shares, all in May 2008.  DX175 p. 8-9.  There is no entry for any payment from Pudles or Cerida for the exercise of the WSCC 3 warrants (for 4,234.37 shares).[31]

---

of $.01 (which would mean that the exercise price that should have been paid was $181.48).  H1 p. 1.  Additionally, the warrant exercise form recited that Pudles enclosed a check for $.05, the amount Pudles said would be the exercise price in his May 24, 2008 email to the Robertshaws.  DX80; DX83 p. 1.  No such check is in the record.

[29] As noted above, Robertshaw received the warrant for 3,959 shares in Answernet in exchange for an investment of $50,000 in May 2000.  DX175 p. 11, 15.

[30] Pudles and Robertshaw each are credited with 3,959.03 rather than 3,959 shares without explanation.  Compare DX175 p. 9 with DX81; DX4 p. 15 (warrants for 3,959.03 to Michael Pudles and Barbara Robertshaw).

[31] On May 23, 2013 I ordered the parties in their post-trial briefs to "point to specific documents in evidence that corroborate their position as to the shares they control in Answernet, including but not limited to those documents that: Demonstrate the assignment or legal transfer to that party (or any entity that a party claims entitlement to vote the shares of) of any warrants

### III.      The Shareholder Agreement and the Special Distribution

In January 2009, the Robertshaws, Pudles, Executel and Cerida entered into the

Answernet Shareholder Agreement.  DX100 p. 1.  The Agreement recites that those parties and

entities are the sole equity owners of Answernet and a number of other entities "which operate

under the marketing name Answernet."  Id. at 7.  It also provides that "Pudles and Robertshaw

each currently earn $350,000 per year in salary . . . and take matching distributions as necessary

to fund their personal and estimated tax payments . . . from AnswerNet. . . .  Pudles and

Robertshaw also have an agreement that Tax Distributions and other distributions from

_____

for Answernet shares from any other person or entity."  Dkt. No. 159.  In a footnote in its post-
trial brief, Answernet argues that:

> Defendants are hampered in their ability to cite to all documents
> which prove the ownership of AnswerNet stock because the
> Court's request exceeds the parameters of plaintiff's claim and
> goes beyond the issues that were tried before the Court. . . .  [I]t
> would be a denial of due process for Cerida to have its ownership
> rights in AnswerNet adversely impacted in any way by litigation to
> which it is not even a party.  See Parklane Hosiery Co. v. Shore,
> 439 U.S. 322, 327 n.7 (1979) ("It is a violation of due process for a
> judgment to be binding on a litigant who was not a party or a privy
> and therefore has never had an opportunity to be heard.").  Any
> invitation, explicit or implicit, by the Plaintiff to have this Court
> determine Cerida's rights without affording Cerida the opportunity
> to represent its own interests should be flatly refused.

Answernet Post Trial Br., Dkt. No. 166, p. 19-20.  I find that this argument has been waived.  At
any point in this litigation Answernet or Pudles—or any party for that matter—could have
subpoenaed Cerida records or added Cerida as a party.  Further, Pudles and Answernet produced
numerous Cerida records in this litigation, including financial statements, which I find
demonstrates that there was no legal or attitudinal barrier preventing the production of other
Cerida documents, should they exist, by Pudles or Answernet.  Moreover, at all material times
Pudles was president of Cerida, and Pudles owned 50% of Cerida and Robertshaw (either
individually or together with William Robertshaw) owned 50% of Cerida.  If there were Cerida
documents that existed that were relevant to this litigation, surely they could have been accessed
by the parties before me.  Finally, the lack of Answernet documents regarding these purported
transactions regarding Cerida, which the warrant contracts prescribe, see e.g., H27 p. 2-3
(WSCC), H1 p. 56-58 (Progress Capital), H3 p. 24, 26, 31-33, 40 (BF/PC), is also probative of
whether the assignments to Cerida actually occurred.

AnswerNet are made equally to Robertshaw and Pudles." Id.  The Agreement also outlines

certain "Special Distributions" available at the request of either Pudles or Robertshaw.  Id. at 7-8.

The section entitled Special Distributions contains the following:

> The shareholders agree to fund the following Special Distributions
> at the request of either Shareholder subject to the limitations
> contained herein: One million to Pudles and Robertshaw each
> August 1, 2010.  Two million to Pudles and Robertshaw each
> August 1, 2013.  One million to Pudles and Robertshaw each
> August 1, 2016 (collectively "Special Distributions").  It is
> understood that these are not cumulative distributions.

Id. at 7-8.  It also stipulates that "nothing in this Agreement should be construed to change the

Agreement between Pudles and Robertshaw regarding Salary payments or other distributions

from AnswerNet to the Shareholders being equal between Robertshaw and Pudles."  Id. at 8.

The Agreement further requires that either shareholder must inform the other of their intention to

take a Special Distribution at least 90 days prior to the date of the Special Distribution.  Id. at p.

9.  Further the agreement states that "neither party shall be required to personally guaranty any

indebtedness to support the Special Distributions and nothing herein shall be construed as a

guaranty by either party of payments to be made hereunder."  Id. at 10.[32]

The record also contains a number of communications that the parties had regarding the

Agreement, particularly with respect to the Special Distributions.  Several months before the

---

[32] The Agreement also contains the following clause:

> this agreement shall be construed, governed and enforced in
> accordance with the laws of New Jersey without regard to the
> principals [sic] relating to the conflict of law.  Any action
> necessary to enforce or interpret the terms of this agreement may
> be only brought in the superior court located in Mercer County[,]
> New Jersey.

DX100, p. 10.  Until Answernet's post-trial brief, no party had mentioned the forum selection
clause or asserted that venue is not proper here but rather should be in Mercer County, New
Jersey.  I will assess these issues below in the section regarding choice of law.

parties entered into the Agreement, Pudles, who was getting divorced, in an email dated October

28, 2008 wrote to the Robertshaws with details of the terms of his divorce and the payments

from Answernet to Pudles with which he intended to fund his divorce settlement: "To fund these

payments I will probably need to take distributions from the company which likely will be

funded by debt.  As per our agreement, every dollar I take I'll distribute an equal amount to you.

So when I get the funding I'll plan to take double."  K3.[33]

On January 20, 2011, Pudles wrote an email to the Robertshaws:

> I will be distributing between 500K and $1 million to each of us
> over the next year starting no later than August 31.  Just want to
> know if there are any special instructions you might want me to
> consider.  Let me know otherwise we'll just distribute to ourselves
> through the pass through entities.

DX121.  On June 24, 2011, Pudles wrote an email to the Robertshaws informing them that he

had renewed Answernet's credit line, and increased the maximum from $1.5 million to $2.5

million.  DX136.  Pudles additionally wrote:

> Also, pursuant to our [Agreement], please be advised that its [sic]
> my intent to make a [S]pecial [D]istribution of as much as $1
> million each sometime after August 31, 2011.  The actual method
> and amounts of the payout isn't determined but the bank has
> already approved us drawing down on the line of credit if
> necessary to fund these payments.  It is likely that the payments
> will be spread out through the year.

Id.  On August 18, 2011, Pudles wrote to Answernet employees and the company's accountants

with instructions to

> set up distributions to me from the various entities . . . in the
> amount of $1 million.  The payment to me must be made in time to
> deliver [Pudles's divorce payment] on August 31.  We also need to
> set up loans payable to the Robertshaws so its [sic] all fair and
> proper. . . .  The distribution should be done out of available cash

---

[33] The payment terms under the divorce settlement outlined in this email overlap with the
dates of the Special Distributions outlined under the Agreement.  Compare DX100 p. 2 with K3.

> first (without strapping us too tightly) and the remaining portion
> out of the [line of credit.]

N15 p. 1.  Pudles also discusses reclassifying the interest rates on various loans to the company

made by the shareholders: "the first thing we will focus on is using this opportunity to eliminate

the 10 percent shareholder loans and move them into 5.5 percent loans. . . ."  Id.  He continued:

> If the Robertshaws are unhappy about the reduction in interest we
> will write them a check for the 278.5K [sic] out of the [line of
> credit] so they get their principle back immediately and the interest
> will be reduced because the debts will flow to the [line of credit].

Id. at 2.

On September 3, 2011, Pudles wrote again to the Robertshaws: "Per our agreement I

distributed money to make my required personal payment and created a distribution payable

from the company to you so we can pay your matching as cash becomes available. . . .  I took

about 980K [sic] from the company."  N18 p. 1.  Pudles also wrote that "we had three goals in

our approach to the payment to me & [sic] the matching for you" and under the heading

"Robertshaw Matching" wrote "we added an additional loan amount of about 646K to bring the

total amount owed to the Robertshaws to 980K. . . .  My goal is to pay 100K-150K per month in

principal repayments . . . until the Robertshaw loans are paid.  This would mean that all loans to

everyone would be paid off within 18 months."  Id. at 2.  He also went into more detail about the

loan reclassifications mentioned above and noted that "the annual difference between the old

treatment of the loans and the new treatment is only $956 per year.  This result occurred because

we are paying interest on loans that didn't have interest before."  Id.[34]

The Robertshaws however demurred, and on September 5, 2011 wrote to Pudles that they

understood that "some months ago [w]hen we agreed [to make the Special Distribution], you

---

[34] Pudles attached a chart to the email detailing which shareholder loans would have their
interest rates changed.  DX141 p. 6.

described and we agreed to making [sic] an equal cash distribution to the shareholders at the same time.  We prefer to keep to this program." DX141 p. 8.  Pudles responded: "In terms of the cash at the same time, the bank will certainly lend the money to us to make equal cash distributions if that is what you want.  It will effect [sic] our borrowing ability for business purposes but I'm sure we can work that out as well." Id. at 9.  Pudles sought such a loan from Answernet's bank, id. at 11-12, which would not provide one without a personal guaranty on the loan.  Id. at 12 ("As the money is creating no value to Answernet [but] simply being used for an equity distribution for Barbara, we will require a guaranty").  Pudles had made such a guarantee for his distribution, id. at 12, but Robertshaw refused to do so, writing: "I am not guaranteeing any loan in order to fund distributions. . . .  You brought this subject of distributions up a year ago saying you wanted the company to make a distribution to you and me equally [because] you needed money personally." Id. at 20.  The distribution, however, went forward, and $980,000 was paid directly to Pudles while Robertshaw received a number of promissory notes for that same amount with interest.  N22 p. 2-4.[35]

Robertshaw then demanded a special meeting of Answernet's shareholders to review the propriety of the Pudles distribution, D4, but that the meeting was not held because Pudles refused to call a shareholder meeting and represented that Robertshaw did not have the right to call one because, under Answernet's bylaws, she did not "control a sufficient amount of shares to call a special meeting."  Trial Tr. April 23, 2013 36:14-37:5 (Robertshaw); A2 p. 1 ("Special meetings of the shareholders may be called for any purpose . . . upon the written request of

---

[35] The details regarding the specific entities out of which the distribution funds came are complicated and do not change the fundamental question regarding the breach of contract claim which is whether the Agreement required that any shareholder distributions be equal and simultaneous.  See Am. Compl. ¶¶ 9-12; Robertshaw Post-Trial Br., Dkt. No. 164 p. 37-38; DX146 (Special Distribution summary).

shareholders holding fifty-one percent of the outstanding shares."). Robertshaw then called a special meeting of the Answernet Board of Directors for the purpose of reviewing the Special Distribution. D5. That meeting took place on October 31, 2011 but only resulted in deadlock and no action being taken. Trial Tr. April 23, 2013 38:7-21 (Robertshaw). Thereafter, on November 17, 2011, Pudles noticed a special meeting of the shareholders on behalf of himself and Cerida, the "collective owners of more than fifty-one percent of the shares of Answernet." D13.

On November 28, 2011, at the special meeting noticed by Pudles, Robertshaw demanded that the corporation provide a list of shareholders pursuant to Delaware General Corporations Law § 219, F12 p. 2, and in response received a partially-handwritten document titled the "AnswerNet Capitalization Table" which she claims falsely asserted that Cerida owned 62,759 common shares of AnswerNet and inaccurately reported the number of issued and outstanding shares. F12 p. 1-3, M11, Trial Tr. April 23, 2013 40:14-41:23 (Robertshaw). At the special meeting Pudles, voting his and Cerida's shares, removed William Robertshaw from the Answernet board of directors. F12 p. 1, 3; Trial Tr. April 23, 2013 42:9-16 (Robertshaw). Subsequently, on November 29, 2011, Robertshaw filed her complaint in this case asserting claims for breach of contract and breach of fiduciary duty against Pudles in connection with the Special Distribution, and a "shareholder derivative claim" and a claim for violation of § 219 of the Delaware General Corporation Law against Answernet. Dkt. No. 1.

