IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| BARBARA ROBERTSHAW | : | CIVIL ACTION |
| | : | NO.  11-7353 |
| v. | : | |
| | : | |
| GARY PUDLES, et al. | : | |

O'NEILL, J.                                                          May 6, 2014

## <u>MEMORANDUM</u>

In this action arising out of an allegedly improper shareholder distribution, plaintiff

Barbara Robertshaw asserted various claims and a request for certain declaratory relief against

defendants Gary Pudles, Betty Babjak and Answernet, Inc.  Following a bench trial, the Court

entered judgment in favor of Robertshaw[1] and entered an award of declaratory relief against

Pudles and Answernet.  Dkt. Nos. 175 and 176.  Pudles and Answernet have filed a motion

pursuant to Rules 52(b) and 59 of the Federal Rules of Civil procedure seeking to open the

judgment to allow additional discovery, a new trial on the issue of Answernet's capital structure,

and/or amendment of the Court's findings of facts and conclusions of law.  Dkt. No. 192.  For

the reasons that follow, I will deny defendants' motion in part and will grant their motion in

part.[2]

---

[1]     Unless otherwise noted, references to Robertshaw refer to Barbara Robertshaw.
References to her father, William (Bill) Robertshaw, will note his first name.  References to
Pudles refer to Gary Pudles.  His father, Michael Pudles, will be referred to by his full name.

[2]     Plaintiff asserts that

> Answernet itself has no legal standing to file the subject Post-
> Verdict Motion.  The Court ruled in Answernet's favor as to all of
> the claims the Plaintiff brought against it. . . .  Answernet has no
> legal or factual basis for requesting a new trial and no legitimate
> corporate interest in the outcome of any such claims by Mr.
> Pudles.

## BACKGROUND

In January 2009, Robertshaw, her father William Robertshaw, Pudles, Executel

Communications (a company solely owned by Robertshaw) and Cerida Investment Corporation[3]

(a company owned by some combination of Pudles and the Robertshaws) entered into an

agreement which provides that they are together the sole equity owners of Answernet and a

number of other entities "which operate under the marketing name Answernet."  DX100 at 1.  In

her amended complaint filed on November 5, 2012, plaintiff alleged that Pudles "claim[ed] that

his shares [in Answernet], together with purported Answernet shares that were allegedly owned

by a company called Cerida Investment Corporation . . . , constituted more than 51% of the

issued and outstanding shares of Answernet, Inc. . . ."  Dkt. No. 86 at ¶ 19.  She alleged that

"Defendant Pudles' Share Ownership Claim [sic] was false," id. at ¶ 19, and made repeated

allegations that Cerida did not own all of the shares it claimed in Answernet.  See Dkt. No. 86 at

---

Dkt. No. 194 at ECF p. 3.  Because I will deny defendants' motion on other grounds, I decline to
rule on this issue.  I note, however that Rule 1.13(a) of the Pennsylvania Rules of Professional
Conduct states that "[a] lawyer employed or retained by an organization represents the
organization acting through its duly authorized constituents."  Pa. Rules of Prof'l Conduct, 42
Pa. C.S.A. Rule 1.13.  "This makes it clear that an attorney representing a corporation generally
represents the corporation and not the corporation's shareholders, officers or directors."  Del
Borrello v. Del Borrello, 62 Pa. D. & C. 4th 417, 440 (Pa. Ct. Com. Pl. 2001).  In light of this, it
is difficult to understand why counsel for Answernet is participating in defendants' motion for a
new trial, since I only entered judgment against Answernet with respect to the declaratory relief
that plaintiff requested pertaining to issues of corporate control.  Answernet, as a corporation,
has no interest in whether it is controlled by Robertshaw or by Pudles.

[3]      Cerida, which is not a party to this action, filed a motion to intervene on August
16, 2013, eleven days after I entered judgment in favor of Robertshaw.  Dkt. No. 180.  I am
entering an order denying Cerida's motion to intervene simultaneous with the filing of this
opinion.
      Pudles is Cerida's President.  Pudles and William Robertshaw, make up Cerida's Board of
Directors.  Cerida and "Answernet share nearly all their backoffice operations, such as insurance,
accounting, information technology, buying, and sales."  Dkt. No. 180 at ECF p. 4.

¶ 25 ("The Answernet Capitalization table that Defendants Pudles and Babjak[4] provided falsely asserts that Cerida owned 62,579 common shares of Answernet, and that Answernet had a total of 423,396 issued shares outstanding."); ¶ 27 (Pudles and Babjak "knew that Answernet had never issued any shares at all to Cerida, and that there were not 423,396 issued shares outstanding."); ¶ 34 ("At the Annual Meeting of the Shareholders that was held on December 15, 2011, Defendants Betty Babjak and Gary Pudles submitted a document entitled 'List of Shareholders of Answernet, Inc.', which also falsely asserted that Cerida owned 62,579 common shares of Answernet, and that Answernet had a total of 423,396 issued shares outstanding.");
¶ 35 (Pudles and Babjak "knew that Answernet's stock ledger did not contain any record of the shares that were allegedly owned by Cerida, and that there were not 423,396 issued shares outstanding."); ¶ 36 (Pudles and Babjak "knew that Answernet had never issued any shares at all to Cerida."); ¶ 40 ("Answernet's counsel provided a document purporting to show warrant transactions which allegedly resulted in Cerida's obtaining the 62,579 common shares of Answernet which Defendants Betty Babjak and Gary Pudles falsely claimed Cerida owned."). Relevant to her claims that Cerida did not own 62,579 common shares of Answernet, in Count VI of her amended complaint, plaintiff alleged that Pudles lacked the requisite authority to undertake certain actions he had taken at both a November 28, 2011 special meeting of Answernet shareholders and a December 15, 2011 annual meeting of Answernet shareholders, and asked the Court to declare the actions void.  Id. at ¶ 75(a) and (b).

On May 13, 2008, in an email to Babjak and Answernet's controller, Pudles wrote that "Cerida owns some AnswerNet warrants.  I want to make sure we exercise them ASAP."  Ex. M2.  Babjak then wrote to the controller of Answernet, explaining that Pudles could "not locate

---

[4]      Babjack is the secretary and general counsel of Answernet.  Babjak is also Cerida's secretary.

the Cerida Warrants and we need to prepare affidavits of lost warrants . . . .  I reviewed

Answernet corporate records . . . and I cannot locate the warrants."  M2.  At trial, Babjak

testified that "she felt comfortable that Cerida had these warrants, the Progress warrants, the Ben

Franklin warrants and the Waterside warrants."  Dkt. No. 154 (Trial Tr. Apr. 24, 2013) at 71:24-

72:1.  Her assertion of comfort notwithstanding, however, Babjak testified that she never saw

any written assignments, written payment records or other transfer documents for any of the

warrants that allegedly belonged to Cerida.  Id.  at 71:11-20; 72:23-73:2.  In the absence of any

such proof, and instead of preparing affidavits of lost warrants,[5] Babjak testified that she

prepared three warrant exercise forms for Pudles to sign as president of Cerida:  one for 12,704

shares, one for 18,148 shares and one for 27,493.3 shares.  Id. at 75:1-77:4.  Each form

represented that there was a warrant attached, although Babjak conceded that she "knew [she]

didn't have warrants, paper warrants."  Id. at 77:10.