Also following the November meeting Babjak noticed an annual meeting of Answernet's shareholders. D3. At the annual meeting held on December 15, 2011, Pudles and Babjak once again produced a document entitled "List of Shareholders of AnswerNet, Inc." which asserted that Cerida owned 62,759 common shares of Answernet. F12 p. 6, 10; Trial Tr. April 23, 2013

43:21-44:18 (Robertshaw).  At this meeting, "[Pudles] used this claim of Cerida shares to claim a majority in the voting [and] to vote [Robertshaw] off the board of Answernet."  Trial Tr. April 23, 2013 45:3-7 (Robertshaw).[36]  The number of directors was reduced from four to two, and a new board consisting of Pudles and his brother Stephen Pudles was elected.  F12 p. 7-8.

On November 5, 2012, Robertshaw amended her complaint to include a claim for fraud against Pudles and added Babjak as a defendant, asserting claims for fraud, negligence and breach of fiduciary duty against Babjak, and various requests for declaratory relief.  Dkt. No. 86. On March 20, 2013, I denied Answernet's motion to dismiss and Pudles's motion to dismiss and granted Babjak's motion to dismiss the negligence claim against her but denied her motion in all other respects.  Dkt. No. 116, 117.  On March 28, 2013, I scheduled this matter for trial, Dkt. No. 119, and on April 23, 2013 the four day trial began.

## CONCLUSIONS OF LAW

### I.      Choice of Law

As a preliminary matter, I must decide which laws govern the claims in this case, a matter disputed by the parties.  Federal courts exercising diversity jurisdiction must apply the conflict of law rules of the forum state.  On Air Entm't Corp. v. Nat'l Indem. Co., 210 F.3d 146, 149 (3d Cir. 2000), citing Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487, 496–97 (1941). Therefore, Pennsylvania choice of law rules apply to this case.  Pennsylvania has "adopted a flexible choice of law rule which weighs the interests [its] sister-states may have in the transaction."  Cmwlth v. Eichinger, 915 A.2d 1122, 1133 (Pa. 2007).  "Application of that rule requires a multi-faceted analysis," Powers v. Lycoming Engines, 328 F. App'x 121, 124-25 (3d

---

[36] Also contained in the meeting minutes is a remark about the $980,000 Special Distribution referenced in the September 3, 2011 email and discussed above.  The minutes reflect that "Pudles stated that AnswerNet, Inc. did not make a distribution, it paid back a loan."  F12 p. 8.

Cir. 2009), citing Hammersmith v. TIG Ins. Co., 480 F.3d 220, 230-31 (3d Cir. 2007), and since

the inquiry "is issue-specific, different states' laws may apply to different issues in a single

case." Berg Chilling Sys., Inc. v. Hull Corp., 435 F.3d 455, 462  (3d Cir. 2006).

 The Court's first level of scrutiny considers whether "an actual or real conflict [exists]

between the potentially applicable laws." Powers, 328 F. App'x at 125, quoting Hammersmith,

480 F.3d at 230 (alterations in original).  "If there are relevant differences between the laws, then

the court should examine the governmental policies underlying each law, and classify the

conflict as a 'true,' 'false,' or an 'unprovided-for' [(i.e., no interest)] situation." Powers, 328 F.

App'x at 125, quoting Hammersmith, 480 F.3d at 230.  A district court must conduct a deeper

analysis only where "'both jurisdictions' interests would be impaired by the application of the

other's laws (i.e., there is a true conflict).'" Powers, 328 F. App'x at 125, quoting

Hammersmith, 480 F.3d at 230.

 The Court's second level of scrutiny affects only true conflicts and when they exist, I

must "determine which state has the greater interest in the application of its law." Powers, 328 F.

App'x at 125, quoting Hammersmith, 480 F.3d at 231 (internal quotations and further citations

omitted).  "Pennsylvania requires that courts making that determination use a 'combination of

the approaches of both the Restatement [(Second) of Conflict of Laws] (contacts establishing

significant relationships) and interests analysis (qualitative appraisal of the relevant States'

policies with respect to the controversy).'" Powers, 328 F. App'x at 125, quoting Hammersmith,

480 F.3d at 231 (further citations omitted).  "It is not enough to simply count the states' contacts;

they should be weighed 'on a qualitative scale according to their relation to the policies and

interests underlying the [particular] issue.'" Powers, 328 F. App'x at 125, quoting

Hammersmith, 480 F.3d at 231 (further citations omitted).[37]  Moreover, "the expectations of the

parties constitute 'an important element' in the inquiry."  Powers, 328 F. App'x at 125, quoting

Phillips Petroleum Co. v. Shutts, 472 U.S. 797, 822 (1985).

     **A.**    **Breach of Contract Claim**

Answernet argues that, with respect to Robertshaw's breach of contract claim, I should

give effect to the clause in the Agreement which states that:

> this agreement shall be construed, governed and enforced in
> accordance with the laws of New Jersey without regard to the
> principals [sic] relating to the conflict of law.  Any action
> necessary to enforce or interpret the terms of this agreement may
> be only brought in the superior court located in Mercer County[,]
> New Jersey.

Answernet Post-Trial Br., Dkt. No. 166, p. 3-4.  The post-trial briefs of Pudles and Robertshaw

do not discuss choice of law or venue issues as to this claim.[38]

In my March 20, 2012 opinion regarding three motions to dismiss brought individually

by the defendants I noted that "[n]o party has mentioned the forum selection clause or asserted

that venue is not proper here but rather should be in Mercer County, New Jersey.  I will thus

consider this provision waived by mutual assent of the parties."[39]  Robertshaw v. Pudles, No. 11-

7353, 2013 WL 1148395, at *1, n.2 (E.D. Pa. Mar. 20, 2013).  I also noted that the elements of a

---

[37] Once the survey has been completed and a choice of law is made, I must then consider
whether applying that law to all the parties violates the Due Process and Full Faith and Credit
Clauses.  Powers, 328 F. App'x at 125.  "[F]or a State's substantive law to be selected in a
constitutionally permissible manner, that State must have a significant contact or significant
aggregation of contacts, creating state interests, such that choice of its law is neither arbitrary nor
fundamentally unfair."  Id., quoting Allstate Ins. Co. v. Hague, 449 U.S. 302, 312-13 (1981)
(plurality opinion).

[38] Babjak is neither a defendant in the breach of contract claim nor a party to the contract.

[39] As no party disputes whether venue was proper in the Eastern District of Pennsylvania,
I consider this argument waived.  See Fed. R. Civ. P. 12(h).

breach of contract claim are substantially the same in Pennsylvania, New Jersey and Delaware and thus the choice of law is not outcome determinative.  Id.

In reviewing this law again, I still find that that there is no real conflict between the laws of these jurisdictions regarding breach of contract claims.  Compare Century Land Grp., LLC v. Mayor & Council of Borough of Keyport, No. 1869-05, 2006 WL 2457846, at *14 (N.J. Super. Ct. Law Div. Aug. 22, 2006) (In New Jersey "to prevail on a breach of contract claim, plaintiff must prove that the contractual relationship existed, that defendant breached the contract, and that plaintiffs suffered damages as a result of the breach")[40] with Omnicron Sys., Inc. v. Weiner, 860 A.2d 554, 564 (Pa. Super. Ct. 2004) (Under Pennsylvania law, a breach of contract requires: (1) "the existence of a contract, including its essential terms, (2) a breach of a duty imposed by the contract and (3) resultant damages.") and VLIW Tech., LLC v. Hewlett-Packard Co., 840 A.2d 606, 612 (Del. 2003) (in Delaware the elements of a breach of contract claim are: "first, the existence of the contract, whether express or implied; second, the breach of an obligation imposed by that contract; and third, the resultant damage to the plaintiff."); see also Boyko v. Am. Int'l Grp., Inc., No. 08-2214, 2012 WL 1495372, at *9 (D.N.J. Apr. 26, 2012) ("the legal

---

[40] In some instances courts applying New Jersey law to breach of contract claims identify a fourth element to a breach of contract claim.  See e.g., Frederico v. Home Depot, 507 F.3d 188, 203 (3d Cir. 2007) ("A claim for breach of contract in New Jersey requires: (1) a contract between the parties; (2) a breach of that contract; (3) damages flowing therefrom; and (4) that the party stating the claim performed its own contractual obligations.").  However, Pudles's assertions notwithstanding, Robertshaw's performance of her contractual duties under the Agreement is not at issue in this case.  Moreover, this fourth element is not always included by courts applying New Jersey law in a breach of contract action.  See e.g., AT & T Credit Corp. v. Zurich Data Corp., 37 F. Supp. 2d 367, 370 (D.N.J. 1999); Hayes v. Wal-Mart, 281 F.R.D. 203, 214 (D.N.J. 2012).  Finally, even when courts identify this fourth element when conducting choice of law analysis, the presence or absence of this fourth element has not precluded the conclusion that "[i]t is clear that the elements required for . . . breach of contract claims are substantially similar in New Jersey and Pennsylvania."  RBC Bank (USA) v. Riley, Riper, Hollin & Colagreco, No. 09-00431, 2009 WL 2580354, at *6, and n.5 (D.N.J. Aug. 19, 2009). Therefore I find that this fourth element of a breach of contract claim does not represent a real conflict between the laws of New Jersey, Pennsylvania or Delaware as to that claim.

elements of a breach of contract claim are substantially similar in all fifty states, such that

certification [of a class of multi-jurisdictional plaintiffs] as to the breach of contract claim is

proper."), order vacated in part on other grounds, 2012 WL 2132390 (D.N.J. June 12, 2012).

Thus, finding no true conflict between the law governing breach of contract claims in New

Jersey and either Pennsylvania or Delaware, I will, as before, apply Delaware law to this claim.

      **B.**      **The Breach of Fiduciary Duty Claims, the Shareholder Derivative Claim, the Claim Raised Under Section 219 of the DGCL and the Declaratory Relief Sought Regarding Issues of Corporate Control**

I must also decide which state's law applies to Robertshaw's breach of fiduciary duty

claims, her shareholder derivative claim, the claim brought pursuant to section 219 of the DGCL

and her requests for declaratory relief.  To do so, I consider the applicability of the internal

affairs doctrine, "a long-standing choice of law principle which recognizes that only one state

should have the authority to regulate a corporation's internal affairs—the state of incorporation."

VantagePoint Venture Partners 1996 v. Examen, Inc., 871 A.2d 1108, 1112-13 (Del. 2005).  The

internal affairs doctrine thus "holds that courts look to the law of the state of incorporation to

resolve issues involving the internal affairs of a corporation."  Banjo Buddies, Inc. v. Renosky,

399 F.3d 168, 179 n.10 (3d Cir. 2005).  Pennsylvania has adopted the internal affairs doctrine by

statute.  Id.; see also 15 Pa. Cons. Stat. Ann. § 4145.[41]

---

[41] In pertinent part, the statute states:

> The courts of this Commonwealth shall not dismiss or stay any
> action or proceeding brought by a shareholder or representative of
> a foreign domiciliary corporation, as such, against the corporation
> or any one or more of the shareholders or representatives thereof,
> as such, on the ground that the corporation is a foreign corporation
> for profit or that the cause of action relates to the internal affairs
> thereof, but every such action shall proceed with like effect as if
> the corporation were a domestic corporation.  Except as provided
> in subsection (b), *the court having jurisdiction of the action or*

The internal affairs doctrine applies to matters that pertain to the relationships among or between the corporation and its officers, directors, and shareholders.[42]  VantagePoint, 871 A.2d at 1113.  Accordingly, the conflicts practice of both state and federal courts has consistently been to apply the law of the state of incorporation to claims relating to "the entire gamut of internal corporate affairs."  Id.  Thus, clearly "corporate voting rights disputes are governed by the law of the state of incorporation."  Id. at 1117.   And given the Delaware Supreme Court's guidance in VantagePoint, I find that the internal affairs doctrine also militates toward the conclusion that the law of the state of incorporation governs the breach of fiduciary duty claims, derivative claims and claims arising under the DGCL, as they all relate to the relationships between the corporation, its directors, officers and shareholders and overlap with the issues of corporate control.  See Banjo Buddies, 399 F.3d 168, 179 n.10 (3d Cir. 2005) (applying law of state of incorporation to breach of fiduciary duty claims); Baker-Bey v. Delta Sigma Theta Sorority, Inc., No. 12-1364, 2013 WL 1742449, at *4 (E.D. Pa. Apr. 23, 2013) (same); Rapoport v. Litig. Trust of MDIP Inc., No. 1035-N, 2005 WL 3277911, at *5 (Del. Ch. Nov. 23, 2005) ("The fiduciary duties owed by directors and officers to the corporation unquestionably pertain to the relationships among the corporation and its officers and directors.  Therefore, Delaware law governs this dispute."); Hamilton Partners, L.P. v. Highland Capital Mgmt., L.P., No. 6547-

---

> proceeding shall apply the law of the jurisdiction under which the
> foreign domiciliary corporation was incorporated.