On May 22, 2008, Pudles as president of Cerida submitted three warrant exercise forms

to Answernet that directed the company to issue stock certificates to Cerida representing:  (1)

27,493.3 warrant shares, Ex. DX 82; (2) 18,148 shares of common stock, Ex. DX 80; and (3)

12,704 shares of common stock.  DX 78.  The warrant exercise form for the 27,493.3 warrant

shares stated that "the undersigned Holder of the attached, original, executed stock Purchase

Warrant hereby elects to exercise its purchase right under such Warrant with respect to warrant

shares . . . by the cancellation of indebtedness of [Answernet] to the undersigned Holder in the

amount of $249,914.10 (27,493.3 @ $9.09/share).  DX 82 p. 2-3.  The exercise form for the

18,148 shares stated that "the undersigned holder of the within Warrant hereby irrevocably elects

---

[5]     Babjak testified that she never saw any lost warrant affidavits.  Dkt. No. 154 at
73:22-24.  ("Q. And you've never seen any such lost warrant affidavits as to any of those alleged
warrants? A. No.")

to exercise the within Warrant to the extent of 18,148 shares of common stock . . . of

[Answernet].  The undersigned herewith encloses the Warrant and a check . . . in the amount of

$.05 in payment of the purchase price thereof."  DX 80.  The exercise form for the 12,704 shares

stated that "the undersigned Holder of the within Warrant hereby irrevocably elects to exercise

the within Warrant to the extent of 12,704 shares of common[ ] stock . . . of Answernet.  Please

credit $127.04 to [Answernet] in payment of the purchase price thereof."  DX 78.  Regardless of

the statements made on the warrant exercise forms, Babjak testified that no warrants were

attached.  See Dkt. No. 154 (Trial Tr. April 24, 2013) at 75:21-76:2; 76:15-20; 76:25-77:11.

Pertinent here, on August 5, 2013, following a bench trial, post-trial briefing and a post-

trial oral argument, I issued an Order entering judgment in favor of Robertshaw and against

Pudles and Answernet with respect to Robertshaw's request for declaratory relief.  I issued a

number of declarations including the following:

> c.      Cerida Investment Corp. does not possess the 12,704 shares
> of Answernet, Inc. that Gary Pudles and Betty Babjak claimed
> Cerida received as a result of an alleged assignment and exercise
> of the Waterside warrants;
>
> d.      Cerida Investment Corp. does not possess the 18,148.02
> shares of Answernet, Inc. that Gary Pudles and Betty Babjak
> claimed Cerida received as a result of an alleged assignment and
> exercise of the Progress Capital warrants;
>
> e.      Cerida Investment Corp. does not possess the 27,493.3
> shares of Answernet, Inc. that Gary Pudles and Betty Babjak
> claimed Cerida received as a result of an alleged assignment and
> exercise of the [Ben Franklin/Progress Capital] warrants;
>
> f.      Gary Pudles does not possess the 3,959.3 shares of
> Answernet, Inc. that Gary Pudles and Betty Babjak claimed Pudles
> received as a result of an alleged assignment and exercise of the
> Michael Pudles warrants;
>
> g.      the total shares of Answernet, Inc. held by Barbara
> Robertshaw and Executel, Inc., constitute a majority of the issued

and outstanding shares of [Answernet] . . . .

Dkt. No. 176 at ECF p. 1-2.  In my bench opinion, I explained "that Robertshaw has

demonstrated by a preponderance of the evidence that Pudles did not own all of the warrant

rights for the shares in Answernet that he claimed and thus was not entitled to exercise those

warrants in 2008."  Dkt. No. 175 at ECF p. 59.  Specifically, I concluded that "Cerida did not

possess the [Ben Franklin/Progress Capital warrants for 27,493.3 claimed shares] or Progress

Capital warrants [for 18,148.02 claimed shares] or the [Waterside] warrants [for 12,704 claimed

shares] at the time of exercise, and thus Pudles's exercise of them was void and these shares

were never issued."  Id.; see also id. at ECF p. 61 ("Robertshaw has shown . . . that there is

nothing in the record that substantiates" Pudles's claim that Cerida had been assigned the rights

to the Progress Capital shares.).  I reasoned that "Robertshaw has shown there to be insufficient

evidence of Cerida's entitlement to exercise the" warrants in question.  Id.  I also concluded that

"the record contains no evidence that Pudles was assigned or purchased and thus was entitled to

exercise the Michael Pudles warrants [for 3,959.3 claimed shares]."  Id.  As a result, I found that

"the actions that Pudles took at the November 2011 and the December 2011 Answernet meetings

on the strength of the votes he was not entitled to exercise are void too."  Id. at ECF p. 59-60.  I

denied plaintiff's fraud claim, however, finding "that Robertshaw has not supplied evidence that

either defendant had anything other than a good faith but mistaken belief that certain warrant

rights had been purchased or assigned by Cerida or Pudles."  Id. at ECF p. 61.  Likewise, I

denied plaintiff's claim that defendants breached their fiduciary duties, explaining that "while

Pudles and Babjak were mistaken in their conclusions regarding Cerida's and Pudles's warrant

rights, Robertshaw has failed to adduce evidence that either defendant had anything other than

good faith but mistaken ideas about the Answernet capital structure."  Id. at ECF p. 64.

## STANDARD OF REVIEW

Defendants now move

> pursuant to Federal Rules of Civil Procedure 52(b) and 59 for a
> new trial on the limited issue of the capital structure of AnswerNet
> . . . and to open the judgment, allow additional discovery, hold a
> supplementary proceeding to take additional evidence, amend the
> Court's findings of fact and conclusions of law, make additional
> findings, and thereafter amend the judgment accordingly, in order
> to correct the record regarding the ownership interests in
> AnswerNet and avoid a manifest injustice.

Dkt. No. 192 at ECF p. 8.

Rule 52(b) of the Federal Rules of Civil Procedure provides that "[o]n a party's motion

filed no later than 28 days after entry of judgment, the court may amend its findings – or make

additional findings – and may amend the judgment accordingly.  The motion may accompany a

motion for a new trial under Rule 59."  Fed. R. Civ. P. 52(b).  "The primary purpose of Rule

52(b) is to ensure that the trial court's findings of fact and legal reasoning are clear, cover the

essential factual and legal points, and will be understood by the appellate court, not to allow a

party a second opportunity to prove its case."  Haberern v. Kaupp Vascular Surgeons Ltd.