15 Pa. Cons. Stat. Ann. § 4145 (emphasis added).

[42] The Restatement (Second) of Conflict of Laws § 301 provides: "application of the local law of the state of incorporation will usually be supported by those choice-of-law factors favoring the need of the interstate and international systems, certainty, predictability and uniformity of result, protection of the justified expectations of the parties and ease in the application of the law to be applied."  VantagePoint Venture Partners 1996 v. Examen, Inc., 871 A.2d 1108, 1113 (Del. 2005).

VCN, 2012 WL 2053329, at *3 n.14 (Del. Ch. May 25, 2012) ("[s]uits such as this that seek to enforce the fiduciary duties of directors and controlling stockholders of Delaware corporations play an integral part in regulating the internal affairs of Delaware corporations.") (citations omitted); <u>Doltz v. Harris & Assocs.</u>, 280 F. Supp. 2d 377, 383 (E.D. Pa. 2003) (applying law of state of incorporation to determine whether plaintiff had standing to bring shareholder derivative suit in that state).[43]  Thus I will apply Delaware law to these claims.

     **C.**      **Fraud Claims**

     As Answernet notes in its brief, "there is a meaningful distinction between Delaware law on fraud and Pennsylvania law on fraud with respect to the burden of proof."  Answernet Post-Trial Br., Dkt. No. 166, p. 10.  Under Pennsylvania law, a plaintiff is required to prove fraud by clear and convincing evidence.  <u>Freeman v. Pittsburgh Glass Works, LLC</u>, 709 F.3d 240, 257 (3d Cir. 2013); <u>Rohm & Haas Co. v. Cont'l Cas. Co.</u>, 781 A.2d 1172, 1179 (Pa. 2001).  In Delaware, the plaintiff need only prove the elements of common law fraud by a preponderance of the evidence.  <u>Outdoor Techs., Inc. v. Allfirst Fin., Inc.</u>, No. 09-151, 2001 WL 541472, at *3 (Del. Super. Ct. Apr. 12, 2001); <u>Tracinda Corp. v. DaimlerChrysler AG</u>, 364 F. Supp. 2d 362, 389 (D. Del. 2005).  This constitutes a real conflict, and I must proceed to the second prong of the choice of law analysis outlined above.

     The second prong in the analysis thus requires me to determine which state has the greater interest in the application of its laws; to do so I must use a "combination of the approaches of both the Restatement  [(Second) of Conflict of Laws] (contacts establishing significant relationships) and 'interests analysis' (qualitative appraisal of the relevant States' policies with respect to the controversy)."  <u>Powers</u>, 328 F. App'x at 125, <u>quoting</u> <u>Hammersmith</u>,

_____

[43] I also note that none of the parties have briefed which jurisdiction's law properly applies to the breach of fiduciary duty claims.

480 F.3d at 231 (further citations omitted).  The Restatement offers the following guidance to

help determine which state has the most significant relationship to the occurrence giving rise to

the fraud claim and to the parties, suggesting a court consider:

> (a) the place, or places, where the plaintiff acted in reliance upon the defendants representations,
> (b) the place where the plaintiff received the representations,
> (c) the place where the defendant made the representations,
> (d) the domicil[e], residence, nationality, place of incorporation and place of business of the parties,
> (e) the place where a tangible thing which is the subject of the transaction between the parties was situated at the time, and
> (f) the place where the plaintiff is to render performance under a contract which he has been induced to enter by the false representations of the defendant.

Restatement (Second) of Conflict of Laws § 148 (Fraud and Misrepresentation) (1971).

However, as noted above, the number of contacts is not dispositive as to which state has the

greater interest in the application of its law.  Powers, 328 F. App'x at 125.

Applying these factors generates ambivalence as to whether Pennsylvania or Delaware

has the more significant relationship to the fraud claim in this case.  Robertshaw is a citizen of

Massachusetts, Pudles a citizen of Pennsylvania, Babjak a citizen of New Jersey, and Answernet

is a Delaware corporation with its principal place of business in Pennsylvania.  Am. Compl. ¶¶ 1-

4.  Answernet's offices, now located in Willow Grove, Pennsylvania, were until the fall of 2007

located in Princeton, New Jersey.  Trial Tr. Apr. 25, 2013, 85:13-15 (Pudles).  The extensive

record in this case reveals that the parties corresponded with each other chiefly by email, though

Pudles and Bill Robertshaw for a time talked daily, and also communicated a great deal via

email.  Trial Tr. April 23, 2013, 67:6-7 (Robertshaw).  Thus, the first three Restatement factors

regarding the place of reliance on the misrepresentations, the place where the representations

were received by Robertshaw and the place where Pudles and/or Babjak made the

representations do not direct me to a forum that clearly has the most significant contacts with the litigation.  Similarly, the fourth factor relating to the domicile of the parties and the place that they conducted business also points to multiple jurisdictions.  Further, the fifth factor, the location of the subject of the transaction, points to Delaware because at issue in the fraud claim, inter alia, is the existence, or lack thereof, of certain documents demonstrating an entitlement to vote certain shares of Answernet, and because the disputed shares were issued in Delaware, as discussed above, the issuance of the shares and voting rights associated with these shares are governed by Delaware law pursuant to the internal affairs doctrine.  VantagePoint, 871 A.2d at 1113, 1117.

However, turning to the interests analysis component of the choice of law analysis, Powers, 328 F. App'x at 125, I find that "with respect to the interest each state holds in the [case] that Delaware has a clear interest in regulating the internal affairs of those entities incorporated under its laws.  Pennsylvania, on the other hand, has a more attenuated interest."  Franklin v. SKF USA Inc., 126 F. Supp. 2d 911, 918 (E.D. Pa. 2000).  I find Delaware's contact as the state of incorporation is dispositive with respect to the law I must apply to the fraud claims, given that the nature of this dispute at its heart is a question of corporate control, implicating Answernet's internal governance and the conduct of its shareholders, officers and directors.  The issues that predominate in this case are "quintessentially . . . associated with the state in which the corporation chose to incorporate itself.  Therefore, Delaware's contact with this dispute has greater weight in [my] choice of law analysis than the fact that [Answernet's] principal place of business is in Pennsylvania."  Id.  Thus, because I find the issues surrounding the question of control of Answernet and the validity of the actions taken at the 2011 Board and Shareholder meetings here are interwoven with the fraud claims, I conclude that Delaware substantive law

should govern the claims for fraud in this case as well.  See e.g., Intarome Fragrance & Flavor Corp. v. Zarkades, No. 07-873, 2009 WL 931036, at *14 (D.N.J. Mar. 30, 2009) (applying Delaware law to fraud and breach fiduciary duty claims because Delaware was state of incorporation).[44]

### D.    Abuse of Process Counterclaim

The parties have not discussed the appropriate choice of law for Pudles's counterclaim for abuse of process, though his post-trial brief identifies the elements of an abuse of process claim as they have been articulated by Pennsylvania courts.  Pudles Post-Trial Br., Dkt. No. 167, p. 36.  In assessing the elements of the tort as they are commonly identified in Delaware and Pennsylvania, there does not seem to be a conflict.  Compare Toll Bros., Inc. v. Gen. Acc. Ins. Co., No. 98C-08-203 WTQ, 1999 WL 744426, at *5 (Del. Super. Aug. 4, 1999), aff'd, 765 A.2d 953 (Del. 2000) (In Delaware "[t]he elements of abuse of process . . . are: (1) an ulterior purpose,

---

[44] I also note that

> [t]he internal affairs doctrine is not, however, only a conflicts of law principle.  Pursuant to the Fourteenth Amendment Due Process Clause, directors and officers of corporations "have a significant right . . . to know what law will be applied to their actions" and "[s]tockholders . . . have a right to know by what standards of accountability they may hold those managing the corporation's business and affairs."  Under the Commerce Clause, a state "has no interest in regulating the internal affairs of foreign corporations."  Therefore, this Court has held that an "application of the internal affairs doctrine is mandated by constitutional principles, except in the 'rarest situations,'" e.g., when "the law of the state of incorporation is inconsistent with a national policy on foreign or interstate commerce."

VantagePoint, 871 A.2d at 1113 (citations omitted).  Because Answernet was incorporated in Delaware, see A3, "Restated Certificate of Incorporation," by Gary Pudles, id. at 14, two of the defendants in this case "purposefully avail[ed] [themselves] of the privilege of conducting activities within [Delaware], thus invoking the benefits and protections of its laws" and satisfying any concerns associated with the due process clause in subjecting them to Delaware's laws.  Burger King Corp. v. Rudzewicz, 471 U.S. 462, 475 (1985).

and (2) a wilful [sic] act in the use of process not proper in the regular conduct of the proceeding.
The improper purpose is usually to obtain a collateral advantage.") with Lerner v. Lerner, 954
A.2d 1229, 1238-39 (Pa. Super. Ct. 2008), quoting Shiner v. Moriarty, 706 A.2d 1228, 1236 (Pa.
Super. Ct. 1998), appeal denied, 729 A.2d 1130 (1998) (In Pennsylvania, "[t]o establish a claim
for abuse of process it must be shown that the defendant (1) used a legal process against the
plaintiff, (2) primarily to accomplish a purpose for which the process was not designed; and (3)
harm has been caused to the plaintiff").

However, in comparing which jurisdiction has the greater interest in the application of its
laws, I find that the laws of Pennsylvania clearly should apply here since the alleged abuse of
process, namely this lawsuit, occurred in Pennsylvania and the alleged victim of the tort, Pudles,
is a citizen of Pennsylvania.  Thus Pennsylvania has the superior interest in protecting Pudles
from various tortious conduct and having its laws applied.  See Chicarelli v. Plymouth Garden
Apartments, 551 F. Supp. 532, 540 (E.D. Pa. 1982); see also Zebrowski v. Wells Fargo Bank,
N.A., 657 F. Supp. 2d 511, 517 (D.N.J. 2009) ("Although the parties have not explicitly
discussed the appropriate choice of law for this case, New Jersey state law is properly applied for
the [tort of abuse of process] as the alleged torts occurred in New Jersey and Plaintiffs appear to
be New Jersey citizens, whom the state has an interest in protecting from conduct of this
nature"); U. S. ex rel. Sacks v. Phila. Health Mgmt. Corp., 519 F. Supp. 818, 826 (E.D. Pa. 1981)
("Under the flexible contacts/interest analysis adopted in Pennsylvania . . . the substantive law of
Pennsylvania would govern in determining the [abuse of process] counterclaim since plaintiff is
a resident of Pennsylvania . . . and no other state appears to have a dominant interest in the
occurrences.").  Thus I will apply Pennsylvania law to the counterclaim for abuse of process.

Having resolved the conflict of law issues I now turn to the substance of the claims.

38

## II.        Breach of Contract Claim

Robertshaw contends that the Agreement mandated that any distributions of funds from Answernet would be distributed equally to her and Pudles, and at the same time, and that Pudles breached the Agreement by taking his Special Distribution in cash while giving her a promissory note.  Robertshaw Post-Trial Br., Dkt. No. 164, p. 37.  Pudles asserts that the Agreement did not require that the Special Distribution be made simultaneously but merely that it be equal.  Pudles Post-Trial Br., Dkt. No. 167, p. 2.  He further argues that Cerida actually made the distribution and that Robertshaw has suffered no damages because she eventually received a distribution with interest that accounted for the time value of money.  Id. at p. 8, 12.

In Delaware the elements of a breach of contract claim are: "first, the existence of the contract, whether express or implied; second, the breach of an obligation imposed by that contract; and third, the resultant damage to the plaintiff.  VLIW Tech., LLC v. Hewlett-Packard Co., 840 A.2d 606, 612 (Del. 2003).  "['W]here the contract language is clear and unambiguous, the parties' intent is ascertained by giving the language its ordinary and usual meaning.'"  AT & T Corp. v. Faraday Capital Ltd., 918 A.2d 1104, 1108 (Del. 2007).  "The fact that the parties disagree on the meaning of a term does not render that term ambiguous."  Id.  "Rather, a contract is ambiguous only when the provisions in controversy are reasonably or fairly susceptible of different interpretations or may have two or more different meanings.'"  Id.  "Where an ambiguity exists in a contract, it is generally construed against the party that created the ambiguity."  Pritchett v. I/O Repair, Inc., No. 12002461, 2013 WL 1750888, at *4 (Del. Com. Pl. Apr. 22, 2013), citing Intel Corp. v. American Guar. & Liab. Ins. Co., 51 A.3d 442, 447 (Del. 2012).  The parties do not dispute the validity of the Agreement, DX 100, but vigorously contest

whether Pudles breached the Agreement and whether Robertshaw suffered any damages as a result.