Defined Ben. Plan & Trust Agreement, 151 F.R.D. 49, 50-51 (E.D. Pa. 1993), citing 9 Charles

Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 2582 (1971); see also

Gutierrez v. Ashcroft, 289 F. Supp. 2d 555, 561 (D.N.J. 2003), quoting Soberman v. Groff

Studios Corp., No. 99CIV.1005(DLC), 2000 WL 1253211, at *1 (S.D.N.Y. Sept. 5, 2000) ("The

purpose of Rule 52(b) is to allow a court to correct manifest errors of law or fact, or in limited

circumstances, to present newly discovered evidence, but not to 'relitigate old issues, to advance

new theories, or to secure a rehearing on the merits.'").

Rule 59(a)(2) similarly provides that following a non-jury trial a Court may "open the

judgment if one has been entered, take additional testimony, amend findings of fact and

conclusions of law or make new ones, and direct the entry of a new judgment."  Fed. R. Civ. P. 59(a)(2).  Under Rule 59, a district court may alter or amend a judgment only if the party seeking reconsideration can demonstrate one of the following:  (1) the availability of new evidence not previously available, (2) an intervening change in controlling law, or (3) the need to correct a clear error of law or to prevent manifest injustice.  See, e.g., Blue Mountain Mushroom Co., Inc. v. Monterey Mushroom, Inc., 246 F. Supp. 2d 394, 398 (E.D. Pa. 2002).  "[W]hen evidence is not newly discovered, a party may not submit that evidence in support of a motion to reconsider" pursuant to Rule 59.  Pavlik v. Lane Ltd./Tobacco Exp. Int'l, 135 F.3d 876, 882 n.2 (3d Cir. 1998) (citation omitted).  Further, "[i]n order to show clear error or manifest injustice, the [movant] must base its motion on arguments that were previously raised but were overlooked by the Court – '[p]arties are not free to relitigate issues that the Court has already decided.'"  United States v. Jasin, 292 F. Supp. 2d 670, 676 (E.D. Pa. 2003), quoting Smith v. City of Chester, 155 F.R.D. 95, 97 (E.D. Pa. 1994) (further citations omitted).

Rule 59(a)(1)(B) specifies that following a non-jury trial "[t]he court may, on motion, grant a new trial on all or some of the issues . . . for any reason for which a rehearing has heretofore been granted in a suit in equity in federal court."  Fed. R. Civ. P. 59(a)(1)(b).  "A movant for a new trial faces a heavy burden; the court may order a new trial in a non-jury action if the court committed a manifest error of law or a mistake of fact, but a judgment should not be set aside except for substantial reasons."  Blackiston v. Johnson, No. 91-5111, 1995 WL 563834, at *2 (E.D. Pa. Sept. 21, 1995) aff'd, 91 F.3d 122 (3d Cir. 1996), citing Gidlewski v. Bettcher Indus., Inc., 619 F. Supp. 87, 91 (E.D. Pa. 1985), aff'd, 779 F.2d 42 (3d Cir. 1985); and 11 Wright, Miller & Kane, Federal Practice and Procedure § 2804 (1995).

**DISCUSSION**

I.     **Cerida's Claimed Shareholdings**

A.     **All of Cerida's Claimed Answernet Shareholdings Were at Issue at Trial**

Defendants first contend that "[a] manifest injustice will occur if the Court does not allow additional discovery and a supplementary proceeding to present all of the evidence of the ownership interests of AnswerNet." Dkt. No. 192 at ECF p. 8-9. They argue that

> [a]t the time of its judgment, the Court had an incomplete record
> before it of the documents relevant to ownership interests in
> AnswerNet because that issue was not raised prior to trial and
> because Defendants were prevented from obtaining records
> regarding the AnswerNet warrants held by Cerida Investment
> Corporation . . . and other AnswerNet share holdings prior to 2007.

Id. at ECF p. 8. Defendants assert that "through the trial, only the 12,704 shares (3%) of AnswerNet related to the Waterside warrants (for which plaintiff requested a declaratory judgment) were at issue" and that "[t]he trial did not involve Cerida's pre-2007 transactions regarding ownership of the AnswerNet warrants." Dkt. No. 192 at ECF p. 25. They argue that "Plaintiff never requested a declaratory judgment regarding any of the other shareholdings in AnswerNet," id. at ECF p. 15, and argue that the Court "sua sponte" granted "broad relief" to the plaintiff. Id. at ECF p. 28. On this point, I disagree with defendants.

In paragraph 75(c) of the amended complaint, plaintiff asked the Court to issue an order "declaring that Cerida Investment Corp. does not possess the 12,704 shares of Answernet, Inc. that Defendants Gary Pudles and Betty Babjak falsely claimed it received as a result of an alleged assignment and exercise of the Waterside Warrants." Id. at ¶ 75(c). But, contrary to defendants' contention that "Plaintiff's request for declaratory relief in her amended complaint . . . sought a declaration *only* as to those 12,704 shares," Dkt. No. 195 at ECF p. 4 (emphasis in original), it was not *only* those 12,704 shares as to which plaintiff sought relief in

her amended complaint.  Paragraphs 35, 36 and 75(d) of plaintiff's amended complaint clearly

put defendants on notice that the entirety of Cerida's claimed shareholdings in Answernet were

at issue in this action, particularly when read in conjunction with the allegations set forth in

paragraphs 25, 27, 34 and 40, which question both the validity of all of the shares Cerida claimed

in Answernet and the total number of outstanding Answernet shares.  Paragraph 35 of the

amended complaint alleges that "[a]t the time that Defendants Pudles and Babjak provided the

above 'list of Shareholders of Answernet, Inc.,' they knew that Answernet's stock ledger did not

contain any record of the shares that were allegedly owned by Cerida, and there were not

423,396 issued shares outstanding."  Dkt. No. 86 at ¶ 35.  Paragraph 36 alleges that "[a]t the time

that Defendants Pudles and Babjak provided the above 'list of Shareholders of Answernet, Inc.,'

they knew that Answernet had never issued *any shares at all* to Cerida."  Id. at ¶ 36 (emphasis

added).  Most importantly, in paragraph 75(d) of the amended complaint, a paragraph that

defendants neglect to address in their briefs in support of their pending motion,[6] plaintiff asked

the Court for an order "declaring that the total shares of Answernet, Inc. held by plaintiff Barbara

Robertshaw and Executel, Inc., constitute a majority of the issued and outstanding shares of the

company."  Id. at ¶ 75(d).  Plaintiff's request for a declaratory ruling that Robertshaw and

Executel's shares constitute a majority of the issued and outstanding shares of Answernet

---

[6]      Even though the Court explicitly asked defendants about the import of paragraph
75(d) at oral argument on defendants' motion, see Dkt. No. 203 at 7:8-14 ("Well, what do you do
with the request for declaratory relief, 75.d., declaring that the total – in the Amended Complaint,
declaring that the total shares . . . of Answernet, Inc. held by plaintiff Barbara Robertshaw and
Executel, Inc. constitute a majority of the issued and outstanding shares of the company?"), their
supplemental brief filed after the argument does not reference the paragraph.  Instead, in their
supplemental brief defendants continue to insist that the amended complaint only requested
declaratory relief regarding the 12,704 shares of Answernet.  See Dkt. No. 209 at ECF p. 18 ("In
the Amended Complaint itself, although plaintiff acknowledged on multiple occasions that the
Defendants' position was that Cerida owned 62,579 common shares of AnswerNet, see
Amended Complaint ¶ 25, 34, 40, 42, 61 and 66, she did not request declaratory relief negating
all of Cerida's ownership of AnswerNet stock – just a portion.  See id. ¶ 75(c).").

necessarily required the Court to determine all Cerida's present share ownership in Answernet. Absent identification of Cerida's total shareholdings in Answernet, I could not have rendered a determination with respect to the majority shareholdings.