While the Agreement does not contain the word simultaneous, Answernet Post Trial Br., Dkt. No. 166 p. 1, DX100, I find that it is unclear whether all shareholder distributions were supposed to be simultaneous.  The Agreement provides that "Pudles and Robertshaw . . . take matching distributions as necessary to fund their personal and estimated tax payments . . . from AnswerNet. . . .  Pudles and Robertshaw also have an agreement that Tax Distributions and other distributions from AnswerNet are made equally to Robertshaw and Pudles."  DX100 p. 7. "Matching distributions" certainly implies that the distributions would be equal but could also suggest that they be exactly the same, including at the same time.  Compare Definition of Match 1a (a person or thing equal or similar to another) and 1c (an exact counterpart), Merriam-Webster Online Dictionary, http://www.merriam-webster.com/dictionary/match (accessed July 16, 2013). The section of the agreement entitled Special Distributions contains the following: "The shareholders agree to fund the following Special Distributions [. . . ]: One million to Pudles and Robertshaw each August 1, 2010.  Two million to Pudles and Robertshaw each August 1, 2013. One million to Pudles and Robertshaw each August 1, 2016 (collectively "Special Distributions").  Clearly then these Special Distributions were to be made on the same day to each shareholder.

Moreover, as Pudles made clear at trial, the Agreement was created in response to Pudles's need for cash to finance his divorce.  Trial Tr. April 25, 2013 111:11-112:4 (Pudles) (e.g., "I was in negotiations with my ex-wife for the . . . property settlement of our divorce . . . Bill and I had been talking about how we could make sure that I can pay that. . . .  As part of my negotiation with my ex-wife, I wanted to make sure that I had an agreement in place so that I

could take the money from the company which was necessary for me to pay the obligation, without having to either sell or break up the company.  And so I reached out to Bill and Barbara to do a shareholder agreement.").  Because the primary purpose of the Agreement was to create Special Distributions to finance Pudles's divorce payments, I find this to be further evidence for the proposition that the Special Distributions were intended to be made on the same day.  DX100 p. 1-2 ("[whereas] Pudles and Robertshaw desire certain Special Distributions . . . the shareholders agree to this future funding plan for such Special Distributions" and then describing the specific dates the Special Distributions were to be made to each of them, as set forth above). Finally, I will look to other record evidence, of which each side has submitted volumes, to confirm what the party's expectations were regarding the timing of the Special Distribution in question.

In an email dated October 28, 2008, Pudles wrote to the Robertshaws detailing the terms of Pudles's divorce and the payments from AnswerNet to Pudles with which he intended to fund his divorce settlement: "To fund these payments I will probably need to take distributions from the company which likely will be funded by debt.  As per our agreement, every dollar I take I'll distribute an equal amount to you.  So when I get the funding I'll plan to take double."  K3.  That Pudles planned to take "double" suggests that he contemplated Answernet would distribute the funds to him and Robertshaw at the same time.

On January 20, 2011, Pudles wrote to the Robertshaws forecasting his plans to distribute between half a million and a million dollars "to each of us over the next year starting no later than August 31."  DX121.  On June 24, 2011 Pudles again wrote to the Robertshaws that it was his

> intent to make a [S]pecial [D]istribution of as much as $1 million
> each sometime after August 31, 2011.  The actual method and

> amounts of the payout isn't determined but the bank has already
> approved us drawing down on the line of credit if necessary to
> fund these payments.  It is likely that the payments will be spread
> out through the year.

DX136.  This suggests that at least some point Pudles contemplated that the payments would not be in one lump sum to either of them.

However, on August 18, 2011, Pudles wrote to Answernet employees with instructions to "set up distributions to me from the various entities . . . in the amount of $1 million.  The payment to me must be made in time to deliver [Pudles's divorce payment] on August 31.  We also need to set up loans payable to the Robertshaws so its [sic] all fair and proper . . . ."  N15 p. 1.  Pudles here seems to contemplate that his distribution would not coincide with the distribution to Robertshaw; rather Pudles would get cash and Robertshaw would get promissory notes.  In this email Pudles also discusses reclassifying the interest rates on various loans to the company made by the shareholders: "the first thing we will focus on is using this opportunity to eliminate the 10 percent shareholder loans and move them into 5.5 percent loans. . . ."  Id.  He continued: "If the Robertshaws are unhappy about the reduction in interest we will write them a check for the 278.5K out of the [line of credit] so they get their principle back immediately and the interest will be reduced because the debts will flow to the [line of credit]."  Id. at 2.  This statement suggests that the Robertshaws were not entirely aware of or in accord with his plans for Robertshaw's payment. [45]

Finally, on September 3, 2011, Pudles wrote again to the Robertshaws: "Per our agreement I distributed money to make my required personal payment and created a distribution

---

[45] This email is also illustrative of the ambiguity as to Bill Robertshaw's role in all of this, as Pudles often discusses the Robertshaws in tandem (and they both received much of the correspondence in the record), though no party disputes that the distributions called for under the Agreement were to be made to Barbara Robertshaw.

payable from the company to you so we can pay your matching as cash becomes available. . . .  I took about 980K [sic] from the company."  N18 p. 1.

Robertshaw contends that this was contrary to their Agreement.  On September 5, 2011, she wrote: "some months ago [w]hen we agreed [to make the Special Distribution], you described and we agreed to making [sic] an equal cash distribution to the shareholders at the same time.  We prefer to keep to this program."  DX141 p. 8.[46]  However, the bank would not loan the money to Answernet without a personal guaranty on the loan, which neither Pudles (who had made a personal guaranty on the loan for his Special Distribution) nor Robertshaw was willing to make.  Id. at 9-12.

Considering this evidence I find that the Agreement meant that Robertshaw and Pudles would take their distributions at the same time and that Pudles breached the agreement by unilaterally taking his Special Distribution and giving Robertshaw a distribution in the form of a promissory note for a Special Distribution to be made and various reclassifications on interests rates on loans already due to her.  DX145 p. 3-5.

However, I also find that Robertshaw's Special Distribution has been made, with interest, and thus she has suffered no resultant damages from the breach of this agreement.  Robertshaw testified that since the breach of the Agreement, she has "received 980 [thousand dollars] back, plus some interest."  Trial Tr. April 23, 2013 94:10-12, 102:24-103:3 (Robertshaw); see also id. at 46:7-13, 94:7-9.  As to the loan reclassifications, Robertshaw points to no contract or authority

---

[46] I find it appropriate to consider Robertshaw's submissions as clarifications of her and Pudles's understanding of the Agreement.  J.A. Moore Const. Co. v. Sussex Assocs. Ltd. P'ship, 688 F. Supp. 982, 988 (D. Del. 1988) ("The parole evidence rule bars evidence only of negotiations and agreements which precede or are contemporaneous with a written integrated agreement.  Subsequent bargains may arise at any time and may be pleaded and proved by the aggrieved party"), citing Pepsi-Cola Bottling Co. of Asbury Park v. Pepsico, 297 A.2d 28 (Del. 1972).

or any record evidence demonstrating why she was entitled to a certain interest rate.  In her damages summary Robertshaw also seems to calculate her damages based on the assumption that all of the loans should have been paid 10% interest, O1 p. 3, but, as Answernet notes in its brief, there is no "justification for why she should be paid 10% interest on those notes, which previously were not accruing or paying any interest at all."  Answernet Post-trial Br., Dkt. No. 166 p. 7.[47]  Accordingly, I find that Robertshaw has not proven any damages as a result of Pudles's breach and thus has not proven her breach of contract claim.[48]

### III.    DGCL Section 219

Robertshaw asserts a claim for violation of section 219 of the Delaware General Corporations Law because the stock ledger Babjak gave to Robertshaw was not based solely on information set forth in Answernet's official stock ledger but rather was based on documents that Pudles himself created.  Robertshaw Post Trial Br., Dkt. No. 164, p. 18.  Section 219(a) provides that the officer who has charge of the stock ledger of a corporation shall prepare and make, at least 10 days before every meeting of stockholders, a complete list of the stockholders entitled to vote at the meeting.  Del. Code Ann. tit. 8, § 219(a) (West).  Implicit in section 219 is the

---

[47] Moreover, by Answernet's calculation, the loan reclassifications actually resulted in Robertshaw receiving slightly more in interest than she would have had the loan interest rates remained the same because all the loans due her after reclassification earned interest whereas before only some did.  DX400.

[48] Robertshaw contends that Delaware law specifically permits punitive damages to be awarded in breach of contract claims where the defendant's conduct is found to have been "characterized by willfulness or malice."  Robertshaw Post-Trial Br., Dkt. No. 164 p. 47, citing Casson v. Nationwide Ins. Co., 455 A.2d 361, 368 (Del. Super. Ct. 1982).  However, "[i]t is clear [that I] cannot award punitive damages without first finding some element of compensatory or consequential damages.  In reviewing the language in Casson, it is clear the court intended the consequential or compensatory damages arising from a failure to pay to be used as the spring board for an award of punitive damages."  E. I. Du Pont De Nemours & Co. v. Admiral Ins. Co., No. 89-AU-99, 1994 WL 465547, *7 (Del. Super. Ct. Aug. 3, 1994), citing Casson, 455 A.2d at 368.  Thus, because Robertshaw has not proven any damages resulting from the breach of the Agreement, she is not entitled to punitive damages.

affirmative duty of Delaware corporations to maintain a stock ledger.  <u>Rainbow Nav., Inc. v. Pan Ocean Nav., Inc.</u>, 535 A.2d 1357, 1359 (Del. 1987) (citations omitted).

I find that the requirements of section 219(a) were satisfied when Pudles delivered what was ostensibly the Answernet stock ledger to Robertshaw at the November and December 2011 meetings.  According to the November 28, 2011 meeting minutes: "Mr. Fitzpatrick made a motion on behalf of Ms. Robertshaw and seconded by Executel, for the list of shareholders and other documentation required under Section 219 of the Delaware Corporation law.  Mr. Pudles in his capacity as President of AnswerNet then provided Mr. Fitzpatrick with a copy of the capitalization table as well as the addresses as known to Answernet of shareholders Barbara Robertshaw and Executel."  F12 p. 2.  Similarly, according to the December 15, 2011 meeting minutes: "[t]he list of Shareholders of the Corporation was produced and remained open and available for inspection throughout the entire course of the meeting."  <u>Id.</u> at 6.  Thus, though the ledger may have been inaccurate, the corporation did indeed turn over the records covered by the statute.  Therefore I find that Robertshaw has not proven her section 219 claim.

### IV.    Declaratory Relief Regarding Corporate Control

The Declaratory Judgment Act provides that in "a case of actual controversy within its jurisdiction, . . . any court of the United States . . . may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought."  <u>Honeywell Int'l Inc. v. Int'l Union, United Auto., Aerospace & Agr. Implement Workers of Am.</u>, 502 F. App'x 201, 203 (3d Cir. 2012), <u>citing</u> 28 U.S.C. § 2201(a).  Any such declaration shall have the force and effect of a final judgment or decree and shall be reviewable as such.  28 U.S.C. § 2201(a).  The Act does not require a court to determine the rights of parties but rather permits a court to exercise its sound discretion in determining whether to grant a

remedy under the Act.  Wohl v. Wilkoski, No. 87-1445, 1989 WL 64426, at *4 (E.D. Pa. June

14, 1989), citing Brillhart v. Excess Ins. Co., 316 U.S. 491 (1942) and Travelers Ins. Co. v.

Davis, 490 F.2d 536 (3d Cir. 1974) (declaratory judgment is discretionary and not mandatory).

Further, "a declaratory judgment is an equitable remedy; therefore, the court must strike a

balance between the needs of the plaintiff and the consequences of giving the desired relief."

Wohl, 1989 WL 64426, at * 4, citing Great Lake Co. v. Huffman, 319 U.S. 293, 300 (1943)

(declaratory judgment is an equitable cause of action and district court is free to grant or

withhold relief on equitable grounds) (further citations omitted).

  Robertshaw requests that I issue an order pursuant to 28 U.S.C. § 2201:

> a. declaring void the November 28, 2011 Special Meeting of the Shareholders of Answernet, Inc., and all votes taken at that meeting;

> b. declaring void the December 15, 2011 Annual Meeting of the Shareholders of Answernet, Inc., and all votes taken at that meeting;

> c. declaring that Cerida Investment Corp. does not possess the 12,704 shares of Answernet, Inc., that Defendants Gary Pudles and Betty Babjak falsely claimed it received as a result of an alleged assignment and exercise of the Waterside Warrants;

> d. declaring that the total of shares of Answernet, Inc., held by Plaintiff Barbara Robertshaw and Executel, Inc., constitute a majority of the issued and outstanding shares of the company;

> e. declaring that Betty Babjak was never lawfully elected Secretary of Answernet;

> f. declaring that Plaintiff Barbara Robertshaw and Executel, Inc., may at any time call a Special Meeting of the Shareholders in order to elect new corporate officers and to take all other actions permitted by law and the By-Laws.

Am. Compl. ¶ 75.