In support of their argument that Answernet's entire capital structure only became an issue after trial defendants point to plaintiff's counsel's comment during a July 2012 hearing on a discovery motion filed prior to plaintiff's filing of the amended complaint that "there's no issue involving Cerida in this case."  Dkt. No. 195 at ECF p. 2, <u>citing</u> Dkt. No. 50 at 27:19-24.  But at that hearing, plaintiff's counsel further explained that "no issue . . . has been raised *by the complaint* or the answer and affirmative defenses of AnswerNet that has any possible bearing on Cerida's internal information."  Dkt. No. 50 at 27:21-24 (emphasis added).  Robertshaw amended her complaint in November 2012, almost four months after that discovery hearing, Dkt. No. 86, rendering moot her counsel's comment at the discovery hearing regarding the relevance to plaintiff's claims of information about Cerida.

In Answernet's motion to dismiss plaintiff's amended complaint, it recognized that plaintiff sought a declaratory judgment that she "and Executel own a majority of the outstanding shares of AnswerNet."  Dkt. No. 94 at ECF p. 5.  Answernet wrote that "[t]he alleged controversy arises from the . . . purported fraudulent statements that Pudles and Cerida collectively owned approximately fifty-one percent of the outstanding shares of AnswerNet stock."  <u>Id.</u> at ECF p. 6.  Answernet explained that plaintiff's amended complaint alleged that Pudles and Babjak "knew that 'Answernet's stock ledger did not contain any record of the shares that were allegedly owned by Cerida and that there were not 423,396 issued shares outstanding."  <u>Id.</u> at ECF p. 7.  This is a recognition by Answernet that the ownership of the shares allegedly owned by Cerida was at issue in this case.

Plaintiffs' responses to Pudles's and Answernet's motions to dismiss her amended complaint contained her argument that "[n]ot a single certificate evidencing the nonexistent shares that Mr. Pudles claims were issued to Cerida has ever been produced by Answernet or Mr. Pudles in discovery, nor did they produce any warrant option assignments or warrant option exercise forms."  Dkt. No. 98 at ECF p. 16; see also Dkt. No. 99 at ECF p. 13-14 (same). Plaintiff wrote that

> discovery in this case [subsequent to the filing of her complaint] revealed that Cerida does not own the shares in Answernet that Mr. Pudles and Ms. Babjak have claimed, and that Mr. Pudles therefore does not have majority control of Answernet.  In fact, the corporate records obtained in discovery confirm that the shares of Answernet that are owned by the Plaintiff and her wholly-owned company, Executel Communications, Inc., actually constitute a majority of the issued and outstanding shares of Answernet.

Dkt. No. 98 at ECF p. 3; see also Dkt. No. 99 at ECF p. 3 (same).  She argued that

> all of the Answernet shares that Mr. Pudles alleges were issued to Cerida were purportedly obtained at different times over a span of five years as a result of Cerida's purchases of warrant options from third-party companies. . . .  In order to have turned any of those alleged warrant option purchases into Answernet share certificates, Cerida would have to have submitted executed agreements to Answernet; requested and received the issuance of new warrant options forms in its own name; exercised those same warrant options in writing; submitted the written exercise forms to Answernet's corporate recordkeeper; and then have requested and received the issuance of Answernet shares commensurate with the number of warrant options it exercised.  Not one of those indispensable corporate records was ever produced by the Defendants . . . .

Dkt. No. 98 at ECF p. 16; Dkt. No. 99 at ECF p. 14 (same).  Even if plaintiff made these statements in the context of her response to defendants' motions to dismiss her fraud claim, they make clear her contention that Pudles did not have majority control of Answernet because Cerida did not own the shares in Answernet that he and Babjak had claimed.  Defendants cannot now

contend that they did not have "sufficient . . . notice that Plaintiff challenged the entirety of Answernet's share ownership . . ." prior to trial.  Dkt. No. 195 at ECF p. 3.

Plaintiff's pretrial memorandum also made numerous references to her contention that Cerida does not own all of its claimed shares in Answernet.  See, e.g., Dkt. No. 125 at ECF p. 3; ("Answernet corporate records show that it never issued the shares to Cerida that were claimed by Mr. Pudles and Ms. Babjak"; id. ("Cerida undeniably has never owned the shares in Answernet that Mr. Pudles and Ms. Babjak have claimed and Mr. Pudles has never controlled a majority interest of Answernet.").  Plaintiff, through her references to ownership claims, share issuances and warrant exercise forms in plural, rather than singular terms, expressed her clear intention to challenge all of Cerida's purported share transactions at trial.  See id. ("No Cerida share issuances were ever recorded in Answernet's Share Transfer Ledger, nor could they have been recorded, because necessary assignment, warrant, payment, and exercise forms on which Cerida's share ownership was claimed do not exist."); id. at ECF p. 4 ("[Pudles] instructed Ms. Babjak to make forms that purported to show the exercise of non-existent warrants that he claimed Cerida had been assigned by other parties, and he completed and signed exercise forms which referenced those non-existent warrants."); id. at ECF p. 5 ("Plaintiff's evidence will show that there are no agreements, payment records, assignments, or other valid documents in Answernet's records which support the Defendants' Cerida ownership claims.").

Further, testimony elicited at trial reflects the parties' apparent understanding of the relevance to plaintiff's claims of share transactions other than those involving the 12,704 shares that defendants now claim were the only shares in controversy at trial.  For example, on the second day of trial, counsel for plaintiff asked Robertshaw about a subordinated note purchase agreement between Answernet and Ben Franklin/Progress Capital that provided for the issuance

of a warrant to Ben Franklin/Progress Capital for the purchase of 27,493.3 shares of Answernet's

stock.  Dkt. No. 154 (Trial Tr. Apr. 24, 2013), at 53:3-56:4; see also Ex. H4 (subordinated note

purchase agreement).  Robertshaw answered "[y]es," when she was asked whether the warrant

shares identified in the agreement were "the same 27,493 shares of stock that Gary Pudles

purported to exercise on behalf of Cerida on May 22, 2008."  Dkt. No. 154 at 54:10-12.  She was

asked whether she had "ever seen any assignment by Ben Franklin/Progress Capital of those

27,493 shares to Cerida" and responded "[n]one, nothing."  Id. at 54:14-16.  Counsel for

Answernet made no objection to the relevance of the subordinated note purchase agreement or

the warrant for 27,493 shares.  Instead, he interjected only that "the document says whatever it

says."  Id. at 54:22-23.