Answernet objects to these requests for declaratory relief.  Answernet claims that, because the warrants for certain shares were assigned to or purchased by either Pudles or Cerida, Pudles was entitled to exercise those warrants in May 2008 and thus the actions that he took thereafter, specifically those taken at the November and December 2011 meetings, were valid. Answernet Post-Trial Br., Dkt. No. 166 p. 13-20.[49]  In order to determine whether the requested declaratory relief is appropriate, I must therefore first decide, in consideration of the facts established at trial, who or what entity controls the Answernet shares associated with each of the warrants described above and how many shares each owner now controls.[50]

### A.      The Warrant Rights at Issue and the Control of Answernet

Section 219 of the Delaware General Corporations Law states that the "stock ledger shall be the only evidence as to who are the stockholders entitled by this section to examine the list required by this section or to vote in person or by proxy at any meeting of stockholders." Del. Code Ann. tit. 8, § 219(c) (West).  However, "[a]lthough a corporation is entitled to rely upon the stockledger to determine who are the stockholders entitled to vote . . . this Court is not limited to or bound by the stocklist in a proceeding to review a corporate election."  Viele v.

---

[49] Pudles does not mention the declaratory relief in his post-trial brief.

[50] Although Robertshaw sued under the federal Declaratory Judgments Act and not its state counterpart, Del. Code Ann. tit. 10, § 6506, when state law provides the rule for deciding which party has the burden of proof in a suit for declaratory judgment in federal court, I must follow the law of the forum state "as that issue is substantive, not procedural."  Fireman's Fund Ins. Co. v. Videfreeze Corp., 540 F.2d 1171, 1175-76 (3d Cir. 1976), cert. denied, 429 U.S. 1053 (1977).  "The rule in Delaware appears to be that "'a plaintiff in a declaratory judgment action should always have the burden of going forward.'"  Policemen's Annuity & Benefit Fund of Chicago v. DV Realty Advisors LLC, No. 7204-VCN, 2012 WL 3548206, at *11 n.81 (Del. Ch. Aug. 16, 2012), quoting Hexion Specialty Chemicals, Inc. v. Huntsman Corp., 965 A.2d 715, 739 (Del. Ch. 2008) (further citations omitted).  Thus, Robertshaw "bears the burden of proof by a preponderance of the evidence for the declaratory judgment sought."  Friends of Christine O'Donnell v. Moseley, No. CPU4-11-00573, 2012 WL 1996860, at *3 (Del. Com. Pl. June 5, 2012), citing Rhone-Poulenc v. GAF Chemicals, No. 12848, 1993 WL 125512, at *3 (Del. Ch. Apr. 8, 1993).

Devaney, 679 A.2d 993, 996 (Del. Ch. 1996) (citations omitted).  Indeed, "Delaware courts have often looked beyond the stockledger to determine shareholder status, particularly with regard to voting rights."  Id. (citation omitted).  In this case, because Robertshaw contends that the share transfer ledger and capitalization tables are inaccurate, I find it necessary to look beyond those documents, which were provided to Robertshaw at the November and December 2011 meetings, and consider extrinsic evidence in order to ascertain the true ownership interests of Answernet. Id., citing Arbitrium (Cayman Islands) Handels A.G. v. Johnson, No. 13506, 1996 WL 12149, at *3-14 (Del. Ch. Jan. 5, 1996) (disregarding inaccurate and "highly suspect" stock ledger and considering extrinsic evidence to determine various ownership interests in a corporation and existence of various agreements about the corporation between the litigants), aff'd, 683 A.2d 59 (Del. 1996) and In re Canal Construction Co., 182 A. 545, 160-63 (Del. Ch. 1936) (looking beyond stock ledger to determine voting rights of shareholders in a corporation).  I will now turn to that extrinsic evidence to resolve the questions of corporate control and Robertshaw's requests for declaratory relief.

Pudles claims an entitlement to exercise certain warrants because these warrants were assigned to or purchased by him or Cerida.  "[A]n assignment of a right is a manifestation of the assignor's intention to transfer it by virtue of which the assignor's right to performance by the obligor is extinguished in whole or in part and the assignee acquires a right to such performance."  Barefoot Architect, Inc. v. Bunge, 632 F.3d 822, 831 (3d Cir. 2011), quoting Restatement (Second) of Contracts § 317(1).  "No words of art are required to constitute an assignment; any words that fairly indicate an intention to make the assignee owner of a claim are sufficient, and the same interpretation should be given the words whether they are oral or

48

written." 29 Williston on Contracts § 74:3 pp. 59-60 (4th ed.).[51]  "[G]enerally speaking the

intent to transfer a right may be manifested through conduct."  Bunge, 632 F.3d at 833 n.4, citing

Restatement (Second) of Contracts § 19 ("The manifestation of assent may be made wholly or

partly by written or spoken words or by other acts or by failure to act."); 6 Am. Jur. 2d

Assignments § 83 ("Under the appropriate circumstances, a right may even be assigned without

the execution of a formal assignment.").[52]  There must be, however, some evidence upon which I

may conclude that such a transfer actually occurred.  Bunge, 632 F.3d at 831-33.

### 1.    WSCC 1

On March 27, 2003, Waterside assigned 75.75% of its interest in Answernet to Executel.

See H6 p. 1.  In October 2003, Answernet issued a stock purchase warrant to Executel for

12.494% of the shares of Answernet; the stock purchase warrant contains handwritten

modifications made by Gary Pudles, clarifying that Executel had a right to purchase 12.494% of

Answernet common stock, rather than 12.5% (the number conveyed in the assignment from

WSCC to Executel).  H7 p. 1.  Though the exact date is unclear, Executel completed its purchase

of 52,900 shares in the fall of 2003 (WSCC 1), see H7 and Trial Tr. April 23, 2013 12:22-13:10

(Robertshaw), and was issued a share certificate by Answernet for that amount of shares.  H12.

As Pudles conceded at the post trial oral argument, "the Executel warrants are undisputed."  Hrg.

Tr. June 19, 2013 48:21-22 (Pudles).  These formalities surrounding the Executel warrant

---

[51] Further, "an assignment that is not a gift, and hence is a completed transaction and
irrevocable, must ordinarily be supported by consideration."  29 Williston on Contracts § 74:3 p.
88 (4th ed.).

[52] The contracts creating the third party warrants, however, are very clear that any
assignment of the warrant rights required a writing as well as the issuance of a new warrant.  See
H3 p. 26, 33 (BF/PC); H1 p. 56-58 (Progress Capital), H27 p. 1-3 (WSCC).

exercise, however, were not observed with similar rigor for the other two transactions that disposed of the remainder of the WSCC interest in Answernet.

## 2.    WSCC 2

Pudles claims that the WSCC 2 warrants were assigned to or purchased by Cerida.  I find that Robertshaw has shown by a preponderance of the evidence that this assignment or purchase did not occur.  As noted above, when Executel purchased the WSCC 1 warrants, it also acquired an option to purchase an additional 3% of Answernet's stock.  H6 p. 1-2.  Executel exercised this option in early 2006.  H30.  Sometime after the exercise, on March 16, 2006, Pudles wrote to Speroni of WSCC expressing concern that "that Answernet has not received any request from Waterside regarding the issuance of a new warrant related to Barbara and my personal purchase of Executel's Option Warrants."  H33.  In response, Speroni wrote to Pudles directing him to "have Answernet issue the two separate warrants (3% and 1%), so we may send one and keep the other.  Executel exercised its rights and now owns the 3% warrant."  Id.

On March 20, 2006 Answernet issued two warrants, one to Robertshaw for 6,351.5 shares of Answernet (or one half of the three percent that Executel had bought the option for), and the other to WSCC for its remaining 1% interest in Answernet (what would become the subject of the WSCC 3 transaction).[53]  Trial Tr. April 23, 2013 68:22-72:20 (Robertshaw); DX29.  However, while Robertshaw maintains the assignment of the issuance of the warrant from Answernet to her was valid, Trial Tr. April 23, 2013 71:17-72:6 (Robertshaw), she concedes that she never exercised the warrant.  Id. at 72:15-20 ("[Its] expiration [date] came and went.");  see DX29 p. 8 ("This Warrant will [be] exercisable in whole or in part at any time . . .

---

[53] Each of these two new warrants had language regarding the exercise and transfer of the warrant rights that is substantially the same as the corresponding sections from the original Waterside warrant (which memorialized the agreement surrounding Waterside's initial investment in Answernet).  Compare H27 p. 1-2 with DX29 p. 3-4, 8-10.

until July 20, 2009"). Thus I find that Robertshaw did not exercise those warrants and thus does not own those 6,351.5 shares (or half of the WSCC 2 shares).

Also on March 20, 2006, Speroni wrote to Pudles and the Robertshaws directing them to "re-issue the 1% warrant with the agreed upon language" and ended the email with a line directed specifically to Barbara Robertshaw: "Please let me know if it is ok with you (Executel) to have the 3% warrant issued directly to you by Answernet." DX398. Pudles also testified that he did produce a new warrant for Waterside's remaining 1%, but never reissued a warrant for the other 3% because "by the time we resolved the issue with Waterside, Bill and I had agreed that we were going to take the warrant in Cerida. So I never created another actual warrant document for Cerida, because Cerida, you know, was us [, i.e., owned 50% by Pudles and 50% by the Robertshaws]." Trial Tr. April 25, 2013 84:20-85:8 (Pudles); see also id. at 73:1-22.[54] There is also an internal Answernet memorandum prepared by Babjak at the direction of Pudles which purports to memorialize the assignment of the rights to the 3% by Executel to Cerida. DX79; Trial Tr. April 24, 2013 79:18-80:16 (Babjak). Finally, there is a notation in the Answernet share transfer ledger indicating that a transaction for 12,704 shares between Cerida and Waterside took place in June 2006. DX175 p. 8.[55] There is, however, no entry recording a transfer between Executel and Cerida. Id. at p. 8-9.

Pudles, however, argues that the best evidence that the WSCC 2 warrants were assigned to Cerida is found in "the most important document in the case," the Release Agreement between WSCC and Cerida by which Cerida purchased the remaining WSCC shares (WSCC 3). Hrg. Tr.

---

[54] Bill Robertshaw testified that there was never an agreement to assign any WSCC warrants to Cerida. Trial Tr. April 26, 2013 110:21-23 (Bill Robertshaw).

[55] As noted above, the share transfer ledger was created and maintained by Pudles. Trial Tr. April 25, 2013 156:5-157:22.

June 19, 2013 49:8-17 (Pudles); DX64.  Pudles contends that this document was prepared by

WSCC, which bolsters its credibility; "the external proof doesn't get much stronger than that."

Hrg. Tr. June 19, 2013 52:21-24 (Pudles).[56]  He argues that "[t]he important thing about this

document is the first recital clause," Hrg. Tr. June 19, 2013 49:8-17, which states:

> whereas Waterside invested in Answernet pursuant to Series A
> Stock Purchase Agreements dated July 20, 1999 and February 29,
> 2000, and a Stock Purchase Warrant dated July 20, 1999 and
> subsequently reissued in October 2003 for four percent of
> Answernet's common stock and then sold to [Cerida] as to three
> percent of Answernet's common stock

DX64 p. 1.

However, I find that "for a writing to 'validate' a past transfer, the past transfer must have

actually occurred."  Bunge, 632 F.3d at 830.  Given Answernet's history of observing contractual

formalities in its interactions with WSCC and warrant transactions, as evidenced by the WSCC 1

transaction and Answernet's issuance of a warrant for the WSCC 3 warrants (1%), I find that the

absence of documentary evidence supporting a transfer of the warrants for the WSCC 2 rights is

dispositive.[57]  There is simply insufficient evidence for me to find that Cerida was actually

assigned the warrants to the WSCC 2 shares by Executel, and I cannot hold that Cerida

purchased or was assigned those warrant rights and therefore entitled to exercise those warrants

in 2008 based upon Pudles's testimony ipse dixit.  See Viele v. Devaney, 679 A.2d 993, 996-97

---

[56] No explanation is offered as to how WSCC would independently know about
subsequent transactions regarding warrant rights that it had sold, or why, given the apparently
tumultuous relationship between WSCC and Pudles, Hrg. Tr. June 19, 2013 50:6-11 (Pudles),
WSCC would undertake to track those subsequent transactions.

[57] Pudles's own correspondence evinced concern for the observance of such formalities.
In March 2006, he wrote to Speroni regarding the option for the WSCC 2 warrants purchased
and exercised by Executel that he was "extremely concerned that Answernet has not received
any request from Waterside regarding the issuance of a new warrant related to Barbara and my
personal purchase of Executel's Option Warrants.  We made our payment over a month ago and
Waterside has not taken any action to deliver the shares."  H33.