        Counsel for Answernet himself asked Pudles about the import of each of the entities who

had been issued warrant shares in Answernet.  On the third day of the trial, counsel for

Answernet asked Pudles the following:  "[w]e've heard discussion during the course of the trial,

of a number of entities:  Waterside Capital, Ben Franklin, and Progress Bank.  What is their

involvement in the [external] financing [of Answernet]?"  Dkt. No. 155 (Trial Tr. Apr. 25, 2013),

at 56:16-19.  Pudles explained that

> Progress Bank was our senior lender, and they were the first ones
> to take warrants in exchange for loaning us money.  So they had a
> right to purchase some shares.  Ben Franklin/Progress Capital was
> a – an SBA [sic] that had actually been started by Progress Bank,
> but it was a nonbanking subsidiary; and they also loaned money
> and took warrants.  And Waterside Capital Corp. was a public
> company . . . which was an SBIC, and they would borrow money
> from the SBA and loan it out with interest; plus they took warrants.

Id. at 56:20-57:4.  Upon further questioning from counsel for Answernet Pudles also testified

about the purported conversion of the Ben Franklin/Progress Capital and Progress Bank

Warrants.  Id.at 104:1-105:23.  He explained defendants' exhibit 83, a document in which he had

written to Bill Robertshaw about amounts that would need to be paid to exercise each of the three categories of outstanding warrants; not only the Waterside warrants ("a penny a share"), but also the Ben Franklin warrants ("$9.09 a share") and the Progress Bank warrants ("about $0.05 for the 15,000"). Id. at 105:15-23.

Counsel for plaintiff, with no objection by defendants, asked Pudles to explain how Answernet obtained the Ben Franklin/Progress Capital and Progress Bank warrants. Id. at 177:22-178:1 ("Q: Now, let's turn for a minute to the Bank Franklin and the Progress (sic). You had Cerida pay Answernet for the Ben Franklin and Progress warrants, is that right? A. Correct. Q. Can you tell me how AnswerNet got them?"). Pudles explained his understanding in the following exchange with plaintiff's counsel:

> Q.    Well, the warrants were given to Ben Franklin, were they not?
>
> A.    I believe they were, yes.
>
> Q.    And you claim to have bought the shares from AnswerNet, is that right?
>
> A.    You mean Cerida bought the share – well, first of all, Cerida, who's not a party to this case, bought the shares from Ben Franklin.  And Cerida, who's not a party to this case, also bought shares from Progress Bank.
>
> Q.    Cerida bought the shares from Progress Bank?
>
> A.    Correct.
>
> Q.    Okay, it's – did it pay AnswerNet for warrants?
>
> A.    It paid AnswerNet to convert the warrants in 2008, for all of the warrants that were ever issued, with the exception of the Executel warrants and the 3,900-and-change warrants that Barbara and I owned individually.

> Q.    So Cerida, your testimony is, purchased the warrants from Ben Franklin, and thereafter used them to buy stock from AnswerNet?
>
> A.    They exercised the warrants and acquired the stock that those warrants represented, yes, sir.
>
> Q.    Is there a shred of paper that indicates the warrants being transferred from Ben Franklin or Progress or – to Cerida?
>
> A.    Sure. There's many shreds of paper; they're in Cerida's books and records.  And Cerida's not a case – a party to this case.
>
>       . . .
>
> A.    So, yes, there's lots of documentation in Cerida's books. That . . . was a transaction between Cerida and Ben Franklin, and Cerida and Progress Bank.
>
> Q.    Can you point to any that are in the record here?
>
> A.    Yes.  I can point to the general-ledger documents that Mr. Mitts – well, no, in terms of a transaction between two third parties who are not a party to this, no.  I don't believe – well, actually I can. . . .
>
>       There is an exhibit here, which Mr. Robertshaw signed in 2003, which confirms that Cerida owns the Progress Bank shares.  Mr. Robertshaw signed the agreement; it was the Executel agreement.
>
>       In addition, there's a shareholder agreement . . . .

Id. at 178:3-179:24.  At no time did defendants object that Pudles was being asked to provide testimony on shareholdings going beyond the scope of the matters on trial.  In light of the foregoing, I find that defendants' "lack of notice" argument is insufficient to meet their burden with respect to their request to open the judgment or to conduct a new trial.

### B.    Defendants Were Not Precluded from Obtaining Necessary Discovery

Defendants also claim that the May 23, 2013 "request to identify evidence in the record

unfairly prejudiced [them] because the necessary documents to prove share ownership had not been procured in discovery . . . and had not been introduced at trial (as they were not relevant to the issues addressed at trial)."  Dkt. No. 192 at ECF p. 16.  In support of their motion, defendants contend that they "were blocked from obtaining records regarding Cerida's AnswerNet warrants and share holdings prior to 2007."  Dkt. No. 192 at ECF p. 18.  But defendants provide no explanation for how they were precluded from obtaining the documents in question other than their statement that "that issue was not raised prior to trial."  Id.

As defendants concede, the evidence which they now seek to introduce does not meet the requirements for consideration as "after-discovered evidence."  See Dkt. No. 195 at ECF p. 4 ("The evidence Defendants presented with their Motion to demonstrate that the judgment should be opened and new evidence should be admitted in the record is not 'after-discovered evidence.'").  A party is only entitled to a new trial on the basis of after-discovered evidence if such evidence could not have been discovered prior to trial through the exercise of reasonable diligence.  See Bohus v. Beloff, 950 F.2d 919, 930 (3d Cir. 1991); citing Stridiron v. Stridiron, 698 F.2d 204, 207 (3d Cir. 1983); and Ulloa v. City of Phila., 692 F. Supp. 481, 483 (E.D. Pa. 1988).  Defendants do not argue that they could not have discovered the evidence they seek, but contend that "[r]ather, it is evidence that is relevant only now, because the issue to which it relates was not part of the case before the Court issued its final order depriving Cerida of virtually all of its ownership interest in AnswerNet . . . ."  See Dkt. No. 195 at ECF p. 4.  As is discussed above, defendants' argument regarding the scope of the issues raised at trial is not persuasive.  Robertshaw amended her complaint in November 2012, almost four months after the discovery hearing in which plaintiff's counsel asserted that there was "no issue involving Cerida in this case" and well before the bench trial.  Dkt. No. 50, July 19, 2012 Hrg. Tr. 27:19-24.

Further, defendants had ample opportunity to seek and produce all available evidence regarding the ownership of the company.  As I noted in my prior opinion, "[a]t any point in this litigation Answernet or Pudles – or any party for that matter – could have subpoenaed Cerida records or added Cerida as a party" and "[i]f there were Cerida documents that existed that were relevant to this litigation, surely they could have been accessed by the parties before me."  Dkt. No. 175 at ECF p. 22 n.31.  Indeed, Pudles is Cerida's president and Babjak is its secretary.