(Del. Ch. 1996) ("The lack of reliable independent evidence supporting [defendant's]

handwritten notations [to the share transfer ledger and warrant contracts], the fact that the

integrity of those notations depends entirely upon [defendant's] own credibility . . . and the

defendants' exclusive control of the stockledger at all times before this litigation arose-all these

factors provide serious reason to question the validity of [defendants' assertions regarding

corporate ownership].").  Thus I will grant Robertshaw's request for a declaration that Cerida

does not possess the 12,704 shares of Answernet that Pudles and Babjak claimed it received as a

result of an alleged assignment and exercise of the Waterside Warrants.[58]

---

[58] There is a notation in the Answernet share transfer ledger indicating that a transaction for 12,704 shares between Cerida and Waterside took place in June 2006, DX175 p. 8.  Cerida financial statements also show notations for distributions of $250,000 for "Investment in [Answernet] warrants" in both 2006 and 2007.  DX88 p. 13; DX203 p. 7.  Buried in a footnote titled "Capitalization" in the yearly Answernet financial statements is the assertion that

> [in] 2007 and prior years, Cerida acquired warrants to purchase common shares of Answernet.  These warrants were issued to Answernet's former lenders and a preferred shareholder in connection with prior financing transactions.  In 2008, Cerida exercised these warrants at an aggregate purchase price of $250,059 and, as a result, owns approximately 15% of Answernet. . . ."

See e.g., DX175 p. 178 (2010), 154 (2009), 130 (2008); DX204 p. 21 (2011).

The "Capitalization" footnote in the Answernet combined financial statements for the years 2006 and 2007 describes the disposition of the WSCC warrants thusly:

> Answernet granted Waterside a warrant to purchase up to 69,837.4 shares of Answernet's outstanding stock at an exercise price of $.01 per share.  The warrant expires on July 20, 2009.  In 2003, Waterside sold the right to purchase 52,900 shares under the warrant in a private transaction.  The purchaser immediately exercised its right to purchase these shares.  In February 2006, an affiliate of [Answernet] purchased 12,703 warrant shares from Waterside for $381,000.  On May 4, 2007, this affiliate purchased Waterside's remaining warrant shares for $250,000.

3.     **WSCC 3**

I find that the record contains sufficient evidence for me to conclude that Cerida bought

WSCC's remaining 1% interest in Answernet in May 2007.  On May 3, 2007, WSCC's counsel

emailed Pudles a release agreement signed by WSCC regarding the transaction for the remaining

1% and said that "once I have received all original signatures to the Release Agreement and the

Purchase Price from Answernet, I will release the original documents and funds from escrow,

[and transfer] the purchase price to [WSCC.]"  DX65 p. 1-2.[59]  On May 4, 2007 Pudles

forwarded the email regarding the release agreement from WSCC's counsel to the Robertshaws

and wrote:

> I have modified the agreement, signed the agreement and sent
> payment to them out of Cerida.  I paid it out of Cerida because [it]
> had the cash and so that the acquisition of these shares are equal
> between the Robertshaws and me.  If we purchased them through

---

DX175 p. 103.  While this paragraph describes the three WSCC warrant transactions, I do not find its characterization of the Executel option purchase (in 2003) and exercise (in 2006) to be accurate (as the payment to WSCC clearly came from Executel).  See H30; H32; DX26.  Moreover it makes the same mistakes specifying a sum certain associated with each transaction that WSCC supposedly rejected.  DX398.  Thus I do not find this to be especially probative of Cerida's, or "the affiliate's," claim of ownership of these warrants.

Answernet financial statements also display an entry regarding "[Cerida's] Investment in Answernet," which totaled $1,231,059.  DX204 p. 5.  John Mitchell, the accountant for Answernet, testified that this sum "represent[ed] the cumulative payments that had been made by Cerida to purchase Answernet warrants up through the end of 2011."  Trial Tr. April 26, 2013 77:4-6 (Mitchell).  However, Mitchell also conceded that he had no "firsthand knowledge about what happened with [the WSCC] warrants" and that his knowledge regarding these warrant transactions was derived exclusively from information and documents given to him by Answernet and from what Pudles told him.  Id. at 87:14-21; 91:5-7.  Mitchell never saw the warrants or the actual stock certificates.  Id. at 97:2-10.  Thus I do not find that the information contained in these financial statements supports the conclusion that Cerida purchased or was assigned warrant rights.

[59] WSCC's counsel also surrendered a stock certificate for 700 shares of preferred stock in Answernet which WSCC still possessed *as well as the new warrant it was issued following its 2003 transaction with Executel, just as the original warrant agreement required*.  DX65 p. 1 (emphasis added); H27 p. 1-3.

> Answernet, we would have increased the disparity of ownership
> between me and the Robertshaws further by .13%.

DX65 p. 1.  The release agreement between WSCC and Answernet has several handwritten modifications, initialed by Pudles, described in his above email.  DX64.  Of prime importance is that Cerida rather than Answernet purchased the warrants.  Pudles altered two clauses to reflect the change in purchaser.  The first initially read: "whereas Answernet desires to close out [WSCC's] investment by purchasing the Warrant from Waterside for a price of $250,000."  Id. at 1.  However, Pudles, as he describes in his email, crossed out the word "purchasing" and replaced it with the phrase "allowing Cerida to purchase."  Id.  The second change is on the same page; the clause initially read: "Answernet shall pay or cause to be paid to Waterside by wire transfer or other immediately available funds the sum of [$250,000] no later than May 4, 2007."  Id.  Pudles crossed out "pay" and "be paid" and replaced it with "Cerida to pay" so the sentence now begins "Answernet shall cause Cerida to pay Waterside . . ."  Id.  There is no evidence in the record that the Robertshaws reviewed these modifications before Pudles transmitted the release to Waterside.[60]

However, Cerida financial statements for 2007 show a notation for a distribution of $250,000 for "Investment in [Answernet] warrants" in 2007.  DX88 p. 13.  The Answernet share

---

[60] While I am troubled that the record is ambiguous as to whether the Robertshaws approved or otherwise ratified these changes after the fact, I am satisfied that Pudles made them unilaterally and without consulting the Robertshaws, as he discusses in his May 3, 2007 email to them.  DX65 p. 1.  From Pudles's assertion in that email that "[i]f we purchased them through Answernet, we would have increased the disparity of ownership between me and the Robertshaws further by .13%" I also infer some indication of his ever-present concern both with even the most minor details regarding the various ownership interests in the company and also that the relative share ownership stakes were "equal between the Robertshaws and [him.]"  Id.; see also H7 (Pudles's handwritten modification to WSCC 1 warrant changing Executel's right to purchase from 12.5% to 12.494% of Answernet stock).

transfer ledger also displays a notation for the transaction for these warrants between Cerida and

WSCC in 2007, DX175 p. 8, and the exercise of those shares in 2008.  Id. at 8-9.  There is,

however, no certificate or exercise form for these shares, which the initial WSCC agreements

called for; Pudles was the signatory of that agreement for Answernet.  H27 p. 1, 3.  Though the

record documentation of this transaction is incomplete, given the observance of some formalities

in this transaction and that the Robertshaws were clearly informed by Pudles that he altered the

terms of the WSCC 3 purchase agreement so that Cerida rather than Answernet would be the

purchaser, I find that Robertshaw has not carried her burden to demonstrate that Cerida did not

purchase the warrant rights to the 4,234.37 shares subject to the WSCC 3 transaction.

### 4.      Progress and BF/PC Warrants

I find that the record does not contain evidence of any assignment or sale of warrant

rights from Progress Capital or BF/PC to Cerida.  The contracts creating these warrant rights

contained lengthy and detailed specifications governing the exercise of the warrants, the

assignment of the warrants, and the replacement of warrants should they somehow be lost or

destroyed.  See H1 at p. 1, 23-24, 26, 31-33; H3 at p. 49, 56-59.  Pudles is a signatory to these

agreements, H1 p. 40, H3 p. 15, and in correspondence with the Robertshaws referred to his

review of the agreements.  See e.g. DX40 ("my review of the . . . Progress Bank warrants (now

owned by Cerida) . . .").  In other transactions involving warrant rights and outside investors,

Answernet observed the terms of the agreements and issued new warrants to the purchasers of

warrant rights and stock certificates, as in the WSCC 1 transaction.  H6, H7, H12.  In contrast,

the formalities called for in the contracts governing the Progress Capital and BF/PC warrants

were either not observed or the documents memorializing these transactions are not in evidence;

there are no written assignments, no new warrants, not even any cancelled checks or citations to

the Answernet ledger demonstrating payment for the warrants or consideration for their

assignment to Cerida.[61]  The Answernet share transfer ledger has a notation for such a transfer

occurring in 2003 (Progress) and 2005 (BF/PC), DX175 p. 8, but apparently no warrants were

ever issued by Answernet to Cerida.  I find the lack of any documentary evidence regarding the

transfer or assignment of the warrant rights from Progress Capital or BF/PC to Cerida to be

dispositive.  See Viele v. Devaney, 679 A.2d 993, 996-98 (Del. Ch. 1996).  Given this lack of

evidence, I cannot hold that Cerida was entitled to exercise the Progress Capital or BF/PC

warrants in 2008.  Thus I will also issue a declaration that Cerida does not possess the 27,493.3

BF/PC shares of Answernet and that Cerida does not possess the 18,148.02 Progress Capital

shares of Answernet that Pudles and Babjak claimed Cerida received as a result of an alleged

assignment and exercise of the warrants for those shares.

### 5.     Michael Pudles Warrants

I find that the record also does not contain sufficient evidence of any transfer of warrant

rights from Michael Pudles to Gary Pudles.  While Michael Pudles was issued warrant rights to

3,959 shares in 2000, DX 175 p. 14, there is no document memorializing any transaction in

which he sold or assigned or otherwise transferred these warrants to Gary Pudles.  The

Answernet share transfer ledger has a notation for such a transfer occurring in 2006, DX175 p. 8,

but apart from this there are no documents that support that this transfer actually occurred and I

cannot hold that Pudles therefore was entitled to exercise those warrants in 2008 based solely on

his unsupported assertions that there was such a transfer.  Thus I will also issue a declaration that

---

[61] Indeed Babjak testified that she never saw any written assignments or written payment record for any of these alleged warrants, nor any request to reissue the warrants sent to Answernet by any of those third-party owners of the warrants, nor any transfer documentation whatsoever regarding any of the warrants allegedly acquired by Cerida.  Trial Tr. April 24, 2013 71:11-20, 72:23-73:2 (Babjak).

Pudles does not possess the 3,959 shares of Answernet that Pudles claimed he received as a result of an alleged assignment and exercise of the those warrants.[62]

### B.    Other Requested Declaratory Relief

As set forth above, I find that Robertshaw has demonstrated by a preponderance of the evidence that Pudles did not own all of the warrant rights for the shares in Answernet that he claimed and thus was not entitled to exercise those warrants in 2008.  Specifically, Pudles and Cerida were not entitled to exercise the WSCC 2 warrants, the Progress Capital warrants, the BF/PC warrants or the Michael Pudles warrants.  The Delaware Supreme Court instructs that "[s]tock issued without authority of law is void and a nullity. . . .  The issuance of corporate stock is an act of fundamental legal significance having a direct bearing upon questions of corporate governance, control and the capital structure of the enterprise.  The law properly requires certainty in such matters."  STAAR Surgical Co. v. Waggoner, 588 A.2d 1130, 1136 (Del. 1991).[63]  "[T]he available form of equitable relief depends on the facts of each case.  If the stock is indeed void, then 'cancellation is the proper remedy.'"  Id. at 1137 (citations omitted).

---

[62] I note that there is no issue with Robertshaw's entitlement to exercise her warrants for 3,959 shares as she was granted these rights in an earlier Answernet shareholder agreement, DX4 p. 15, and there is no dispute that she paid the exercise price of $39.59.  Therefore I find it proper to conclude that she exercised those warrants and owns those shares.

[63] As the Delaware Supreme Court notes, the DGCL statutory structure governing the rights and options respecting corporate stock and the issuance of such stock "consistently requires board approval and a writing."  Grimes v. Alteon, Inc., 804 A.2d 256, 260 (Del. 2002). See e.g., Del. Code Ann. tit. 8, § 157 (West) ("Subject to any provisions in the certificate of incorporation, every corporation may create and issue . . . rights or options entitling the holders thereof to acquire from the corporation any shares of its capital stock of any class or classes, such rights or options to be evidenced by or in such instrument or instruments as shall be approved by the board of directors.")