It matters not that on July, 20, 2012, then-Magistrate Judge L. Felipe Restrepo entered an order declining to permit discovery related to Cerida's ownership of the Answernet shares prior to 2007.  See Dkt. No. 192 at ECF p. 15, citing Dkt. No. 45.  On November 16, 2012, after plaintiff filed her amended complaint, Magistrate Judge Restrepo entered an order, Dkt. No. 91, granting an earlier motion by Pudles to compel discovery, Dkt. No. 66, in which Pudles had argued, inter alia, that he was "severely prejudiced and hampered in his ability to properly pursue his counterclaim and prepare his defenses in this action without the requested documents.  Pudles and Answernet produced documents from 1998 and Plaintiff should be compelled to do the same."  Dkt. No. 66 at ECF p. 4, ¶ 14.  If defendants believed thereafter that plaintiff was in violation of the November 16, 2012 order or was in violation of her obligation to supplement her prior discovery responses pursuant to Rule 26(e) of the Federal Rules of Civil Procedure as a result of the amendments to her complaint, they could have moved the Court to compel plaintiff to produce further discovery.  Defendants did not.

To the extent that defendants contend that "there are still additional documents that have not yet been obtained that could be quickly brought before the Court with limited additional discovery,"  Dkt. No. 192, at ECF p. 21, they provide no justification beyond their scope of trial argument for not having sought to obtain those documents prior to trial.  If, as they now contend

to be the case, defendants required discovery of additional evidence of Answernet's shareholders after plaintiff amended her complaint, they could have requested time for such discovery either prior to trial or in response to the Court's May 23, 2013 Order.  They did not.  Only now after receiving an unfavorable verdict do they contend that they were "unfairly limited [in their] ability to cross-examine Plaintiff with respect to how Cerida's Plaintiff's and Mr. Pudles's checks were treated in Executel's financial records."  Dkt. No. 192 at ECF p. 13.

In support of their argument, defendants assert, inter alia, that in November 2011, "Babjak wrote to Alan Zar, who was the former corporate secretary of Cerida, and requested Cerida's corporate records . . ." and "Pudles followed Ms. Babjak's letter with a letter to Plaintiff's counsel requesting Cerida's document."  Dkt. No. 192 at ECF p. 16-17.  They contend that "Plaintiff and Zar never responded" and that "Alan Zar testified on the final days of discovery that he still retains corporate records of *both* Answernet and Cerida."  Id. at ECF p. 17 (emphasis in original).  They now assert that they "have served subpoenas on Alan Zar and Executel seeking production of AnswerNet's corporate records and neither ever produced the requested documents."  Dkt. No. 192 at ECF p. 18.  But they do not identify when these subpoenas were served.  Nor do defendants explain why, prior to trial, they never moved to compel production of the information they claim they sought and never received from Zar, Executel or plaintiff.[7]

---

[7]         In her response to defendants' motion, plaintiff counters that "Defendants never subpoenaed Mr. Zar as an agent of Executel" prior to trial and that he was instead, subpoenaed as an individual, with no "record production ability or obligations at all [regarding Answernet, Cerida or Executel] with regard to that subpoena."  Dkt. No. 192 at ECF p. 22.  Defendants did not "issue a new subpoena to Mr. Zar as a corporate officer of Executel, or file a Motion to obtain a ruling from the Court," rather "the Defendants chose to accept Mr. Zar's appearance without any production of the specified records, and then proceeded to take his deposition."  Id. Following his deposition, Zar submitted an affidavit in which he corrected certain answers he made at his deposition.  See id. at ECF p. 23; see also Dkt. No. 194-12.  In the affidavit Zar

Further, as plaintiff contends, "Pudles himself has always been the only person who could generate and sign any warrant or stock certificate on behalf of Answernet and Answernet itself has always been the legal repository for any such corporate records." Dkt. 194 at ECF p. 15. "Pudles has always been the President of both Answernet and Cerida . . . ," id. at ECF p. 12, and defendants' contention that they were unable to obtain relevant documents seems to be contradicted by Pudles's own signature on many of the documents attached to defendants' motion for a new trial. See, e.g., Dkt. No. 192, Ex. G. (2003 Agreement selling Progress Capital's Answernet warrants to Cerida); Dkt. No. 192, Ex. I (September 27, 2002 assignment of Progress Bank Warrants to Cerida); see also Dkt. No. 192 Ex. G (unsigned June 16, 2003 memorandum attributed to Pudles addressed to plaintiff and others regarding "May 2003 Financials").

I decline to accept defendants' argument that they should "be allowed limited discovery to subpoena evidence from the additional individuals and entities in order to complete the record regarding ownership interests in AnswerNet . . . ," Dkt. No. 192 at ECF p. 21, when they were not precluded from seeking such evidence after plaintiff filed her amended complaint and prior to the trial and made no motion to seek such discovery upon the Court's order that they point to evidence to "corroborate their position as to the shares they control in Answernet." Dkt. No. 159. I will not grant defendants' request to open the judgment or to conduct a new trial on the basis that they were precluded from obtaining necessary discovery.

## C.     Burden of Proof

In their motion defendants also contend that "[t]he Court incorrectly applied the burden of proof to Defendants rather than plaintiff as to the share ownership interests in AnswerNet."

---

makes repeated assertions that he did not keep Answernet books or records in his office or control. See Dkt. 194-12.

Dkt. No. 192 at ECF p. 27.  I disagree, having specifically found that plaintiff met *her* burden of

proof, when she demonstrated that there was insufficient proof to support Pudles's share

ownership claims.  Dkt. No. 175 at ECF p. 59; see also id. at ECF p. 50 ("I find that Robertshaw

has shown by a preponderance of the evidence that [the assignment to or purchase by Cerida of

the Waterside warrants for 12,704 claimed shares] did not occur.").

As I explained in my bench opinion, "the rule in Delaware appears to be that a plaintiff in

a declaratory judgment action should always have the burden of going forward."  Dkt. No. 175 at

ECF p. 47, n.50, citing Policemen's Annuity & Benefit Fund of Chicago v. DV Realty Advisors

LLC, No. 7204-VCN, 2012 WL 3548206, at *11 n.81 (Del. Ch. Aug. 16, 2012), quoting Hexion

Specialty Chemicals, Inc. v. Huntsman Corp., 965 A.2d 715, 739 (Del. Ch. 2008) (alterations,

internal quotation marks and further citations omitted).  Thus, Robertshaw "bears the burden of

proof by a preponderance of the evidence for the declaratory judgment sought."  Friends of

Christine O'Donnell v. Moseley, No. CPU4-11-00573, 2012 WL 1996860, at *3 (Del. Com. Pl.