Because I find that Robertshaw has shown there to be insufficient evidence of Cerida's entitlement to exercise the BF/PC and Progress Capital warrants and the warrants for the WSCC 2 transactions, and that the record contains no evidence that Pudles was assigned or purchased and thus was entitled to exercise the Michael Pudles warrants, "[Answernet] had no power to issue the kind of stock that was attempted to be issued [in 2008]; the act was void and not merely voidable, and under practically all the authorities, it is incapable of being cured or validated by an attempted ratification by amendment or other subsequent proceeding."  Superwire.com, Inc. v. Hampton, 805 A.2d 904, 909 (Del. Ch. 2002), quoting Triplex Shoe Co. v. Rice & Hutchins, 152 A. 342, 348 (Del. 1930).[64]

Thus, Cerida did not possess the BF/PC or Progress Capital warrants or the WSCC 2 warrants at the time of exercise, and thus Pudles's exercise of them was void and these shares were never issued.  They therefore expired by the terms of the agreements that created them.  See DX29 p. 8 ("[WSCC] Warrant will [be] exercisable in whole or in part at any time . . . until July 20, 2009"); H6 p. 1-2 (WSCC 2 option to expire on April 30, 2006); H3 p.1 ([BF/PC] warrant set to expire on May 19, 2010); H1 p. 55 (Progress Capital warrant was set to expire if not exercised on or before October 15, 2008).  Further, Pudles does not possess the Michael Pudles shares, and these shares too were void ab initio.  Thus the actions that Pudles took at the November 2011 and

---

[64] The question of corporate control of Answernet is not merely whether Pudles's exercise in May 2008 of the warrant rights was proper.  While the May 2008 exercise ignored contractually-imposed formalities governing the warrants that heretofore Answernet had observed, my inquiry into his or Cerida's entitlement to exercise those rights reveals that he had no authority to do so in the first place, and thus I do not reach the question of  whether the problems with the exercise forms—namely that they falsely recited that the warrants were surrendered with the exercise forms—are curable deficiencies or even independent grounds to reject Pudles's control claims.  Rather, the problems with the exercise forms—of which the lack of the surrender of the warrants with the forms or the arguably incorrect exercise price (i.e., the consideration for the stock issuance) are just examples—are part and parcel of the lack of evidentiary support for the contention that Pudles or Cerida possessed the exercise rights at all.

the December 2011 Answernet meetings on the strength of the votes he was not entitled to

exercise are void too.  Accordingly, I will issue the declarations requested by Robertshaw: 1)

declaring void the November 28, 2011 Special Meeting of the Shareholders of Answernet, Inc.,

and all votes taken at that meeting; and 2) declaring void the December 15, 2011 Annual

Meeting of the Shareholders of Answernet, Inc., and all votes taken at that meeting.[65]

I will also issue a declaration that "Barbara Robertshaw and [Executel] may at any time

call a Special Meeting of the Shareholders in order to elect new corporate officers and to take all

other actions permitted by law and the By-Laws."  Am. Compl. 75(f).  Because she and Executel

now together hold more than 51% of the outstanding shares in Answernet, they are entitled under

the Answernet bylaws to call such a meeting.  A2 p. 1 ("Special meetings of the shareholders

may be called for any purpose, at any time . . . upon the written request of shareholders holding

fifty-one percent of the outstanding shares of stock of the corporation eligible to vote at the

meeting."); see also Appendix, infra.

## V.     Fraud

Robertshaw argues that Pudles and Babjak were aware that the Cerida ownership claims

were false, that no records existed to support such a claim and that these facts thus constitute

common law fraud.  Robertshaw Post-Trial Br., Dkt. No. 164, p. 22-36.  I disagree.  The

elements of fraud under Delaware law are: (1) a false representation, usually one of fact, made

by the defendant; (2) defendant's knowledge or belief that the representation was false or was

---

[65] The Order that follows this opinion includes a comprehensive declaratory statement of the rights of the parties as determined by my findings in this case.  It also includes as an Appendix to this opinion a chart demonstrating the resulting capitalization structure of Answernet.

I also find that Robertshaw has not carried her burden to demonstrate that Babjak was not lawfully elected Secretary of Answernet.  There is no documentary support for that proposition and no testimony on the issue, and so I will not issue such a declaration.

made with reckless indifference to the truth; (3) an intent to induce the plaintiff to act or to refrain from acting; (4) the plaintiff's action or inaction taken in justifiable reliance upon the representation; and (5) damage to the plaintiff as a result of such reliance.  Metro. Life Ins. Co. v. Tremont Group Holdings, Inc., No. 7092, 2012 WL 6632681, at *16 (Del. Ch. Dec. 20, 2012).  In Delaware, a plaintiff must prove the elements of common law fraud by a preponderance of the evidence.  Outdoor Techs., Inc. v. Allfirst Fin., Inc., No. 09-151, 2001 WL 541472, at *3 (Del. Super. Ct. Apr. 12, 2001); Tracinda Corp. v. DaimlerChrysler AG, 364 F. Supp. 2d 362, 389 (D. Del. 2005).

        While I find that the representations made by Babjak and Pudles regarding the Cerida and Pudles share ownership were inaccurate, I find that Robertshaw has not supplied evidence that either defendant had anything other than a good faith but mistaken belief that certain warrant rights had been purchased or assigned by Cerida or Pudles.  For example, the validity of the Cerida/Progress transaction was in controversy since 2003, DX175 p. 23, but Pudles consistently represented that Cerida had been assigned the rights to those shares.  See e.g. DX40.  Robertshaw has shown, however, that there is nothing in the record that substantiates that claim.  Pudles also testified that in 2006 he lost a lot of files in a computer crash, Trial Tr. April 25, 2013 176:20-25 (Pudles), which may explain the disappearance of some of the pertinent records in this case.  I do not find that the evidence reveals that Pudles knew that he and Cerida did not possess the rights to all of the shares that he believed he and Cerida possessed.  Nor is there anything to demonstrate that Babjak, though she failed to undertake any further investigation of Pudles's representations about the Answernet capital structure, knew that Cerida did not possess certain warrants.  Trial Tr. April 24, 2013 71:24-72:1, 79:8-80:16 (Babjak).  Moreover, when confronted with the controversy about the capital structure, Babjak sought the advice of outside

counsel.  Id. at 105:24-106:21 (Babjak).  Thus, Robertshaw has failed to carry her burden on

common law fraud and I find for each respective defendant on the fraud claims.

      **VI.**      **Breach of Fiduciary Duty**

      Robertshaw argues that the actions of Pudles and Babjak with respect to the Cerida

ownership claim were not taken for any legitimate corporate purpose but rather to further

Pudles's own personal interests at Robertshaw's expense.  Robertshaw Post-Trial Br., Dkt. No.

164, p. 40-41.  Pudles responds that his actions in taking the Special Distribution and his

assertions regarding the capital structure of Answernet all demonstrate that he was acting in good

faith at all times and thus he did not breach any fiduciary duty.  Pudles Post-Trial Br., Dkt. No.

167, p. 21, 35.  Babjak argues that, in response to Robertshaw's contentions about the relative

shareholder interests in Answernet, she sought and relied on the advice of outside counsel, and

that this demonstrates that she too acted in good faith and thus did not breach her fiduciary

duties.  Babjak Post-Trial Br., Dkt No. 165, p. 11-13.

      The directors of a Delaware corporation are presumed to act with care and loyalty.

Shocking Techs., Inc. v. Michael, No. 7164-VCN, 2012 WL 4482838, at *8 (Del. Ch. Oct. 1,

2012).  "[O]fficers of Delaware corporations, like directors, owe fiduciary duties of care and

loyalty, and [ ] the fiduciary duties of officers are the same as those of directors."  Gantler v.

Stephens, 965 A.2d 695, 708-09 (Del. 2009).  The fiduciary duty of loyalty imposes "an

affirmative obligation to protect and advance the interests of the corporation" and requires an

officer or director "absolutely [to] refrain from any conduct that would harm the corporation."

      Encompassed within the duty of loyalty is a duty of good faith, and "a failure to act in

good faith may result in liability because the requirement to act in good faith 'is a subsidiary

element[,]' i.e., a condition, 'of the fundamental duty of loyalty.'"  Stone ex rel. AmSouth

Bancorporation v. Ritter, 911 A.2d 362, 369-70 (Del. 2006). "To act in good faith, a director must act at all times with an honesty of purpose and in the best interest and welfare of the corporation." Id., quoting In re Walt Disney Co. Deriv. Litig., 907 A.2d 693, 755 (Del. Ch. 2005), aff'd, 906 A.2d 27 (Del. 2006). Thus a showing of bad faith conduct demonstrates a violation of the duty of loyalty. Id. at 370. A failure to act in good faith may establish a violation of the duty of loyalty, inter alia,

> where the fiduciary intentionally acts with a purpose other than
> that of advancing the best interests of the corporation, where the
> fiduciary acts with the intent to violate applicable positive law, or
> where the fiduciary intentionally fails to act in the face of a known
> duty to act, demonstrating a conscious disregard for his duties.

Id. The third of these examples describes the lack of good faith conduct that the Delaware Supreme Court held was a "necessary condition" for oversight liability, i.e., "a sustained or systematic failure of the board to exercise oversight—such as an utter failure to attempt to assure a reasonable information and reporting system exists. . . ." Stone, 911 A.2d at 369, quoting In re Caremark Int'l Inc. Derivative Litig., 698 A.2d 959, 971 (Del. Ch. 1996). "[T]he necessary conditions predicate for director oversight liability are: (a) the directors utterly failed to implement any reporting or information system or controls; or (b) having implemented such a system or controls, consciously failed to monitor or oversee its operations thus disabling themselves from being informed of risks or problems requiring their attention." Stone, 911 A.2d at 370. In either case, imposition of liability requires a showing that the directors knew that they were not discharging their fiduciary obligations. Id. "A director acting in subjective good faith may, nevertheless, breach his duty of loyalty." Shocking Techs, 2012 WL 4482838, at *8; see also Johnston v. Pedersen, 28 A.3d 1079, 1092 (Del. Ch. 2011) (finding defendants breached duty of loyalty despite honest and good faith belief that they were acting toward the

corporation's best interests).  However, the "essence of the duty of loyalty" stands for the fundamental proposition that a director or officer, even if he is a shareholder, may not engage in conduct that is "adverse to the interests of [his] corporation."  Shocking Techs., 2012 WL 4482838, at *8.

Here, as with the fraud claims, I find that while Pudles and Babjak were mistaken in their conclusions regarding Cerida's and Pudles's warrant rights, Robertshaw has failed to adduce evidence that either defendant had anything other than good faith but mistaken ideas about the Answernet capital structure.  Thus, while Pudles's consistent assertions that Cerida owned Answernet warrants, see e.g., M2, DX40, DX77, DX175 p. 23, turned out to lack substantive documentary support, I cannot based on the evidence before me find that his assertions were tantamount to bad faith.  Further, Pudles gave the Robertshaws opportunities to challenge his assertions or unmake his actions as they deemed necessary.  For example, after altering the WSCC 3 purchase agreement to make Cerida rather than Answernet the purchaser, Pudles told the Robertshaws of his actions and offered them the opportunity to take the shares personally rather than through Cerida.  DX65 p. 1.  Similarly, after the completion of the May 22, 2008 warrant exercise, Pudles in a May 23, 2008 email describes the details of the warrant exercise, and that same day Bill Robertshaw responded that "doing the warrants is proper and ok."  DX83 p.1-2.[66]  There is no evidence before me that Pudles took these actions for an illegitimate purpose; he simply was mistaken about his right to exercise certain warrants.  Similarly, there is no evidence that Babjak, though she failed to undertake further investigation of the claims made

---

[66] Though I note that if the dates on the warrant exercise forms are correct, Pudles had already exercised the warrants when he wrote to the Robertshaws about the warrant executions. Compare DX83 with DX78, DX80-82.

by Pudles, Trial Tr. April 24, 2013 79:8-80:16 (Babjak), acted or failed to act for an improper

purpose.  Moreover, she did seek the advice of outside counsel.  Id. at 105:24-106:21.

Further, I do not find that Robertshaw has established the conditions required to impose

oversight liability on Pudles or Babjak.  Answernet had a recordkeeping system, albeit one that

fell short of having the precision one might desire, and when its records were challenged by the

Robertshaws, Answernet's officers and directors sought the advice and assistance of outside

counsel.  There is also no evidence that Answernet was harmed by the imprecise recordkeeping

by its officers and directors.  Thus I find that Robertshaw has failed to produce evidence that

satisfies the predicate conditions for oversight liability.

Similarly, I do not find that Pudles's unilateral taking of the Special Distribution (while

giving Robertshaw promissory notes to pay her Special Distribution) was a violation of his

fiduciary duties.  There is no evidence that his conduct surrounding the Special Distribution

harmed the corporation or was even really adverse to its interests, and to protect against that risk,

Pudles made the personal guaranty that the bank required in order to loan Answernet the money

to make the Special Distribution.  Because there has been an insufficient evidentiary showing of

bad faith or lack of good faith on the part of either Pudles or Babjak, I find for defendants on

these claims.