June 5, 2012), citing Rhone-Poulenc v. GAF Chemicals, No. 12848, 1993 WL 125512, at *3

(Del. Ch. Apr. 8, 1993).[8]

An absence of proof can constitute evidence in certain circumstances.  This is true here,

where plaintiff established her claims through evidence of an absence of proof to support

Pudles's or Cerida's claimed entitlement to exercise Ben Franklin/Progress Capital warrants for

---

[8]       Similarly, in any proceeding to determine the validity of any election,
appointment, removal or resignation of any director or officer of any corporation under Section
225 of the Delaware General Corporations Law, where the "dispute centers on the plaintiff's
ownership percentage, the plaintiff bears the burden to establish its percentage based on the stock
ledger, stock certificates, or other extrinsic evidence and then the defendant may rebut that
position by establishing that additional, or less, stock has been validly issued."  Boris v.
Schaheen, C.A. No. 8160-VCN, 2013 WL 6331287, at *13 (Del. Ch. Dec. 2, 2013), citing Eluv
Holdings (BVI) Ltd. V. Dotomi, LLC, C.A. No. 6894-VCP, 2013 WL 1200273, at *6 (Del. Ch.
Mar. 26, 2013).

27,493.3 claimed shares, Progress Capital warrants for 18,148.02 claimed shares and the

Waterside warrants for 12,704 claimed shares (the WSCC 2 warrants) where it would have been

expected that such proof would exist.[9]  I will not grant defendants' motion on the basis of their

argument regarding the application of the burden of proof.

> **D.    Issue of Written Assignments**

Defendants also contend that the Court applied an incorrect legal standard when it

"require[ed] written documentation for the issuance and transfer of shares in AnswerNet."  Dkt.

No. 192 at ECF p. 29.  I disagree and find that defendants have not established a clear error of

law that would require me to set aside my prior judgment.

Defendants assert that "the Court's position regarding the level of documentation needed

for an effective stock or warrant transfer, given the contractual language of the warrants, is

contrary to [ ] Delaware law."  Id.  They argue that "despite the language in the warrants, the

parties to those warrants, in this case AnswerNet and Cerida, were free to agree otherwise and

transfer securities without a written contract."  Id., citing 6 Del. C. § 8-113.  Defendants contend

that Answernet and Cerida were free "to disregard the need for formal issuance of new warrants

and avoid the legal expense of drafting new warrants among themselves."  Dkt. No. 192 at ECF

p. 29-30.  Defendants are correct in that "'[u]nder the appropriate circumstances, a right may

even be assigned without the execution of a formal assignment.'"  Dkt. No. 175 at ECF p. 49,

quoting 6 Am. Jur. 2d Assignments § 83.  As I explained in my bench opinion, "'[n]o words of

art are required to constitute an assignment; any words that fairly indicate an intention to make

the assignee owner of a claim are sufficient, and the same interpretation should be given the

---

[9]      In contrast, I found that plaintiff did not "carr[y] her burden to demonstrate that Cerida did not purchase the warrant rights to the 4,234.37 shares subject to the WSCC 3 transaction" because she had not similarly established an absence of evidence of observed formalities with respect to the transaction.  Dkt. No. 175 at ECF p. 56.

words whether they are oral or written.'" Dkt. No. 175 at ECF p. 48-49, quoting 29 Williston on

Contracts § 74:3 p. 59-60 (4th Ed.).

However, as I further explained, "[t]here must be . . . some evidence upon which I may

conclude that [ ] a transfer [of warrants] occurred." Dkt. No. 175 at ECF p. 49. This is

particularly true where "[t]he contracts creating the third party warrants . . . are very clear that

any assignment of the warrant rights required a writing as well as the issuance of a new warrant."

Id. at ECF p. 49 n.52, citing Pl.'s Ex. H3 p. 26, 33 (Ben Franklin/Progress Capital); Pl.'s Ex. H1

p. 56-58 (Progress Capital), Pl.'s Ex. H27 p. 1-3 (Waterside). I concur with plaintiff's

contention in her reply to defendants' motion that "no evidence was presented to show that there

ever were [securities transferred without a written contract] or that any such oral agreement to

transfer was ever made." Dkt. No. 194 at ECF p. 29. Ultimately, in the absence of such

evidence and with insufficient documentary evidence regarding the transfer or assignment of the

WSCC 2, Progress Capital or Ben Franklin/Progress Capital warrants, and taking into

consideration the warrant contract terms requiring a writing, I found support for my

determination.[10] Plaintiff met her burden at trial by showing that there is insufficient evidence to

substantiate Pudles's and Cerida's claimed Answernet shareholdings. Defendants have not met

their burden to show that I applied an improper legal standard such that there are "substantial

reasons" to set aside the my prior judgment. Blackiston, 1995 WL 563834, at *2.

### F.    Equitable Relief

Defendants contend that the Court wrongly granted declaratory relief to plaintiff with

---

[10]    Indeed, Pudles and Babjak must have understood that it was necessary to have
some written proof evidencing Cerida's shareholdings as evidenced by Babjak's having prepared
warrant exercise forms despite her testimony that she never saw any written assignments of,
written payment records for or written requests to reissue the allegedly executed warrants. Dkt.
No. 154 (Trial Tr. April 24, 2013) at 71:11-72:1. Asked if she "simply prepared warrant exercise
forms for Mr. Pudles," Babjak testified "Yes, I did." Id. at 73:25-74:3.

respect to Cerida's shareholdings, arguing that "Plaintiff has been on notice for over a decade

that Cerida, a company in which she holds a 50% stake, had acquired the Progress Bank and Ben

Franklin/Progress Capital warrants for AnswerNet stock," Dkt. No. 192 at ECF p. 34, and that

equitable defenses including the doctrines of unclean hands and "laches should have long ago

barred these equitable proceedings."  Id. at ECF p. 35.  "By its very nature, the Federal

Declaratory [Judgment] Act is a form of equitable relief, which states that a court with

jurisdiction 'may declare the rights and other legal relations of any interested party seeking such

declaration, whether or not further relief is or could be sought.'"  Canal Ins. Co. v. Flores, No.

3:06-CV-84-KC, 2009 WL 1033770, at *16 (W.D. Tex. Apr. 14, 2009), citing 28 U.S.C. § 2201.

As defendants contend, "as a form of equitable relief, declaratory judgment may be foreclosed by

equitable defenses, including unclean hands," laches, ratification and/or acquiescence.  Canal

Ins. Co., 2009 WL 1033770, at *16.  But equitable estoppel does not apply where the underlying

transaction is void, rather than voidable.  See STAAR Surgical Co. v. Waggoner, 588 A.2d 1130,

1137 (Del. 1991) (holding that equitable estoppel "has no application in cases where the

corporation lacks the inherent power to issue certain stock or where the corporate contract or

action approved by the directors or stockholders is illegal or void."); see also Boris v. Schaheen,

C.A. No. 8160-VCN, 2013 WL 6331287, at *15 (Del. Ch. Dec. 2, 2013) ("Neither can a board

ratify void stock.  Only voidable acts are susceptible to these equitable defenses."), citing

Waggoner v. Laster, 581 A.2d 1127, 1137 (Del. 1990); and Harbor Fin. Partners v. Huizenga,

751 A.2d 879, 896 (Del. Ch. 1999).

Because I find that any stock issued by Answernet based on the purported exercise of the

WSCC 2 and Ben Franklin/Progress Capital and Progress Capital warrants was void and not

voidable, defendants cannot rely upon the equitable defenses to plaintiff's claims for declaratory

relief.