## VII.   Shareholder Derivative Claim

Robertshaw also asserts a shareholder derivative claim against Pudles.  Am. Compl. ¶¶

76-81.  Whether a claim is direct or derivative "turns solely on who suffered the alleged harm

and who would receive the benefit of any recovery or other remedy."  Tooley v. Donaldson,

Lufkin & Jenrette, Inc., 845 A.2d 1031, 1033, 1035 (Del. 2004).  To be a direct claim, plaintiff's

alleged injury "must be independent of any alleged injury to [the corporation]."  Tooley, 845

A.2d at 1039.  In other words, Robertshaw "must demonstrate that the duty breached was owed to [her] and that [she] . . . can prevail without showing an injury to [Answernet]."  Id.  "In determining whether plaintiff has done this, the court looks beyond [plaintiff's] characterization of the claims." Polak v. Kobayashi, No. 05-330, 2008 WL 4905519, at *7 (D. Del. Nov. 13, 2008), citing Dietrich v. Harrer, 857 A.2d 1017, 1027 (Del. Ch. 2004) ("Even after Tooley, a claim is not 'direct' simply because it is pleaded that way . . . .  Instead, the court must look to all the facts of the complaint."); In re Syncor Int'l Corp. Shareholders Litig., 857 A.2d 994, 997 (Del. Ch. 2004) (courts applying Tooley "look at the nature of the wrong alleged, not merely at the form of the words in the complaint").  "[T]he same set of facts can give rise to both a direct claim and a derivative claim."  Gentile v. Rossette, 906 A.2d 91, 100 n.19 (Del. 2006) (internal quotation marks omitted).  However, "Delaware law generally does not allow shareholders to assert breach-of-fiduciary-duty claims directly, unless the shareholders can show damage distinct from the damage to the corporation.  LaSala v. Bordier et Cie, 519 F.3d 121, 130 (3d Cir. 2008), citing Tooley, 845 A.2d at 1034.

Robertshaw has consistently styled one of her claims as derivative, but in her post-trial briefing, Robertshaw seeks "judgment against [Answernet] in addition to the above judgments against Pudles and Babjak . . . and judgment against [Answernet] jointly and severally with [Pudles and Babjak] for the total amount of attorney's fees and litigation expenses this litigation ultimately costs her."  Robertshaw Post-Trial Br., Dkt. No. 164 ECF p. 45-46.  This then is plainly not a derivative claim because no benefit Robertshaw seeks would inure to the corporation.  However, because I find that there was no breach of fiduciary duty or fraud by either Pudles or Babjak, there is no relief from those claims that would go to Answernet, and so it is irrelevant whether they are direct or derivative.  Further, because the Special Distributions

created no value for Answernet (and thus the bank required personal guaranties from the shareholders who intended to take them), I find that Robertshaw's breach of contract claim, if successful, also plainly would have created no benefit for Answernet.  See DX141 at p.11-12. Finally, as noted above, there is no evidence that Answernet itself was harmed by Pudles's conduct.  Thus, I find for Pudles and Babjak on this claim as well.

### VIII.   Punitive Damages

Because Robertshaw has failed to carry her burden on the breach of contract, fraud and breach of fiduciary duty claims, she is plainly not entitled to punitive damages on those claims.

### IX.   Attorneys' fees

Robertshaw also has requested that I award her attorneys' fees because she had to bring suit to enforce her rights and as a result incurred significant litigation costs.  Dkt. No. 164 ECF p. 45-47.  I decline to do so.

"[U]nder the prevailing 'American Rule,' courts generally do not award attorney's fees to a prevailing party unless some special circumstance is present."  Barrows v. Bowen, No. 1454-S, 1994 WL 514868, at *1 (Del. Ch. Sept. 7, 1994).  Those special circumstances which warrant exceptions to the American Rule are limited to:

> 1) cases where fees are authorized by statute, 2) cases where the applicant creates a common fund or non-monetary benefit for the benefit of others, 3) cases where the underlying (pre-litigation) conduct of the losing party was so egregious as to justify an award of attorneys' fees as an element of damages, and 4) cases where the court finds that the litigation was brought in bad faith or that a party's bad faith conduct increased the costs of litigation. (This fourth exception is referred to as the "bad faith exception").

Arbitrium (Cayman Islands) Handels AG v. Johnston, 705 A.2d 225, 231 (Del. Ch. 1997), aff'd, 720 A.2d 542 (Del. 1998).[67]  Here, only the last two exceptions could possibly apply to Robertshaw's direct claims.  I find that they do not.

Pudles's conduct which led to the litigation was not sufficiently egregious so as to justify fee shifting in this case.  As noted above, he held good faith but mistaken beliefs about the Answernet capital structure and shareholder agreement, and outside counsel was retained to review and affirm his opinions as to the former.  See Judge v. City of Rehoboth Beach, No. 1613, 1994 WL 198700, at *2 (Del. Ch. Apr. 29, 1994) (holding that bad faith exists where a defendant requires a plaintiff to utilize the courts in order to enforce a right which clearly belongs to the plaintiff; such bad faith was found where the "defendants were faced with a mountain of evidence, including legal opinions, legal authority and judicial declarations, demonstrating" the plaintiff's right to an easement).  Similarly, while "in unusual circumstances attorneys' fees will be assessed against a corporation in connection with its treatment of one or more stockholders," Weinberger v. UOP, Inc., 517 A.2d 653, 656 (Del. Ch. 1986), the circumstances of this case are not so unusual as to warrant a departure from the American Rule and a shift in legal fees from Pudles or Answernet to Robertshaw.[68]  Further, though this

---

[67] An entitlement to attorneys' fees could also be created by contract.  See Kahan v. Rosenstiel, 424 F.2d 161, 165-66 (3d Cir. 1970).  No such contract right exists here.

[68] Robertshaw contends that she is entitled to fees for bringing her shareholder derivative suit.  Robertshaw Post Trial Br., Dkt. No. 164 p. 45-47.  While

> [u]nder the common fund doctrine, "a litigant or a lawyer who recovers a common fund for the benefit of persons other than himself or his client is entitled to a reasonable [attorneys'] fee from the fund as a whole."  The common fund doctrine is a well-established basis for awarding attorneys' fees in the Court of Chancery.  It is founded on the equitable principle that those who have profited from litigation should share its costs.  "Typically,

litigation has undoubtedly been acrimonious, I do not find that the conduct of Pudles, or any

party for that matter, constitutes bad faith; neither has a party's conduct increased the costs of

litigation in an outlandish way.  Thus, I will not award Robertshaw attorneys' fees.

### X.    Abuse of Process

Pudles also asserts a counterclaim against Robertshaw for abuse of process.  Dkt. No. 22.

I find that nothing in the record demonstrates an abuse of process.[69]  In Pennsylvania, "[t]he tort

---

> successful derivative or class action suits which result in the
> recovery of money or property wrongfully diverted from the
> corporation . . . are viewed as fund creating actions."

Americas Mining Corp. v. Theriault, 51 A.3d 1213, 1252-53 (Del. 2012), reargument denied
(Sept. 21, 2012).  Robertshaw did not bring a successful derivative claim, and thus is not entitled
to attorneys' fees under that theory.  Further, it is unclear to me that the declaratory relief
Robertshaw has shown an entitlement to in this case creates any benefit to Answernet, and thus I
will not grant Robertshaw attorneys' fees on that claim either.

[69] I note that the Pennsylvania Supreme Court, in T.C.R. Realty, Inc. v. Cox, 372 A.2d
721 (Pa. 1977), held that Pennsylvania procedural rules governing counterclaims preclude the
assertion of a counterclaim for abuse of process based on the initiation and prosecution of the
underlying action.  372 A.2d at 727-29.  The Court found that such a counterclaim is not
sufficiently related to the same transaction or occurrence giving rise to the plaintiff's cause of
action to permit its joinder.  Id. at 727-29.  However, it is a long-recognized principle that federal
courts sitting in diversity "apply state substantive law and federal procedural law."  Shady Grove
Orthopedic Assoc.'s P.A. v. Allstate Ins. Co., 559 U.S. 393, 130 S. Ct. 1431, 1448 (2010), (J.
Stevens, concurring), quoting Hanna v. Plumer, 380 U.S. 460, 465 (1965).  I find that my
consideration of Pudles's counterclaim is not precluded by the rules of federal procedure.  See
Fed. R. Civ. Pro. 13; 28 U.S.C. § 1367.

Moreover, the T.C.R. Realty Court identified several problems associated with permitting
joinder of such a counterclaim, namely that joinder would

> require the plaintiff to present his case in chief, which would not
> involve the elements of the tort claim, e.g., malice, probable cause,
> improper motive, etc., and then to allow the defense in addition to
> the presentation of his evidence in rebuttal of plaintiff's case in
> chief, to interject additional and unrelated testimony to establish
> the claimed tort.  Thereafter of course, the plaintiff would be
> required to introduce further evidence to meet that issue, thus
> probably completely obfuscating the basic issue which initially

of 'abuse of process' is defined as the use of legal process against another primarily to

accomplish a purpose for which it is not designed." Lerner v. Lerner, 954 A.2d 1229, 1238-39

(Pa. Super. Ct. 2008), quoting Shiner v. Moriarty, 706 A.2d 1228, 1236 (Pa. Super. Ct. 1998),

appeal denied, 729 A.2d 1130 (1998).  "'To establish a claim for abuse of process it must be

shown that the defendant (1) used a legal process against the plaintiff, (2) primarily to

accomplish a purpose for which the process was not designed; and (3) harm has been caused to

the plaintiff.'" Lerner, 954 A.2d at 1238, quoting Shiner 706 A.2d at 1236.  The Pennsylvania

Supreme Court has said that "[t]he gist of an action for abuse of process is the improper use of

process after it has been issued, that is, a perversion of it." Gen. Refractories Co. v. Fireman's

Fund Ins. Co., 337 F.3d 297, 304 (3d Cir. 2003), quoting In re Larsen, 616 A.2d 529, 586 (Pa.

1992).  As the Court of Appeals notes, abuse of process generally is found only:

> where conduct has been truly abusive. In General Refractories, we
> held that an abuse of process claim would be valid where a party
> "intentionally withheld critical documents, ignored court orders,
> permitted false testimony at depositions and misrepresented facts
> to opposing counsel and the court." Id. at 301.  The defendants
> perverted the legal process by "engag[ing] in an intentional effort
> to obstruct legitimate discovery by using the claim of privilege"
> and attempting to hide critical facts and discoverable documents.
> Id. at 302.

In re Finney, 184 F. App'x 285, 289-90 (3d Cir. 2006), quoting Gen. Refractories Co. v.

Fireman's Fund Ins. Co., 337 F.3d 297, 301 (3d Cir. 2003).  Here I find nothing that would

> inspired the bringing of the lawsuit.  Such a co-mingling of the
> plaintiff's claim and those of defendants' counterclaim would be
> likely to produce such confusion in the mind of the fact finder as to
> make the possibility of a just decision unlikely and increase the
> probability of a miscarriage of justice.

T. C. R. Realty, Inc. v. Cox, 372 A.2d at 728 (1977).  Because Pudles introduced no evidence to
prove his counterclaim apart from the legal bills he incurred in defending this litigation, I was
spared the confusion anticipated by the Court as outlined above.

constitute an abuse of process.  I find no evidence in the record that Robertshaw initiated this suit

with an improper purpose.  She commenced the action with a reasonable interpretation of the

Agreement and the belief that Pudles was in breach of its terms.  Additionally, Robertshaw has

now proven by a preponderance of the evidence that Pudles did not comply with the terms of the

Agreement and she has shown that his ownership claims regarding certain Answernet shares

were false.  Pudles submitted no additional evidence to prove his counterclaim, apart from a

document purporting to demonstrate his legal bills in defending the lawsuit.  Trial Tr. April 26,

2013 101:22-102:9; 104:13-105:3.  There is nothing in the record that suggests Robertshaw

conducted the lawsuit in an abusive fashion or employed the process to accomplish an improper

purpose.  Thus I find for Robertshaw on the counterclaim.

       An appropriate Order follows.

Appendix: Answernet Capital Structure

| | Robertshaw/Executel | | Pudles/Cerida | |
|---|---|---|---|---|
| | Prejudgment | Post-judgment | Prejudgment | Post-Judgment |
| Initial issue | 150,000 shares | 150,000 shares | 150,000 shares | 150,000 shares |
| Initial warrant issue | 3,959 shares | 3,959 shares | | |
| WSCC 1 (Executel) | 52,900 shares | 52,900 shares | | |
| WSCC 2 (Cerida) | | | 12,704 shares | 0 shares |
| WSCC 3 (Cerida) | | | 4,234.37 shares | 4,234.37 shares |
| Progress warrants (Cerida) | | | 18,148.02 shares | 0 shares |
| BF/PC warrants (Cerida) | | | 27,493.3 shares | 0 shares |
| Michael Pudles warrants (Gary Pudles) | | | 3,959 shares | 0 shares |
| Total | 206,859 shares (48.86%) | 206,859 shares (57.29%) | 216,538.69 shares (51.14%) | 154,234.37 shares (42.71%) |

Parenthesis in left column denote alleged transferee of the warrants rights

Total issued shares pretrial: 423,397.69
Total issued shares post-trial: 361,093.37