> The essential distinction between voidable and void acts is that the former are those which may be found to have been performed in the interest of the corporation but beyond the authority of management, as distinguished from acts which are [u]ltra vires, fraudulent or gifts or waste of corporate assets.  The practical distinction . . . is that voidable acts are susceptible to cure by shareholder approval while void acts are not.

Michelson v. Duncan, 407 A.2d 211, 218-19 (Del. 1979);

> Voidable acts are traditionally held to be ratifiable because the corporation can lawfully accomplish them if it does so in the appropriate manner.  Thus if directors who could not lawfully effect a transaction without stockholder approval did so anyway, and the requisite approval of the stockholders was later attained, the transaction is deemed fully ratified because the subsequent approval of the stockholders cured the defect.
>
> In contrast, void acts are said to be non-ratifiable because the corporation cannot, in any case, lawfully accomplish them.  Such void acts are often described in conclusory terms such as "ultra vires" or "fraudulent" or as "gifts or waste of corporate assets."

Harbor Fin. Partners, 751 A.2d at 896; see also Klassen v. Allegro Dev. Corp., --- A.3d ----

(2014), No. 583, 2013, 2014 WL 996375, at *7 (Del. Mar. 14, 2014), quoting Boris, 2013 WL

6331287, at *15 ("board action, taken in violation of equitable principles is voidable, not void,

because '[o]nly voidable acts are susceptible to . . . equitable defenses") (alteration in original);

Solomon v. Armstrong, 747 A.2d 1098, 1114 (Del. Ch. 1999) ("Void acts are those acts that the

board, or more generally the corporation, has no implicit or explicit authority to undertake or

those acts that are fundamentally contrary to public policy.").

Following the bench trial, I found there was insufficient proof to show that Cerida had

purchased or been assigned the Answernet warrants that it later purported to exercise.

Accordingly, I held that "'[Answernet] had no power to issue the kind of stock that was

attempted to be issued [in 2008]; the act was void and not merely voidable, and under practically

all the authorities, it is incapable of being cured or validated by an attempted ratification by amendment or other subsequent proceeding.'"  Dkt. No. 175 at ECF p. 59 (emphasis in original), quoting Superwire.com, Inc. v. Hampton, 805 A.2d 904, 909 (Del. Ch. 2002) (further citations omitted).  I reiterate that holding here.

Answernet's shareholders had no authority to effectuate a transfer of warrants, which represented a right to purchase shares of Answernet's stock, between Waterside and Cerida.  Waterside, and not Answernet was the holder of the warrant shares in question.  It was therefore not within Answernet's power and authority to accomplish a valid transfer of the WSCC 2 warrants to Cerida.  Only Waterside and Cerida could cure any defects in the purported transfer of the WSCC 2 warrants to Cerida.  Answernet could not accomplish any such transfer on its own.  Cerida's alleged stockholdings in Answernet based on Cerida's claimed exercise of the WSCC 2 warrants were thus void and not voidable.

Likewise, Cerida's alleged stockholdings in Answernet based on Cerida's claimed exercise of the Progress Capital and or Ben Franklin/Progress Capital warrants were void and not voidable.  I found there was a "lack of any documentary evidence regarding the transfer or assignment of the warrant rights from Progress Capital or BF/Progress Capital . . . ."  Dkt. No. 175 at ECF p. 57.  Only Progress Capital, Ben Franklin and Cerida could cure any defects  in the purported transfer of the warrant rights between them.  Here again, Answernet could not accomplish any such transfer on its own.

Because I conclude that the purported stockholdings based on Cerida's purported exercise of the WSCC 2 and Ben Franklin/Progress Capital and Progress Capital warrants were void and not voidable, I need not reach the question of whether defendants have shown that plaintiff should have been barred from seeking the awarded declaratory relief as a result of

equitable estoppel.  "A court cannot imbue void stock with the attributes of valid shares."

STAAR Surgical, 588 A.2d at 1136.  I will deny defendants' motion for a new trial on this basis.

### G.      Conclusion With Respect to Cerida's Claimed Shareholdings

Defendants argue that if I do not grant their requested relief "a manifest injustice will occur because Cerida and Mr. Pudles will lose the shares of AnswerNet stock that they have paid significant sums to acquire."  Dkt. No. 192 at ECF p. 32.  With respect to Cerida's claimed shareholdings in Answernet, I disagree and find that defendants have not demonstrated that amendment of the Court's findings is warranted under Rule 52(b) or that a new trial is "required to prevent injustice in this case."  Defendants had a fair opportunity at trial to rebut plaintiff's showing that her requested declaratory relief was warranted with respect to Cerida's Answernet shareholdings, defendants failed to do so, and they have not shown that there is a reason to give them a second chance.  Therefore, I will deny their motion to the extent that they seek to challenge my holdings regarding Cerida's shareholdings in Answernet.

## II.    Michael Pudles Warrants

In defendants' motion, they also contend that "Gary Pudles's ownership of the shares he received from his late father, Michael Pudles, first came into question a month *after* the trial when the Court issued its Order of May 23, 2013 . . . ."  Id. at ECF p. 15 (emphasis in original). They assert that after the trial "Pudles was . . . able to locate bank records documenting his payment of $50,000 to his father, Michael Pudles, for the warrants for 3,959 shares of AnswerNet stock held by Michael Pudles," and they point to a "cancelled check . . . noting the $50,000 payment for AnswerNet warrants in the memo line and [Pudles's] February 2005 bank statement showing the deduction from his account for the payment."  Id. at ECF p. 20.

Unlike with Cerida's claimed shareholdings, upon reconsideration I agree with defendants that they did not have sufficient notice prior to trial that plaintiff sought to challenge this subset of Pudles's claimed shareholdings in Answernet. Plaintiff's amended complaint is bereft of specific allegations regarding any warrants that Pudles claimed he purchased from his father and then exercised. Likewise, there is no specific mention of these warrants in plaintiff's pretrial memorandum.

Accordingly, I will grant defendants' motion to the extent that it seeks amendment of my August 5, 2013 Order with respect to the following declaration contained therein: "Gary Pudles does not possess the 3,959.3 shares of Answernet, Inc., that Gary Pudles and Betty Babjak claimed Pudles received as an alleged assignment and exercise of the Michael Pudles warrants." See Dkt. No. 176 at ECF p. 2. I will amend my prior judgment to strike only the foregoing declaration.

Although I will amend my prior judgment to strike the declaration finding that Pudles did not possess the 3,959.3 shares that he claimed he held as a result of an alleged assignment and exercise of Answernet warrants held by his father, this amendment does not require that I vacate my other declarations, including the declaration that "the total shares of Answernet, Inc. held by Barbara Robertshaw and Executel, Inc., constitute a majority of the issued and outstanding shares of [Answernet]." Dkt. No. 176 at ECF p. 2. Because my ruling on defendants' motion leaves intact my other prior declarations, I will lift the stay entered on August 19, 2013, Dkt. No. 183, and will deny plaintiff's motion to lift the stay order, Dkt. No. 214, as moot.

An appropriate Order follows.